UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**BENJAMIN LIGERI**
**CENTRAL CONCEPTS, INC**
**TRADEMARK HOLDINGS, LLC**
**GLOBAL SPECIALITY PRODUCTS, LLC**     DOCKET NO. _____
**MEDCARE, LLC**
      **Plaintiffs,**

     **vs**

**AMAZON.COM, INC**
**AMAZON, LLC**
**AMAZON SERVICES, LLC**
**AMAZON MEXICO SERVICES, INC**
**AMAZON BUSINESS PAYMENTS, INC**
**AMAZON PAYMENTS, INC**
**AMAZON CAPITAL SERVICES, INC,**
      **Defendants**

### VERIFIED COMPLAINT

The Plaintiffs hereby allege to the best of their knowledge and belief, as follows:

    **I. Parties**

*1.*  Plaintiff Benjamin Ligeri is a resident of Connecticut and does business

through corporations he owns, as follows: Trademark Holdings, LLC (a

Wyoming LLC), Medcare LLC (a Wyoming LLC), Global Speciality Products,

LLC (a Rhode Island LLC), and Central Concepts, Inc. (a Rhode Island

Corporation), which is an Amazon retailer, brand development company,

importer, and a third-party logistics provider that helps the Plaintiffs

collectively manage their supply chain and inventory.

*2.*  Defendant Amazon.com, LLC is the parent/affiliate of Defendants Amazon,

LLC, Amazon Services, LLC, Amazon Mexico Services, LLC, Amazon

Business Services, Inc. (which is engaged in the lending business), Amazon
Capital Payments, Inc. (which is also engaged in the lending business),
Amazon Payments, Inc. (which processes all card payments and third party
transactions for the Defendants in addition to issuing tax documentation) and
Amazon Capital Services, Inc. As also used herein, the Defendants are
collectively referred to as "Amazon", as is their platform.

## II. Jurisdiction and Venue

3. This Court has jurisdiction under 28 USC §1332 because the amount in
controversy exceeds $75,000 and the Parties are domiciled in different
States. This Court also has jurisdiction under 28 USC §1331 because this
case presents federal questions under the Lanham Act (15 USC §§1113
through §1121, inclusive) as well as the Sherman Anti-Trust Act (15
USC §§1, 2, 14 and 15). Moreover, the Defendants have satisfied
Connecticut's Long Arm Statute (CGS §52-59b) by doing business directly in
this forum with consumers. Plaintiffs operate and do business with the
Defendants in this forum by way of shipping operations and via computer
networks within this State. The Court further has supplemental jurisdiction
over State law claims under CGS §42-110g and CGS §§35-51 through 35-
53, inclusive pursuant to 28 USC §1367.

## III. Facts Common to All Counts

### Business of the Plaintiffs, and Their Trademarks

4. Plaintiff Ligeri owns the trademarks to products sold by his co-Plaintiffs,

which he licenses to them for their use on the Defendants' online platform, Amazon.com (or "Amazon"). These trademarks are identified by USTPO Serial numbers 87734708 ("Biological Essentials"), 90477619 ("Green Sky"), 90737125 ("EBION"), 87643392 ("Rhode Island Organics"), 97021014 ("Liquid Allure"), 90428794 ("Point"), 90382586 ("Bau Technik"), 90428898 ("Alpha Raw"), 90428839 ("Ellie"), 90428745 ("Skin Deep"), 97159645 ("Christinagenix"), 90722310 ("VANGUARD"), 90477602 ("MAXCLAMP"), 97259635 ("Cool Chimpanzee"), 97020471 ("Health and Household"), 97558230  ("GREEN SKY"), 97253311 ("Skin Deep"), 90296553 ("RIBIT"), 90296472 ("KATHAROS"), 90296289 ("MindCast"), 87948884 ("PRIMEMED"), 88269466 ("PRIME MED"), and 90296605 ("Rae Lynn") known also as the "Marks" and Plaintiffs' "Intellectual Property" or "IP".

5. Plaintiff Ligeri also opened the "Health and Household" Amazon account about a decade ago, which he transferred the rights to operate to Central Concepts, Inc. on or about August 2020. The Defendants, without any adequate warning and without any good cause, deactivated this Amazon Account and its advertising campaigns despite the account having excellent Amazon Account Health. Plaintiffs, on an individual basis also operate the "Vanguard" account (owned by Plaintiff Global Specialty),  "Medcare Industries" account (owned by Plaintiff Medcare) and "Twin Horses" account (owned by Plaintiff Trademark Holdings). These accounts display Plaintiffs' products associated with their Marks and IP regardless of whether the

related webpage has been deactivated or whether or not users of Amazon's Platform can actualize on their purchase.

6. Plaintiffs sell a mix of products that are Fulfilled by Amazon (FBA) or Fulfilled by Merchant (FBM). FBA products are stored, warehoused and shipped by the Defendants. FBM products are stored, warehoused and shipped by the Plaintiffs themselves. Approximately 95% of the Plaintiffs' business is FBA products.

**General Business of the Defendants**

7. The Defendants' platform is a listing service for their branded products as well as the Plaintiffs' branded products, which the Defendants compete directly against. Defendants also offer shipping and warehouse services for FBA products in addition to the Defendants' own products. Defendants also solicit and directly loan money to the Plaintiffs as well as others similarly situated.

8. The Defendants offer IT security to the Plaintiffs and others similarly situated under the false pretense of providing a secure selling platform and a market place. Defendants also act as a fiduciary and trustee for funds earned by the Plaintiffs' sales. In fact, the Defendants also use, sell and share the Plaintiffs' and their customers' data in order to directly compete with Plaintiffs and others similarly situated.

9. Once Amazon succeeds in trapping enough customers and merchants like the Plaintiffs in its "flywheel" to secure a dominant position across varied

markets, Amazon can then raise prices or remove incentives or allowances for Marketplace sellers to sell products at favorable prices for consumers. One example of the latter is Amazon's treatment of "CRAP," a term coined internally which refers to products on which Amazon, according to its own admission, "Can't Realize Any Profit." CRAP products are low-priced items that are heavy and expensive to ship—often consumables, like packs of bottled water. Amazon then sells CRAP and other products ahead of others similarly situated to the Plaintiffs via banner placements, buttons and gimmocks like the "get it faster" feature shown to customers to induce them into buying a confusingly-similar product from Amazon itself instead of the Plaintiffs. The CRAP sold by Amazon is often so wasteful and cumbersome that returns cannot be resold on the platform, and must be bundled onto pallets with random content for bulk purchase by others. In fact, many of Amazon's warehouses operate in whole or part as de facto landfills where returned product awaits disposition in either landfills proper or bundled consolidation on pallets for random wholesale disposition.

10. Amazon also operates as a collections agency, stepping in as a third party middleman to act as the sole mediator and arbiter of all disputes in terms of chargebacks, refunds and other disputes such that neither the Plaintiffs nor any of their customers have any means for remedy but for Amazon's inadequate system and its mandatory binding arbitration provisions of the Terms of Service. Amazon does this primarily for the unlawful, illegal, self

serving and nefarious ends complained of herein.

11. Amazon's fees for interest, penalties, inventory, inventory liquidation, storage, listing, advertising and placement charged to merchants always change. These fees are incalculable and are unknowable and undisclosed in advance. Even after the fees take effect, they are frequently still arbitrary, incalculable, unknowable, and untethered to any quantifiable cost of business.

12. Plaintiffs' submission to Amazon regarding Plaintiffs' disputes concerning password resets, intellectual property disputes and technical issues are dealt with at weeks-long intervals, which have locked the Plaintiffs out of their own accounts and denied access to their own funds. This is also currently preventing Plaintiffs from selling their own products for even months at a time while the Plaintiffs are being denied access to the very funds Amazon pledges to hold for them as a trustee and fiduciary. Illustrative of this example is the lackadaisical approach to which Amazon tells its merchants to send an email to disbursement-appeals@amazon.com in the event funds have not been disbursed within 90 days. Moreover, when the Defendants' systems and processes result in arbitrary deactivation of accounts, the Plaintiffs' funds associated with each account are put into reserve instead of disbursed (so that the Plaintiffs are unable to meet payroll and other obligations). These funds aren't even being applied to loans and fees charged by Amazon itself (leading to further interest and penalties that

otherwise would not have accrued). These arbitrary account lockouts also prevent changes in listings. For example, Plaintiff Trademark Holdings had initiated a lower price sales campaign to drum up business, but was unable to end the lower sale prices due to the arbitrary account lockout. For another example, when Plaintiff Central Concepts' account was deactivated, they were not able to edit descriptions and photos on listings it created and controlled the IP for.

13. Amazon also brokers loans for Goldman Sachs and offers these to merchants. Plaintiff Global Specialty Products presently has one of these loans, for which Plaintiff Ligeri is the personal guarantor. These loans are offered and brokered by Goldman Sachs' Marcus Division. The Defendants' business model is designed to adversely affect the Plaintiffs cash flow. This entraps the Plaintiffs and others similarly situated into needing these loans for operating capital as up to a third or more of their funds are being held back by the Defendants for successive quarters in a row under the bogus theory and fraudulent representation that up to one third of all sales could be the subject of returns, disputes or chargebacks, when in fact the actual rate of chargebacks, returns and disputes have been nowhere near a third of all sales throughout the Plaintiffs' operating history as Amazon merchants. Return rates for the Plaintiffs have averaged between 1% and 5% per product.

14. Amazon also allows, as part of its business model, the filing of frivolous,

meritless complaints by third parties to stifle merchants similarly situated to the Plaintiffs in order to frustrate their efforts to compete against Amazon's own products. For illustrative example, the Defendants' platform has allowed numerous frivolous intellectual property complaints that have had no merit whatsoever which Amazon used as an excuse to take down and deactivate Plaintiffs' listings and accounts. For other illustrative example, Defendants have fraudulently and unjustifiably taken down a listing for honey claiming it falsely violated EPA standards and that honey was a pesticide. For further example, Amazon allowed Hustle Butter (sellers of a cream designed to help heal new tattoos) to take down Plaintiffs' product "Dragon Butter" for stating our product is "better and cheaper than Hustle Butter".

**15.** The Defendants' business model relies on content provided by merchants and products offered by merchants through its platform in order to draw consumers in. Once those similarly situated to the Plaintiffs drive product listings, data and consumer analytics to the Defendants' platform, algorithms programmed by the Defendants then drive sales preferences to products sold by the Defendants – even though these Defendants' products themselves are often made by the same manufacturers using the same specifications, labels and branding of Amazon merchants similarly situated to the Plaintiffs.

**Unlawful Acquisition and Use of Plaintiffs' Trade Secrets**

**16.** The Defendants business model requires that merchants like the Plaintiffs,

on demand, provide inventory and price lists, product specs, driver's licenses and passports, financial institution credentials (such as credit and debit card numbers), customer lists, customer data, vendor lists, pricing strategies, and agreements and contracts among other business, customers and vendors ("Trade Secrets").

17. Upon information and belief, and in the ways set forth, infra, the Defendants use the Plaintiffs' data to actively compete against the Plaintiffs by selling products of a like kind, nature and quantity. Moreover, Defendants also acquire and use the Plaintiffs' customer-generated data and sales habits without ensuring adequate protections against hacking and unauthorized use and dissemination. Moreover, and upon information and belief, the Defendants' own systems, networks and protocols have led to the unauthorized use of data and false association with other entities such that Defendants' own systems have triggered account deactivations of the type that terminally threaten Plaintiffs' business as complained of herein.

18. Plaintiffs have shared and continue to share their protected Trade Secrets (which they take proprietary steps to limit access to) with the Defendants as required by the Defendants to continue to operate as Amazon merchants.

**Monopoly Building Activities of Defendants**

19. Amazon was founded on July 5, 1994, by Jeff Bezos. Amazon went public in May 1997. It began selling music and videos in 1998, and began international operations by acquiring online sellers of books in the United

Kingdom and Germany. The following year, it began selling music, video games, consumer electronics, home improvement items, software, games, and toys.

20. In 2002, the Defendants launched Amazon Web Services (AWS), which initially focused on providing APIs for web developers to build web applications on top of Amazon's ecommerce platform. In 2004, AWS was expanded to provide website popularity statistics and web crawler data from the Alexa Web Information Service. AWS later shifted toward providing enterprise services with Simple Storage Service (S3) in 2006, and Elastic Compute Cloud (EC2) in 2008, allowing companies to rent data storage and computing power from Amazon. In 2006, Amazon also launched the Fulfillment by Amazon program, which allowed individuals and small companies (called "third-party sellers") to sell products through Amazon's warehouses and fulfillment infrastructure. This infrastructure as used, developed and rolled out was utilized to engage in the acts complained of herein.

21. Zappos.com is an American online shoe and clothing retailer based in Las Vegas, Nevada, United States. The company was founded in 1999 by Nick Swinmurn and launched under the domain name Shoesite.com. In July 2009, Amazon acquired Zappos in an all-stock deal worth around $1.2 billion at the time.

22. Amazon purchased the Whole Foods Market supermarket chain in 2017.

23. Amazon has, to present, made over 100 corporate acquisitions, taking over smaller competitors, their data, their books of business and their infrastructure in lieu of building a more meritorious business model, and to otherwise engage in the acts complained of herein.

24. The pricing agreements Amazon imposes on third-party sellers such as the Plaintiffs are anticompetitive and through which Amazon illegally builds and maintains monopoly power in the online retail market in the United States. Amazon also forces the Plaintiffs and others similarly situated to set some item prices so low that sales won't cover Amazon's FBA fees, forcing the Plaintiffs to incur a loss, and by extension, the Plaintiffs' accounts to be debited as a consequence of consumer purchases through the Platform. If the Plaintiffs refuse to comply with Amazon's demands to lower the price of their products, Amazon delists the products and deactivates the Accounts associated with them.

25. Amazon has controlled online retail prices through its restrictive contracts and policies, including its Terms of Service as complained of in ¶¶59-66 herein. Amazon requires third-party sellers such as the Plaintiffs to agree that they won't offer their products anywhere else online–including their own websites–for a lower price than on Amazon. These agreements result in an artificially low price across the online retail marketplace. The agreements in essence ensure that the high fees charged to third-party sellers by Amazon– as much as 40% of the product price–are incorporated not only in the price

charged on Amazon, but also in the prices charged on competing platforms across the online retail sales market. Amazon also forces the Plaintiffs to lower their prices on their platform if Amazon deems them too high, even if those products are not sold on any other platform. Amazon also doesn't allow the Plaintiffs to raise prices commensurate with the increase in Amazon's fees. For illustrative example, Amazon tripled the fee on a pink cowboy hat sold under the Green Sky Mark. Plaintiffs merely raised the price of the pink cowboy hat by about 50%, and Amazon also responded by taking away the Buy Box. Sometimes Amazon takes whole listings down if they deem the price too high, on some unknowable, randomized but internal rationale designed to limit competition. In the event a product is sold on a competing platform, like Walmart's, Amazon will penalize merchants by taking away the Buy Box.

26. Amazon has used its dominant position in the online retail market to win at all costs, even resorting to tactics that utilize leveraging power so great that it bullies states and municipalities to offer Amazon incentives Amazon does not actually need to buy property and employ labor. Due to Amazon's size and wasteful practices that take advantage of the US tax code, it pays no income taxes simply by engaging in economically wasteful and destructive activities that operations of the size and scale of the Plaintiffs could never contemplate, let alone obtain any competitive advantage in engaging.

27. Amazon is one of the Big Four Tech giants (which include Google, Apple and

Facebook) that have dominated the exchange of information, goods and services in the United States. As of September 2020, the combined valuation of these platforms was more than $5 trillion—more than a third of the value of the S&P 100. At its core, Amazon is an information technology company that uses the data and analytics acquired from the Plaintiffs, those similarly situated to the Plaintiffs and their customers to drive sales and profits toward Amazon itself – more increasingly in direct competition with those similarly situated to the Plaintiffs.

28. Amazon exploits its gatekeeper power to dictate terms and extract concessions that no one would reasonably consent to in a fair and competitive market. Plaintiffs' dependence on Amazon as the gatekeeper to access users and markets requires unreasonable concessions by the Plaintiffs and bullying demands by the Defendants that cause significant economic harm to the Plaintiffs, that are the costs of doing business on the Amazon platform given the lack of other viable options.

29. Amazon's significant and durable market power as described herein is acquired through a particular scheme, including the high volume of strategic, hostile and aggressive acquisitions by Amazon. Over the years, Amazon acquired nascent or potential competitors to neutralize a competitive threat or to maintain and expand their dominance. In other cases, Amazon acquired smaller companies to shut them down or discontinue underlying products entirely—transactions aptly described by Amazon itself as "killer

acquisitions."

**30.** Amazon has significant and durable market power in the US online retail market. Although Amazon is frequently described as controlling about 40% of US online retail sales, this market share is likely understated, and estimates of about 50% or higher are more credible. As the dominant marketplace in the United States for online shopping, Amazon's market power is at its height in its dealings with third-party sellers. The Amazon platform has monopoly power over many small and medium-sized businesses that do not have a viable alternative to Amazon for reaching online consumers. Amazon has 2.3 million active third-party sellers on its marketplace worldwide, and a recent survey estimates that about 37% of them—about 850,000 sellers—rely on Amazon as their sole source of income.

**31.** Amazon achieved its current dominant position, in part, through acquiring its competitors, including Diapers.com and Zappos. It has also acquired companies that operate in adjacent markets, adding customer data to its stockpile and further shoring up its competitive moats. This strategy has entrenched and expanded Amazon's market power in e-commerce, as well as in other markets. Amazon's control over, and reach across, its many business lines enables them to self-preference and prejudice competitors in ways that undermine free and fair competition. As a result of Amazon's dominance, other businesses are frequently beholden to Amazon for their success. Amazon has engaged in extensive anticompetitive conduct in its

treatment of third-party sellers. Publicly, Amazon describes third-party sellers as "partners." But internal documents show that, behind closed doors, the company refers to them as "internal competitors." Amazon sabotages the Plaintiffs and others similarly situated through a multitude of unfair and oppressive tactics, including unannounced changes in inventory storage limits and arbitrary demands to then ship an excessive number of units beyond the number of sales that actually exist in the real world, leading to hidden fees and penalties.

32. Amazon's dual role both as an operator of its marketplace that hosts third-party sellers, and simultaneously as a seller in that same marketplace, creates an inherent and direct conflict of interest. This conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other anticompetitive conduct. Voice assistant ecosystems are an emerging market with a high propensity for lock-in and self-preferencing. Amazon has expanded Alexa's ecosystem quickly through acquisitions of complementary and competing technologies, and by selling its Alexa-enabled smart speakers at deep discounts. The company's early leadership in this market led to the collection of highly sensitive consumer data, which Amazon used to its unjust enrichment as complained of herein.

33. Finally, Amazon Web Services (AWS) provides critical infrastructure for many businesses with which Amazon directly competes. This creates the potential for a conflict of interest where cloud customers are forced to consider

patronizing a competitor, as opposed to selecting the best technology for their business. In other words, Plaintiffs are forced to patronize and unjustly enrich Amazon, their direct and vastly superior market competitor.

34. There is a strong link between Amazon Marketplace and Fulfillment by Amazon (FBA), Amazon's paid logistics service. Amazon uses its dominance in each of these markets to strengthen and reinforce its position in the other.

35. Amazon's FBA program combines warehousing, packing, storage, and shipping services, and most importantly, access to Prime customers. For a seller's products to get the Prime badge, which is essential to making sales on the platform, a seller must either qualify for Amazon's Seller Fulfilled Prime (SFP) program or use Amazon's FBA service. On August 18, 2020, Amazon informed sellers of changes to Seller Fulfilled Prime, which render it an entirely impractical option for most sellers. Even before this change, only a very small percentage of sellers could meet the onerous eligibility requirements for Seller Fulfilled Prime. Currently, and for over a year now, Seller Fulfilled Prime has been "invite only" and "not accepting any applications". This means FBA is functionally the only way for sellers to get the Prime badge for their product listings. A document setting forth draft Q&A before a 2018 earnings call for Amazon Chief Financial Officer Brian Olsavsky explained the connection between Prime and FBA: "Prime and FBA reinforce each other – they are inextricably linked. FBA adds Prime eligible selection. Prime member growth and purchasing habits attract sellers to

FBA." The Defendants have blocked the Plaintiffs from using Prime *and* selling products FBA. Amazon used to have a program called Seller Fulfilled Prime where merchants could get a form of the Prime Badge if you could demonstrate impeccable high speed shipping, which it removed in furtherance of, and consistent with, their anti-competitive and monopoly building strategy complained of herein. Amazon also keeps shipping charges. Prime members don't pay shipping, but if a non-Prime member pays 50 dollars shipping, Amazon keeps 100% of it and still charges the Plaintiffs the FBA fee.

36. Due to a lack of alternatives, third-party sellers have no choice but to purchase fulfillment services from Amazon. More than 73% of all Marketplace sellers worldwide reportedly rely on FBA services. Numerous third-party sellers feel they have no choice but to pay for FBA to maintain a favorable search result position, to reach Amazon's more than 112 million Prime members, and to win the Buy Box—through which the vast majority of Amazon sales are made. A recent consumer survey indicated that 75% of Amazon Prime customers specifically search for products flagged as Prime-eligible. As a result, without Prime, many merchants are dead in the economic water. In the beginning of FBA, and in order to capture both consumers and those similarly situated to Plaintiffs, Amazon was merely a place to store Merchants' goods for fast shipping to consumers on demand. These goods were treated by Amazon as Merchant property, which could be

pulled back at any time for a nominal fee or disposed of via bulk order. Amazon, over time, has astronomically increased its fees just to have goods thrown away. Said fees are entirely incalculable in advance by weight or dimension. For illustrative example, Plaintiffs' Green Sky cowboy hats come in various colors, but all have identical weights and dimensions but Amazon charges radically different fees for storage and shipping. Moreover, Amazon started selling cowboy hats of similar likeness in direct competition against the Plaintiffs. Inventory destroy fees were once 15 cents per unit. Now they are the same as removal fees and it can be over a dollar to destroy an item, and then Amazon, instead of destroying it, will be seen selling the item under the seller name "Amazon Warehouse Deals" as a "used" item.

37. On information and belief, Amazon's own internal documents show that it has considered FBA participation for purposes of determining the Buy Box winner. An Amazon document that sets forth pricing rules for a pilot program appears to favor third-party sellers that use FBA over those who do not for awarding the Buy Box. On information and belief, Amazon also gives itself weighted advantage directly against the Plaintiffs and those similarly situated against whom it competes directly.

38. Amazon's rise of market power online has also materially stifled innovation and entrepreneurship in the US economy. Some venture capitalists, for example, report that there is an innovation "kill zone" that insulates dominant platforms from competitive pressure simply because investors do not view

new entrants as worthwhile investments. Other investors have said that they avoid funding entrepreneurs and other companies that compete directly or indirectly with dominant firms in the digital economy.

39. There is a strong economic incentive for many firms and those similarly situated to the Plaintiffs to avoid head-on competition with dominant, well established operations.

40. Additionally, in the absence of adequate privacy guardrails in the United States, the persistent collection and unlawful use and misappropriation of consumer data from the Plaintiffs, those similarly situated to the Plaintiffs, and their customers, is an indicator of the market power online. Online platforms rarely charge consumers a monetary price—products appear to be free but are monetized through people's attention or with their data. In the absence of genuine competitive threats, dominant firms offer fewer privacy protections than they otherwise would, and the quality of these services has deteriorated over time. As a result, consumers are forced to either use a service like Amazon with poor privacy safeguards or forego the service altogether.

41. Amazon has captured control over key channels of distribution and come to function as a gatekeeper. A large swath of businesses like the Plaintiffs across the US economy now depend on Amazon to access users and markets. Amazon exploits this gatekeeper power to dictate terms and extract concessions that third parties would never consent to in an otherwise open

and competitive market. These types of concessions and demands by Amazon carry significant economic harm but are the cost of doing business given the lack of other options for the Plaintiffs. Amazon's role as gatekeeper also gives it outsized power to control the fates of other businesses like the Plaintiffs. This dependent relationship creates an inherent, unavoidable risk to the Plaintiffs' businesses. Moreover, this has prevented the Plaintiffs from reestablishing their business with Walmart, which itself is unable to become an effective direct market competitor due to the Defendants' monopolistic ambitions and monopoly building behavior.

42. The rates of entrepreneurship and job creation have also declined since Amazon became ensconced in its gatekeeper role. The entrepreneurship rate—defined as the "share of startups and young firms" in the tech industry as a whole— fell from 60% in 1982 to a low of 38% as of 2011. As entry slows, the average age of technology firms has skewed older. Job creation in the high-technology sector has likewise slowed considerably. In 2000, the job creation rate in the high-technology sector was approaching 20% year-over-year. Within a decade, the rate had halved to about 10%. Although the job creation rate in the high-technology sector has fallen substantially since the early 2000s, the job destruction rate in 2011 was roughly unchanged from 2000. As a result, in 2011 the rate of job destruction in the high-technology sector was higher than the rate of job creation, a reversal from the year 2000, when the job-creation rate far outpaced the job-destruction rate.

In line with this trend, there is mounting evidence that the dominance of online platforms has materially stifled innovation and entrepreneurship in the US economy. Some venture capitalists avoid funding entrepreneurs and other companies that compete directly with dominant firms in the digital economy.

43. Amazon has significant and durable market power in the US online retail market. The company's actual share of US e-commerce is unknown outside of Amazon because it does not report the gross merchandise volume of third-party sales made on its marketplace. A frequently cited analysis by market research company eMarketer estimates that Amazon's share in this market is 38.7%. eMarketer's estimate, however, is likely understated because its definition of e-commerce is overly broad. For example, under eMarketer's approach to e-commerce, the Auto and Parts category includes online sales of cars. In contrast, marketing analytics company Jumpshot estimates that Amazon captures an average of 74% of digital transactions across a wide range of product categories. The Jumpshot analysis may overstate Amazon's share because it calculates market share as a percentage of transactions made on well-known market participants' websites, like Amazon, Walmart, and Target, but excludes small, online retailers. Estimates that place Amazon's share of US e-commerce at about 50% or higher are more credible than lower estimates of 30-40%. In a number of key product categories, ranging from household essentials to sports, fitness and

outdoors, Amazon is reported to account for well over 50% of online sales.

44. Amazon is the dominant online marketplace. It reportedly controls about 65% to 70% of all US online marketplace sales. The platform's market power is at its height in its dealings with third-party sellers, as well as many of its suppliers, which Amazon refers to as vendors. Increasingly, Amazon is also gaining market power in certain business-to-business (B2B) online markets through Amazon Business, its B2B marketplace.

45. Other retailers are unable to match Amazon on its ability to provide free and fast delivery for such a large volume and inventory of products. Even Walmart, with its extensive, national distribution network, does not come close to matching Amazon on this measure. Amazon currently offers Prime members free, next-day delivery on over 10 million items anywhere in the continental United States. Walmart, by contrast, has only about 200,000 of products eligible for two-day shipping in select markets.

46. Amazon's market power is durable and unlikely to erode in the foreseeable future. There are several factors that make successful entry or expansion by a challenger to Amazon unlikely. Barriers to entry include: (1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery. Amazon's internal

documents recognize that entry into online commerce "require[s] significant incremental investments in brand development, inventory, and marketing/customer acquisition." Further, Amazon expanded its market power through avoiding taxes, extracting state subsidies, and engaging in anticompetitive conduct—tactics that have given the company an unfair advantage over actual and potential competitors.

47. Over the past two decades, Amazon has acquired at least 100 companies. It has been particularly aggressive over the past few years, making deals that are bigger and more ambitious relative to its historic approach. In 2017, the company made its largest acquisition to date by purchasing Whole Foods for $13.7 billion. Amazon's other large purchases include Ring, which it bought for $1.2 billion in 2018; PillPack, which it bought for $1 billion in 2018; and Zappos, which it bought for $1.2 billion in 2009. Over the years, Amazon has acquired an assortment of highly recognizable companies, including IMDB.com, which it bought in 1998; Audible, which it bought in 2008; Goodreads, which it bought in 2013; and Twitch, which it bought in 2014.

48. The most prominent example of Amazon's use of strategic losses, other than CRAP, to lock customers into the platform's ecosystem is its popular membership program, Amazon Prime. As of August 2020, a Prime membership costs $119 per year, up from its original $79 at its launch in February 2005 and $99 from March 2014 to April 2018. An Amazon executive wrote in 2013, in reference to pricing Prime, "the better course is to

let the existing Prime program grow . . . and then raise prices later assuming a lower elasticity in future years," once customers are locked in.  An Amazon internal document describes the rationale behind Amazon Prime and its other membership programs: "Membership programs are created with a long-term, company-wide perspective with the goal of increasing loyalty and cross-category shopping behavior. The programs do not optimize for short-term gain or profitability in a single category." Another internal Amazon document describes these membership programs as, "[d]oubl[ing] down on 'Big Moats,'" aiming to create an impenetrable barrier around its dominant position Amazon."

49. Amazon documents show the extent to which Amazon was committed to below-cost pricing. A 2010 review of its baby formula business identified Amazon's "most frequently matched internal competitor" as ABCBabyFormula, which "typically ... price[d] 15-20% below [Amazon's] cost." Identifying this company as the most significant influence on Amazon's baby formula profit loss, the document notes of ABCBabyFormula that "[m]anufacturers do not sell to them directly and believe they are sourcing black market stolen goods." Amazon frequently price-matched, at significantly below-cost, a competitor that it had reason to believe was sourcing baby formula from illegal and potentially dangerous sources— indicating the lengths to which Amazon was willing to go to ensure product selection and, in turn, growth.

**50.** As Amazon's e-commerce business has grown, it has also developed a significant logistics business surrounding fulfillment and delivery of third-party orders with its Fulfillment by Amazon (FBA) program. More than 73% of all Amazon Marketplace sellers reportedly rely on this program to fulfill their orders. Because of this, a trade association that represents third-party sellers refers to Amazon's fulfillment operation "as the railroad of [e-commerce]." In addition to its fulfillment operation, Amazon is also one of the largest shippers in the world. The company provides global shipping services for its own products and independent sellers that sell on Amazon.com, as well as other e-commerce sites. Amazon's ground shipping infrastructure consists of trucks, trailers, intermodal containers, and delivery vehicles. Its truck fleet consists of more than 10,000 trailers. It also has its own freight airline, Amazon Air, with about 50 leased aircraft, and plans to expand its fleet to 70 by 2021. Amazon has also built hundreds of package sorting and delivery centers across the United States and has established its own network of contracted delivery providers exclusively dedicated to delivering packages for Amazon. In recent years, the size and scope of Amazon's delivery services and network has grown significantly. When Amazon first launched Fulfillment by Amazon, it stored products and packed orders in its warehouses, but relied on other carriers to handle shipping and delivery. Today, Amazon ships a growing number of products itself.

**51.** In 2019, Amazon delivered about half of its own packages, up from 15

percent just two years before. Amazon has also lessened its use of large delivery companies during this time, using 800 small, independent contractors [which] are now responsible for around 48 percent of Amazon's last mile deliveries. These smaller providers are economically-dependent on Amazon, and many are in fact reliant on Amazon for 100 percent of their business. Parcel volume handled by Amazon's delivery service now rivals the top carriers, including UPS, FedEx, and the US Postal Service. In 2019, Amazon delivered 2.5 billion parcels, or about one-fifth of all e-commerce deliveries, and anticipates growth. In a July 2020 investor call, Amazon CFO Brian Olsavsky stated that Amazon "expect[s] a meaningfully higher year-over-year square footage growth of approximately 50%," which includes "strong growth in new fulfillment center space as well as sort centers and delivery stations." Amazon has already surpassed the US Postal Service, which has been downsized dramatically under its current leadership. Last year, the US Postal Service had a decrease in parcel volume for the first time in nearly a decade.

**Defendants' Breach of Fiduciary Duty**

52. Despite its hoarding of IT and logistics infrastructure and immense resources, Amazon has increasingly failed the Plaintiffs by not timely resolving technical and account access issues necessary to the Plaintiffs' performance of basic business functions like addressing returns and answering frivolous intellectual property disputes which were enabled by

Amazon's defective platform.

53. The Plaintiffs cannot access an account they purchased called "My Medical Warehouse", renamed to "Twin Horses" upon acquisition, which they have the rights of access to.

54. Amazon's defective system has also denied access to funds owed to the Plaintiff Medcare for up to nine months. While failing to address basic business tasks ensued, Amazon continued to fraudulently take funds owed the Plaintiffs under the pretense of bogus fees such as ancient removal orders. Amazon has also lost inventory that belongs to the Plaintiffs. For illustrative example, Plaintiff Medcare LLC  never got its pay cycle where it had accrued thousands of dollars. This particular account had been deactivated for 9 months by Amazon, and then Amazon arbitrarily denied the Account Seller's driver's license as an adequate form of identification to prove his identity as owner of the account. Said license was repeatedly denied for months and then one day the same license was accepted as valid. For further illustrative example, if a Merchant's debit card ever expires, Amazon instantly locks the Merchant out of its account and holds all of its money until the card is replaced, an occurrence that happened to the Plaintiff at least a dozen times. During these lockouts, Amazon withheld the Plaintiffs' funds until future pay cycle dates, and wouldn't let the Plaintiffs complete a shipment or even edit a listing or control its intellectual property during this time.

**55.** IT staff for the Plaintiffs reports that the cowboy hats sold under the Green Sky brand had to be discontinued due to unpredictably fluctuating storage fees, and the Defendants still have no explanation as to why hats of the same size, shape, packaging, manufacturer, dimensions and weight differed only by color, were charged drastically different fees, the same Tan Cowboy Hat which was formerly a $3 dollar FBA fee was changed to a $9 dollar FBA fee by Amazon. Upon request by Plaintiffs to remeasure the hat it became a $14.77 FBA fee. The other cowboy hats of same size and weight and differing colors have fees varying from $6.39 to $14.77. Plaintiffs sell a similar product called a Panama Hat, whose storage fees should be (and formerly were) under $4 per unit but now fluctuate between $6 and $12 per unit. Further, IT staff reports that deactivation issues are believed to have been resolved, only to have the Defendants randomly reintroduce them after the corrective action instructions given by the Defendants were followed and the account reinstated. Plaintiffs were invited into the Defendants' "Account Health Assurance" Program, which falsely claims it will prevent deactivation of accounts while the Plaintiffs' efforts continue to look for, upload and re-upload documents the Defendants claim to need in order to keep the accounts active. Moreover, the only staff for Amazon that can be reached via phone by the Plaintiffs are located in foreign countries approximately 19 out of 20 times. These foreign phone contacts for the Defendants: (a) are not necessarily fluent in English; (b) do not understand intellectual property or

legal issues sufficiently to even understand the Defendants' policies; (c) answer to Plaintiffs' inquiries are as generic as possible; (d) are themselves unable to understand or navigate Amazon's search functionalities, merchant interface and merchant dashboard; (e) have demonstrated no meaningful or substantive training in Amazon's systems, let alone business or IP law; (f) have demonstrated to have substandard comprehension of the English language and (g) are entirely unable to explain what it is that Amazon even needs to prevent account deactivation or restore deactivated accounts.

56. Amazon's customer service and treatment toward the Plaintiffs has rapidly and precipitously declined in recent years. Internal Amazon documents suggest that the company's hyper-focus on a cost-cutting strategy to adopt automated processes for nearly everything—which Amazon refers to as "HOTW" or "Hands off the wheel". This is precisely the approach that has led to a functional breakdown in the Plaintiffs' very ability to do business for which they contracted with the Defendants to do. This approach has affected Plaintiffs' ability to manage the financial aspects of the Plaintiffs' accounts from funds disbursement, listings and even routine inventory tracking. Amazon's HOTW approach and defective inventory tracking platform has made it impossible to track not only inventory storage fees, but also what Amazon itself represents to be available to the Plaintiffs for storage and shipping capacity. This functionally breaks the Plaintiffs' ability to plan for Halloween or Christmas buying seasons, which must be planned well in

advance on an annual basis. Moreover, the HOTW approach has also

confused Plaintiffs' shipping to Amazon itself by, without Plaintiffs' input or

prompting, re-routing trucks, trifurcating shipments and preventing the

Plaintiffs from merging workflow to maximize efficiency. Moreover, Amazon

advertised a displayed a "merge shipments" option button which never

functioned and was unable to be used for more than a year. Plaintiffs have

been directly harmed by this logistical chaos imposed by Amazon's HOTW

approach in drastically increased payroll costs. This HOTW approach

organizes storage virtually, though the products themselves are still in the

same warehouse and physical location, by reclassifying what products are so

as to increase storage fees and create delays. For example, items like socks

and shoes may be classified as "general apparel" one day, but classified as

"clothing" the next day;, the different classification triggers different inventory

cost and charge thresholds in the Defendants' software that allot the

Plaintiffs only a certain amount of storage for certain categories of products.

According to Plaintiff's IT manager, illustrative of what this approach did to

the Vanguard Amazon Account:

"In summary, our account was first deactivated on January 6th, 2023, due to Amazon claiming that it was related to another account, "Arizona Corp," which would violate Amazon's multiple account policy. However, we have no connection to Arizona Corp. We submitted an appeal but did not receive an immediate response. Between January 13th and February 2nd, we received multiple notifications and requests for information from Amazon. We complied with all requests, providing contracts, bill of ladings, inventory invoices, and government ID, as required. Eventually, our account health information/deactivation disappeared from our dashboard, and we believed the issue to be resolved. However, on March 14-15, 2023, we received a performance notification stating that Account Health Assurance was enabled on our account. It promised proactive

assistance from an account health specialist if any critical policy issues were identified. Unfortunately, our account was deactivated again on March 28th, 2023, with no warning or communication from Amazon, again citing a connection to "Arizona Corp. "We have once again submitted an appeal and provided evidence supporting our claim that we have no relation to Arizona Corp. Regrettably, our appeal has been denied, and we have been asked to provide further evidence. Additionally, the lack of communication from Amazon despite being enrolled in Account Health Assurance has been extremely frustrating."

57. The HOTW approach also arbitrarily shut down the Plaintiffs Accounts after promising to not shut down the accounts because Plaintiffs' enrollment in the Account Health Assurance Program. Amazon only transmits TWO messages regarding account deactivations, which are: "We received your submission but do not have enough information to reactivate your account at this time.." and "we have reviewed your submission and reinstated your account". Moreover, the Defendants continue requiring repeated document submissions they claim necessary to reactivate accounts, submissions that are ignored or outright not at all read or adequately reviewed by an actual human being. Examples of this include how the Defendants shut down the Vanguard Amazon Selling Account though Global Specialty Products never had any association with "Arizona Corp", which the Defendants falsely asserted as a related business. Meanwhile, during this arbitrary review and repetitive document submission process where the Defendants claim accounts won't be or remain deactivated, the Defendants force the Plaintiffs and others similarly situated to liquidate their FBA inventory at fire sale prices – of course all of it sold back to the proverbial Company Store.

58. The intentional HOTW leads to arbitrary oppressive results that purposefully

bury the Plaintiffs and those similarly situated and force them into a standard

of conduct that is not only impossible to prove when accounts are arbitrarily

deactivated, but also a standard of conduct for the reasons, *infra*, that the

Defendants themselves do not comply with. Plaintiffs have had accounts

deactivated based on arbitrary and false accusations that they have violated

the Seller Code of Conduct that the Defendants themselves don't even follow

when they sell on their own platform. That Code states:

This policy requires that sellers act fairly and honestly on Amazon to ensure a safe buying and selling experience. All sellers must:

- Provide accurate information to Amazon and our customers at all times
- Act fairly and not misuse Amazon's features or services
- Not attempt to damage or abuse another Seller, their listings or ratings
- Not attempt to influence customers' ratings, feedback, and reviews
- Not send unsolicited or inappropriate communications
- Not contact customers except through Buyer-Seller Messaging
- Not attempt to circumvent the Amazon sales process
- Not operate more than one selling account on Amazon without a legitimate business need
- Not engage in conduct that violates price fixing laws

### The Terms of Service are an Unlawful Adhesion Agreement

59. Amazon has represented to the Plaintiffs that by doing business with

Amazon, they would obtain (1) protection for their intellectual property from

counterfeits; (2) timely disbursements of their profits by Amazon; (3) reliable

and useful tech support to operate on the Amazon Platform; (4) a fair market;

(5) fixed and reliably knowable fees in advance; and (6) protection against

the placement of dangerous products on the Amazon Platform that could be

confused with the Plaintiffs'. None of these representations were true, and

they are increasingly untrue.

60. Amazon knows the power they have as a retailer. In the midst of negotiations, Amazon, through its platform repeatedly referenced its power to destock the company's products on Amazon.com as a "bargaining chip to force terms" unrelated to retail distribution on the company. Amazon knows they have a lot of power in retail e-commerce and they are not afraid to use it to get terms they want in other markets, which starts with forcing merchants to accept the Terms of Service on a take it or leave it basis.

61. Amazon can treat sellers in this manner because it knows that sellers have no other realistic alternatives to the Amazon platform. As an extremely successful company with all these partners, Amazon continues to maintain partnerships with so many companies while bullying them. It is because of the power asymmetry that companies tolerate Amazon's business practices. From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but "check out" from Amazon Marketplace and you can quickly find your business in bankruptcy.

62. All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding arbitration clause, requiring them to sign away the right to their day in court if a dispute with Amazon arises. If it were not for Amazon's market power over them the Plaintiffs and those similarly situated would not agree to these terms.

63. Through arbitration, Amazon knows it holds all the cards, and in most ways, has the final say whenever there is a dispute. As a result, sellers rarely initiate arbitration actions against Amazon. Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 sellers and 16 vendors initiated arbitration proceedings. Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an arbitration action.

64. Amazon's forced arbitration often fails to provide a legitimate forum for resolving disputes and instead this arbitration process usually serves to insulate Amazon from liability while engaging in wrongdoing – especially because these so-called arbitration proceedings are private. In short, arbitration functions as a way for Amazon to keep disputes within its control, with the scales tipped heavily in Amazon's favor. As such, Amazon can withhold payments from sellers, suspend their accounts without cause, and engage in other abusive behavior without facing any legal consequences for its actions in a legal proceeding.

65. In reality, Amazon treats the Plaintiffs and its other sellers as a source of profit rather than partners. Individuals and small businesses who depend on access to the Amazon platform to make sales report that Amazon has raised seller fees significantly over the past decade. Over the past five years, a recent Institute for Local Self-Reliance report estimates that Amazon added

an extra 11% to its cut of third-party sales. The platform now takes an average of 30% of each sale compared to 19% in 2015. In 2018, third-party sellers paid Amazon $39.7 billion in fees, which totaled about 25% of Amazon's $160 billion in Gross Merchandise Volume. This amount includes commissions, fulfillment and shipping fees, and other third-party seller services, but does not include revenue from the advertising fees for third-party sellers, which are often substantial. Amazon can and does increase its wildly fluctuating and unpredictable fees to third-party sellers without concern for them switching to another marketplace. For illustrative example, Amazon previously took 25% of the profits on the sale of Green Sky's Cowboy Hats a few months ago. It now takes 75% of the profits.

66. Amazon's pattern of exploiting sellers, enabled by its market dominance raises serious threats and concerns of an open and competitive market in a fair playing field. Sellers like the Plaintiffs have no viable alternative to Amazon and rely on its marketplace for their entire livelihood. Ergo, all of those sellers are forced into the Terms of Service's indentured servitude.

**Practices of the Defendants that Infringe on Trademarks**

67. The Defendants have generally taken all of the actions alleged above to build their monopoly and induce the Plaintiffs into their adhesion agreement by making the representations that they will (1) protect Plaintiffs' intellectual property rights; (2) be a fair, exclusive arbiter of Plaintiffs' intellectual property rights; (3) not use or infringe upon the Plaintiffs' intellectual property rights;

and (4) not directly compete against the Plaintiffs using their Amazon products or similar products and brands sold via Amazon's "get it now" functions. Said representations were not true.

68. None of the Plaintiffs ever licensed to Defendants their IP or Marks.

69. The Defendants, in order to boost sales of similar and like products, intentionally allowed the likeness of Plaintiffs' products to drive Defendants' sales and additional sales to the Defendants. Additionally, the Defendants developed a system that purposefully allowed the Plaintiff's IP rights to be infringed by counterfeiters in order to drive its sales to the exclusion of Plaintiffs' profits that would have otherwise been realized.

70. Amazon makes the Defendants' fatally defective platform the one, true and only venue for IP disputes via its oppressive Terms of Service.

71. One of the widely reported ways in which Amazon treats third-party sellers unfairly centers on Amazon's asymmetric access to and use of third-party seller data. Amazon leverages its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its marketplace. Amazon has used this information inappropriately for Amazon's own benefits by (1) copying the product to create a competing private-label product; or (2) identifying and sourcing the product directly from the manufacturer to free ride off the seller's efforts, and then cut that seller out of the equation. Amazon claims that it has no incentive to abuse sellers' trust because third-party sales make up nearly

60% of its sales and Amazon's first-party sales are relatively small. Amazon has similarly pointed out that third-party listings far outnumber Amazon's first-party listings. In a recent shareholder letter, CEO Jeff Bezos wrote, "Third-party sellers are kicking our first party butt. Badly." Amazon admitted that by percentage of sales—a more telling measure—Amazon's first-party sales are significant and growing in a number of categories. For example, in books, Amazon owns 74% of sales, whereas third-party sellers only account for 26% of sales. At the category level, it does not appear that third-party sellers are kicking Amazon's first-party butt. Amazon may, in fact, be positioned to overtake its third-party sellers in several categories as its first-party business continues to monopolistically grow.

72. In furtherance of its IP infringement scam, Amazon will submit a product authenticity claim to sellers, forcing the retailer to submit their original sales receipts as proof that the items are authentic. Although a seller is supposed to be able to black out price information, sometimes the platform will reject a submission on the basis that is an "altered document." With insight into the seller's costs and supplier, combined with its knowledge of the seller's retail price among a virtually unfathomable amount of other data, Amazon Retail can easily replicate the seller's listing to offer a competitively priced Amazon product. In addition to its private-label business, Amazon also uses third-party seller data to benefit its Amazon Retail business, where the company functions more like a retailer.

73. Amazon also engages in strategic mismanagement of its platform by (1) allowing the sale of proliferation of counterfeit and unsafe goods; (2) using its ability to control the flow of counterfeits as leverage; and (3) putting in place ineffective counterfeit prevention tools that result in the suspension of a large number of innocent sellers. It also results in purposefully aiding and abetting Trademark Infringement of the Plaintiffs' and other Merchant's Marks and IP. As Amazon's dominance in e-commerce has grown, so has the proliferation of dangerous and counterfeit products on its marketplace. A 2019 *Wall Street Journal* investigation found that Amazon had active listings for over 4,000 items "that have been declared unsafe by federal agencies [and] are deceptively labeled or are banned by federal regulators." In the worst cases, these products have even caused bodily injury or even death to unsuspecting consumers.

74. Amazon's marketplace platform is designed in a way that makes it difficult for consumers to identify counterfeit products. Amazon's platform both obfuscates the origin or source of products and provides fulfillment services, Such an arrangement has made it difficult if not impossible for consumers to recognize or identify a seller of counterfeits because the item appears to have the backing of the Amazon platform.

75. Although it claims to take its counterfeit problem seriously, Amazon would likely not police counterfeit products at adequate levels in the absence of this public scrutiny. For illustrative example, Plaintiff Ligeri bought a USA Sony

camera on Amazon, and got a bootleg European camera recently. He then reported it to Amazon, yet the seller "Electronics Basket" is still selling it and its account has not been deactivated or their bootleg product delisted. Because Amazon's profits increase with the number of sales on the platform, the company has an incentive to turn a blind eye to counterfeit products that contribute to its increased sales volume. Regardless of the source, more sales generally result in more profits for Amazon because Amazon typically profits twice from a sale through purchase and fulfillment, and potentially three times through advertising, thus leading to brand confusion.

76. Amazon, instead of focusing on IP protection, has used its ability to police counterfeits as a leverage in Amazon's own contract negotiations with brands who resist Amazon pressure to sell on its platform—Amazon even referred to these companies internally as "holdouts." This is demonstrated recently when Amazon agreed to increase efforts to crack down on counterfeit Apple products as part of Apple's agreeing to establish a wholesale relationship with Amazon Retail.

77. Thus, through the efforts, means and devices enumerated above, Amazon is using the Plaintiffs' Marks and their likenesses to drive customers to Amazon's platform, and then obtaining sales for Amazon which would have otherwise and ordinarily gone to the Plaintiffs had the likeness of their marks not been used to drive sales to the Defendants using the advantages they unfairly and fraudulently created such as the Prime and "Get it Now"

features. In short, the customers of the Plaintiffs end up getting products that are not the Plaintiffs' by associating the Plaintiffs' marks with Defendants' corporate identity.

78. This case involves a 'reverse confusion' trademark infringement claim. Amazon is using the Plaintiffs' marks to profit off of Plaintiffs' reputation and corporate goodwill. The Defendants are the commercially larger but junior users of the Marks. Consumers are then subsequently fooled and confuse Plaintiffs' Marks with Defendants' corporate identity.

79. By extension, the greater relative strength of the Defendants' junior use of the Marks has allowed them to overwhelm the market – an online market with Oppressive Terms of Service that prevent the Plaintiffs from listing products associated with the Marks elsewhere.

80. By further extension, the Defendants use the Marks to promote their own very similar products using the Prime and "Get it Now" functions to siphon off Plaintiffs' sales of nearly identical types of products – many of which are actually stored in the same warehouses as Plaintiffs' products, which Plaintiffs pay storage fees to house. For illustrative example, Plaintiffs were selling a jar of honey, and Amazon marketed their Amazon Brand honey underneath as "similar item to consider" while calling theirs the "AMAZON'S CHOICE" as if it is the more premium option. That ad is underneath and to the right, they were advertising "AGAVE IN THE RAW", completely surrounding Plaintiffs' honey with Amazon's honey products.

81. By even further extension, Defendants take wholesale advantage of limiting the Plaintiffs to selling the Products associated with the Marks on Plaintiffs' own website, making them unavailable anywhere else except the Amazon Platform, such that the Defendants' scheme can further capitalize on their products' likeness and similarity to the Plaintiffs different products and misappropriated corporate goodwill. This is conjoined with the Defendants' separate use of deceptive advertising that makes their products appear to be identically advertised to that of the Plaintiffs' products while front loading Defendants' efforts to poach Plaintiffs' sales using the Prime and "Get it Now" schemes.

82. Prior to engaging in the IP infringements acts complained of, Amazon had prior knowledge of the Plaintiffs' seven year plus old accounts, and its products, and continued on with its scheme to misappropriate and abuse IP access anyhow against the Plaintiffs and those similarly situated. Amazon then flooded the market into which it captured Plaintiffs' business, customer base and corporate goodwill, resulting in actual confusion among consumers.

### Unlawful and Unregistered Banking Activities of Defendants

83. Amazon has reached into this forum to conduct lending activities with the Plaintiffs. Amazon is clearly not a bank, nor does it meet any of the usury exceptions contemplated by CGS §37-4.

84. Although the loan purportedly offered to Plaintiffs for $120,000 has a

purported APR of 9%, it does not pass muster after Amazon charges its unknowable, unpredictable fees. Moreover, the functional interest rate far exceeds Connecticut's limit of twelve percent (12%) as set by CGS §37-4 after accounting for the withholding of a third or more of Plaintiffs' funds at a time, which continues to trigger fees, penalties, interest and payments in its own right.

**Unjust Enrichment Activities**

85. As alleged, *infra*, the Defendants have unlawfully and without any just cause or explanation, taken a third or more of the Plaintiffs' revenue, which the Defendants have had the ability to park at large financial institutions such that they earn profit on the interest derived therefrom.

86. By virtue of its role as an intermediary in the marketplace, Amazon can give itself favorable treatment relative to competing sellers. It has done so through its control over the Buy Box, as well as by granting itself access to data and tools that are off limits for third-party sellers. Most recently, there have been reports that Amazon has given preferential treatment to its own non-essential products over competitors' non-essential products during the pandemic. Accordingly, the Defendants have also obtained a benefit at the direct expense of the Plaintiffs that they have not paid for.

87. Amazon has access to data that gives it greater insight into consumer behavior and preferences than competing sellers on its platform. Amazon has access to every piece of data on what products each customer has

searched and purchased or not purchased. With information about what customers have searched, Amazon is able to create customized marketing and targeting of products for the individual customer in order to take sales away from the Plaintiffs and those similarly situated.

**Terminal Business Events Caused by the Defendants' Illegal Conduct**

88. The conduct complained of herein has forced terminal business losses, permanently impaired forward looking revenue, substantially downgraded earnings forecasts and tarnished corporate goodwill as online merchants –all of which the Defendants have profited from doing, even at the cost of the Defendants' own short term profits.

89. The Defendants have forced the Plaintiffs and others similarly situated to liquidate their inventory and sell it to the Defendants at fire sale prices, usually at below cost and many times at 5-10% of what the inventory is worth. Amazon has triggered this forced liquidation by withholding Plaintiffs revenues, by imposing arbitrary reserve requirements equaling a third to half or more of sales along with interest, by unpredictable warehousing costs, by unpredicable storage classification and reclassification (which triggers what space is claimed to be available), resulting in financial penalties and additional fees.

90. At present, Plaintiff Medcare's Amazon Account was reactivated after 9 months of arbitrary deactivation even though this particular account did not violate the Terms of Service. It has now suffered from arbitrarily limited

storage which prevents it from doing any meaningful business and is still awaiting release of funds due it from the Defendants.

91. At present, Plaintiff Global Specialty's Amazon account was arbitrarily closed based on the false assertion by the Defendants that it is associated with a seller account known as "Arizona Corp.".

92. At present, Plaintiff Central Concepts' Amazon account was deactivated, and this is also based on the false assertion by the Defendants that it is associated with "Arizona Corp."

93. Arbitrary deactivation of the Plaintiffs' accounts permanently downgrades their search ranking on Amazon's platform. However, products previously available for sale by the Plaintiffs are still displayed as available for sale to the public, which benefits the Defendants by associating the Defendants with Plaintiffs' corporate goodwill by the use of their Marks, logos and IP. When users attempt to click on and buy products from Plaintiffs deactivated accounts, they are unable to purchase them, and are instead redirected to like products sold by the Defendants. Meanwhile, even if accounts are reactivated, the Plaintiffs will have permanently lost the time value of search engine ranking that would have driven their sales even though the Defendants will continue to enjoy the use and benefit of the Plaintiffs' IP and their customer driven data and analytics.

**IV. Specific Counts**

## COUNT ONE: TRADEMARK INFRINGEMENT

(All Plaintiffs vs All Defendants)

94. The Defendants have infringed the marks set forth in ¶4 by way of the means and methodologies described in ¶¶67-82 herein.

95. In doing so, the Defendants have wilfully or negligently misused, abused and misappropriated the Plaintiffs' Marks, likeness of their products and their corporate goodwill in order to sell Defendants' products at the direct expense of Plaintiffs' sales and profits without any fully informed consent from the Plaintiffs and in a manner not permitted under Fair Use.

96. Plaintiffs seek remedies pursuant to 15 USC §§1114, 1116, 1117 and 1125.

WHEREFORE, Plaintiffs claim:

A. Costs

B. Damages and Treble Damages per §1117(b)

C. Statutory Damages per §1117(c)

D. Attorney Fees

E. Injunctive Relief forbidding any use of the Marks or likeness or names of the Plaintiffs' products so long as their accounts are deactivated and funds lawfully owed them withheld or embargoed.

## COUNT TWO: NEGLIGENCE

(All Plaintiffs vs All Defendants)

97. The Defendants made the representations to the Plaintiffs described in ¶¶59-66 herein, and in doing so, assumed those duties and obligations toward the Plaintiff, and the Defendants did not honor those duties.

98. Additionally, the Defendants had positive duties imposed under the Lanham

Act (15 USC §§1114-1125, inclusive), which they did not honor.

99. The Defendants also assumed the duty of turning over to the Plaintiffs funds justly owed to them in addition to an accurate accounting of the Defendants' duties as escrow, shipping and warehouse agents, which the Defendants did not honor.

100. The Defendants acquired the Plaintiffs' data and Trade Secrets in the manner described in ¶¶16-18, which they failed to adequately protect and safeguard from misappropriation by Amazon itself as well as hackers and third parties looking to exploit data breaches.

101. The Defendants owed the aforesaid duties in respect to care for the safety of the persons or property of the Plaintiffs, which they did not honor

102. Failure of the Defendants to honor the aforesaid duties have proximately caused damage and actual injury to the Plaintiffs in the form of trademark infringement, trademark dilution, the terminal business conditions complained of in ¶¶ 89-93, increased payroll costs and lost sales. WHEREFORE, Plaintiffs claim:

A. Costs

B. Damages

C. Attorney Fees

### COUNT THREE: RECKLESSNESS AND GROSS NEGLIGENCE

(All Plaintiffs vs All Defendants)

103. The conduct of the Defendants as contemplated in ¶¶4-93 herein were

the sum of intentional plotting, intentional means and intentional motivation to harm

the Plaintiffs and those similarly situated, and the Defendants knew the damages

and the risk of damages were manifestly unreasonable, and they in fact knew of

such risks.

**104.**     The reckless misconduct of the Defendants by way of failure to uphold the

duties owed to the Plaintiffs, resulted in catastrophic business losses, losses of profit,

misappropriation of the Plaintiffs' IP, tarnishing of the Plaintiffs' corporate good

will, dilution of the Plaintiffs' Marks and wholesale fraud perpetuated on the

Plaintiffs such that they have resulted in the terminal business condition of the

Plaintiffs set forth in ¶¶89-93 herein.

WHEREFORE, Plaintiffs claim:

A. Costs

B. Damages

C. Attorney Fees

## COUNT FOUR: FOR DECLARATORY JUDGMENT THAT THE TERMS OF

## SERVICE ARE A VOIDABLE ADHESION CONTRACT

(All Plaintiffs vs All Defendants)

**105.**     The Defendants have purposefully built a monopoly with leverage that

does not exist on the part of any other company or market participant as

described in ¶¶19-51 herein.

**106.**     That power of the Defendants was abused to engage in unjust

enrichment and unlawful banking activities at the direct expense of the

Plaintiffs as described by ¶¶83-84.

**107.**     That the disproportional bargaining power of the Defendants was used to

infringe trademarks as described in ¶¶67-82 as well as ¶¶85-87 herein.

**108.**    That disproportional bargaining power of the Defendants was literally used to functionally lock the Plaintiffs out of any IT recourse as described by ¶¶59-66, in addition to being used to withhold and keep moneys due the Plaintiffs from the custody of the Plaintiffs.

**109.**    By virtue of the foregoing, the Terms of Service concern a business of a type generally thought suitable for public regulation. In fact, the activities of lending, trademark policing, interstate commerce and consumer protection which Amazon purports to regulate itself but misregulates to its own unjust enrichment are in fact regulated by the United States Congress under the Sherman Antitrust Act and the Lanham Act as well as by the General Assembly under Connecticut General Statutes §42-110g (Connecticut Unfair Trade Practices Act) and the Connecticut Trade Secrets Protection Act (§§35-51 through 31-53).

**110.**    The Defendants are engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public and is in fact impossible now for the Plaintiffs to engage in business anywhere else due to the Terms of Use themselves.

**111.**    The Plaintiffs are willing to sell their products for any member of the public who seeks it, or at least for any member coming within certain established standards.

**112.**    Amazon possesses a monopolistic advantage over the Plaintiffs and a

disproportional and overly decisive bargaining strength and power that could muscle out Walmart and the United States Postal Service, if they saw fit to do so.

113.     In exercising a superior bargaining power, Amazon confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

114.     Amazon's Terms of Service themselves are a means to the end of avoiding accountability in the public, open forum of Court where its actions must be explained in a timely, expeditious fashion so that its unjust enrichment, IP infringement, unlawful banking and monopolistic practices come to a halt and victims similarly situated to the Plaintiffs see justice before they see the irreparable harm of losing their entire enterprises, laying off their employees forever and closing their doors for good.

115.     Finally, as a result of the Terms of Service, the Plaintiffs are placed under the control of the seller, subject to the risk of carelessness by the seller or his agents – especially those well documented in ¶¶59-66 herein.

WHEREFORE, the Plaintiffs claim:

A. Costs

B. Declaratory Judgment that the Terms of Service are a Voidable Adhesion Contract

## COUNT FIVE: CONNECTICUT UNFAIR TRADE PRACTICES ACT. (CUTPA) CGS §42-110g

(All Plaintiffs vs All Defendants)

116.    As alleged herein, the Defendants have violated the public policies set forth in the Lanham Act (15 USC §1114 through 1125, inclusive), the Sherman Anti-Trust Act (15 USC §§2 and 15) and Connecticut's Banking Law Against Usury (CGS §37-4) in addition to the Connecticut Trade Secrets Protection Act (CGS §§35-51 through 35-53, inclusive).

117.    Additionally, Defendants' Terms of Service are an unlawful Adhesion Contract in the manner and ways set forth in ¶¶59-66, supra, the purpose of which is to avoid public exposure, withhold money which is lawfully and immediately due the Plaintiffs and prevent the public from learning about the Defendants' unlawful activities in a public court of law.

118.    An act is "deceptive" in violation of CUTPA if (i) it is "a representation, omission, or other practice likely to mislead consumers[;]" (ii) "consumers . . . interpret the message reasonably under the circumstances[;]" and (iii) "the misleading representation, omission, or practice [is] material— that is, likely to affect consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 215 Conn. 590, 597 (1990)

119.    The foregoing wilful, intentional, grossly negligent and reckless misconduct is so unfair, burdensome and oppressive that normal members of the public who learned of it would condemn it as unconscionable.

120.    Within this ecommerce business relationship, the Defendants' conduct also damaged the Plaintiffs in the form of lost revenues that would have materialized had

they not imposed their monopolistic system to both suppress commerce and

unjustly enrich themselves at the direct expense and detriment to the Plaintiffs.

**121.**    None of the things the Defendants have done as alleged herein in

direct violation of law and public policy provides any countervailing benefit to

consumers or competitors.

**122.**    As a consequence hereof, the Plaintiffs suffered ascertainable losses, which
        are proximately caused by the CUTPA violations committed by the
        Defendants.

**123.**    A copy of this Complaint will be transmitted to the Attorney General.
        WHEREFORE, the Plaintiffs claim:

    A. Costs

    B. Damages and punitive damages under CGS §42-110g

    C. Attorney Fees

### COUNT SIX: NEGLIGENT MISREPRESENTATION

(All Plaintiffs vs All Defendants)

**124.**    The Defendants, in order to induce the Plaintiffs into the Terms of

Service, made representations to them as described in ¶¶59-66 herein.

**125.**    The representations made by the Defendants were known to be false

or should have been known to be false false and the Defendants made

theses false representations without reasonable ground for believing them to be

true.

**126.**    The Plaintiffs have justifiably and in good faith relied on the

Defendants representations described in ¶¶59-66, increasingly to their

detriment, especially to the end result as described in ¶¶89-93.

**127.**    As a consequence of relying on the aforesaid representations, the
        Plaintiffs were damaged.

WHEREFORE, the Plaintiffs claim:

A. Costs

B. Damages

C. Attorney Fees

### COUNT SEVEN: FRAUD AND CIVIL THEFT (CGS §52-564)

(All Plaintiffs vs All Defendants)

**128.**     The Defendants, in order to induce the Plaintiffs into the Terms of
Service, made intentional representations to them as described in ¶¶59-66 herein.

**129.**     The representations made by the Defendants were known to be false .

**130.**     The Plaintiffs relied on the Defendants representations described in
¶¶59-66, increasingly to their detriment.

**131.**     As a consequence of relying on the aforesaid representations, the
Plaintiffs were damaged.

**132.**     The Defendants purposefully, wrongfully and intentionally made the
representations described in ¶¶59-66 in order to exact increasing
control over the Plaintiffs' revenue streams, steal customer data and
stifle the Plaintiffs' business as direct competitors.

WHEREFORE, the Plaintiffs claim:

A. Costs

B. Damages and treble damages per §52-564

C. Attorney Fees

### COUNT EIGHT: TORTIOUS INTERFERENCE WITH BUSINESS

**EXPECTANCIES**

(All Plaintiffs vs All Defendants)

**133.** The Defendants knew of the Plaintiffs' business as described in ¶¶4-6 herein.

**134.** The Defendants, in the manner and ways described in ¶¶16-93, have purposefully interfered without justification and frustrated the Plaintiffs' business and operations.

**135.** The Defendants, in the manner and ways described in ¶¶16-93, have purposefully and wrongfully stolen customers and profits from the Plaintiffs.

**136.** The Defendants, in the manner and ways described in ¶¶16-93, have purposefully infringed on the Plaintiffs' Trade Marks and allowed others to infringe on their Trade Marks without any justification.

**137.** Accordingly, in the ways enumerated above, the Defendants have interfered with Plaintiffs' business *vis-a-vis* Plaintiffs' customers, and Defendants' interference showed a reckless indifference to and was a wanton violation of the Plaintiffs' rights, and Defendants interference has caused Plaintiff financial losses and actual harm in Plaintiffs business reputation . WHEREFORE, the Plaintiffs claim:

A.Costs

B. Damages and treble damages per §52-564

C. Attorney Fees

**COUNT NINE: CONVERSION**

(All Plaintiffs vs All Defendants)

**138.** The Defendants have made use of the tactics, practices and systems alleged in ¶¶7-82 as alleged herein to come into possession of the Plaintiffs' funds and Intellectual Property by serving as an escrow agent and fiduciary.

**139.**     The Defendants obtained control and dominion over Intellectual Property and funds that belonged to the Plaintiffs.

**140.**     The Defendants exceedingly, wrongfully and knowingly exercised unauthorized control over the Plaintiffs' Intellectual Property and funds that belonged to the Plaintiffs for indefinite periods of time without any lawful right, license or permission to do so.

**141.**     Said withholding of Plaintiffs' fund has caused substantial harm to the Plaintiffs.

WHEREFORE, the Plaintiffs claim:

A. Costs

B. Damages

C. Attorney Fees

## COUNT TEN: SHERMAN ANTI-TRUST ACT (15 USC §§1, 2, 14 and 15)

(All Plaintiffs vs All Defendants)

**142.**     The Defendants have in fact constructed and maintained an online retail monopoly as described by ¶¶16-93, which have, in the aggregate, allowed the Defendants to operate in abusive, immoral and oppressive practices which unreasonably restrain competition and affect interstate commerce, with impunity and no legal liabilities.

**143.**     15 USC §1 provides, in part, that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

**144.**     The Plaintiffs are injured persons for the purposes of 15 USC §15

**145.**     A violation of 15 USC §1 requires a showing that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 US 752, 764 (1984). The conduct alleged herein demonstrates and elucidates in comprehensive detail that scheme upon which the Defendants conspired to dominate online retail, kill competition and fraudulently induce those similarly situated into business under the guise of partnership when in fact the Defendants intended the relationship to be parasitic and deceitful.

**146.**     Defendants' Terms of Service, purposeful neglect of IT infrastructure in the "HOTW" approach, intentional sale of CRAP to undercut sellers on the Platform, and breach of fiduciary duty and oppressive bargaining tactics satisfy classification of Market Restraints under the Per Se Rule of a Sherman Act Claim. Restraints analyzed under the Per Se Rule are those that are always (or almost always) so inherently anticompetitive and damaging to the open and fair market that they warrant condemnation without further inquiry into their effects on the market or the existence of an objective competitive justification. *(US v Socony-Vacuum Oil Co., 310 U.S 150 (1940); United States v. Sealy, Inc., 388 US 350 (1967); United States v. Topco Associates, Inc., 405 US 596 (1972); Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761 (8th Cir. 2004).*

**147.**     The Market Restraints exercised by Amazon have imposed permanent dominance on the entire United States Online Retail Market.

**148.**    The tactics employed by the Defendants purposefully restrict and often kill competition through their aggressive acquisitions, theft and misappropriation of Intellectual Property and illegal use of data to compete directly against the Plaintiffs and those similarly situated on their own Platform.

**149.**    The Defendants took a preexisting relationship, that, over time, constituted an increasing challenge and impossibility to do fair business with the Defendants in the way and manner complained of. Plaintiffs' refusal to submit to the Defendants' terms and business practices refusal was actualized by the unlawful embargo of funds and inventory owned by the Plaintiff in addition to misappropriation of the Plaintiffs' Intellectual Property and Trade Marks. Further, the conduct complained of the Defendants suggests a long-term plan to forego profits in order to harm competition (such as through the sale of CRAP). Said products at issue are similar to those of the Plaintiff and already out there for sale, and said sales are captured at the last minute through deceptive misappropriation of data, the Prime Function, the "Get it Now" scheme and proprietary algorithms designed and coded for such purposes.

**150.**    As complained herein according to the means, methods and schemes complained of, the Defendants acted in violation of 15 USC §14, which states, "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the

United States or any Territory thereof or the District of Columbia or any

insular possession or other place under the jurisdiction of the United States,

or fix a price charged therefor, or discount from, or rebate upon, such price,

on the condition, agreement, or understanding that the lessee or purchaser

thereof shall not use or deal in the goods, wares, merchandise, machinery,

supplies, or other commodities of a competitor or competitors of the lessor or

seller, where the effect of such lease, sale, or contract for sale or such

condition, agreement, or understanding may be to substantially lessen

competition or tend to create a monopoly in any line of commerce."

WHEREFORE, the Plaintiffs claim:

A. Costs

B. Reasonable Attorney Fees per 15 USC §15

C. Damages

D. Prohibitory Injunctive Relief Against the Defendants' Monopolistic Conduct

Complained of Herein per 15 USC §14

## COUNT ELEVEN: BREACH OF FIDUCIARY DUTY

(All Plaintiffs vs All Defendants)

**151.**   The Defendants represented to the Plaintiffs numerous obligations

they would undertake and to which they acted in direct opposition to as

described by ¶¶52-66 herein.  The Defendants owe an

obligation of trust, good faith  and loyalty to the Plaintiffs.

**152.**  The Defendants did not honor such fiduciary duty of trust, good faith and loyalty in

their business relationship with the Plaintiffs, but instead the Defendants have

advanced their own interests and Defendants have benefited to the detriment

of the Plaintiffs as described in ¶¶16-93, which include bad faith and disloyal

behaviors, misuse and misappropriation of pertinent information provided by the

Plaintiffs, misappropriating Plaintiffs' funds, abusing Defendants' position and power of

influence, and intentional misrepresentations .

**153.**      The Defendants did not honor such fiduciary duty, but instead

advanced their own interests and Defendants have benefited to the detriment

of the Plaintiffs as described in ¶¶16-93.

**154.**      As a consequence, the Plaintiffs sustained damages that were

proximately caused by the Defendants' breach of fiduciary duty.

WHEREFORE, the Plaintiffs claim:

A. Costs

B. Reasonable Attorney Fees

C. Damages

D. Injunctive Relief

## COUNT TWELVE: UNJUST ENRICHMENT

(All Plaintiffs vs All Defendants)

**155.**      The Defendants represented to the Plaintiffs numerous obligations

they would undertake as described by ¶¶52-58 herein.

**156.**      Relying on the Defendants' representations,  in good faith,  the

Plaintiffs agreed to the Defendants' access to Plaintiffs' funds, Intellectual

Property, corporate goodwill, trade secrets, customer information, data and

analytics (heretofore "Assets" as described in this Count).

**157.**      The Defendants embargoed and withheld these Assets without

Plaintiffs consent to realize an illegal and unjustified profit.

**158.**      The Defendants embargoed and withheld the Assets to realize an

illegal and unjustified profit.

**159.** The Defendants shortchanged the Plaintiff and did not deliver on its promised Information Technology  infrastructure while  realizing a financial gain for the Defendants as to both costs savings and purposefully impeding the Plaintiffs as their direct competitors.

**160.** The Defendants have withheld a third or more of Plaintiffs' revenues in order to profit from the same as a float for Defendants' expenses, a means of earning interest on deposit or both or compensating the Plaintiffs..

**161.** None of the aforementioned benefits were those that the Defendants had paid for.

**162.** Consequently, the Defendants were unjustly enriched.

WHEREFORE, the Plaintiffs claim:

A. Costs

B. Reasonable Attorney Fees per 15 USC §15

C. Damages

D. Injunctive Relief

**COUNT THIRTEEN: THEFT OF TRADE SECRETS, CGS §§35-51 through 35-53, inclusive**

(All Plaintiffs vs All Defendants)

**163.** Said Trade Secrets as specified in ¶¶16-18 herein derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can

obtain economic value from its disclosure or use in the field of online commerce as well as the sale, marketing and product sourcing for online commercially available consumer products.

**164.** Said Trade Secrets were the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Indeed, the safekeeping of said Trade Secrets with the Plaintiff's staff were among those reasonable efforts.

**165.** Said Trade Secrets have been obtained by "improper means" by the Defendants as defined by CGS §35-1(a), which includes theft, misrepresentation, breach of duty to maintain secrecy, through electronic or other means.

**166.** Upon information and belief, said Trade Secrets have been subject to "misappropriation" as defined by CGS §35-1(b). The misappropriation was so extreme that it has resulted in terminal business losses suffered by the Plaintiffs.

**167.** Said misappropriation has continued and remains continuing through the present.

**168.** Upon information and belief, the Defendants have continued to misappropriate said Trade Secrets by sharing them and the information they contain with others for the purpose of profit and Defendants' own profits in direct competition with the very Plaintiffs whose accounts they have deactivated.

**169.** Said Trade Secrets include and contain, by their nature, secret formulas, methods, practices and devices that give the Plaintiffs an advantage over competitors in the field of online commerce.

**170.** The Plaintiffs lack any other adequate remedy at law for the cessation

of the misappropriation of their Trade Secrets and IP.

**171.**    The Plaintiffs continue to suffer irreparable harm as a consequence of the misappropriation of their Trade Secrets and IP.

**172.**    Plaintiffs are continuing to be the subject of fines, penalties, interest and even lost business opportunities as a consequence of the Defendants' misconduct complained of in this Count.

WHEREFORE, the Plaintiffs claim

A. Costs

B. Damages, and liquidated damages to any extend damages cannot be fully computed as a consequence of lost or spoliated evidence.

C. A mandatory injunction commanding either reactivation of their Accounts or permanent destruction of their illegally acquired data in addition to a full accounting of that data's usage and unauthorized sharing and any profits derived therefrom

D. An immediate prohibitory injunction stopping Defendants current misappropriation of Plaintiffs' Trade Secrets and preventing Defendants from misappropriation of Plaintiffs' Trade Secrets.

FOR THE PLAINTIFFS,
BENJAMIN LIGERI
CENTRAL CONCEPTS, INC
TRADEMARK HOLDINGS, LLC
GLOBAL SPECIALITY PRODUCTS, LLC
MEDCARE, LLC

By:/s/ Paulus Chan
Paulus H. Chan, Esq.
157 Forest Hill Road,

North Haven CT 06473
Tel: (860) 250-9536
Fax: (860) 631-1111
Email: phc_ssg@yahoo.com

### VERIFICATION

STATE OF CONNECTICUT

s.s. _Voluntown_

COUNTY OF NEW LONDON

I, Benjamin Ligeri, hereby make oath that the foregoing is true and accurate to the best of my knowledge and belief this _6_ day of May, 2023:

Benjamin Ligeri

Benjamin Ligeri, having satisfactorily identified himself, the CEO and Managing Member of Plaintiffs Central Concepts, LLC, Trademark Holdings, LLC, Global Specialty Products, LLC and Medcare, LLC, and for himself, made oath to the foregoing, before me, this _08_ day of May, 2023:

Notary Public

My Commission Expires: _01/31/2028_



GAIL MARIE COUTU
Notary Public, State of Connecticut
I.D. # SNPC.0186085
My Commission Expires 1/31/2028