UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BENJAMIN LIGERI<br>CENTRAL CONCEPTS, INC<br>TRADEMARK HOLDINGS, LLC<br>GLOBAL SPECIALTY PRODUCTS, LLC<br>MEDCARE, LLC<br><br>Plaintiffs<br><br>v.<br><br>AMAZON.COM, INC<br>AMAZON, LLC<br>AMAZON SERVICES, LLC<br>AMAZON MEXICO SERVICES, INC<br>AMAZON PAYMENTS, INC<br>AMAZON CAPITAL SERVICES, INC<br><br>Defendants | No. 3:23CV603(JAM)<br><br>New Haven, Connecticut<br>April 8, 2024 |

HEARING ON MOTION TO COMPEL ARBITRATION

VOLUME I

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

A P P E A R A N C E S:

FOR THE PLAINTIFFS:

LAW OFFICES OF PAULUS H. CHAN, LLC
157 Forest Hill Road
North Haven, Connecticut 06473
BY: PAULUS CHAN, ESQ.

FOR THE DEFENDANTS:

DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
BY: JOHN M. MAGLIERY, ESQ.
ADAM WALLACE SGRO, ESQ.

TABLE OF CONTENTS


| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ORKUN OZBATUR | | | | |
| By Mr. Magliery | 11 | | | |
| By Mr. Chan | | 34 | | |
| By Mr. Magliery | | | 60 | |
| By Mr. Chan | | | | 64 |
| KEVIN PAK | | | | |
| By Mr. Magliery | 68 | | | |
| By Mr. Chan | | 113 | | |
| By Mr. Magliery | | | 137 | |
| ERIC SMITH | | | | |
| By Mr. Sgro | 138 | | | |
| By Mr. Chan | | 187 | | |
| By Mr. Sgro | | | 214 | |

**10:01 A.M.**

THE COURT: We're here today for a hearing on motion to compel arbitration in the matter of Ligeri v. Amazon.

Appearance of counsel, please, for plaintiffs.

MR. CHAN: Good morning, Your Honor. Paulus Chan, counsel for the plaintiffs.

THE COURT: Good morning. And do you have anybody here? Mr. Ligeri, your client?

MR. CHAN: Actually, he's stuck in traffic. He will be here momentarily.

THE COURT: Stuck in traffic? From where?

MR. CHAN: He lives in the northeast part of Connecticut.

THE COURT: So he had to come all the way from northeast Connecticut to get here?

MR. CHAN: On top of that, he had some car trouble over the weekend. I think if you ask, he can explain.

THE COURT: Car trouble. I see. Okay. Thank you.

Mr. -- is it Magliery?

MR. MAGLIERY: Your Honor, it's Magliery, a silent G.

THE COURT: Magliery, thank you.

MR. SGRO: And Adam Sgroe.

MR. MILLER: Robert Miller from Amazon.

THE COURT: Mr. Miller, are you an attorney as well?

MR. MILLER: I am an attorney, but I'm in-house at Amazon.

THE COURT: In-house, great.

MR. MAGLIERY: Your Honor, Mr. Miller is here as our client representative. He won't present today.

THE COURT: Sounds good. Please be seated.

It sounds like we have -- I think, consistent with what we talked about before, we're going to hear first from Amazon since it's obviously its motion to compel. I know you have, Mr. Magliery, three witnesses. The first I think is appearing by video from Istanbul?

MR. MAGLIERY: That's correct, Your Honor. He's in Luxembourg now. He was in Istanbul when the doctor treated him. That's why the note came from Istanbul.

THE COURT: All right. What we'll do is we'll hear from him first. Hopefully our tech is going to work without a problem. We hope that's so. What we'll do is hear from him.

Mr. Chan, you'll have an opportunity to cross-examine that witness following the direct examination.

Then have you got Mr. Pak next?

MR. MAGLIERY: That's correct, Your Honor.

THE COURT: And then the third witness as well.

MR. MAGLIERY: And that's Mr. Smith.

Your Honor, those witnesses are in the courtroom. Do you want them sequestered in the hallway?

THE COURT: If you don't mind just standing when you address the Court.

MR. MAGLIERY: I beg your pardon. Certainly.

THE COURT: It's a Connecticut thing.

MR. MAGLIERY: Absolutely.

THE COURT: So unless there's a request for sequestration -- I don't know if there's a request for sequestration.

Is there a motion for sequestration, Mr. Chan? Does it matter to you whether the others are present here?

MR. CHAN: I would prefer them not present while the other --

THE COURT: While there's testimony?

MR. CHAN: Yes.

THE COURT: All right. So I'll take that as a motion for sequestration.

I'll ask those witnesses if they don't mind waiting outside outside of earshot. I know we have the doors open. Wherever is comfortable. Perhaps we can

find -- I don't know if we can find a room. We'll work on getting a room for the other witnesses to be as comfortable as possible.

In terms of scheduling today, I know we've got until 4:00 p.m. or so. This Court has always, by tradition, whenever there's a solar eclipse has taken a break, a recess. We'll plan to take a recess around 3:00 just to respect that long-standing tradition of federal courts taking a break for solar eclipses every couple of decades.

As I think I may have shared with the parties, I'm undergoing some substantial medical treatment at this point in time. This is why you see staff members near me, because of some immunocompromise issues, with masks on. I am expecting a rather urging communication from a physician. So I may have to take a recess on quite short notice this morning, so you understand why I need to do that if I hear back from that physician while we're in session. I expect otherwise we'll kind of go to until whenever our court reporter would like a recess, basically usually it's about a 90-minute period when we take a recess for a break, and then we can resume. We'll obviously take a lunch break as well.

Any initial questions?

MR. MAGLIERY: Your Honor, I have a few.

THE COURT: Sure.

MR. MAGLIERY: The Court probably saw that Mr. Ligeri filed a notice of pro se appearance on Sunday night. Was that drawn to the Court's attention?

THE COURT: I saw that. He's not even here, though, today. So I don't know what to make of that.

Mr. Chan, is Mr. Ligeri trying to appear as counsel in the action? What was that about, that notice of pro se appearance?

MR. CHAN: The reason he filed that is he feels that he's knowledgeable enough so that he could participate in some sort of cross-examination of the witnesses, if necessary. But that all depends on how the testimonies go.

THE COURT: I see. You're his counsel, I gather. You've filed the complaint. Ordinarily, the Court just hears from counsel and not from the parties, even if the parties have some knowledge about matters. So the Court does not intend to allow Mr. Ligeri to conduct cross-examination of witnesses. Of course, we'll be glad to hear from Mr. Ligeri to testify after we hear from the Amazon witnesses.

MR. CHAN: I told him it's up to the Court to decide whether he could act as cocounsel. So he's aware of that. He's just submitting it to see how the Court

would rule on it.

THE COURT: Sure. All right.

Is he a lawyer?

MR. CHAN: No, he's not.

THE COURT: Why would you be saying he should act as cocounsel?

MR. CHAN: He feels that with over ten years of experience doing business at Amazon he probably knows more than most of us, which I concur. We are counsel, but the business side and the technical side, the IT side, he is quite knowledgeable. So that's why I went along and said try it. It's up to Your Honor --

THE COURT: It is up to me. And I'm not allowing him to engage in the unauthorized practice of law.

MR. CHAN: Okay. Thank you, Your Honor.

THE COURT: All right.

Mr. Magliery, what else?

MR. MAGLIERY: I wondered whether the Court likes a succinct statement after objection or just objection and let the Court rule.

THE COURT: Well, tell me why you're objecting, but we don't need to give a long oration.

MR. MAGLIERY: Thank you.

Lastly, do you like presentation from the

lectern and do you want counsel to be masked when we're there?

THE COURT: I think it's helpful just from the table and you don't need to mask at all.

MR. MAGLIERY: And what about the witness, Your Honor?

THE COURT: The witness is fine, no mask.

And I may wear a mask for some periods of time during the witness testimony.

MR. MAGLIERY: Very good.

One last question. There's been extensive pretrial briefing, Your Honor. Do you want any kind of opening statement or will we go right into the witnesses?

THE COURT: I'm pretty familiar with the briefing. I've looked at that. I have helpful submissions from both sides here. I think it's most helpful just to hear the facts --

MR. MAGLIERY: Thank you, Your Honor.

THE COURT: -- as the witnesses would proceed.

MR. MAGLIERY: Thank you.

THE COURT: Thank you. All right.

Mr. Magliery, would you like to call your first witness.

MR. MAGLIERY: Yes, Your Honor. Thank you very much.

We call Orkun Ozbatur who is testifying remotely on Zoom.

THE WITNESS: Good morning.

THE COURT: Good morning. We're going to swear you in, sir, for your testimony.

THE CLERK: Please raise your right hand.

ORKUN OZBATUR,

called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please state your name and spell your last name.

THE WITNESS: My name is Orkun Ozbatur. My last name is O-Z-B-A-T-U-R.

THE CLERK: And give us your location of employment.

THE WITNESS: I'm currently employed by Amazon.

THE CLERK: Thank you.

THE COURT: Please proceed, sir.

MR. MAGLIERY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MAGLIERY:

Q. Good morning or I think for you good afternoon.

THE COURT: Mr. Magliery, I think it's going to be easier for you to sit down for this portion just because you're looking at a video screen that's well below you. I don't want you to get neck strain.

MR. MAGLIERY: Thank you, Your Honor.

BY MR. MAGLIERY:

Q. Mr. Orzbatur, where are you currently located?

A. I'm currently in Luxembourg in my home office.

Q. Is there anyone else with you in your home office?

A. No, there's no one in my home office or my home except my dog.

Q. Can you confirm that you have the exhibit book of paper exhibits before you?

A. Yes, I do have the exhibits in front of me.

Q. Do you have anything else in front of you that you're looking at?

A. No. Just a keyboard and laptop, two screens and camera.

Q. Will you agree that we have no electronic communication of any sort while you're giving your testimony?

A. I can confirm that. We don't have any other electronic or other type of communication.

Q. Thank you.

And you've just said you're employed by Amazon,

correct?
A. That's correct. I'm employed by Amazon since 2017, September 2017.
Q. What is your job title?
A. My title is Senior Manager, Product Management in the Marketplace business.
Q. What are your duties as Senior Manager of Product Management?
A. I'm responsible for the third-party seller registration and verification process worldwide. This includes United States Store for Amazon or other worldwide stores as well. And I manage the capacity of different product managers, program managers who help me manage that process.
Q. You mentioned sellers. What are sellers?
A. The sellers are individuals or companies who sell on Amazon stores. And when we say Amazon store, we can easily refer that as Amazon.com in United States or other international stores for Amazon around the world, could be Germany, Amazon.de, or others. Sellers are the parties who sell on those stores.
Q. And other than sellers, who else sells on the Amazon stores?
A. Amazon itself as a company or Amazon's other companies sell within the Amazon stores. It's commonly

known as Amazon Retail when it sells their own product. There are other companies under Amazon which sells, those parties and the sellers.

Q. Do your duties involve reviewing records of third-party sellers in the Amazon store?

A. My duties include reviewing the large data for sellers within registration and verification process. So I do have access to large data where myself or my team can analyze the seller behavior within the registration and verification process. I do not have access to personal data. That's more restricted data, so I don't have access to individual data.

Q. Okay. How can a party become a third-party seller on Amazon?

A. They need to go through registration and verification process. So they need to provide sufficient details about their company, other individuals. They have to provide sufficient details about themselves, their company. They still need to provide details about the individuals who present the company. They also need to provide required documents. And we review those and we verify those. We may do additional checks such as a video interview or similar automated interviews as well.

Once they are verified, they can have access to selling rights.

Q. Does a third-party seller have to agree to any agreement with Amazon to sell on the Amazon store?
A. Yes, they do. That's one of the first steps in the registration process.
Q. And what is the name of the portal through which sellers interact with Amazon?
A. It is called Seller Central.
Q. And in the current experience, Mr. Orzbatur, what is the first page a registrant encounters when they want to become a third-party seller?
A. The first page of the registration process is where we collect email address and ask the people to select a password. We also ask individual's name and log name. That's the starting point. And it's followed by multiple registration, multiple pages where we collect information or documents.
Q. Okay. What is the second page after the email and password that a registrant encounters?
A. Currently, the second page is what we call a welcome page which is a content page where we tell sellers what to expect in the registration and verification and what details they need to provide us.
Q. Does the seller input any information on the welcome page?
A. Currently, they do not. It's more of a content page

where we specify what they need to provide in the coming pages.
Q. And what is the next page after the welcome page that a registrant encounters?
A. The next page is what we call agreements page. This is primarily where the seller, they need to provide the initial details about their company and confirm the location of their company in terms of country. And they can also review Amazon's agreement, business service agreements, and agree on continue with that. In short, we call it internally agreements page.
Q. Could you turn in your exhibits binder to Exhibit 3, please.
Mr. Orzbatur, to make sure we're looking at the same exhibit, could you read the legend that's placed at the top of the exhibit beginning with the word "Case"?
A. Sure. It reads as "Case 3:23-cv-00603-JAM."
Q. What document number is listed there?
A. Document 61-2.
Q. Thank you.
And are you familiar with this document?
A. Yes, I am familiar with this page.
Q. What is it?
A. This is the agreements page that I just mentioned.
MR. CHAN: Objection, Your Honor.

THE COURT: Hold on just a second.
Are you offering that exhibit, sir?
MR. MAGLIERY: I was going to lay a further foundation, but --
THE COURT: Go ahead and lay the further foundation.
And then, Mr. Chan, I'll hear your objection if you have an objection.
MR. MAGLIERY: Thank you, Your Honor.
BY MR. MAGLIERY:
Q. And how are you familiar with this document, Mr. Orzbatur?
A. Sure. I and my team, we go through the registration and verification process to test the experience when we either launch something new or just from time to time to experience it. This is a screenshot taken in one of those test runs.
Q. Am I correct that you tested the registration experience as if you were registering?
A. That's correct. It's like a seller registering to sell on Amazon. And we may check the whole experience or specific pages, depending on what we are testing.
Q. And you made the document that has been submitted as Exhibit 3, correct?
A. That's correct, yes.

Q. Okay.
A. We document them, we archive them for our own purposes. And this is one of those.
MR. MAGLIERY: We move for Exhibit 3 to be admitted into evidence.
THE COURT: Any objection, Mr. Chan?
MR. CHAN: Yes, objection.
THE COURT: What's the basis?
MR. CHAN: Document like this needs to be authenticated. There's no showing of where this displayed on the website such as the link. You can easily print a page with the actual link, either top or bottom, when this was displayed. And there's no information on date and time. This is just a snapshot of a screen. So it's not authenticated in reference to what it's showing and what time frame it's showing. It's just a blank page.
THE COURT: I see.
I don't think it's blank. Maybe you've got a different copy than I have.
MR. CHAN: I mean --
THE COURT: I see writing on my page. Do you see writing on your page?
MR. CHAN: I don't see any information regarding where this appear. Because technically -- I'm not technical, but if you print -- if you go online and print

something, you can actually show the web link where it's showing which would help to authenticate. It's not there.

THE COURT: I see. Okay.

So, Mr. Magliery, is this -- the witness testimony, is this what's done today, as I understand it, right? And I know, is the witness going to testify about what was the practice I guess in 2014 when the four entity plaintiffs' accounts were created or roughly I think most of them were created then?

MR. MAGLIERY: Yes, Your Honor. We're going backwards in time. This is the current experience. I could ask the witness what date he made the test and pulled this screenshot, if that would be helpful.

THE COURT: That would be great. Thanks.

MR. MAGLIERY: Thank you, Your Honor.

BY MR. MAGLIERY:

Q. Mr. Orzbatur, do you recall the date that you went through the exercise of a test registration and made this screenshot?

A. I don't know the exact date. We do dozens, hundreds of them. But I can -- from the version of it, I can confirm this would be somewhere after 2021.

Q. Do you recall whether this screenshot was applicable in the year 2024?

A. Yes. As of today, yes.

Q. And are you personally familiar with, in your role as senior manager of product managers, the experience a registrant must go through to register as a seller?
A. Yes, I am. That's primarily my scope and responsibility. I manage the experience.

MR. MAGLIERY: Your Honor, that's our proffer.

THE COURT: So I overrule the objection. I find that the witness has adequately authenticated the document notwithstanding the absence of a web link information on the page there. It's not necessary as a matter of evidentiary admission. And Mr. Chan's concerns I think go to weight, not admissibility.

MR. CHAN: May I ask a second question related to the objection? I know you ruled, but the witness just said that this came from an archive. Which means that he would have to authenticate that the archive is accurate and reliable to show the metafile where this comes from and where was it retrieved from, and what was used to retrieve the archive to show that that's authentic.

THE COURT: I see. The objection's overruled. You can cross-examine the witness on that.

Please proceed.

MR. MAGLIERY: Thank you, Your Honor.

THE COURT: Exhibit 3, full exhibit.

(Defendants' Exhibit 3 admitted in

evidence.)

BY MR. MAGLIERY:

Q. Mr. Orzbatur, looking at Exhibit 3, what is the need -- withdrawn.

What does a seller do in the "Business location" field?

A. That's what we call a drop-down. The seller is asked to select the country of business registration. So it's a drop-down of countries where Amazon accepts sellers from. If the seller is not a company but an individual, then in that drop-down they select their residence.

So in this exhibit we can see "United States" selected, so meaning that the seller would be based and their company is based in the United States. It represents the location of the company.

Q. And probably everyone is familiar, but just for completeness, what is a drop-down?

A. Drop-down is a term for user interface on internet where when you click, you can see a list of items. In this case, you would see a list of countries. And the way to activate it is when you click on it with your mouse, you can see the full list.

Q. Thank you.

And what does the seller do in the field called "Business type"?

A. They select what type of business they have. Today we have a variety of business types there. It could be private company. It could be a publicly listed company. It could be charity. Or we have other types of businesses as well based on which country is selected.
Q. Okay. And could you read for the Court the line after the two drop-down menus?
A. Yes. It reads as follows: "By clicking on 'Agree and continue', you agree to the Amazon Services Business Solutions Agreement and Amazon's Privacy Notice."
Shall I continue reading the rest?
Q. That's fine for now, thank you.
Is there a way that sellers can view the Amazon Services Business Solutions Agreement before pressing "Agree and continue"?
A. Yes, they can. On this exhibit you can see coloring difference. And the light blue turquoise color represents a link. So if the seller clicks on that link, that would open on a new window on the laptop. And it leads to the full page of Amazon Services Business Solutions Agreement. So they can read through before proceeding with the page.
MR. CHAN: Objection, Your Honor. It's hearsay. The color doesn't prove the fact that you can indeed get to the document. It's just a blue color.
THE COURT: So it's overruled. The witness is

competent to testify about the operation of the web page including the use of the coloring and the effect of clicking on a particular color. I understand you might think, Mr. Chan, it's not a hundred percent certain that's so. But that's the role for cross-examination. When you have the opportunity to cross-examine, you can ask the witness about the basis for his conclusion on that.

Please continue.

MR. MAGLIERY: Thank you, Your Honor.

BY MR. MAGLIERY:

Q. Can a seller -- withdrawn.

Can a registrant for a seller account proceed to register their account without clicking "Agree and continue"?

A. No, they cannot. "Agree and continue" at the bottom of the page is required to go to the next page. And without doing that, you cannot finish registration process.

Q. Thank you.

You mentioned that this is the current experience to register as a seller. Do you know how long this experience has existed for seller registration at Amazon?

A. We started growing this experience, started from beginning of 2009. And this is a version of changed experience as well in terms of coloring. But we started

rolling beginning 2019 globally. And as I mentioned, the different versions or different coloring existed there and we launched it throughout the years as well. So different stores we had different times to launch it.

Q. Let me understand that a little better. What do you mean by rolling it out over time?

A. Sure. Because our users may go through different experiences -- sorry, let me explain better. We want to experiment or we want to get data about how the versions work. And when we say rolling out, meaning that we control technology and the percentage of the sellers who can see the version and how they behave on that. So it takes time. And when we say roll it out, we slowly launch it to all sellers globally.

Q. Do you introduce a new seller registration experience in different geographies at different times?

A. We may introduce different experiences in different geographies, that's correct.

Q. Okay. Thinking to the prior version of the seller registration experience, the one that existed before Exhibit 3, do you recall what a seller -- withdrawn -- do you recall what a registrant to be a seller would first encounter in the prior version of the experience?

A. In the prior version, we again used to start with the email and password. After that, we used to follow

directly with the agreements page. You may remember that I mentioned a welcome page. The welcome page was introduced 2019 onwards, whereas the previous versions we had the agreements page directly.
Q. And could you please turn in your exhibit book to Exhibit 1. Do you recognize this document?
A. Yes, I do recognize this document.
Q. And what is it?
A. Do you want me to read the first line just to ensure the document number?
Q. Thank you so much. Yes, Mr. Orzbatur, please tell us what the blue legend line says.
A. It reads again "Case 3:23-cv-00603-JAM" and Document 61.
Q. Thank you. We're looking at the same document.
So my question was: What is it?
A. This is one of the versions or this is the version which existed prior to the version we just talked about, Exhibit 3. So this existed in United States store, Amazon United States store prior to current version.
Q. And how are you familiar with this document?
A. Similar to previous exhibit, it was either myself or somebody on my team or within my capacity has taken this screenshot.
Q. Was this the seller experience for registering during

a time that you were responsible for seller registration at Amazon?

A. Yes, it was. For a period of time.

MR. MAGLIERY: We move for the admission of Exhibit 1.

THE COURT: Can we be more specific about what he believes the estimated period of time it was?

MR. MAGLIERY: Yes, Your Honor.

BY MR. MAGLIERY:

Q. Mr. Orzbatur, do you know when this experience was applicable to seller registration?

A. I notice this experience, Exhibit 1, was available before 2019. And I am confident that this has been there since I joined the company, so September 2017. I do not have direct confirmation because I did not take the previous screenshots myself or do this before I joined the company.

Q. This experience was in effect at least from the time you began until the rollout of the Exhibit 3 experience?

A. That's correct, yes.

THE COURT: Any objection to Exhibit 1?

MR. CHAN: Pardon me?

THE COURT: Any objection to Exhibit 1?

MR. CHAN: No objection.

THE COURT: Exhibit 1, full exhibit.

(Defendants' Exhibit 1 admitted in evidence.)

MR. MAGLIERY: Thank you, Your Honor.

BY MR. MAGLIERY:

Q. Mr. Orzbatur, could you describe what the registrant does in this Exhibit 1 registration page?

A. Sure. Similar to previous but slightly different. They provide their legal name. If it's a company, they provide the legal name of the company. And if they are an individual, they provide their full name. And they can, similar to previous one, previous exhibit, they can also read the Amazon Services Business Solutions Agreement and continue with the registration experience.

Q. Okay. And may I direct you to the line -- well, let me withdraw and ask: What does the seller input into the field "Legal name"?

A. They put their legal name or registered name of the company if it's a company. Or if they're an individual, their full name.

Q. May I direct you to the next line that says "Seller agreement." Could you read for the Court the words after "Seller agreement"?

A. Sure. It reads as follows: "I have read and accepted the terms and conditions of the Amazon Services Business Solutions Agreement."

Q. Could a seller review the Amazon Services Business Solutions Agreement from this page?
A. Yes, they can. They can click on the "Amazon Services Business Solutions Agreement" which is different color, which is blue color. That represents the hyperlink which takes them -- which opens in a new window and then they can read the full agreement over there.
Q. Mr. Orzbatur, there's a small box next to the text that you just read. Could you describe what that box is?
A. That box is a check box where we go. So the seller needs to check on that box or check the box before they could proceed with the registration process.
Q. Is there any way to click or link to the next link without checking the box?
A. The next link would not work unless the box is checked, meaning that they could not continue to the next page.
Q. Thank you. What information -- withdrawn.
After these steps that were shown in Exhibit 3 and Exhibit 1, the agreements page, what information does the seller provide during account opening?
A. The seller needs to provide a variety of information about the company. These are such as the registered company name, the registered address. They also need to provide phone number in case we need to contact them for

any issues. They also need to provide the primary contact person details, who is opening the account and who is going to manage the account for the companies as a company representative. And that also includes the identity details, full name, birth date, birth place. They also need to provide documents, identity documents, it could be a passport or a national identity or a driver's license depending the country. And they also need to provide address documents for the company. And we verify the information.

The information sellers need to collect throughout the years, of course, we slightly change them. We made it more robust, more information collected, but high level. It's about the company information as well as the individual.

Q. Thank you.

Let me break that down a little and ask first: In your capacity at Amazon, are you familiar with the verification process that Amazon requests of sellers?

A. Yes, I'm familiar with that. My sister teams manage the verification process, and I am responsible for some of the performance of those pages.

Q. And I believe you testified that -- withdrawn.

Does Amazon seek to verify that the registrant is the person they claim to be?

A. Sorry, can you repeat the question?
Q. Yes. Does Amazon seek to verify that the person registering is the person they claim to be?
A. Yes. It is important for us to know couple of things about the individual. One, the individual exists as an actual, so it's not a fake person. And second, the person who is registering the account is the person who they claim to be. We do that through -- as of today, we do that through a video interview or an automated version of that. And throughout the years we improve that experience as well.
Q. Is it important for Amazon to know the identity of the sellers?
A. It is. It is crucial for us to know so we know who we are doing business with.
Q. When a seller is registering a seller account, how does Amazon know in what stores or geographies it seeks to sell?
A. It is depending on where the seller starts the registration process. Commonly, there are globally marketing websites. So there would be a marketing website for United States, Canada, Mexico, other countries as well. Those drive sellers to register. And when a seller starts registration from United States, by default they are elected to United States stores.

Throughout the years, we improved that experience, we altered that experience. Today they are registered globally. But if they are starting from United States marketing websites, they're electing to sell on Amazon.com, United States store.

Q. When you say marketing websites, are those Amazon websites?

A. They are Amazon websites.

Q. What is the domain that a seller would register through Seller Central to sell in the United States?

A. It's sell.amazon.com.

Q. Would the domain be different if a seller is seeking to sell in a different country before the integrated global experience you just described?

A. Yes, the -- sorry, can you repeat the question? Is it about marketing site?

Q. Yes. Let me just ask a new question.

Would the domain be different if a seller was seeking to sell in a different Amazon store other than the United States?

A. Yes, the marketing domain would be different. It would be -- I don't know the domains on top of my mind right now, but it would be sell.amazon.uk for UK or .au or other translated words for sell. In German, it's a different word, I can't remember right now. It is

depending on where they start.
Q. Does the seller elect the store that it seeks to sell in when it registers the account?
A. By default, they are electing the country based on where they start the registration. So if they start registration in U.S., United States, by default they are elected to sell in the United States store.
Q. Thank you, Mr. Orzbatur.
MR. MAGLIERY: I have no further questions. Thank you, Your Honor.
THE COURT: You have no further questions?
MR. MAGLIERY: That's correct, Your Honor.
THE COURT: And so you've just introduced I think just Exhibits 3 and 1 through this witness. You have another witness doing Exhibit 2, I gather?
MR. MAGLIERY: Exhibit 2, Your Honor, is a blowup of Exhibit 1 which we thought may be helpful. But if the Court can read Exhibit 1, I think we're comfortable with Exhibit 1.
THE COURT: I see. All right. I didn't quite realize that. That's fine. All right.
So cross-examination, Mr. Chan, if you'd like.
MR. CHAN: Yes. I can be seated, right?
THE COURT: Yes, you can remain standing so -- sitting, pardon me.

Any update? Is Mr. Ligeri coming? Is that him who walked in the courtroom?

Mr. Ligeri, since you're the client here, you can sit next to your counsel, if you'd like.

Mr. Ligeri, we started at 10:00 a.m. Are you able to -- was there a problem getting to court today?

MR. LIGERI: I was having some health issues. I apologize for the delay.

THE COURT: I see. All right. Well, your counsel can fill you in on what's occurred so far.

Mr. Ligeri, I also know you filed a pro se notice of appearance. Since you're not a lawyer, I'm not going to allow you to do questioning of witnesses in the case. You'll be welcome at a later time in the hearing to testify yourself as a fact witness, but since you're not an attorney, you're not able -- if you have suggestions to your own attorney about how to cross-examine or ask witnesses questions, you're welcome to do that and give him suggestions, but you won't be able to do it yourself. Do you understand?

MR. LIGERI: I thought I could as a pro se party just for myself.

THE COURT: Well, you have an attorney who has already entered a notice of appearance and filed an action on your behalf. He's filed a complaint in the case on

your behalf. So he represents you in this action.

MR. LIGERI: Understood, Your Honor.

THE COURT: So cross-examination of the witness. If you'd like to proceed, Mr. Chan.

CROSS-EXAMINATION

BY MR. CHAN:

Q. Good morning here, good afternoon there.

Your name is pronounced as Orzbatur? Did I say it right?

A. Yes.

Q. I just have a few questions.

THE COURT: If you could put your microphone down a little closer to you so we can hear you better, that would be great. You can bend it down. Thank you.

MR. CHAN: Hear me better?

THE COURT: I think so.

THE WITNESS: I can hear well.

BY MR. CHAN:

Q. You can hear me, right?

A. Yes.

Q. I just have a few follow-up questions.

You mentioned you are in charge of the seller registration process?

A. That's correct.

Q. Okay. And you're referring as to the initial registration, meaning the first time somebody registers, correct?
A. That's correct. If the seller registers first time to sell.
Q. Okay. Does your job duty go beyond -- strike that.
After the registration, does your duty continue to monitor those accounts?
A. Sorry. Can you repeat the question?
Q. Does your duty include monitoring the data that was entered during the registration?
A. That's correct.
Q. We hear the word "click" quite a few times. So can you tell the Court what software you're using and then when somebody clicks what actually happened in terms of the information that the seller is entering, it goes on record somewhere?
MR. MAGLIERY: Objection, compound.
THE COURT: Is it a relevance objection?
MR. MAGLIERY: Compound, Your Honor.
THE COURT: Just try to break up the question, Mr. Chan, if you can.
MR. CHAN: Okay.
BY MR. CHAN:
Q. What software do you use to record the input

information from the seller?
A. There are many, many data sets that we use to store information for our sellers. There's no specific software. Most of them are internal. Big data. And there are also internal softwares where we can turn that big data into representable dashboards.
Q. For the most important piece of information which is to show that somebody did click and agree they have read the BSA and consent to it, how is that information being stored?
A. The information is tracked through a seller's behavior on going to the next page. So as I mentioned in my testimony earlier, the seller cannot proceed to the next page unless they either click on "Agree and continue" on Exhibit 3, or in the Exhibit 1 and 2 if they checked the box and proceed. That is stored based on the seller behavior. So if the seller continues to the next page, that is stored within the click scan ID of that account. Similarly, acceptance of the business services -- sorry, Business Solutions Agreement is also stored in internal services or internal software as well.
Q. Okay. Let me repeat my question. Where is the digital signature of the transaction stored in your system?
MR. MAGLIERY: Objection, foundation. I don't

know that there's any testimony about a digital signature, Your Honor.

THE COURT: Yes, but I'll let the witness answer the question, if he can.

You can try to answer the question, sir.

THE WITNESS: Sure.

I am not exactly sure what you mean by digital signature. I assume it is known as the signature used on the document. In that case, the seller's email address, which is the first page where we collect, along with the account ID created or stored when they click on "Agree and continue" or when they check the box and continue to the next page.

So in our terms, in our system it is actually the confirmation of seller's behavior that they take the necessary steps to agree and continue and go on to the next page.

BY MR. CHAN:

Q. Are you familiar with a digital transaction log that records the whole process of the registration in terms of the sequence of events, the date, time, basically a log? Are you familiar with that?

A. Yes, I think -- I'm not fully understanding what you mean by that.

Q. Okay.

A. But the logs are -- within the time stamps are used in our system.

Q. In the real world we have everything, paper, dated, signed. But in the digital world, everything is also recorded in a digital format called a log. So I'm asking: Where is this log recording the whole registration process and transaction? Where is it stored?

MR. MAGLIERY: Objection, foundation.

THE COURT: I'm sorry, the objection is --

MR. MAGLIERY: Foundation, Your Honor. There's been no testimony about a log.

THE COURT: I'll allow the witness to testify. And you can clear up on redirect, if you'd like.

MR. MAGLIERY: Thank you, Your Honor.

THE COURT: Please proceed.

THE WITNESS: Sure. Those are stored in our dataset. For example, the time stamp available in the registration process and some steps are logged in, let's say. One of the tools is called Merchant Portal. There are other tools such as Paragon with the identity details are stored. And this also includes time stamps of the seller behavior or it could be an individual seller potentially or the mass data. And so all the sellers would get it.

BY MR. CHAN:

Q. Okay. So section detail would show what time and when and who actually clicked that box that you referred to, correct?

A. Which box are we talking about?

Q. The box on the exhibit that's been showing like four times. The one that says you click to agree and continue, that box. So there's a record of somebody clicking that box if they actually did click it?

A. I cannot confirm if there's a time stamp of clicking the box. But there should be a stamp for going to the next page which represents the agreement of it. The reason there might not be a time stamp for clicking the box is because once it's clicked it can also be unclicked before going to the next page. And because it can be done like dozens of times, that would pose unnecessary data storage. So it may or it may not exist. Once the seller clicks and goes to the next page, there should be a time stamp for that.

Q. What did you say may or may not exist? The recording of the click may or may not exist?

A. The recording of the clicking the box may or may not exist because of the data, unnecessary data storage. But I don't have confirmation of it.

Q. Okay. We had a hearing in August. The Judge ordered

more evidence in terms of showing somebody did consent to the BSA. Are you telling the Court today after seven months you cannot show a digital evidence that somebody clicked a box on a certain date and time? Is that what you're telling the Court?

MR. MAGLIERY: Objection, Your Honor. This is beyond the scope. The witness is here to testify about the experience. We have two more witnesses.

THE COURT: So I'll allow the witness to testify what he knows or doesn't know. That's fine. I'm glad to hear from the next witnesses as well.

BY MR. CHAN:

Q. Want me to repeat the question?

A. No. I'm not familiar with the previous discussion, so I cannot comment on that.

Q. Okay. You mentioned about verification of the information submitted by the seller. What exactly is that verification process? How do you check whether the information is correct?

A. I'm sorry, can you repeat the last part? I lost it for a second. How would I check --

Q. During the registration you request information to be submitted by the seller such as name, company name, email, and then you said there's a verification process. What exactly is the verification process?

A. Sure.

First of all, email is different than the rest of the verification process. Email is verified through one-time password in the beginning of the process.

The rest of the details, identity verification or business verification, they are done by either automated solutions or manual solutions. Automated solutions could be checking third-party or government databases if the ID exists and if the ID matches with what is provided on the document and full details. And manual process could be an actual individual responsible for it and have the acts rights to check the documents and data provided and verify that. This also includes -- as I mentioned in the testimony earlier, this also includes as of today video interview or potentially automated version through a selfie.

And additional verifications includes for the address of the company or potential individual if they are registering as individual. Today we do it in different ways. One manual way we do, depending on the country where the business is located, we send a postcard with a code on it so they have to enter on our process. Or we may again do it through automation with the third-party databases.

Q. During the registration process, do you require an ID

with a photograph on it so you have a record of who this registrant looks like?
A. Yes, we do.
Q. Okay. Do you require very personal information such as driver's license number, passport number, or any particular unique information that relates to the seller?
A. Yes, we do. We precisely require document details and document number and the document itself, uploading the document itself.
Q. Okay. So if somebody asks you, gives you account name, you can tell who registered it and some of the specific personal information relating to the seller, correct?
A. That's not correct. I cannot tell because I do not have access to private data. As I mentioned, I have access to mass data, but not individuals. We have investigators within the company who do have access or some other roles who do have access to private data.
Q. Okay. If somebody comes to you, asks the same question that I just asked, what department would you refer the person to to get that data, any particular department?
A. I can imagine that at Amazon there are multiple departments which may have access to that data, but my knowledge, broader organization which I am also employed

by which is the seller trust or, in more narrow terms, like registration services, there are individual roles who do have access to that.

Q. Are you familiar with a Amazon portal that allows the seller to change account information? Are you involved in that or is it beyond your scope?

A. I am -- I think you are talking about Seller Central; is that correct?

Q. I'm talking about a portal where a seller can change name, change ID, and change all kinds of stuff on that particular account. Do you get involved in that or is that beyond your scope?

A. I can confirm only for Amazon portal there's Seller Central where sellers can manage their accounts. My scope not necessarily covers everything in Seller Central. But individuals in my team do have some scope to manage some experiences over there.

Q. Okay. So if something happened to the account after the initial registration, you are not responsible in managing that database? Someone else does?

A. Yeah, I do not directly manage that.

Q. Okay. Thank you. Because I have questions outside your scope. I will wait to ask. Thank you for answering that.

A. Sure.

Q. What happens if there is computer error or malfunction or software issues, how does it affect the registration process?
A. Can you be more -- can you define more what you mean by computer malfunction? I couldn't understand that.
Q. Is it possible that somebody submits information and somehow your verification process does not pick up the bad information and allows the registration to go through? In other words, identity theft, somebody put something in. Is it possible that something would get through?
A. Technically, errors and bugs, what we may call, can of course happen. In any online system, any software, error or bugs can happen, that's correct.
Q. Are you aware of any safeguard steps to prevent the BSA, the agreement, from being tampered while it's online available for people to view? In other words, do you have a system to prevent it from being hacked so that the agreement is solid the way it is?
MR. MAGLIERY: Objection, Your Honor. This is also beyond the scope.
THE COURT: I'll allow it.
THE WITNESS: Could you -- I couldn't understand the question. Could you elaborate more?
BY MR. CHAN:
Q. What procedure you have in place to safeguard so that

you know the BSA is not tampered or altered while it's available for viewing?
A. We do have internal logs of pages being available, and these are monitored by our tech teams. This is not necessarily only on BSA, but it would be other pages, other widgets as well. So these are automated logs created.
And we also reveal the performance of registration and verification weekly within team and leadership. And that can also represent a sharp degree in increase if something is wrong on that page. So there would be a deep dive to understand what is happening.
Q. I believe you mentioned your employment with Amazon began in 2017; is that correct?
A. That's correct, September 2017.
Q. Okay. So anything before 2017 you really don't have any personal knowledge of it, whether it's system or the data itself, you can't be sure whatever is there is personal knowledge of yours; is that correct?
A. That's correct. It wouldn't be my direct personal knowledge.
Q. Okay. Give me a second.
You mentioned about a welcome page earlier. What exactly is on the welcome page?
A. On the welcome page we have content about what to

expect in the upcoming pages in registration. This is mostly a text page where we tell sellers in the coming pages you will need to provide details about your company as well as the individual registering the company. Please make sure you have ID details, company details. And you also ask credit card, so please make sure you have all of this information before you start the registration process.

Q. You mentioned earlier that the agreement, the BSA, was in a different color and that represents a live link. So when one clicks that link, does it go to a different page? In other words, on the screen does it go into a different page?

A. Hyperlinks, these hyperlinks open in new window, meaning that once someone clicks on that, the existing page would stay as is and it would still open on a new window or a new tab depending on the internet explorer they are using, internet browser they are using.

Q. And so the viewer would look at this on the screen and scroll down to the agreement; is that the process?

A. It would depend on the individual who is doing that, obviously. But specifically if you're asking the Amazon Services Business Solutions Agreement link precisely, they would land on the other page which has the full content of the agreement itself. So if they want to read all the

details, of course they can read through by scrolling.
Q. Can you educate me, what is the software, the mechanism that prevents anybody from clicking the box without clicking the BSA itself?
A. I'm not exactly sure about the technology stack they're using. It would be my technical counterparts who would be able to share more about the coding.
Q. Okay. So it's beyond your knowledge whether somebody can click the box without even clicking the BSA hyperlink, correct?
A. Those are -- I believe those are two different things.
Q. My question is: Is it beyond your knowledge to tell me and the Court that somebody can click that box without first clicking the BSA link?
A. I can confirm that somebody can click the box without clicking the link on the Amazon Services Business Solutions Agreement.
Q. Can you repeat your answer? I'm not sure I quite get it.
A. In the experience on Exhibit 1 and 2, somebody could click on the check box before they click on Amazon Services Business Solutions Agreement link.
Q. Okay. So there's no mechanism that you know of would prevent anybody clicking the box before they click --

without clicking the agreement box? In other words, there's no control mechanism that you're aware of?
A. I am not aware of a control mechanism exists or not.
Q. So your answer is you don't know?
MR. MAGLIERY: Objection.
THE WITNESS: Yes, I don't know.
THE COURT: Hold on.
MR. CHAN: I just want to clarify.
THE COURT: I'm sorry, what's the objection?
MR. MAGLIERY: I withdraw it.
THE COURT: Please continue, Mr. Chan.
BY MR. CHAN:
Q. Would a potential seller registrant be able to print out the BSA if he or she wants to?
A. I'm not familiar with the BSA page itself. I don't manage that. But I believe anyone usually on internet, they would be able to print what is on the screen. And I believe it would be the same for the BSA, but I don't have the knowledge because I don't manage that space.
Q. When you say print the screen, you mean a screenshot or you mean to print the document?
A. I'm talking about the standard browse behavior of printing the screen which is through right-clicking the mouse and then selecting print function.
Q. So you're saying to print what's on the screen?

A. That's correct.
Q. Okay. So how many screenshots do you have to print to see the entire BSA? It's like a 30-page --
A. I am not familiar about the number of pages for the BSA.
Q. Okay. Doesn't Amazon require some sort of bank account information or credit card during registration?
A. We do require credit card information during registration. In some stores we also require bank account as well. But it is not necessarily always on registration or during registration.
Q. Okay. So there's on option they can provide the information during registration or they can provide afterwards?
A. Are you asking about bank account or credit card?
Q. Both. Either credit card or bank, when do they enter that?
A. Credit card information is a must provide within registration in United States. Bank account, at the top of my mind at the moment I am not sure which countries need to provide within registration and which countries they need to provide after registration.
Q. You mentioned after the initial registration is done your department duty stops there, correct? That's what you say earlier, correct?

A. Can you define "department"?
Q. After the initial registration is completed, you're saying your department's duty stops there. You don't continue to monitor the account after the initial registration; is that correct?
A. I could not answer that question unless I know what you mean by "department."
Q. Okay.
A. Because if you're talking about my team, it's different. But if you're talking about a larger organization which may be called department, that could be dozens of people and it's different.
Q. If a coworker comes to you and says I need to look at this particular account, give you a number, would you be able to access everything on that account? Are you authorized to look at everything on that account since the beginning opening through today?
A. No, I do not. And the individuals in my team, product or program managers, would not also have access to that. Everything -- as I mentioned, everything would include personal details which is restricted to some individuals. So neither myself nor my team would have access to every detail on an account.
Q. Okay. Do you know which particular department within Amazon would manage the seller account information past

the initial registration?
A. It would be different departments, but I cannot tell you exactly which departments. But it would be different departments. We would have -- we have escalating teams which would have access to some of those or requires access to look into some details.
Q. Okay. You answered my question. My main question was accountability of a particular account, it changes hands after the registration. Past the registration it's out of your hands and you're not responsible, correct?
A. I am not directly responsible for all the information after registration.
Q. Okay. But you do have access to everything that was entered during the initial registration process, correct?
A. No, I do not have access to everything within registration. As I mentioned, I do not have access to private information, like identity information, myself. I do have access to large data where I can analyze or my team can analyze the behavior across these pages, but we do not or I do not have specifically access to all the information within registration.
Q. If somebody comes to you and says can you show me information on Account 12345, within your authority what would you see when you open up that account?
A. At the moment I don't necessarily myself, I don't

really check individual accounts.
Q. But if somebody asks you to look up -- if somebody were to ask you show me the information under Account 12345, what would you see when you opened it?
A. Again, I don't have access to that. So I cannot confirm what they could see.
Q. Okay. Is that because of the privacy of personal data?
A. Exactly. To be able to access private data, meaning that identity details, personal details, birth date, ID itself, an individual in the company needs to have a specific role and they need to go through specific trainings and they need to have specific access to be able to do that. And I don't have that.
Q. So you're here today because we are in litigation and the Court and myself would love to see the actual initial registration information of certain accounts. And your counsel comes to you, who would you refer him to to look for that actual data ten years ago?
MR. MAGLIERY: Objection. Calls for privilege, it's a hypothetical.
THE COURT: Are you just asking does he know who to speak to at Amazon to get the private information?
MR. CHAN: That's what I'm saying.
THE COURT: Let's ask that question, okay?

MR. CHAN: Okay.

THE COURT: If he knows.

BY MR. CHAN:

Q. Do you know who has the authority or the privilege to provide the detailed account information when it's needed?

A. It would be -- we have escalations teams. So we would direct requests to get private data or check of personal data to escalations teams. And it could be investigation teams as well. These are the two teams that I can tell: escalations and investigation.

Q. So this needs some special clearance to get to? In other words, it takes a certain level of clearance to get to the information that I ask?

A. Yes, that's correct. There are specific roles who can access that, and they require training and they need to go through a specific training periodically. In some cases they should be located in precise locations where no one else can actually see their screens. So it wouldn't be open to everyone. That data is not open to everyone.

Q. If we asked for information of an account that's more than ten years old, do we need to talk to anybody particular to get that information? If you don't know, just tell me you don't know.

A. Clarification. Like when you say ten years, do you mean as compared to two years ago? I couldn't understand

the question in that sense.

Q. I'm saying in this particular account, Account Number 12345 that was opened ten years ago, and if there's a court order ordering you to provide the information, it's beyond your scope because you weren't even there, so how would you go about getting that?

A. I understand.

Again, the example teams that I shared, investigators or escalations teams, they would be able to look at the historical data, historical records of provided accounts. And I do not have -- just to repeat, I do not have access to that data.

Q. It can be done, correct?

MR. MAGLIERY: Objection, Your Honor.

THE COURT: Hold on a second.

What's the objection?

MR. MAGLIERY: The objection is foundation. He's asked him repeatedly whether he knows, and he's established he does not know. And the question again seeks the same information he does not know.

THE COURT: I see. I'll let him answer this question, if he can.

THE WITNESS: Sure. Can you repeat the question?

BY MR. CHAN:
Q. Based on your experience in 2017, if someone comes around, asks you for account information dated back ten years ago, the question is, based on your knowledge, can that information be found with the right -- through the right channel?
A. I don't have full knowledge to be able to say what information can be presented until what date or depth of information since I am not -- since it's not in my scope.
Q. Do you know if there is a special archive department within Amazon that manages archives?
A. I do not know of any archive department, if it exists or not.
Q. Give me five seconds.
(Pause.)
After the potential seller going through the registration process, is that account approved instantaneously or is there a delay where Amazon could do due diligence to make sure that everything checks out before they approve it?
A. It is in my wider department so I have knowledge about that. It is depending on the solution or depending on the experience they go through. You may remember that I mentioned there are automated as well as manual solutions. And this is because of the coverage of some of

the automated solutions. So if there is a fully automated solution, it could be in seconds. But if it is a manual solution, it could be in few days as well. Because manual solutions is also depending on the number of sellers to be verified, the time frame may increase if there are too many sellers that the company needs to verify.

Q. What happens if a potential seller has a domicile of, say, Europe somewhere, like France, and tried to open account and clicked country as U.S., what would happen to that person?

A. Can you elaborate more? Do you mean what happens as a registration? I couldn't understand the question.

Q. Could somebody in Europe click and say that they are in the United States? Would the system catch that or would this person be able to register regardless of the discrepancy?

A. I think -- I need to ask clarification questions. When you say they claim they're in United States, do you mean the individual or actually their business is located in United States whereas their business is not located in the United States?

Q. Okay. Let me give more detail on the example or the hypothetical. Somebody live in France, have a full address Paris, and he tries to open the account, and he clicks United States as the country of choice. Would that

person be able to open an account? Would the system catch that discrepancy?
A. We have address verification solutions. As I mentioned earlier, we look at some of the documents we collect to verify the country of the business and what they claimed earlier in the registration process. In some instances we also send postcards to those addresses so they can take the code and enter in the system.
Q. So what's the answer? Would this person be able to fool the system or no?
A. No. If they claim their country is -- sorry, if they claim their company is based in France -- sorry, let me correct this.
If they are based in France but they claim their company is based in United States, our verification solutions should catch it. I have to mention, of course, there could be false negatives, so missed chances either with automation or manual.
Q. So your internal verification process have access to worldwide data?
A. We use internal and also external databases. And those in some capacity have worldwide access. I don't have the full knowledge of the exact coverage. So it wouldn't be a hundred percent of global data, but it could have percentages of worldwide data.

Q. Okay. The reason I ask is I'm trying to understand the integrated mechanism that you use during the initial registration because the potential seller has all this information from domicile, personal data, business information, and Amazon does not have a worldwide data. So you would access some database to verify that before the potential seller gets approved?

A. So as I mentioned, during registration seller provides couple of documents. One of them is identity document and the other one is the address document. And if it is a manual process, if they go through a manual process, and the investigator actually reviews the documents, and these individuals would be trained to understand if the documents are forged or not. And they would take actions or decisions about accepting that request or rejecting that. And this is a manual process.

In addition to that, we also have automated processes as you also called out and I mentioned which connects with vendor databases which automatically check if the ID details match. At the moment I do not have exact coverage knowledge because we don't use automation for everyone.

We have both automation and manual depending on where the seller is based, what type of company they have, et cetera. But we use a variety of options throughout the process.

Q. Are you familiar with the terms of the BSA yourself since you're in charge of the registration process?
A. I would not be -- since it's a legal document and legal documents, they are not in my scope. I am not aware of the complete terms of the agreement itself.
Q. One more question. After the initial registration is approved, you have a new account, new seller. Down the line information on this account changed, whether it is business entity, personal information, credit card, bank information, it got changed. Who gets notice of these changes? Do you or someone else?
A. I do not get notice for those changes. There are different teams and my sister teams as well, some of them, they would receive some notifications for reverification of that. And there are also potentially periodical reverification solutions for existing sellers.
Q. Okay. You've been helpful in regard to what you do know and what you do not know. So I would have to get information from somebody who does know. Thank you for your time, sir.
THE COURT: Any redirect?
MR. MAGLIERY: Yes, Your Honor. Thank you. Just very briefly.
THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. MAGLIERY:

Q. Mr. Orzbatur, just a few follow-up questions.

You mentioned that there is no record of a user clicking or unclicking the check box on the Exhibit 1 experience because they can toggle that box. Do you remember that?

A. Yes, I remember mentioning that.

Q. Is there a record of a registrant for a seller account clicking the next box on Exhibit 1 if that was their experience?

A. Yes, there should be a record of seller clicking and going to the next page. There should be a time stamp.

Q. And is there a record of a registrant clicking "Agree and continue" if Exhibit 3 was the registration experience?

A. Yes. We would have a record of a seller clicking "Agree and continue" on Exhibit 3.

Q. And I believe you testified about how the link to the Business Solutions Agreement works. Can a seller -- withdrawn.

Can a registrant for a seller account proceed without clicking through and reading the Amazon Services Business Solutions Agreement?

A. Which exhibit are we talking about?

Q. Let's start with Exhibit 3, the current experience.
A. Exhibit 3, they can click "Agree and continue" without clicking the Amazon Services Business Solutions Agreement. They can only click -- sorry. They can only go to the next page after they provide business location and business type which is also followed by legal business name and they select the business type. So they would only continue after filling the required information on the page.
Q. And you previously read the words on the page. I'll refer you back. It says "By clicking on 'Agree and continue', you agree to the Amazon Services Business Solutions Agreement," correct?
A. That's correct. This is the term we've got.
Q. It's up to the seller to click through the link that's available; is that right?
A. That's correct, yes.
Q. And on Exhibit 1, the prior experience, can the seller advance through the next button if they click the check box without reading the Amazon Services Business Solutions Agreement?
A. Yes, they could continue if -- only if they check the box, but not necessarily --
Q. And the text says -- I'm sorry, I beg your pardon. Please finish.

A. But not necessarily they needed to click on the Amazon Services Business Solutions Agreement.
Q. The text there, which I think you read already, says "I have read and accepted the terms and conditions of the Amazon Services Business Solutions Agreement," correct?
A. Correct.
Q. In your discussion with the other counsel, you discussed ID verification. When did Amazon begin ID verification, if you know?
A. I don't know the start date, but I believe it's quite an old process. Definitely predates my time.
Q. Did the verification process require a positive photo ID the entire time that you're aware of?
A. I believe so. We have a list of documents which are accepted based on the country of the individual. And those documents usually have -- they need to have standard information. And I believe they have photo, but I'm not a hundred percent sure, because it's a historical process as well.
Q. Okay. Mr. Orzbatur, are you responsible for technologically securing any part of the Amazon website from hacking or manipulation?
A. I am not responsible for that.
Q. And did you -- withdrawn.
You mentioned the input of certain personal

information during registration. Is the credit card information required to be input during seller registration?

A. In United States, credit card is required. The reason I'm highlighted United States is because in some countries, some stores, it is not. One example is United Arab Emirates, they have an optional selection. But United States, it's a must provide information.

Q. And lastly, plaintiffs' counsel asked you questions about a registrant in another country. Does Amazon allow a registrant located in another country to register to sell in a different country store?

A. Yes. We do allow sellers registered in accepted countries to be eligible to sell in different stores. Just talking about previous example, a company based in France or Europe or some other parts of the world, they could register and sell in the United States.

Q. The registration process would still -- withdrawn.

Would the registration process confirm the seller's location based on the business location that's input?

A. Yes.

We would look into the business location which is available in Exhibit 3.

And in Exhibit 1, we would also collect the address of the company. So in the following pages in

registration, we would actually ask the full address of the company. So not only the country, but the street name, street number, and location.
Q. But it is permissible on Amazon to be located in one country and register to sell in a different country?
A. It is. Sellers are allowed to do that.
MR. MAGLIERY: I have no further questions. Thank you, Your Honor.
THE COURT: Mr. Chan, anything else to follow up on, sir?
MR. CHAN: Yeah. Counsel brought up the credit card issue, so I want to follow up.

RECROSS-EXAMINATION

BY MR. CHAN:
Q. You say credit card information is required first step in initial registration. What happens when a credit card expires? Does the account go dead?
A. I am not sure about that. This is, I assume, after registration or during registration?
Q. After.
A. I'm not sure about what happens after registration if credit card expires.
Q. Are you aware of a monitoring system within Amazon so that the seller's account don't get shut down because a

credit card expires?
A. I know there are systems to monitor bad debt, but I am not knowledgeable about those systems. It's not within my scope and responsibility.
Q. The personal information that I referred to earlier, the ID, the tax ID, credit card would be part of that personal data, correct?
A. I believe so. I'm not sure if it would be in the same category of the identity, because identities might be in a different category. It is also private information. That's information that I would not have access.
Q. Okay. But to the best of your knowledge, that data would be on archive, correct? In other words, you don't delete the data just because it's five years old, do you?
A. I'm not aware of -- I can't answer the question, because I'm not sure what you mean by "archive." I believe our system to have access to the data, but I cannot confirm how long it is stored specific for credit card information.
MR. CHAN: Okay. No other questions.
THE COURT: Do you have anything else, Mr. Magliery?
MR. MAGLIERY: Nothing further.
THE COURT: I thank our witness for appearing today. Sir, you're excused at this time. Have a good

day, sir.

THE WITNESS: Thank you very much. Have a good day.

THE COURT: I think we'll take a recess of approximately 15 minutes or so and then resume at that point. We'll be hearing from Mr. Pak at that point?

MR. MAGLIERY: That's correct.

THE COURT: We'll probably go until somewhere close to 1:00 p.m. or so and then take a lunch break and then resume after that before I guess we'll take a break for the eclipse at some point. Thank you all.

MR. MAGLIERY: We should be able to at least finish the direct in that amount of time.

THE COURT: Sounds good.

(Whereupon, a recess followed.)

THE COURT: Ready for our next witness.

MR. MAGLIERY: Thank you, Your Honor. We call Kevin Pak to the stand.

THE COURT: Come on up, sir.

MR. MAGLIERY: Your Honor, should I use the lectern now?

THE COURT: That would be great.

MR. MAGLIERY: Thank you.

THE COURT: Mr. Pak, remain standing and we'll put you under oath.

THE CLERK: Please raise your right hand.

KEVIN PAK,

called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please state your name and spell your last name.

THE WITNESS: Kevin Pak, P-A-K.

THE CLERK: Give us your city and state of employment.

THE WITNESS: Seattle, Washington.

THE CLERK: Thank you. You can be seated.

THE COURT: Have a seat, sir.

Sir, are you feeling well today?

THE WITNESS: I am.

THE COURT: You don't have any kind of COVID conditions or anything?

THE WITNESS: I don't.

THE COURT: Okay, great.

Please proceed.

MR. MAGLIERY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MAGLIERY:

Q. Good afternoon, Mr. Pak.

By whom are you employed?

A. By Amazon.

Q. And how long have you been employed by Amazon?

A. About nine and a half years.

Q. What is your job title?

A. Senior Content Manager on the Seller Content Team.

Q. In that capacity, what are your duties?

A. My team manages the building, translation, and publishing of content in the Amazon system primarily on Seller Central.

Q. And what is Seller Central?

A. Seller Central is the primary platform that third-party sellers use to manage their inventory, their shipments, basically their third-party selling business on Amazon.

Q. What does it mean to publish content?

A. For content within Seller Central, it means basically to make that content visible within Seller Central. Mostly we're talking about help pages and seller news articles, just to make them live within Seller Central to publish them.

Q. Are you familiar with the Amazon.com store?

A. I am, yes.
Q. What is the Amazon.com store?
A. It is the website through which consumers purchase goods from Amazon.
Q. And who sells on the Amazon.com store?
A. It's Amazon itself and third-party sellers.
Q. And has Amazon allowed third-party sellers to open selling accounts from 2014 to the present on the Amazon.com store?
A. Yes.
Q. Generally speaking, how does someone become a third-party seller on the Amazon.com store?
A. They go into Seller Central, register their selling account, their business, indicate what they want to sell, provide any requisite info on those products. And then once they provided sufficient info, those requirements depend on the actual item being sold. After that's all been cleared, they're selling on Amazon.
Q. Do you know what Amazon's Business Solutions Agreement is?
A. Yes, I do.
Q. Do your duties involve publishing changes to the BSA?
A. Yes.
Q. Has Amazon made any changes to the BSA from 2014 to the present?

A. Yes.
Q. Approximately how many different versions of the BSA have existed --
A. About 40.
Q. Let me finish the question.
-- in that time period?
A. About 40.
Q. Does Amazon keep records of prior versions of the BSA in the ordinary course of business?
A. Yes, they do.
Q. How does Amazon keep records of the BSA?
A. Within our content management systems, our CMSs, we keep records of each version that was published.
Q. And have there been more than one type of content management systems at Amazon since 2014?
A. Yes. Two different systems. The most recent one is called Ajuda. That's our proprietary system for managing content. Before that, it's a system called OAS, which is the online agreement system. And that's where it was stored prior to Ajuda.
Q. Let's take a look, please, in your book which is in front of you. If there's a convenient way to place that in front of you, please do. Let's take a look at what is tabbed as Exhibit 4, please.
A. Exhibit 4?

Q. Yes.
A. Okay.
Q. Have you seen this document before?
A. Yes.
Q. And what is it?
A. This is a screenshot of the Ajuda system. And the screenshot is of the BSA within Ajuda.
Q. Did you personally access this document to obtain it?
A. Yes, I did.
Q. And how did you go about obtaining the information in this exhibit?
A. I logged into Ajuda directly and then screenshotted that screen directly.
Q. Is this information stored in the ordinary course of business by Amazon?
A. Yes.
Q. And how does this text relate to the BSA?
A. So within Ajuda, this is the web page code. And then this gets published onto Seller Central and becomes the page. So this is just the HTML of the web page that would appear within Seller Central.
MR. MAGLIERY: We move Exhibit 4 into evidence.
THE COURT: Any objection to Exhibit 4?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibit.

(Defendants' Exhibit 4 admitted in evidence.)

BY MR. MAGLIERY:

Q. Are there -- withdrawn.

What version of the BSA is depicted in this screenshot?

A. The one that was active as of December 31, 2023.

Q. And how do you know that?

A. Within the screenshot there is the publishing date that appears at the bottom there, the revisions. Also in the last modified date, December 31, 2023.

Q. Okay. And are there other versions of the BSA that are stored in Ajuda?

A. Yes, there are.

Q. Do you know what time frame of the versions of the BSA are stored in Ajuda?

A. Everything from September 2017 to present is in Ajuda.

Q. Did you obtain and provide copies of all of the versions of the BSA that are stored in Ajuda?

A. Yes, I have. Yes.

Q. Let's take a look, please, at Exhibit 46 in your binder. Have you seen this document before?

A. Yes, I have.

Q. I'm sorry, are you there?

A. Yes, I am here.
Q. What is it, Exhibit 46?
A. This is the BSA that was live as of December 31, 2023, the text of the BSA.
Q. And how do you know the time period in which this BSA became effective?
A. It's in the file name that appears on the title page.
Q. Regrettably, it's obscured by the Court's legend date stamp. Can you read the file name in the top line?
A. Yes. The file name, BSA_2023_12_31.
Q. Did you obtain Exhibit 46 from Ajuda as you described?
A. Yes.
Q. Is Exhibit 46 the text version of the code that we just looked at in Exhibit 4?
A. That's correct, yes.
Q. And this information is stored in the ordinary course of business by Amazon, correct?
A. Yes, it is.
MR. MAGLIERY: We move Exhibit 46 into evidence.
THE COURT: Any objection to Exhibit 46?
BY MR. MAGLIERY:
Q. Could you take a look at --
THE COURT: Just a second. I didn't get an objection.

MR. CHAN: Can you repeat that?

THE COURT: They're moving Exhibit 46, that's the version of the BSA from December 31, 2023. Any objection to that BSA?

MR. CHAN: No, Your Honor.

THE COURT: Okay. Full Exhibit, 46.

MR. MAGLIERY: Thank you, Your Honor.

(Defendants' Exhibit 46 admitted in evidence.)

BY MR. MAGLIERY:

Q. Mr. Pak, working backwards in the binder, please take a look at Exhibit 45.

A. Okay.

Q. Have you seen this document before?

A. Yes, I have.

Q. And what is it?

A. This is the version of the BSA that was active as of December 28, 2023.

Q. And again, how do you know what time period this BSA version was active?

A. The time that the BSA started becoming active is in the file name.

Q. Again, I apologize, it's obscured by the court legend. Can you read the file name?

A. Sure. BSA_2023_12_28_version 2.

Q. Did you obtain Exhibit 45 from Ajuda as you described?

A. Yes, I have. Yes, I did.

Q. Is this information stored in the ordinary course of business by Amazon?

A. Yes, it is.

MR. MAGLIERY: Your Honor, if you'll permit it, I would ask Mr. Pak to review Exhibits 44 through 17 in order to not belabor the record.

THE COURT: Are you intending to do the same foundational questions?

MR. MAGLIERY: Yes.

THE COURT: These are successive versions of the BSA going back in time?

MR. MAGLIERY: That's correct.

THE COURT: You can probably just ask the witness collectively for those if he's undergone the review that you've talked about.

MR. MAGLIERY: I will. Thank you.

BY MR. MAGLIERY:

Q. Mr. Pak, take a minute, please, to look through Exhibit 44 and go backwards in the binder, please, through Exhibit 17. When you have been able to make that review, please look up at me and I will ask you some questions.

A. Okay, sure.

Okay.
Q. Thank you.
Have you been able to review Exhibits 44 through 17 going backwards?
A. Yes.
Q. What are those exhibits?
A. These are all versions of the BSA down through September 1, 2017.
Q. And how did you obtain the Exhibits 44 through 17?
A. Logging into Ajuda, downloading the HTML directly, and applying the date stamp from Ajuda as the file name in each case.
Q. For each of these exhibits, can you identify the date that the version of the BSA became effective?
A. Yes. Within file names, yes.
Q. And that's located at the top of each page?
A. Correct.
Q. Are these documents stored in the ordinary course of business by Amazon?
A. Yes, they are.
Q. Did you capture every version of the BSA that was available in Ajuda in the exercise to collect the exhibits?
A. Yes, I did.
MR. MAGLIERY: We move Exhibits 17 through 44

into evidence.

THE COURT: Were you moving 45 as well?

MR. MAGLIERY: I'm sorry if I didn't, Your Honor, yes.

THE COURT: So 17 through 45, any objection to those exhibits?

MR. CHAN: They are like 25, 30 pages. I don't know how fast witness can read through -- well, no objection.

THE COURT: Full exhibits. I think the witness has testified he produced these from the Ajuda system, if I'm pronouncing that right, so there's adequate authenticity.

(Defendants' Exhibits 17 through 45 admitted in evidence.)

THE COURT: Please proceed.

BY MR. MAGLIERY:

Q. For versions of the BSAs prior to the earliest version available in Ajuda, where are those versions stored in Amazon?

A. In a system called OAS, which stands for Online Agreement System.

Q. Do you have an understanding what OAS is?

A. Yes. It's a legal controlled CMS that stores policy-type pages.

Q. And just for clarify, what is a CMS?

A. A content management system.

MR. CHAN: Can you repeat that?

THE WITNESS: Content management system.

BY MR. MAGLIERY:

Q. Mr. Pak, please take a look in your binder at Exhibit 5.

A. Okay.

Q. Have you seen this document before?

A. Yes. This is a screenshot of OAS, the content within the screenshot is a version of the BSA.

Q. Did you personally prepare this document?

A. Yes, I did.

Q. And how did you obtain the information in this document?

A. I logged into OAS directly and then screenshotted from within the system.

Q. Is the information depicted here stored in the ordinary course of business by Amazon?

A. Yes.

Q. When Amazon wants to make a document or a record of the data in OAS, how does it go about doing that?

A. By copy-pasting from the preview here which can be seen at the bottom of the screenshot.

Q. Is that a different process than you used to produce

the BSAs from Ajuda?
A. Yes. Ajuda allows you to download the code directly as a way to obtain the content. Here, there's not really a way to download it, per se, so it's a copy-paste.
Q. The BSA is depicted in one of the frames or boxes in the OAS system?
A. Correct.
MR. MAGLIERY: We move Exhibit 5 into evidence.
THE COURT: Any objection to Exhibit 5?
MR. CHAN: It took me a while to get to the page, Your Honor. Give me ten seconds.
THE COURT: Okay.
MR. CHAN: No objection, Your Honor.
THE COURT: Full exhibit.
(Defendants' Exhibit 5 admitted in evidence.)
BY MR. MAGLIERY:
Q. Mr. Pak, what time frame of prior versions of the BSA are stored in OAS that are not included in Ajuda?
A. Between -- so prior to September 2017 down to 2014.
Q. Did you obtain and provide copies of all of the versions of the BSA that are available and stored in OAS?
A. Yes, I did.
Q. Did you assemble those documents for submission at this hearing?

A. Yes, I did.
Q. Let's take a look at Exhibit 16, please. Let me know when you're there.
A. Okay, yes.
Q. Have you seen this document before?
A. Yes, I have.
Q. What is it?
A. This is the version of the BSA that was live on May 22, 2017.
Q. How do you know what time period this version of the BSA was in affect?
A. It's in the file name which is in the page just prior to the BSA text.
Q. Okay. Unlike the Ajuda versions, the file name is not printed at the top of the page. Can you explain the difference?
A. The Ajuda versions for HTML downloaded directly from the system. So when you print HTML, the file name appears at the top. But this here is a copy-paste into a Word doc. By default, the file name doesn't appear within the printout.
Q. So how did you make a record of the date that the BSA versions in OAS became effective?
A. I added a title page to each version of the doc which includes the file name for the record.

Q. And is the second page of the exhibit something that you supplied along with the version of the BSA?
A. Yes, correct.
Q. Is it a true and accurate record of the dates depicted in OAS of the versions of the BSA?
A. Yes.
MR. MAGLIERY: We move Exhibit 16 into evidence.
THE COURT: Any objection to 16?
MR. CHAN: No objection, Your Honor.
THE COURT: Full exhibit.
MR. MAGLIERY: Thank you, Your Honor.
(Defendants' Exhibit 16 admitted in evidence.)
MR. MAGLIERY: If you don't mind, Your Honor, I'll ask the witness to look at Exhibits 7 through 15 in the same process as before.
THE COURT: Certainly.
BY MR. MAGLIERY:
Q. Mr. Pak, please take a look through Exhibits 7 through 15 and familiarize yourself with them and then I'll ask you some questions.
A. Sure.
Q. Have you had a chance to view Exhibits 7 through 15?
A. Yes, I have.
Q. Can you identify these documents?

A. These are versions of the BSA pulled from OAS from 2014 to the versions prior to September 2017.
Q. Okay. Just for clarify on the record, what is the earliest date of the BSA available in OAS?
A. "Earliest," as in most recent?
Q. I beg your pardon. The earliest in time. The least recent.
A. Okay. The oldest will be April 7, 2014.
Q. Okay. And you already testified about Exhibit 16, but could you just identify the date of that version of the BSA?
A. For Exhibit 17?
Q. 16.
A. 16, okay.
16, the date is May 22, 2017.
Q. And are the exhibits you've collected here, Exhibit 7 through 16, all of the BSA versions that were available in OAS?
A. That's correct, yes.
Q. Are those documents stored in the ordinary course of business by Amazon?
A. Yes, they are.
Q. And you're able to personally access them, right?
A. Correct, yes.
MR. MAGLIERY: We move Exhibits 7 through 15

into evidence.

THE COURT: Okay. I got mixed up on my numbers, I'm sorry. You've got Exhibit 7 or is it 6?

MR. MAGLIERY: It was 7 through 15. 16 we did as a freestanding exhibit. And then we've just reviewed Exhibits 7 through 15 now.

THE COURT: Great. Okay.

Any objection to 7 through 15?

MR. CHAN: No, Your Honor.

THE COURT: Okay. Full exhibits.

MR. MAGLIERY: Thank you.

(Defendants' Exhibits 7 through 15 admitted in evidence.)

BY MR. MAGLIERY:

Q. Mr. Pak, for versions of the BSA stored -- withdrawn.

For versions of the BSA that exist prior to the earliest version available in OAS, where are those versions stored in Amazon systems?

A. They are stored in a content system owned by legal called iManage, which I do not have direct access to.

Q. Were you able to identify and locate a version of a BSA prior to April 2014?

A. Yes.

Q. Was it in iManage?

A. Yes.

Q. How did you come to possess a version of the BSA before this version stored in OAS?
A. So a member of the legal team did a screen share with me. I watched as she pulled from her system the BSA, and then she emailed it directly to me also on screen share so that I knew I got the same file that she downloaded.
Q. Take a look, please, at Exhibit 6 in your book. Do you recognize this document?
A. Yes, I do.
Q. And what is it?
A. This is the version of the BSA that the member of the legal counsel emailed to me.
Q. Was it legal counsel or someone on the legal team?
A. Sorry, someone on the legal team.
Q. And this document has redlines in it, colored text and the other documents do not. Do you have any understanding as to why?
A. So my understanding from that legal POC is back then they would provide a doc like this to the technical writer or the content manager at that time. And they would use the redlines to update what was on the site. So the redlines are for the benefit of whoever is building it within the web page. And then when it's published, it wouldn't have redlines.
Q. And what is your understanding of the date of this

version of the BSA?
A. This would be the version that was live as of February 11, 2013.
Q. And how did you form that understanding?
A. It was in the -- it was the date that I saw in the screen share and also the date that was conveyed to me by the member of the legal team when they provided the file to me.
Q. There's -- withdrawn.
Is there any official repository of BSA versions for more than ten years ago?
Let me withdraw it and ask it again. Is there any content management system that Amazon views as the sole version of live BSAs from more than ten years ago?
A. Not to my knowledge.
Q. There's no equivalent to OAS or Ajuda for more than ten years ago?
A. Yes, not to my knowledge. Of the systems I'm aware, I don't know of a system that would be.
Q. Is iManage the place where agreements of more than ten years ago are located?
A. Yes. Correct.
MR. MAGLIERY: We move Exhibit 6 into evidence.
THE COURT: Any objection?
MR. CHAN: No, Your Honor.

THE COURT: Full exhibit.

(Defendants' Exhibit 6 admitted in evidence.)

BY MR. MAGLIERY:

Q. Are you familiar with Amazon's Seller Central website?

A. Yes, I am.

Q. In the U.S., what is the URL of that website?

A. Sellercentral.amazon.com.

Q. What is the first thing that registered sellers see when they log into Seller Central?

A. They would land on the Seller Central home page which has news articles, forum posts like highlights of the most recent ones, and other metrics around their selling account, little cards to show a brief overview of how things overall are for their account.

Q. Thank you. Let's turn in your binder to Exhibit 48.

Are you there, sir?

A. Yes.

Q. I'm asking you to look at what has been marked as Exhibit 48. Do you recognize this document?

MR. CHAN: Can you repeat what exhibit? You're so tall, the mic is so far away.

MR. MAGLIERY: Let's see if that's any better.

THE WITNESS: Yes, I recognize the exhibit.

BY MR. MAGLIERY:
Q. And what is it?
A. It is a screenshot of the landing page of Seller Central for a logged-in seller.
Q. Did you make this document?
A. Yes, I did.
Q. Was this made as of a certain time?
A. Yes. As of -- sorry, I believe it was March 30th or 29th, right around that time period.
Q. Does this accurately show a screenshot of a view a seller would see when logging into Seller Central on that date?
A. Yes.
Q. Did you make this document?
A. Yes, I did.
Q. And how did you do that?
A. I logged into Seller Cental and took a screenshot of the home page.
Q. Is this an internal view of Seller Central or something that sellers would also see?
A. It's the same thing a seller would see.
MR. MAGLIERY: We move Exhibit 48 into evidence.
THE COURT: Any objection? 48, any objection?
MR. CHAN: Yeah. Objection based on the authentic -- the document need to be authenticated.

THE COURT: So the witness has just done that. He said that he produced this document himself. So it has been authenticated. Any other objection?

You're, of course, welcome to challenge him and his testimony. He has furnished the requisite information for the document to be admitted into evidence. You're welcome to challenge his credibility when you cross-examine him if you believe he's lying.

MR. CHAN: He said he printed it?

THE COURT: He's done that.

Sir, did you create this actual document that's Exhibit 48?

THE WITNESS: Yes, I did. I took the screenshot.

THE COURT: Personally did it yourself?

THE WITNESS: Yes.

THE COURT: On the basis of Amazon records?

THE WITNESS: Correct.

THE COURT: That's what's called authentication. The witness has said he generated the business document. So I'm overruling the authentication objection.

Any other objection?

MR. CHAN: No, I'll just cross-exam.

THE COURT: Full exhibit.

MR. MAGLIERY: Thank you, Your Honor.

(Defendants' Exhibit 48 admitted in evidence.)

BY MR. MAGLIERY:

Q. Mr. Pak, can a seller access the BSA from Seller Central?

A. Yes, they can.

Q. And how can they do that?

A. The most direct way would be to do a search in the blue search box at the top of the page, and then within the results they can click on the BSA. Other ways would be through news articles if there's a link to the BSA through other help pages which may also have links. Through responses from seller support on questions, they may provide a link. There's a number of ways to reach the BSA.

Q. Okay. Let's take a look, please, at Exhibit 62 in your book.

A. Okay.

Q. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. So this is a screenshot of what would happen if you were to search for the BSA in the top search box. It would -- a search result would appear on the right, and you could click on the BSA from within the results.

Q. Did you make this document, sir?
A. Yes, I did.
Q. And does it accurately show a screenshot of a view that a seller would see if they inputted the search into the search box?
A. Yes, it does.
Q. Does the search bar show results that appeared the day you performed the search in Seller Central?
A. Yes, it does.
MR. MAGLIERY: We move Exhibit 62 into evidence.
THE COURT: Any objection?
MR. CHAN: No, Your Honor.
THE COURT: Okay. Full exhibit.
(Defendants' Exhibit 62 admitted in evidence.)
BY MR. MAGLIERY:
Q. Mr. Pak, what's the first results under the -- well, let me withdraw it and ask: Can you read into the record, please, what is the search you inputted into the search box?
A. The search is "amazon services business solutions agreement."
Q. And what is the first result under your search?
A. "Changes to the Amazon Services Business Solutions," and then it's truncated but it would say Agreement, I

would assume, there.
Q. You already mentioned other ways that a person could obtain the BSA. What is the result of those methods to navigate to the BSA?
A. Wherever they get the link to the BSA, clicking the link will take them to the BSA page.
Q. And could you read the second result under the search bar that you made in Exhibit 62?
A. It says "Amazon Services" --
MR. CHAN: What's exhibit again, Counsel?
MR. MAGLIERY: I'm sorry?
MR. CHAN: Which one are you referring?
MR. MAGLIERY: I'm still on Exhibit 62. And I've asked him what the second search result is.
BY MR. MAGLIERY:
Q. Please go ahead, Mr. Pak.
A. It says "Amazon Services Business Solutions Agreement."
Q. And does the blue text on that search indicate anything to you?
A. Yes. It indicates that it's a hyperlink they can click on.
Q. And what would happen if a seller clicked on that link?
A. They would be taken to the BSA.

Q. Could you turn in your book to Exhibit 74.
A. Okay.
Q. And do you recognize this document?
A. Yes, I do.
Q. What is it?
A. So this is the web page version of the BSA, what would appear on -- if you were to go to the web page.
Q. Did you make this document?
A. Yes, I did.
Q. Do you recognize the URL at the top right corner of the document?
A. Yes, I do.
Q. Is that -- withdrawn.
What is that?
A. The URL at the top of the document is the URL that this page exists on.
Q. And is that URL familiar to you?
A. Yes, it is.
Q. Is that the place where the BSA is stored on Amazon's server?
A. Yes.
Q. Is this a version of the BSA that is currently -- withdrawn.
Is this a version of the BSA that as of the date you made the document was live and available to sellers?

A. Correct, yes.
Q. Did you create this document?
A. Yes, I did.
Q. And how did you do that?
A. I went to the web page via the URL shown at the top of the page. Then I printed this page into a PDF doc.

MR. MAGLIERY: We move Exhibit 74 into evidence.

THE COURT: Any objection?

MR. CHAN: I have trouble catching the content of Counsel because his mic is so far away.

THE COURT: Okay.

MR. CHAN: I would really appreciate if you can just lean down tiny bit so I can catch.

THE COURT: If you can maybe get the microphone closer to you.

But the witness has just testified --

MR. CHAN: It's not his fault. He's a tall person.

Can you repeat that, Counsel?

THE COURT: Sir, we've had Exhibit 74 shown to the witness. Do you see Exhibit 74?

MR. CHAN: No, I was still on the last exhibit. I couldn't hear instructions. Okay, I'm on 74 now.

THE COURT: So Exhibit 74 is a copy of the Amazon Services Business Solutions Agreement that the

witness has testified that he produced by clicking on the link that was available in Exhibit 62, the last exhibit. And now it's been offered into evidence. Do you have an objection?

MR. CHAN: I thought 74 was already admitted.

THE COURT: Do you have an objection, sir, to 74?

MR. CHAN: No.

THE COURT: Full exhibit.

MR. MAGLIERY: Thank you, Your Honor.

(Defendants' Exhibit 74 admitted in evidence.)

BY MR. MAGLIERY:

Q. Mr. Pak, let me take you into a different area. Could you please go in your book to Exhibit 48.

A. Okay.

Q. Exhibit 48 is the Seller Central home page that you've already testified about.

Do you see the section that's got the heading "News"?

A. Yes, I do.

Q. What is the News section?

A. The News section is a section of the home page that highlights the latest seller relevant news being put up by Amazon.

Q. And could you read for the Court what the first news

item is on Exhibit 48?
A. Sure. It says "Policy update for automotive and marine emissions tuners."
Q. Are policy updates listed by Amazon in the News section of Seller Central?
A. Yes.
Q. Let's take a look at Exhibit 49, please. Do you recognize this document -- I'm sorry, please take your time. Do you have 49?
A. Yes.
Q. Okay. Do you recognize this document?
A. Yes. This is a screenshot of the full view of a specific news article.
Q. Did you make this document?
A. Yes, I did.
Q. And how did you do that?
A. I went into Seller Central, clicked on this news article to expand it to the full view, and then took a screenshot of that screen.
Q. Does this accurately show a screenshot of a view that a seller would see of a news item?
A. That's correct, yes.
Q. Is this stored in the ordinary course of business by Amazon?
A. Yes.

MR. MAGLIERY: We move Exhibit 49 into evidence.
THE COURT: Any objection to 49?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibit.
(Defendants' Exhibit 49 admitted in evidence.)
BY MR. MAGLIERY:
Q. Mr. Pak, could you read for the Court the last two lines of this news update?
A. Yes. It says, "We have also updated the Amazon Services Business Solutions Agreement for consistency with the new law. To learn more, go to Changes to the Amazon Business Solutions Business Agreement."
Q. Does Amazon post changes to the Business Solutions Agreement to Seller Central?
A. Yes, they do.
Q. What does it mean to you that Amazon Services Business Solutions Agreement is in blue?
A. That indicates that this is a hyperlink that can be clicked on to go to that page.
Q. What about the blue text --
MR. CHAN: Excuse me. What exhibit are you on, still 49?
MR. MAGLIERY: 49, yes.

BY MR. MAGLIERY:
Q. What about changes to the Amazon Services Business Solutions Agreement, what does it mean to you that that's in blue?
A. That's also a hyperlink that goes to that page which is separate from the BSA page.
Q. Please turn to Exhibit 50 in your book.
Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This is a screenshot of the changes to the Amazon Services Business Solutions page.
Q. Did you make this document?
A. Yes, I did.
Q. How did you obtain this document?
A. I went to the URL for the page and took a screenshot of the page once I was in.
Q. Is this document stored in the ordinary course of business by Amazon?
A. Yes.
Q. Is this an example of something that would be available for a seller to view in Seller Central?
A. That's correct, yes.
Q. Take a look, please, at what I will call the page hierarchy, the series of clicks that a user could make to

get to this page. Is that familiar to you?
A. Yes, it is.
Q. Could you read what the page hierarchy is?
A. It goes from "Seller Central help" to "Policies, agreements and guidelines," then to "Changes to the Amazon Services Business Solutions Agreement."
Q. Is this the page that a user would land on if they clicked the highlighted link in a news article such as Exhibit 49?
A. Yes. The one that says "Changes to the Amazon Business Solutions Agreement," it would go to this page.
MR. MAGLIERY: We move 50 into evidence.
THE COURT: Any objection to 50, Exhibit 50?
MR. CHAN: No, Your Honor.
THE COURT: Okay. Full exhibit.
(Defendants' Exhibit 50 admitted in evidence.)
BY MR. MAGLIERY:
Q. Does Amazon maintain copies of the changes to the BSA it's made and posted to Seller Central?
A. Yes, it does.
Q. Let's take a look, please, at Exhibit 51.
Do you recognize this document?
A. Yes, I do.
Q. And what is it?

A. It is a version of the text on the Amazon Services Business Solutions Agreement.
Q. How did you obtain this document?
A. I went into Ajuda and pulled the HTML directly.
Q. Is the text that's shown here what would be published to the seller available website that we looked at in Exhibit 50?
A. That's correct.
Q. And how do you know what time period the changes to the BSA page was live?
A. It would be in the file name.
Q. Once again, I apologize, it is obscured. Can you read the file name on Exhibit 51?
A. On this particular one, I don't see the file name.
Q. Are you on Exhibit 51?
A. Yes, 51.
Q. It unfortunately is obscured behind the blue text that the Court system imposed on filed documents. Are you able to make it out? If not, I am going to try to obtain a copy without the blue text.
A. It looks to me like -- I think I can read it, but I don't see the file name.
Q. I see.
MR. MAGLIERY: Your Honor, may I take a moment?
THE COURT: Of course.

MR. MAGLIERY: Thank you very much.

(Pause.)

MR. MAGLIERY: Your Honor, unfortunately, this is unexpected because the --

THE COURT: I can just tell you, I have an electronic copy. Obviously you filed all this electronically some days ago. I can see what it says under the blue.

MR. MAGLIERY: Thank you, Your Honor.

THE COURT: It states "Changes to BSA_2020_01_06.html."

MR. MAGLIERY: Thank you, Your Honor.

If the witness can just authenticate the documents, you'll have the copy that's legible. Is that acceptable to the Court?

THE COURT: Yes.

MR. CHAN: Your Honor, the content of the document is over four years old. So how does he authenticate that this is exactly what appear on the -- when he published it? Do we need -- in terms of timing and the time frame.

THE COURT: The timing in terms of the reference to January 21, 2020?

MR. CHAN: Yeah. If this was published that he claim, how does he prove that indeed four years ago this

was published?

THE COURT: If you want to clarify that with the witness, that would be great.

MR. MAGLIERY: Thank you, Your Honor.

BY MR. MAGLIERY:

Q. I believe, Mr. Pak, you obtained these from Ajuda?

A. That's correct.

Q. When you navigated to this record in Ajuda, does it indicate to you anything about the date that this document was available on Seller Central?

A. Yes. I can see the date when it was published within Ajuda.

Q. Is there a field in Ajuda that indicates to a user when the document was available on Seller Central?

A. Yes.

Q. And is that a field that you reviewed?

A. Yes.

Q. Is it a field, the date field maintained in the ordinary course of business by Amazon?

A. Yes, it is.

Q. And did you seek to obtain the changes in the BSA for different time periods?

A. Yes, I did.

Q. Is Exhibit 51 one such exhibit?

A. Yes. Yes. I believe this is one of those.

MR. MAGLIERY: I think that's the proffer, Your Honor.

THE COURT: So you're offering 51?

MR. MAGLIERY: Yes.

THE COURT: Any objection to 51?

MR. CHAN: No, Your Honor.

THE COURT: Full exhibit.

(Defendants' Exhibit 51 admitted in evidence.)

BY MR. MAGLIERY:

Q. Mr. Pak, let's take a look, please, at Exhibit 52.

MR. MAGLIERY: Your Honor, if you will allow us again, I'll have him review 52 through 61 and ask him to authenticate how he prepared all of these documents.

THE COURT: I understand.

MR. MAGLIERY: Thank you.

BY MR. MAGLIERY:

Q. Mr. Pak, please take a look at Exhibits 52 through 61 and familiarize yourself with them.

A. Sure.

Q. Have you had a chance to review Exhibits 52 through 61?

A. Yes, I have.

Q. Do you recognize all of those documents?

A. These are all the various versions of the changes to

the Amazon Services Business Solutions Agreement page.
Q. When you say all of them, all of them that were available how?
A. All of them that were available in Ajuda.
Q. Thank you.
How did you obtain these documents?
A. I logged into Ajuda, downloaded each of these as HTML. Yes, that's how I obtained them.
Q. Is this the system that allows you to turn the code into a record that can be printed?
A. That's correct, yes.
Q. And did you personally make all of these documents from Ajuda?
A. Yes, I did.
Q. Are these changes to the Amazon BSA pages stored in the ordinary course of business by Amazon?
A. Yes, they are.
Q. Do each of the records in Ajuda indicate the dates that these pages were published?
A. Yes.
MR. MAGLIERY: We move Exhibits 52 through 61 into evidence.
THE COURT: Any objection to 51 through 62?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibits.

MR. MAGLIERY: Your Honor, forgive me. I'm sorry, I just muddied the record. It's 51 through 61. 62 we've already looked at. I'm sorry.

THE COURT: Yes, correct. 51 through 61, full exhibits.

MR. MAGLIERY: Thank you.

(Defendants' Exhibits 52 through 61 admitted in evidence.)

BY MR. MAGLIERY:

Q. Mr. Pak, are you aware of any other policies that apply to sellers on Amazon?

A. Yes, I am.

Q. What are the other policies that apply to sellers?

A. There is a seller code of conduct.

Q. How can sellers access the code of conduct?

A. Similar to the BSA, it can be searched upon in Seller Central or a link can be provided through seller news, help pages, support responses, et cetera.

Q. Thank you. Could you take a look in your book at what's been marked as Exhibit 66.

Are you familiar with this document?

A. Yes.

Q. What is it?

A. This is a copy of the selling policies and seller code of conduct page.

Q. How did you obtain this document?
A. By going to the page and then printing out the page.
Q. Is the URL where the page is located listed at the top of the page?
A. Yes.
Q. Does this accurately reflect a screenshot of a view a seller would see when looking at Seller Central's seller code of conduct as of the date you made the exhibit?
A. Yes.
Q. And is this document maintained in the ordinary course of business by Amazon?
A. Yes, it is.
MR. MAGLIERY: We move Exhibit 66 into evidence.
THE COURT: Any objection to 66?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibit.
(Defendants' Exhibit 66 admitted in evidence.)
BY MR. MAGLIERY:
Q. Please take a look at Exhibit 67. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This is a copy of the text on the seller code of conduct page pulled from Ajuda.

Q. Did you personally make this document?
A. Yes, I did.
Q. How did you do that?
A. I went into the Ajuda system and downloaded the code.
Q. Does Amazon keep records in the ordinary course of business in Ajuda of the versions of the seller code of conduct that are available on the live Seller Central website?
A. Yes, it does.
MR. MAGLIERY: We move Exhibit 67 into evidence.
THE COURT: Any objection?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibit.
(Defendants' Exhibit 67 admitted in evidence.)
BY MR. MAGLIERY:
Q. Do you know what time period the seller code of conduct was in affect?
A. I believe this one was between 2022 and 2024, if I recall correctly. I'm looking for the file name. Unfortunately, I don't see it. But I believe those were the dates.
Q. Does the -- let's take a look. Just to zero in on one of them, let's take a look at the live version, Exhibit 66. Take a look at the section called "Acting

fairly." Do you see that?
A. Yes, I do.
Q. Could you read the text before the bullet points under "Acting fairly"? Can you read it?
A. I can. "You must act fairly and lawfully and may not misuse any service provided by Amazon. Examples of unfair activities include" --
Q. And let me direct you to the last bullet point. Could you read that.
A. "Allowing other people to act on your behalf in a way that violates Amazon's policies or your agreement with Amazon."
Q. And is this, just to clarify, the version publicly available to sellers today?
A. That is correct, yes.
Q. Are there any other places where sellers can get information about how they are to interact with Amazon?
A. There are a set of FAQs also related to this page --
Q. Okay.
A. -- around specific topics.
Q. Could you turn in your book to what's been marked as Exhibit 63, please.
A. Okay.
Q. Are you familiar with this document?
A. Yes, I am.

Q. What is it?
A. This is a screenshot of the page for the FAQ titled "Can I transfer my seller account?"
Q. Did you make this document?
A. Yes, I did.
Q. And how did you do it?
A. Went to the web page and took a screenshot of it.
Q. Does this accurately show a screenshot of a view a seller would see when looking at the "Can I transfer my seller account?" FAQ in Seller Central?
A. That is correct.
MR. MAGLIERY: We move Exhibit 63 into evidence.
THE COURT: Any objection?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibit.
(Defendants' Exhibit 63 admitted in evidence.)
BY MR. MAGLIERY:
Q. Mr. Pak, could you read the first line of the answer "Can I transfer my seller account?"
A. "Seller accounts generally are not transferable."
Q. And then skip two lines down. So the fourth sentence, could you read the fourth sentence for the Court?
A. "Every seller on Amazon must have a seller account

and an agreement with Amazon that establishes the terms under which the seller lists and sells their products."
Q. And then read the next paragraph, the line that's by itself?
A. "If the ownership of a business changes for any reason, the new owner must establish a new seller account."
Q. And your responsibilities include ensuring that this page is published to the Seller Central website, right?
A. That's correct.
Q. And this is currently available to any seller on Seller Central?
A. That's correct.
Q. Let's take a look, please, at Exhibit 65 -- actually, I beg your pardon. I'm sorry. Let's take a look at Exhibit -- yes, Exhibit 65. I was right the first time. Sorry about that.
A. Okay.
Q. 65, do you recognize this document?
A. Yes.
Q. And what is it?
A. This is a pull directly from Ajuda of the content that exists in the FAQ page that we just referenced.
Q. And did you obtain this document from Ajuda?
A. Yes, I did.

Q. Is this a record that's kept in the ordinary course of business by Amazon?
A. Yes, it is.
Q. Did you make this document as you've described how you made other documents from the Ajuda system?
A. That's correct.
MR. MAGLIERY: We move Exhibit 65 into evidence.
THE COURT: Any objection to 65?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibit.
(Defendants' Exhibit 65 admitted in evidence.)
BY MR. MAGLIERY:
Q. Let's take a look at Exhibit 64. Did you -- before I ask you about the document, did you locate any other versions of the "Can I transfer my account?" FAQ?
A. If I recall correctly, there were two versions of that FAQ with very, very minor wording differences.
Q. Okay. Let's take a look at 64, then, please.
Do you recognize this document?
A. Yes.
Q. What is it?
A. This is a pull from Ajuda of an older version of that FAQ.
Q. And how did you make this document?

A. By going into Ajuda and downloading the code.
Q. Is this a document that's stored in the ordinary course of business by Amazon?
A. Yes, it is.
Q. And you personally accessed this?
A. Yes, I did.
MR. MAGLIERY: We move Exhibit 64 into evidence.
THE COURT: Any objection to 64?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibit.
(Defendants' Exhibit 64 admitted in evidence.)
BY MR. MAGLIERY:
Q. Mr. Pak, if you could put Exhibits 65 and 64, if you fold the page next to each other and read the second paragraph, the line that's a paragraph sort of on its own, could you compare the two and let me know if there's any differences?
A. There is a difference.
Q. Okay. What does it say in Exhibit 65?
A. 65, it says if the owner of a business changes for any reason, the new owner must establish a new seller account.
Q. That's the current version, correct?
A. Yes.

Q. 64?
A. If the owner of a business changes for any reason, the new owner needs to establish a new seller account.
Q. The only difference is the "must" or "needs to"?
A. That's correct.
Q. Do you know when the earliest record that you viewed of this FAQ being on Seller Central?
A. Yes.
Q. When is that?
A. I believe it's 2021, if I recall the year correctly. Again, it's in the file name. I just don't see it here. I think it was 2021, if I recall right.
MR. MAGLIERY: Thank you, Your Honor. I have no further questions.
THE COURT: What we'll do is we'll take a half hour lunch break at this time and then we'll resume with cross-examination of Mr. Pak. We'll probably go until about 3:00 p.m., take an eclipse break at that point for about half an hour, and then resume probably as late -- I don't know of the timing. I was thinking probably another hour-and-a-half segment at that point in time which would wrap us up around 5:00 p.m. Does that sound okay with everybody?
MR. MAGLIERY: That should be great. Thank you, Your Honor.

THE COURT: We'll see you in half an hour, folks. We'll see you at 1:30 back here to resume.

(Whereupon, a recess followed.)

THE COURT: Please be seated.

Do we have Mr. Pak still here? Come on up, sir.

All right. Mr. Chan, if you'd like to proceed with cross-examination. Come on up to the lectern.

MR. CHAN: Can I do it here?

THE COURT: It's probably better to come up to the lectern.

MR. CHAN: I have to bring the whole book.

THE COURT: You can probably carry it. Do you need help carrying it up?

MR. CHAN: No, I'm okay.

CROSS-EXAMINATION

BY MR. CHAN:

Q. Mr. Pak or Pak?

A. Pak.

Q. Thank you for your time this afternoon. I just have some questions to clarify.

You used the word "publish" on the new BSA. What exactly do you mean using the word "publish"?

A. Sure. So any changes to the BSA we have to code up in our system first and then publish it out. So in this

case, publish would mean make appear within Seller Central.
Q. So basically make it available online --
A. Correct.
Q. -- in layman's term?
A. Yes.
Q. In a lot of the exhibits I almost got confused. There was one -- let me find it. I believe it's Exhibit 62. Do you have that, 62?
I'm looking at basically what the computer would see online. On the left-hand side it says Amazon.com home. And then there's an overlap on the right which you typed in "amazon services business solutions agreement." And it shows up on the content. So basically you don't see this on the home page, you have to type those exact words in the search to find it, correct?
A. You have to type into the search box, yes, to summon a search results page. Yes.
Q. Right, right. But the fact you overlap it on top of the home page, I almost thought that when you signed on home page it shows that. But it doesn't, correct?
A. Yes. Without typing in a search, that search results pane will not come up.
Q. Okay. For me, like a layman, if you don't put it in two separate pages, I almost thought that when you open up

the home page, this popped up. But it didn't. I just wanted to clarify.

Likewise, Exhibit 63, I saw on the top there it says select sellercentral.amazon.com, then help/hub/reference and then a G with a whole bunch of numbers. So there's one, two, three, four. As a layman, it looks like four layers of hypertext before I can see this page, correct? So when you go on Seller Central, I don't know what hub means. But the fact there's a help/hub/reference and then slash G 2005, something, what exactly does it mean? What do I got to do to get to this page for a layman like me?

A. So the URL itself doesn't indicate any sort of hierarchy. All help pages will start with help/hub/reference. All help pages have that before the end ID.

To get to this page, it would be through either the search box at the top or a link found in other help pages or news articles, et cetera.

Q. I was under the impression when you sign on Seller Central, that would be default home page, sellercentral.com or something.

How many steps do I have to do to get to this page? That's my question. I'm not technical person.

A. Most directly would be to search on the search box and then click on the result within the result panel.

Q. So you have to push help? What word do you search to find this particular page?
A. You don't have to click on help. The search box is on the home page as well. Every page has a search box at the top. In that search box, you could type in whichever query. In this case, I would assume like "transfer seller account" would bring this up as a result.
Q. So you have to type the exact word "can I transfer my seller account" to find this page?
A. No.
Q. If I put "seller account," would this pop up?
A. If you typed in just "seller account"?
Q. Yeah.
A. I'm not sure. I'd have to try.
Q. Not sure, okay.
In the same line, so to see the agreement that we've been referring to, the BSA, do you have to type all five words "amazon services business solutions agreement" before it show up or just do "BSA"?
A. You don't have to type all five words. But I'm not sure of all the permutations and how the results would appear. So if you just typed "solutions agreement" or just "BSA," I'm not sure where in the results it would appear.
Q. Okay. You're the guy in charge of all the website

information and you're not even sure how to find these?

MR. MAGLIERY: Objection, misstates testimony.

MR. CHAN: No, he just admitted he doesn't know.

THE COURT: It's fine. You can ask the question.

MR. CHAN: Okay.

BY MR. CHAN:

Q. As a IT tech, you just told me you don't know how to find this. You think a seller can easily find this information as a regular seller?

A. So I believe a lot of different search queries would result in the result being popped up. I don't know the exact results of every query. Like if you were to say what would appear if you searched X, Y, or Z, I don't know off the top of my head what would appear. But to that end, I think a lot of different queries would result in the BSA appearing as a search result.

Q. Okay. So, so far I learned there are three ways. One is a word search. One is clicking the news. One is clicking the help and then do a search again to find this document. Am I correct?

A. So the search can be at any time. You don't have to click into help to do a search. The search bar appears on every page, so you can search whenever you want.

Q. Can you move your mic closer? I'm still having

trouble.
A. You can search whenever you want. You don't have to click into help to search. The search bar is always present at the top.
You mentioned searching, which is yes. Clicking within a news article, yes. Clicking within other help pages is another way. Emails from seller support are another way.
Just to clarify, you don't have to click into help to search again or -- yeah.
Q. Okay. Prior to the more recent posting of specific changes of the agreement, back in the old days the seller would have to click the actual agreement to see the details, correct?
A. So just to make sure I understand the question, prior to the posting in the news of a change, the seller would have to click into the agreement; is that what you're asking?
Q. Yes.
A. Okay. Outside of the news, there's also the Changes to Business Solutions Agreements page which also shows the changes and links to the BSA. Yes, either that page or the BSA itself could be clicked or accessed to see changes.
Q. Okay. Is the BSA in like a scroll-down within a box

format like most of the websites? I think the registration one, there's like a little box and you scroll down. Is that the same in this case?
A. Yes. The BSA is kind of a longish page that you can scroll down to read, that's correct.
Q. It looks like this is a notice to sellers by publicating something available. That's the system, correct?
MR. MAGLIERY: Objection. The question is too vague. Are you referring to an exhibit?
BY MR. CHAN:
Q. Your method of notifying changes is publishing, putting notice on the website so the seller would have a chance to see the information; is that a correct statement?
A. It's really up to legal counsel. But, yes, that is an often employed way to publish something on the site as a means of notification. Sometimes they deem it necessary to send an email if it's -- whatever legal counsel determines is appropriate.
Q. Are you knowledgeable enough to tell me how many third-party sellers are still on Amazon right now?
A. Within the U.S.?
Q. Within the U.S., that's correct.
A. I hear this number every year. The latest number

I've heard is around 800,000.
Q. 800,000, okay.
It's a very nice system, but we live in the real world. We have different kinds of people as sellers, diligent detail oriented, lazy people, and somewhere in between. Did you bring any data today to show who actually -- how many people, what percentage actually click news, help, or word search to get to the agreement? Do you have that data?
A. I did not bring that data, no.
Q. From last hearing, myself and the Judge want to show proof of people seeing the agreement and consenting. That was seven months ago. You were not instructed to bring any data to prove that this system is working; is that what you're telling me?
MR. MAGLIERY: Objection. Calls for privilege. He just said "you were not instructed to."
BY MR. CHAN:
Q. You did not bring any data? I change that.
THE COURT: Okay.
THE WITNESS: Correct, I did not bring data around clicks or traffic or anything like that.
BY MR. CHAN:
Q. Okay. Same token, you did a BSA modification so many times. You're real familiar with the BSA, the terms,

correct?
A. I'm sorry, can you restate?
Q. Okay. Because your involvement in modifying so many versions of the BSA, you should know the terms fairly well just from practice modifying it, correct?
A. No, I don't think -- like the BSA is quite long, and the changes I make are to specific parts. So I don't know the overall word-by-word very closely, no.
Q. Are you familiar with this term says if you continue to do business Amazon, that means you agree; if you don't agree, terminate the account. Something like that. Not the exact word. Are you familiar with that sentence?
A. It sounds kind of like sentences I may have -- like that sentence that you described right there, I don't recall an instance where it says we will terminate your account or something like that.
Q. No, no, no. Let me repeat. It says by continuing to do business with Amazon, you have agreed to the terms of this agreement; if you do not agree, then you can terminate doing business with Amazon. To that affect. I don't have the exact word. Is that correct?
A. I do believe I've seen wording similar to that at least, yes.
Q. So basically with the spectrum of people for those who are lazy and those mediocre, not that diligent, if

they fail to click help, fail to click news, fail to do word search diligently and they just jump in and do business, so basically they agree to the BSA by default; is it true?

A. My understanding is that the BSA applies to all sellers. So to do business on Amazon, you would have to adhere to the BSA. That's just my understanding, yes. That you have to --

Q. I don't want to put words in your mouth. This basically, in addition to being a notice by publishing system, it's also a consenting by default system; am I right?

A. I believe upon registration you have to agree to the BSA. So to that end, I don't -- the exact question sounds like you must -- if the question is do you have to consent to the BSA to be on the platform, I believe the answer is yes. But if the question is not knowing that there's a BSA you just must consent or something like that, I don't --

Q. Okay. I made a statement, you agree earlier. Let me repeat.

A. Sure.

Q. It says by continue to do business with Amazon, you consent and agree to the BSA. And then the second half is if you do not agree with the BSA, you can terminate doing

business with Amazon. There's only two choice.
A. Sure.
Q. So to those who did not read anything because they're too lazy or they just too busy and they just jump in and continue to do business, they missed a chance to consent. But nonetheless, by default they have consented, isn't it?
A. I'm taking a minute to think here what you mean.
I guess if the question is to use the system you have to consent to the terms, yes. I believe that to be a true statement, yes. Is that pretty much what you're after?
Q. I'm not going to belabor that.
A. Okay.
Q. You also showed an exhibit that says that sellers are not to transfer accounts. And again, you've written in the BSA there's also a clause in the BSA that says this agreement is not assignable without the consent of Amazon. Do you remember reading that?
MR. MAGLIERY: Objection, misstates testimony.
MR. CHAN: So can I just refer to one of the --
THE COURT: Sure.
MR. CHAN: Let's pick one.
MR. MAGLIERY: 74 is the live version.
BY MR. CHAN:
Q. Let's pick something in between, like -- what year can we pick? Something like in not too far distance.

Well, let's pick 2020. Exhibit 36. That's why -- my notes are back there. I think it's right in the beginning. Give me a second, Your Honor. Actually, I know the older version better. See if I can find an older one.

I can't get to it. But based on the fact that you said seller cannot transfer the account, but out of the 800,000-plus sellers that you just mentioned, do you have knowledge of how many of those are still the first original registered accounts?

A. I do not have knowledge of it. That's not my -- that's not what my team does. I wouldn't have access to that data.

Q. You do not have?

A. I do not.

Q. You mentioned you have information on inventory and sales, right? Didn't you say you're in charge of sales and inventory?

A. My team having information on sales and inventory? Are you asking if my team has that kind of information?

Q. I thought when Counsel asked you about your experience and your responsibility, you mention about you were in charge of some sort of inventory and sales.

A. Oh, I think that question was what is Seller Central used for. And it's used for a seller to manage inventory,

sales. But it's not what my team does.
Q. I misunderstood you then, okay.
So within your duty you have no access to information about which account is new, which account is old, you don't have that?
A. Correct. I don't have account-specific information.
Q. Thank you for letting me know. I'll spare you all kinds of questions. I'll get to the right witness.
The data that I asked you before about who actually clicks what link and looks at what information, you say you do not have it. But do you keep them?
A. I don't know to what extent that kind of information is kept. But I do believe in some form it's tracked. I just don't know how deeply or how specifically.
Q. Do you keep the other side of the information, meaning people who never even touch any button on news or search anything or help and just go right ahead and skip everything and just continue doing business as usual? Do you keep data on that or no?
A. I'm not aware of how or if that data is kept. My team doesn't have access to that data.
Q. Okay. But if you were given a task to look back at the historic data, statistically, would you be able to find out what percentage of sellers actually get actual notice of this agreement and the changes? Would you be

able to find it?
A. The data we do have is very -- we have like very aggregated traffic data on my team. Like how many sellers viewed a given page, I can see that kind of magnitude data. But I don't have specific --
Q. Let me rephrase it.
Were you instructed as part of your job and duty to monitor the web activities of sellers to see what they actually look at and what they don't look at? Is that your task?
A. In day-to-day work, no, we don't monitor traffic. Just generally speaking, we look at it in -- if we suspect something is going on, we may check data.
Q. Isn't it critical data to tell yourself how efficient is my system notice by publishing? Because if 10 percent is doing that, then the system is not working. Isn't it important to keep that data which you don't?
A. So I think you're asking is it important to keep traffic data. Yes, I suppose it is important.
Q. So as IT expert, you think it's important. But you say not your duty or job to keep track of it. You just said that.
A. To clarify, yeah, my team doesn't look at overall -- we don't monitor overall traffic like all the time. We look up traffic as needed to determine if an action is

needed.
Q. So you did all the work, beautiful job setting everything up. Do you ask yourself, am I doing an efficient job for the company to notify the seller? Do you ever ask yourself that?
A. Yes. So the team, when we look at how we -- you know, the nature of a change and what amount of notice is needed, it's a fairly typical question how much do we need to -- how much seller communication is needed on a given change. Our bar is if it's very impactful and it's like something they will notice day to day, then they need to know and therefore we need to use as many channels as necessary.
It varies quite a bit project to project, change to change. So it's very dependent on, you know, what everyone's inputs are, business, legal, et cetera. But, yes, it is a question that gets asked.
Q. So you seem very knowledgeable in the whole Seller Central system. Are you aware of a portal that allows a Seller A to change the account to Seller B without Amazon's consent, approval, or even knowing it? Are you aware of that?
A. I'm not aware.
Q. Okay. Are you aware of the term "black market sellers"?

A. No, I'm not familiar with the term.
Q. You don't? You never heard of it?
A. It's not a term we use internally. So I'm not sure what's being referred to exactly.
Q. Excuse me. Is it difficult to have a pop-up notice when you go on like Seller Central, something pops up automatically? Is it difficult from IT standpoint?
A. From the IT perspective, I'm not sure how difficult that would be.
Q. Okay. And with 800,000 Amazon sellers, would it be a huge task to send an individual email to the accounts even though it could be automated? Would it be doable to send notices directly to the email of the account on record?
A. Yes, we have the capability to send emails to sellers, including all sellers.
Q. You have sent email. But on the notice of changes you don't send email, you just put it on the website?
MR. MAGLIERY: Objection, misstates testimony.
THE COURT: I'll overrule it, but you can clarify as you like on redirect.
BY MR. CHAN:
Q. Do you send separate emails to tell sellers that there's some changes?
A. Specifically to the BSA, you're referring to?
Q. Yeah. Yeah.

A. If legal states that we should. But generally speaking, no, it's not a requirement, email. It doesn't have to be sent.
Q. Okay. Because I have not seen any exhibit indicating any email communication regarding the changes. I thought I missed it, but you're saying there isn't.
Over the years, how many articles under help exist right now with all these years -- you don't delete old one, right? They just load up? Do you purge files or everything stays on help?
A. Are you asking if we, like, take down old pages that aren't relevant?
Q. Yeah, yeah.
A. Yes, we do take down old pages that aren't relevant. The exact number of help pages in circulation right now, I'm not totally sure of the number. It's a decent number, but I don't know how much.
Q. So when you click help in search, it depends how accurate your word search is. You could have a hundred show up and then you have to go page by page and find the one that you really need; is that correct?
A. Yes. When searching for something, the accuracy is dependent on the query. I believe that to be a true statement.
Q. Same thing as the news portion. How often do you

delete old news and have fresh news pop up when people go to news?
A. News is treated a little differently from help in that we don't generally take down old news. It just kind of stays there. New news just comes to the top of the list, essentially.
Q. Is it sorted by date? So if I put something in, is newer news automatically popped up, I hope?
A. That's correct. The new news would be on the top of the list, yes.
Q. It is by date, right?
A. Uh-huh.
Q. But the key would be finding the right word to search, so people have to know exactly what to search for the right article to pop up, correct?
A. Yeah. So if we're talking about news, it would be sorted to the top, newest first. For help pages, yes, using the appropriate search term to find a page would be how you navigate to it in the search results.
Q. As an IT guy and knowledgeable with the BSA, if you were a seller and you were to click that thing with the box that you scroll down, how long would it take to finish reading that document from top to bottom? Just estimate. It's in small font, too, because it's in a box.
A. So long to read through the BSA --

THE COURT: I'm sorry, I can't hear you. If you have an objection, just stand up, then I know you're really objecting.

MR. MAGLIERY: Thank you, Your Honor.

Objection, it's calling for an opinion of a lay witness that does not elucidate his testimony.

THE COURT: How long does it take to read through the BSA? Yes, I agree with that. We don't need to hear from this witness about that.

BY MR. CHAN:

Q. If you were to log on and read the BSA, how long would it take you to read from top to bottom, not someone else, you?

A. I guess it depends how carefully I'm trying to read it. Maybe a half hour to read through it. And I think it would take much longer if I was really trying to find specific information, really understand the nature of it. In day to day, it takes me a while to get through documents, yeah.

Q. What does the word "hub" mean after the "help/"? There's a "hub" and then there's a "reference" and then there's a number. What does "hub" mean? I'm trying to understand.

A. Hub generally refers to a place where things come together. So here I think the idea was it's a help hub,

so there's a section where all the help exists.
Q. It's like a folder?
A. It's used colloquially here. I think it's just a general term meaning collection of in this case help articles. But it doesn't refer to like a specific folder somewhere, if that's what you're asking.
Q. Are you in charge of managing other systems within the Seller Central as well? Or just the BSA?
A. My team manages all help content within Seller Central, the News section, and some of the user interface text. Like some features, the text that appears in the boxes and such. So that's primarily what my team covers.
Q. Okay. You mentioned some of the tools would be through the inventory control sales things. When a new seller signs up the account, does somebody from your department have to authorize them to use certain features under Seller Central? In other words, are you the gatekeeper so that people can access the software and use the features?
A. So you're referring to new sellers who try to access Seller Central for the first time are you asking?
Q. Yeah.
A. It's a system. It's all automated. I don't have direct view into each seller registering.

Q. Okay. So is it governed by, say, account number, password, a pin of some sort to get onto that website to use?
A. Yes. When an account is created, there's a user name and a password associated with it that would be used for accessing the account in Seller Central.
Q. If someone else other than the original person with the account, either they want to add somebody or they want to change someone, is there a way to do that?
A. Could you restate the question? I'm not sure if you mean ownership or --
Q. Somebody who just opened the account, they have access to the Seller Central and they can use the features of inventory, monitoring sales. But if this person wants to add another person, like a secretary so when he's on vacation she can do it, or he wants to transfer it to someone for whatever reason, is there a way to get this other person access to the Seller Central features? And if there is, how do they go about doing that?
A. So within Seller Central you are allowed to add authorized users to your account, meaning other people, you can give them access to your account. That's spelled out in the help content. I don't think you're allowed to transfer your account to someone else, to my knowledge. But it is possible to add an authorized other user other

than the main account holder.
Q. You are not aware of any transfer or are you saying it cannot be transferred? There's two different answers. Are you saying you're not aware of any transfer or are you saying that it's your opinion that they cannot be transferred?
A. My understanding of the policy is you cannot transfer. But if you're asking is it possible to transfer, like give your credentials to someone else, I mean, that's -- by policy, it's not allowed.
Q. It goes back to my previous question. Who is the gatekeeper that grants authority for someone to access the Seller Central and to use those features? Is your department the gatekeeper so that whoever wants to add a second person, they have to go through you, whatever step it takes?
A. No. My team doesn't handle the authorization of additional users, if that's what you mean. We don't -- we don't have a relation to that system.
Q. What if somebody just wants to change name because they decided they want to change name, they find some name they like better, how do you go about to do that? Is there a way to do that?
A. I'm not sure.
Q. You're not sure?

A. Uh-huh. I don't own the registration portal so I don't --
Q. That's outside your duty?
A. Correct.
Q. Okay. So the fact that you are not aware of any portal that allows name change, whatnot, doesn't mean it cannot be done, you're just not aware; correct?
A. Correct in that -- yeah, if there's a way to change names within Amazon, I'm not sure how that's done. I'm not familiar.
Q. It's beyond the scope and duty of your current position?
A. That's correct.
Q. Okay. Very specific about seller cannot transfer the account. And are you aware of any system that actually enforces this policy? It's a nice policy, but is there a system to enforce that?
A. I'm not aware of how that policy is enforced.
Q. Okay. It's beyond the scope of your duty?
A. That's correct.
Q. Could you tell us why you had a change in the -- what you call software or programming? The one you use now is called Ajuda, correct?
A. That's correct.
Q. Can you explain why you went from the other system to

Ajuda? Just educate me.
A. We wanted to pull together the tool sets into a single unified tool that allows us to build, translate, publish content from one unified interface. So the idea of the shift there was to bring in the various content sets into a single and single tool. In addition to, for example, the help pages that get updated in Ajuda, we also provide the repository that seller support uses for their reference content within Ajuda as well. It's just a unified place that allows us to work in one tool.
Q. So is it correct statement to say Ajuda is more advanced, sophisticated, and more capable than your old system?
A. Yes, that's correct.
Q. So that's an improvement.
MR. CHAN: I think I'll rest for now. There's some questions this is not the proper witness to ask.
THE COURT: I see.
Any redirect?
MR. MAGLIERY: Just one, Your Honor.
THE COURT: Okay.
MR. MAGLIERY: Should I take the lectern?
THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. MAGLIERY:

Q. Hello again, Mr. Pak.

A. Hello.

Q. You just said that the Ajuda system is more advanced than the prior CMS systems, right?

A. Correct.

Q. Is there any reason to doubt that the prior CMS systems also housed true and correct copies of Amazon's business records kept in the ordinary course?

A. No. No reason to doubt. It's really just -- the change was to allow us to work in one tool versus several. But the validity of the records should be the same.

MR. MAGLIERY: No further questions. Thank you.

THE COURT: Anything else, Mr. Chan?

MR. CHAN: No.

THE COURT: Great.

Sir, you can step down. Thank you for traveling today.

Would you like to call another witness.

MR. MAGLIERY: Your Honor, he's in the other room, if you'll just allow us one minute. Thank you.

(Pause.)

THE COURT: Welcome back, sir. If you don't mind standing by the witness box and remain standing.

THE WITNESS: Yes, Your Honor.

THE CLERK: Please raise your right hand.

ERIC SMITH,

called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please state your name and spell your last name.

THE WITNESS: Eric Smith, S-M-I-T-H.

THE CLERK: And give us your city and state of employment.

THE WITNESS: City is Tempe, Arizona.

THE CLERK: Thank you. You can be seated.

DIRECT EXAMINATION

BY MR. SGRO:

Q. Good afternoon, Mr. Smith.

By whom are you employed?

A. Amazon.com.

Q. What is your job title?

A. My job title is Manager of Risk Managers.

Q. And what are your duties as Manager of Risk Managers?

A. So I run a team of risk managers or a couple teams of risk managers. Our job is to handle escalations within

the company.

Q. You mentioned escalations. What is an escalation?

A. An escalation can be a couple different things, but it's essentially if a seller has an issue and it fails to be resolved in the standard path, that may be escalated to another person within the company. That person internally can escalate to my team to have that reviewed. There are also some instances where somebody internally finds, hey, maybe something isn't working right or there is some abuse that is happening that we're not aware of. They can also escalate those things to my team and we will handle those cases to investigate if there's some malfeasance going on or if the standard path is not working as intended, we are supposed to come in and help rescue sellers.

Q. You mentioned abuses and malfeasance. What type of abuses do you and your team investigate?

A. It can be a bunch of different things. So I have multiple teams under me. So we have some teams that handle intellectual property issues, for example, trademark violations, things like that. We have teams under me that handle catalog violations which would be like somebody messing with the page of their particular product that they're selling on Amazon. I also have teams under me that handle financial fraud and abuse. If customers are being duped or something to that effect, we

investigate those. And a couple of other smaller things like reviews abuse and things like that.
Q. If you discover an abuse, does your team handle the enforcement against those abuses?
A. We do. We handle ad hoc enforcements. Or also seller rescue if, you know, there is something happening to a seller, we're trying to step in and help there. So we may, you know, depending on the severity of the issue, we may block the seller's listing or we may block an entire product if there's something wrong with the product. And sometimes we can also enforce seller accounts if the account violations are severe enough.
Q. Are you familiar with the term "ASIN"?
A. Yes, I am.
Q. What is an ASIN in Amazon parlance?
A. ASIN is a alphanumeric identifier that identifies the different products at Amazon on the Amazon store.
Q. And do your duties at Amazon involve reviewing the records related to third-party seller's activity in the Amazon store?
A. Yes. My team is mostly now at this point, but yes, we are involved in those escalations and reviewing those.
Q. Do you know how to personally access those records?
A. I do.
Q. And does Amazon maintain a website where products are

sold in the United States?
A. Yes. Amazon.com.
Q. Can we agree to call it the Amazon store?
A. That's fine with me.
Q. And does Amazon allow third parties to sell products in the Amazon store?
A. Yes. Third parties can apply for a third-party seller account on Amazon and they can sell alongside first-party offers on Amazon.
Q. Generally speaking, what is your understanding as to how someone becomes a third-party seller?
A. So they would apply for a seller account through our system called Seller Central which will give them access to the tools and things they need to sell on Amazon.
Q. And what do sellers use the Seller Central portal for?
A. A variety of different things. So Seller Central is kind of, as the name implies, the centralized location for sellers to operate their selling accounts so they can list products on Seller Central, they can apply for promotions, they can send inventory in to our warehouses using our FBA, Fulfillment by Amazon, network. And they can also apply for I think I said a different promotions for their ASINs and their products on there.
Q. How does Amazon keep records about sellers'

activities in Seller Central in the Amazon store?
A. So the seller activities that happen in Seller Central are logged in databases. And we maintain all of our information in relational databases, essentially.
Q. Does your team have access to those databases?
A. We do have access to some of the databases. Obviously for info security and to protect customer service, we don't have access to every single piece of information. But Amazon has built tools for us to access individual seller accounts. One of the tools we use most frequently is Paragon to access individual seller accounts, but then we can also query those data as well using SQL, or Structured Query Language, to be able to download large amounts of information if we need it.
Q. In your exhibit book can you please turn to Defendants' Exhibit 68.
A. Yes.
Q. Let me know when you've gotten there. I know you have pages to flip there.
A. It's a little awkward here.
MR. SGRO: Does the court reporter need the witness to slow down?
THE COURT: Doing fine. Let me check just with our court reporter. Okay.

THE WITNESS: If you need me to slow down, let me know.

Yes, I'm on Exhibit 68.

BY MR. SGRO:

Q. Have you seen this document before?

A. I have.

Q. And what is Exhibit 68?

A. Exhibit 68 are screenshots from our Paragon program and they are for four different selling accounts. This is the screenshot of the customer summary tab in Paragon.

Q. Did you obtain the screenshots shown in Exhibit 68?

A. I did.

Q. Can you describe how you obtained those screenshots?

A. Yes. So in Paragon what we do is we take the seller's ID and we put it into the Paragon system which pulls up the account for that particular seller. And then I navigated over to the customer summary tab within that and I screenshotted the customer summary tab for each of the individual selling accounts.

Q. Can you please describe what Paragon is?

A. Paragon is a tool for our investigators and risk managers to access seller information that needs to be frequently accessed. It could be customer performance or it could be seller performance information. It could be like this, kind of general information about the seller.

We can also look at their orders. So frequently things that we need to access. And it puts it in kind of a visual way that's easier for us to interpret rather than banks of numbers and data.

Q. Is the information shown in Exhibit 68 kept in the ordinary course of business by Amazon?

A. Yes.

Q. When Amazon wants to make a record of data it has in Paragon, how does it go about doing that?

A. Pretty much in the way that I had described. You get the seller ID for the seller you're looking to identify, you place that into the Paragon search, it will pull up the seller account. And then you can navigate through the different tabs based on the information that you are looking for.

Q. Are the screenshots in Exhibit 68 true and accurate records of Amazon's records in Paragon?

A. Yes.

MR. SGRO: I move for Exhibit 68 to be admitted into evidence.

THE COURT: Any objection?

MR. CHAN: No, Your Honor.

THE COURT: Okay, full exhibit, 68.

(Defendants' Exhibit 68 admitted in evidence.)

BY MR. SGRO:
Q. Mr. Smith, can you take a look at each page of Exhibit 68 and let me know what each page shows?
A. Absolutely.
So the first page shows the customer summary tab for the Twin Horses account.
The second page shows the customer summary tab for the Health and Household account.
The third page lists the customer summary tab of the Vanguard account.
And the fourth page lists the customer summary tab of Medcare Industries selling account.
Q. In Exhibit 68 in the right column of each screenshot do you see the entry "Merchant Registration Date"?
A. Yes, I do.
Q. And what does that entry show?
A. So for each account it shows the date that the account was registered with Amazon. So the date the account was opened, essentially.
Q. What are the dates each of these selling accounts registered with Amazon?
A. Absolutely.
So the Twin Horses account was registered on January 30, 2014.
The Health and Household account was registered on

March 11, 2014.

The Vanguard account was registered on June 22, 2017.

And the Medcare Industries account was registered on December 8, 2019.

Q. Do you see on the left column the entry "Customer ID"?

A. Yes, I do.

Q. What a selling account's customer ID?

A. The customer ID is the unique numeric identifier that we use to identify accounts internally at Amazon. So if I need to search a particular seller account, I will use that seller account's customer ID or seller ID to search their account.

Q. And the entry in the right column at the top "Name," what does that entry signify?

A. So it signifies two things in these instances. After the slash it is the name of the actual seller account. And before the slash it shows the primary user for Seller Central for the account.

Q. And how do sellers obtain the name after the slash?

A. The name after the slash, they can choose their own name for their selling account. There are some restrictions, obviously. We don't allow them to use profanity or trademark terms, things like that. They can generally choose their own selling name as long as it

doesn't interfere with our rules.
Q. Can sellers change the name?
A. They can.
Q. What are the four names shown in this screenshot in Exhibit 68?
A. Yeah, absolutely.
So for the Twin Horses account, it shows Ben Joseph Ligeri/Twin Horses.
For the Health and Household account, it shows Benjamin J. Ligeri/Health and Household.
For Vanguard, it shows Global Specialty Products, LLC/Vanguard.
And then for the Medcare Industries, it shows Medcare LLC/Medcare Industries.
Q. You mentioned something called the primary account user. Can you explain what a primary account user is?
A. Yeah. In Seller Central there has to be a main user for the account that gives permissions to potentially other users on the account. And that mainly accesses the account and is typically the primary email that we communicate with as well.
Q. How does someone become a primary user in connection with their selling account?
A. That is set by the seller themselves. So they can set who the primary user is on the account and who can

access and make those changes.
Q. And how does someone go about changing the primary user for their selling account?
A. They would do that in Seller Central. So they can change the users and change permissions on the users within Seller Central, it's one of the options that they have.
Q. In Exhibit 68 in the right column at the bottom entry "Tax Verified Legal Name"?
A. Yes.
Q. What does that entry mean?
A. So if a seller wants to, they can have their account operated under a LLC or a corporation. And so they can in Seller Central enter that information in like this is my legal entity that I'm operating under and they can put their LLC or their incorporation in there.
Q. And that's something the seller provides to Amazon?
A. That is something the seller provides to Amazon.
Q. What are the tax verified legal names for each of the accounts shown in Exhibit 68?
A. For the Twin Horses account, it is Trademark Holdings LLC.
For Health and Household, it is Central Concepts Inc.
For Vanguard, it is Global Specialty Products, LLC.
And for Medcare Industries, it is Medcare LLC.

Q. And what does the entry "Selling Email" mean in Exhibit 68?
A. The selling email is typically the email of the primary account holder and it is how we communicate with sellers on their account. So if they -- you know, if something goes wrong with the account, if they need to update something on the account, if we need to notify them of something going on with the account, we would communicate with them via their selling email.
Q. And how does Amazon obtain the information selling email for selling accounts?
A. Provided by the seller.
Q. What are the selling emails for each of these four accounts?
A. Some of these are a little hard to read, so I apologize if I mispronounce something here.
The selling email for Twin Horses is timmignacca, I believe, 34@gmail.com.
For Health and Household, billing@jasminesgifts.com.
For Vanguard, it is MedicalResponseUnit@gmail.com.
And medcarewyomingllc@gmail.com for Medcare Industries.
Q. Do sellers provide payment information to Amazon in connection with their selling accounts?
A. They do.

Q. Why do they do that?
A. There are fees associated with operating a selling account at Amazon when you're using FBA or operating a selling account, so you have to have a method of payment on the account.
Q. How do sellers provide payment accounts to Amazon?
A. Again, they can provide that through Seller Central through the settings, they can update their payment method.
Q. How does Amazon keep records of the payment information that sellers provide?
A. Again, it's logged in databases, but we can pull it through tools like Seller Central or SQL -- sorry, Paragon or SQL, I apologize.
Q. Can you please turn to Exhibit 69.
A. Sure. I have it here.
Q. Have you seen this document before?
A. I have.
Q. Can what is it?
A. This is a screenshot of the -- again, the customer summary tab in Paragon. And this shows the Registered Payment Accounts section.
Q. And did you obtain the screenshot for this exhibit?
A. I did.
Q. How? How did you do so?

A. Again, I searched the seller ID in Paragon. I pulled up the customer summary tab for this particular seller. I scrolled down to the Registered Payment Accounts section and I screenshotted that section.

I do want to advise there is a piece redacted out of this that I did not do.

Q. Is the information shown in this exhibit stored in the ordinary course of business at Amazon?

A. Yes, it is.

Q. When Amazon wants to make a record of the information shown in this exhibit, how does it do that?

A. By the method that I described.

Q. Just for clarity, can you please tell me what is redacted from this document?

A. Yeah. There is a column at the beginning called Token, and this applies to the payment token information. We just don't want to disclose that as a potential it could open up a seller or the account holder of these credit card accounts to potential identity theft or fraud.

Q. So that token information pertains to financial accounts?

A. Correct.

Q. And is the screenshot shown in Exhibit 69 a true and accurate depiction of Amazon's records?

A. Yes.

MR. SGRO: We move for Exhibit 69 to be admitted into evidence.

THE COURT: Any objection?

MR. CHAN: I do have a question. You said this is a regular business record? You print it out all the time? Or is it --

THE COURT: Hold on a second. So it's not your turn to ask the witness questions.

MR. CHAN: I know, but I question --

THE COURT: Just say what your objection is.

MR. CHAN: My objection is this does not look like a regular business record because it's tailored to presenting something in court. It's basically prepared in anticipation of litigation.

THE COURT: Sir, did you develop this screenshot on the basis of Amazon's business records, the information that was already regularly kept in the regular course of business?

THE WITNESS: Correct. I took a screenshot of it, but yes.

THE COURT: Overruled. Exhibit 69, full exhibit.

(Defendants' Exhibit 69 admitted in evidence.)

BY MR. SGRO:
Q. Do you see the column marked -- sorry.
Do you see the column marked "Usage"?
A. Yes.
Q. What does the "X" signify for each of the rows in that column?
A. Whether that's still an active payment method on the account. And the X signifies no.
Q. And what -- can you please tell me what the entries under the heading "Name" mean?
A. So that is the name of the person that owns that particular financial instrument. So there's a couple different ones. There's credit cards and then there's also some bank accounts as well.
Q. And what do the entries under the column "Created On" mean?
A. Created is the date that that account was added to their Seller Central account.
Q. And how does a seller add a payment account to their selling account?
A. As I described before, they would log into Seller Central. There is a Settings section, and then they can go up in there and update their payment method to add those on.
Q. And looking at 69, can you identify the rows with

payment information under the name "Ligeri" and the dates each of those were added to the selling account?
A. Yes.
So as we go down just in sequential order, the first one I see is, again, 14th of October 2016, Benjamin J. Ligeri.
The next one would be 16th of October 2018, Benjamin Ligeri.
16th of June 2017, Benjamin J. Ligeri.
And then 8th of June 2017, Benjamin Ligeri.
Then there's also a PNC bank account, 18th of May 2017.
Q. Do you see an entry under the name Benjamin+Joseph?
A. Yes.
Q. What date was that added to the selling account as a payment instrument?
A. 4th of August 2022.
Q. Can you please look at Exhibits 70, 71 --
THE COURT: Before you do that, I have a clarifying question about this exhibit.
Sir, this exhibit showing a number of payment, basically, methods and addresses --
THE WITNESS: Yes.
THE COURT: -- does it tell us which of the four accounts that are specifically linked?

THE WITNESS: Yes.

So if you look at the top left, Your Honor, you'll see "Seller ID." And that will show you which seller ID this applies to this. So this particular one applies to the House and Household account. You can see it's the seller ID ending in 5615. And if you refer back to --

THE COURT: And I'm sorry, you lost me a moment ago. Seller -- very small print.

THE WITNESS: It is. Do we have those magnifying glasses?

MR. SGRO: Your Honor, we have a magnifying glass.

THE COURT: I can see it okay now that you told me. So these are the registered payment accounts for only one of these four accounts?

THE WITNESS: Only one of the seller accounts.

THE COURT: And it's which account?

THE WITNESS: This is Health and Household.

THE COURT: Okay, thank you.

BY MR. SGRO:

Q. Mr. Smith, can you please turn to Exhibits 70, 71, and 72.

A. Yes. I have a hard time doing them all at the same time, but yes.

I have 70 right here and I can flip through them as we go.
Q. Have you seen these documents before?
A. Yes.
Q. What are they?
A. These are, again, screenshots from Paragon that list the registered payment accounts for the seller, this one is Medcare Industries.
Q. Can you please identify which selling account each of Exhibits 70, 71, and 72 pertain to and how you were able to come to that conclusion?
A. Yes.
70, as I said, is Medcare Industries. Again, if you look at the seller ID in the top left-hand corner ends in 0902. And that is Medcare Industries.
For 71, it ends in 7015. So that would be the Twin Horses account.
And for 72, it is ending in 7002. And again, that would be the Vanguard account.
Q. Did you obtain the screenshots shown in Exhibits 70, 71, and 72?
A. Yes.
Q. Did you obtain those screenshots in the same manner you described for Exhibit 69?
A. Yes.

Q. Just to confirm, the information shown in Exhibit 70, 71, and 72 were stored in the ordinary course of business by Amazon?
A. Yes.
Q. Do each of these exhibits have a similar redaction in that left-most column?
A. In the Token column, yes.
Q. Are these screenshots true and accurate depictions of Amazon's records?
A. Yes.
MR. SGRO: Your Honor, we move for Exhibits 70, 71, and 72 to be admitted into evidence.
THE COURT: Any objection?
MR. CHAN: No, Your Honor.
THE COURT: Full exhibits, 70 to 72.
(Defendants' Exhibits 70, 71, and 72 admitted in evidence.)
BY MR. SGRO:
Q. Mr. Smith, looking at Exhibit 70, can you identify the rows with the payment account under Medcare LLC and the dates each of these payment instruments were added to the account?
A. Yes. I'll try and go a little slower for the court reporter this time. Apologies.
So the first one I see, just going down from the top,

is the 7th of May 2021, MEDICARE LLC.

The next one that I see is the 23rd of April 2021, Medcare LLC.

The next one is the 27th of April, Medcare LLC.

The next one I see after that is a bank account from Webster Bank and that is the 24th of April 2021.

And then the last one I see is a JPMorgan Chase account, 27th of April 2023.

I'm sorry, there's a second page, I apologize.

There's also one entered on the 24th of April 2021.

Another one on the 27th of April 2023.

Another one on the 24th of April 2021.

And another on the 23rd of April 2021, again.

Q. Turning to Exhibit 71, can you identify the rows with the payment account under the name Trademark Holdings LLC and the dates that each of those were added to the selling account?

A. Yes.

The first one I see, going down from the top, is the 13th of January 2023.

The next one I see is the 4th of January 2023.

The next one I see after that is the 13th of January 2023.

And the second page, sorry --

MR. CHAN: Do you have a magnifying glass?

MR. SGRO: May I approach the witness?

Would you like one, Your Honor? These are really small.

THE COURT: Sure, I'll take one. Thank you.

THE WITNESS: I think that was all of them. There's some duplicates on the second page from scrolling down. I think the last one was the 13th of January 2023 that I saw on here.

BY MR. SGRO:

Q. Looking at Exhibit 72 --

A. Yes.

Q. -- can you identify the rows with the payment account under the name Joseph Ligeri --

A. Yes.

Q. -- and the dates each of those payment accounts were added to the selling account?

A. So again going down from the top, Joseph Ligeri on 21 of June, 2017.

And again, Joseph Ligeri bank account, checking account or savings account on the 21st of June 2017.

Q. Sticking with Exhibit 72, can you identify the rows with payment information under the name Global Specialty Products and the dates each of those were added to the selling account?

A. Again, from the top, Global Specialty Products, 20th

of May, 2021.
The next one is the 10th of February 2023.
The next after that is the 22nd of September 2020.
And again after that one, 22nd of September 2020.
Q. Thank you.
Does Amazon record information about the volume of sales that sellers make in the Amazon store?
A. We do.
Q. How does Amazon keep records of those sales?
A. Again, in databases, but we can access it primarily through tools like Paragon as we're seeing here just on a different tab or we can also search those through our SQL database.
Q. Can you please turn to Exhibit 75.
A. Yes.
Q. Have you seen this document before?
A. Yes, I have.
Q. What is it?
A. This is a screenshot of the Performance tab in Paragon, specifically the section for Monthly Performance. And this lists the gross monthly sales from each of the selling accounts.
Q. Did you obtain this record?
A. I did.
Q. And how did you obtain this record?

A. So, again, I searched the selling account ID in Paragon. And then I went to the Performance tab this time and I put in a date range that I was looking for for the gross monthly sales for each of those dates. And then I ran that. I hit the update button, and then that updated the gross monthly sales for each of the months for the date range I specified.
Q. And is the information shown in this exhibit stored in the ordinary course of business by Amazon?
A. Yes.
Q. Are these screenshots true and accurate depictions of Amazon's records?
A. Yes.
MR. SGRO: Your Honor, we move for Exhibit 75 to be admitted into evidence.
THE COURT: Could you clarify one more time on each page -- I gather we have four pages here --
THE WITNESS: Yes.
THE COURT: -- which is which seller?
THE WITNESS: Absolutely. I need to flip back here, I apologize, because it's hard to memorize the numbers. Was that 68 that had all the screenshots?
MR. SGRO: I can give you my copy if it's easier between flipping.
THE WITNESS: I think I got it.

The first page for the account ending in 7002, that would be the Vanguard account.

The second page for the account ending in 5615, that is the Health and Household account.

For the third page that is ending in 7015, that is the Twin Horses account.

And for the last page, 0902, that is for the Medcare Industries account.

THE COURT: Thanks.

All right. Are you offering this?

MR. SGRO: Yes.

THE COURT: Any objection to 75?

MR. CHAN: No objection, Your Honor.

THE COURT: Full exhibit.

(Defendants' Exhibit 75 admitted in evidence.)

BY MR. SGRO:

Q. Mr. Smith, do the sales records shown in Exhibit 75 pertain to a specific date range?

A. Yes. I believe for all of them -- let me just doublecheck that -- I pulled from January 2022 until January 31, 2023.

Q. And how are the sales records displayed on this exhibit?

A. They are displayed monthly in a table. And so the

table has different columns. The Date column shows the month and then the Sales column shows the gross monthly sales for that month.
Q. Is the sales represented in dollars?
A. Yes.
Q. And based on the records shown in Exhibit 75, each of the selling accounts sold products to customers in the Amazon.com store?
A. Yes.
Q. Are you aware of Amazon's Business Solutions Agreement?
A. Yes, I am aware of it.
Q. What is Amazon's Business Solutions Agreement?
A. The Business Solutions Agreement is the agreement between sellers on Amazon to sell in a particular way, act fairly, kind of sets up the rules for working with Amazon.
Q. Does Amazon permit existing selling accounts to be transferred to another party who did not register the account?
A. They do not.
Q. Does Amazon inform sellers of this prohibition?
A. Yes.
Q. Do you know where?
A. In the BSA.
Q. Does Amazon have any record authorizing or consenting

to the transfer of the four selling accounts shown in Exhibit 75 to any other person?
A. Not that I am aware.
Q. How do sellers communicate with Amazon?
A. They can communicate directly through Seller Central. We send notices through there. They can also communicate through email.
Q. What type of communications does Amazon exchange with sellers?
A. Lots of communications. About their products. About the status of their account. About their promotions. You know, how they're doing. Performance data. All of that information.
Q. And does Amazon store records of the communications it exchanges with its sellers?
A. Yes, it does.
Q. How does Amazon store records?
A. Again, these are stored in databases which we can access through tools like Paragon or SQL queries.
Q. Can you please turn to Exhibit 73 in the book.
A. Yes.
Q. Have you seen this document before?
A. Yes, I have.
Q. What is it?
A. This is an Excel spreadsheet of communications

between the four selling accounts that we're speaking of and Amazon.

Q. And did you obtain this document from Amazon's records?

A. I did.

Q. How did you obtain this document?

A. So in this instance, we wanted to pull a lot of different records. So I worked with one of our business intelligence engineers who helped me write a SQL query to pull all of the communications for all of the four selling accounts that we are looking for. I took the results of that query and I filtered them down to every time that referenced the BSA.

Q. And is the information shown in Exhibit 53 stored in Amazon's course of business?

A. Yes.

Q. When Amazon wants to make a record or a document showing the type of records in Exhibit 73, how does it go about doing that?

A. When we want to do just an individual communication, we typically would do that through something like Paragon. But when we are pulling mass communications like this, we would do that through an SQL query. Structured Query Language basically allows you to ask relational databases for specific information. In this case, we limited it to

the selling accounts and we wanted all communications with those selling accounts. And then I filtered them down in an Excel spreadsheet. And then we would present that.

Q. Is Exhibit 73 a true and accurate record of certain of Amazon's communications with the four selling accounts we've been discussing?

A. Yes.

MR. SGRO: Your Honor, we move for Exhibit 73 to be admitted into evidence.

MR. CHAN: Your --

THE COURT: Just hold on.

Just by clarification, sir, Exhibit 73, is it the universe of all communications that Amazon had with the four sellers? Is it the universe, in other words, all of the communications Amazon ever had with the four sellers? Or is it just, as I think I heard you say, just ones that reference the BSA?

THE WITNESS: This document is just ones that reference the BSA. But we did pull all of the communications and I filtered them down by that.

THE COURT: Okay. All right. So Exhibit 73 is only references about or communications concerning the BSA?

THE WITNESS: Correct.

THE COURT: Okay.

Is there an objection?

MR. CHAN: Objection, Your Honor. We should have the best evidence according to the rule. We don't send email by Excel. So he cut and paste into an Excel spreadsheet. We don't know how accurate it is. He said it's accurate. But it's easier to show the original document. That's what best evidence rule says. So the fact that it was cut and pasted into Excel spreadsheet, we know we don't email through Excel. So I would like to see the original email with date, time, and everything. This is not admissible, Your Honor.

THE COURT: Sir, where did you draw these from? Did you go to an email account or how did you draw them?

THE WITNESS: So the communications that we have on Amazon are stored in databases themselves. They're essentially spreadsheets but very, very large and very, very easy to store as far as data storage is concerned. And so when we want to query this information, we have to tell the databases, hey, we want communications from what selling account. And then it will pull all of that down and it will pull the relevant communications out. We don't really store them for long periods of time as like an HTML format because that would just take up a lot more space.

THE COURT: I see.

Did you have more, Mr. Sgroe, you want to set by foundation and in response to the objection?

BY MR. SGRO:

Q. For the record, you don't store the actual emails, this is the manner in which Amazon stores records of its emails?

A. Correct. It is stored in these databases.

Q. And you didn't do any copying and pasting of emails into an Excel sheet to create this document?

A. No. We downloaded the raw output of the SQL query which is typically a table just like an Excel spreadsheet. And then I went to the communication body section and I searched for any reference in the body of the email that referenced the BSA.

MR. SGRO: We move for Exhibit 73 to be admitted into evidence.

THE COURT: Anything else on this objection, Mr. Chan?

MR. CHAN: No, Your Honor.

THE COURT: I'm going to overrule the objection. I think the witness has demonstrated that the information to be produced comes from Amazon's business records, that it's essentially primary business records from Amazon's database that it keeps, that I don't know that there's a particular kind of other email account that could have

been manifested to obtain this information, I'm not satisfied that there is. And I don't have anything to indicate that this information has been fabricated or altered in some way. So I'm going to go ahead and allow Exhibit 73.

(Defendants' Exhibit 73 admitted in evidence.)

BY MR. SGRO:

Q. Mr. Smith, looking at the top of page 2 in that first row, can you tell me what each of those headings mean?

A. Yeah. These are the titles of the columns for this particular spreadsheet.

So the first one is seller_ID. As we established previously, this is the numeric identifier for each individual selling account.

The next column is seller_name. That is the name of the selling account.

The next column is comm_date_pst. I apologize, I speak a little fast. That is the date the communication was either sent or received.

And then comm type is the next one which is comm_type which is the type of communication that it is.

The next column is communication_subject. This is the subject line of the communication.

And then the last column is communication_body. And

this is the body of the communication.
Q. And are all the communications shown in Exhibit 73 accessible to the respective selling account shown in the second column?
A. Yes.
Q. How can a selling account access those communications?
A. So the selling account can receive those via email or they can also use our internal tools like Seller Central to access those notifications as well.
Q. If you go to the top of page 2, the first entry in this document --
THE COURT: And I think I'll stop you there. We're right at 3:00 now. I think what we'll do is we'll take a 30-minute break and resume at 3:30 for continued testimony. Thank you.
(Whereupon, a recess followed.)
THE COURT: Cross-examination.
MR. MAGLIERY: Your Honor, forgive me, I don't think we were done with our direct yet.
THE COURT: Okay. I though we were done.
MR. SGRO: We were going to go through some of the emails on Exhibit 73.
THE COURT: I'm sorry to be premature about that. Please proceed.

MR. SGRO: Your Honor, thank you for letting us adjourn to view the eclipse.

THE COURT: Yes. It's kind of ongoing, but glad we all got to take a little bit of a look at it.

BY MR. SGRO:

Q. Mr. Smith, I believe we were on Exhibit 73. Do you have that open in front of you?

A. I do.

Q. Please turn to page 2 of 30 in Exhibit 73.

A. Yes, I can.

Q. At the top of that page, can you please tell me which selling account that communication pertains to?

A. Vanguard.

Q. What is the date of that communication?

A. The 1st of December 2021.

Q. Can you read the first two lines of that communication?

A. I can.

"Hello Global Specialty Products, LLC. We received your submission but do not have enough information to verify your proof of liability insurance at this time for the following reasons. As a reminder, per Section 9 of the Business Solutions Agreement, you are required to obtain liability insurance within 30 days of reaching $10,000 in gross proceeds."

Q. Do you know if this communication was sent by Amazon?
A. From the context, it looks to have been sent by Amazon to the seller.
Q. And does this communication mention the BSA?
A. It does.
Q. Can you please go to the top of page 3, tell me which selling account this communication pertains to and the date?
A. This pertains to Vanguard.
Q. And what is the date of this communication?
A. The 21st of November 2017.
Q. Can you read the first two lines of this communication?
A. I can.
"Please describe your issue." And then all caps, "BELOW IS AN EMAIL WE RECEIVED LAST WEEK AND WE TRIED SEVERAL TIMES TO ACTIVATE IT. DID WE ACCOMPLISH GETTING IT ACTIVATED? I CAN'T SEEM TO TELL. I received an error message one time and the next time it opened the page but didn't say anything. If we didn't activate, can we please manually activate it. Thanks. We would like to try sponsored products."
Q. Do you know who sent this portion of the communication?
A. From the context, it looks like the seller sent that

to Amazon.
Q. And why is that your understanding?
A. Because it comes before the two slashes and after that is an Amazon salutation and an Amazon signoff. And it's written in all caps which is not something we try to do.
Q. What is your understanding as to the content that comes after the two slashes?
A. That was promotional email from Amazon.
Q. Can you read the eighth line of this communication starting with the word "advertisers" right after the period, "2018."
A. One second. Yes.
"Advertisers must maintain a Sponsored Products account in good standing with Amazon subject to the terms of the Amazon Services Business Solutions agreement."
Q. And does this communication involving a selling account mention the BSA?
A. It does.
Q. Can you please go to the top of page 4 of this exhibit and tell me which selling account this communication pertains to?
A. Again, Vanguard.
Q. What's the date of this communication?
A. The 7th of November 2020.

Q. Can you read the first two lines of this communication?
A. "There may be some mistake with this email received. We are selling the latest edition Tattoo Goo. I know there was an older one. But we are selling the same product that appears on this listing. So this listing would have to come down too if you are accurate. Can we get some more info." And then a link to an Amazon ASIN. "Do I also have to deal with Account Health on this as well?"
Q. Do you know who sent this portion of the communication?
A. Again, from context, that looks to be coming from the seller to Amazon.
Q. And why is that your understanding?
A. Again, they're asking questions of Amazon. And then after the three asterisks there is a hello from Amazon, meaning we proactively reached out with the communication and this is the response back.
Q. So what is your understanding as to the content of the communication that comes after the three asterisks in the second line?
A. This is an ask from Amazon letting them know that we removed some detailed pages from the catalog.
Q. Can you please read the eighth line of this

communication, it starts with "It is your obligation."
A. Just give me one moment to find that.
Q. Beginning of that line stars "sale on Amazon.com."
A. "It is your obligation to make sure the products you offer comply with all applicable laws, regulations, and Amazon's policies. What actions do I need to take? If any of the above ASINs are Fulfillment by Amazon (FBA) offers, please initiate a removal request for the ASIN(s) referenced above to have your inventory sent to a location of your choosing. If you fail to initiate a removal request within 30 days of this notification, we may dispose of it in accordance with the Amazon's Business Solutions Agreement and FBA policies."
Q. Is this communication from a seller responding to a communication from Amazon referencing the BSA?
A. The top of the communication is the seller responding.
This communication, the part I just read, is from Amazon to the seller letting them know how to deal with the removal order.
Q. You mentioned a removal order. What is a removal order?
A. Removal order -- so when sellers participate in Amazon FBA, they store their inventory with Amazon warehouses. And we don't allow them to store it

indefinitely. The idea is you sell the product, it goes out to customers. But there are some times when products don't sell, there's a problem with ASIN where that just ends up sitting in the warehouse. So the seller would have to create a removal order to remove that inventory so it doesn't take up valuable space and continue charging them fees. Also, sometimes sellers made a mistake with labeling their orders or something and need to pull stuff back out of the warehouse.

Q. And how does a seller initiate a removal order?

A. They would do that through Seller Central.

Q. Can you please turn to the bottom of page 8 and tell me which selling account this communication pertains to and the date it was sent?

A. Did you say page 8?

Q. Yes, bottom of page 8.

A. Yes.

Q. And tell me which selling account this communication pertains to and the date.

A. This is the Twin Horses account. And the date is the 12th of October 2020.

Q. And can you read the first line of this communication through the portion that has a bullet point and then the word "ASIN"?

A. Yes.

So it starts with ASIN and then lists the alphanumeric ASIN. Complaint ID lists the complaint ID. "Additional information Ben Joseph CEO Medical Collaborative, 100 Commerce Park Rd North Kingstown, RI 02852 MyMedicalWarehouse@gmail.com October 12, 2020 Dear Seller Performance Team: I am writing this appeal for reinstatement of a listing on my Amazon seller account entitled My Medical Warehouse. Merchant Token Number" and then lists also the alphanumeric merchant token number "(the 'Account'). I use the account to sell products for my business, Medical Collaborative, which sells a range of medical equipment. Unfortunately, one of my listings has recently been deactivated and it is in reference to that listing that I write to you today. The listing is one of our top sellers and has been in service for over three years with no problems up to this point. The listing was deactivated on September 23, 2020, in accordance with Amazon Services Business Solutions Agreement due to the following issue."

Q. The text in this communication mentions an appeal. What is an appeal?

A. If a seller has an ASIN or their account enforced, we always provide them an appeals path to get that ASIN reinstated or get their account reinstated. Or they could explain that a mistake was made. They can also admit to

the mistake if they want and provide remedial ways that they're going to stop that mistake from happening. So that would be an appeal.
Q. And is this an example of a communication the seller sent to Amazon?
A. Yes. The salutation is "Dear Seller Performance Team" on the email.
Q. And this communication references the BSA?
A. It does.
Q. The merchant token referenced in this email, can you tell me if that corresponds to a particular selling account using Exhibit 68?
A. I would need to flip back, but yes, I can tell you that.
The merchant token is slightly different from the seller ID. It reflects the same thing. It's an alphanumeric identifier, but it is what we present externally to customers. It's not internal only.
And so that is the one ending in 69L7. That would be, again, Twin Horses, 69L7.
Q. Thank you. Can you please turn to the bottom of page 9.
A. Yes.
Q. Tell me which selling account this communication pertains to.

A. Again, Twin Horses.
Q. What was the date this communication was sent?
A. The 1st of April 2022.
Q. Can you please read the first line of this communication through the third line?
A. I can.
"Hello Wholly Wholesale, LLC, We received your submission but do not have enough information to verify your proof of commercial liability insurance at this time for the reasons below. As a reminder, per Section 9 of the Business Solutions Agreement, you are required to obtain commercial liability insurance within 30 days of reaching $10,000 in gross proceeds or if requested by Amazon."
Q. And do you know who sent this communication?
A. This came from Amazon to the seller.
Q. And is this a communication that references the BSA?
A. It does.
Q. Can you please go to the bottom of page 13.
A. Yes, I can.
Q. Tell me which selling account this communication pertains to.
A. This communication pertains to Health and Household.
Q. What is the date of this communication?
A. The 1st of February 2019.

Q. Can you please read from line 13 in this communication. It's the sentence that starts with "I understand" and the beginning it says "on expedited basis" period and "I understand."

A. Yes.

"I understand that I am asking you to wait 30 days for your hard-earned money, however, kindly understand that we, at Seller Support, have to abide by the policies and regulations set by our business team. Please refer on the link below for more helpful information: FBA Lost and Damaged Inventory Reimbursement Policy," then it lists a link. "Amazon Services Business Solutions Agreement," it lists another link. And then "Inventory Adjustments" and lists another link.

Q. And does this communication reference the BSA?

A. It does.

Q. And do you know who sent this communication?

A. This came from our seller support team at Amazon.

Q. Why is that your understanding?

A. The salutation is "Greetings from Amazon Seller Support."

Q. Please go to the bottom of page 14 and tell me which selling account this pertains to.

A. I just want to clarify, you said 14?

Q. Correct. Sorry, 14.

Can you tell me which selling account this communication pertains to?
A. The bottom of 14, Health and Household.
Q. What's the date on this communication?
A. The 18th of August 2020.
Q. Can you read the first line of this communication ending in "Thanks" then "re"?
A. Yes.
"The ASIN cannot have anything edited from my end so let's do this. Whatever you don't like, REMOVE IT! Thanks."
Q. And prior to the re line, is that something the seller sent?
A. Correct.
Q. And why is that your understanding?
A. Again, the context of the seller talking about the ASIN and asking us to remove it. And then after that comes the communication from Amazon, Notification of Restricted Products Removal.
Q. Can I ask you to please read the tenth and eleventh line of this communication starting with "If you fail." And the line starts on the left-hand side "for the ASIN(s)." And midway through is "If you fail."
A. "If you fail to initiate a removal request within 30 days of this notification, we may dispose of it in

accordance with the Amazon Services Business Solutions Agreement and FBA policies."

Q. This is a communication to the seller that references the BSA?

A. Correct. That part of it is to the seller, but the original was from the seller.

Q. Can you please go to the top of page 19.

A. I can.

Q. Let me know when you're there.

A. I am here.

Q. Which selling account does the communication on the top of page 19 pertain to?

A. The top of page 19 is Health and Household.

Q. And the date on this communication?

A. The 17th of October 2021.

Q. Can you read the first four lines of this communication?

A. Yes.

"DID YOU RECENTLY CHANGE YOUR REQUIREMENTS? AMAZON SYSTEM IS ASKING FOR COMMERCIAL LIABILITY INSURANCE NOW AND NOT PRODUCT LIABILITY AS WELL AS THE VENDOR. Insurance requirements. Commercial liability insurance will protect you from incidents resulting from the products you sell and give you piece of mind while you focus on growing your business. Under Section 9 of the

Amazon Services Business Solutions Agreement, you are required to obtain and maintain commercial liability insurance within 30 days after exceeding $10,000 in gross proceeds in sales in one month on Amazon.com."

Q. Do you know who sent this communication?

A. The initial communication looks like it's coming from the seller as it is in all caps and is asking questions of us.

And then the following communication looks like it's coming from Amazon advising of the commercial insurance liability requirements.

Q. And can you now please go to the bottom of page 23.

A. I can.

Q. Can you please tell me which selling account this communication pertains to?

A. Medcare Industries.

Q. What's the date on this communication?

A. The 16th of December 2021.

Q. And can you please read the first four lines of this communication.

A. Yes.

"Our carrier, Pil Freight Services, has notified us that the ship to address you listed for the following removal order(s)," and then lists the removal order ID, "Has refused shipment. Seller/cosignee has moved. In

order to resolve this issue, provide us with an alternative delivery address within 400 miles of the original cosignee/designated recipient by replying to this email within five business days 23rd of December 2021. Please be sure to include contact name, phone number, and/or email address, too. Please note that per Amazon Business Solutions Agreement (BSA) if your designated ship-to address doesn't accept delivery of the removal order shipments, Amazon reserves the right to dispose or donate this freight and you will not be eligible for reimbursement from Amazon."

Q. Do you know who sent this communication?

A. That looks to be coming, again, from Amazon to the seller.

Q. Why is that your understanding?

A. So it talks about our carrier refusing shipment of a removal order. And then it is signed Zach H. at Amazon.com Vendor Services.

Q. Following this email, if you look on pages 24 through 30, do you see various emails that begin with "Hello from Fullfillment by Amazon"?

A. Yes.

Q. What are each of these emails concerning?

A. Again, in this instance notifying that the inventory removed from our fulfillment centers was not accepted.

MR. CHAN: What page are we on, sir?
THE WITNESS: 24, I think.
MR. SGRO: Yes, pages 24 through 30, the emails that begin with "Hello from Fulfillment by Amazon."
THE WITNESS: They look to be from our fulfillment, our FBA service to the seller.
BY MR. SGRO:
Q. And do each of these communication reference Amazon's BSA?
A. Let me go through them again.
Yes. Yep. 26, 27, yes. Yes. 28, yes. Yep. Yep.
Yes, they all look to reference the BSA.
Q. Can you please turn back to Exhibit 68.
A. Yes.
Q. And specifically page 4 of 5 on Exhibit 68. Let me know when you're there.
A. Page 4 of 5, yes.
Q. Yes, page 4 of 5.
A. This is the screenshot for the Vanguard account.
Q. And what's the merchant registration date for the Vanguard account?
A. The merchant registration date is June 22, 2017.
Q. And does the entry indicate what time zone the registration is in?
A. Yes. UTC.

Q. What is your understanding UTC is?
A. It's meridian time. It's in Europe. It's the start of all the time zones, from my understanding.
Q. And I would like to turn to Exhibit 72. Can you please tell me, which we previously looked at on Exhibit 72, which selling account Exhibit 72 pertains to?
A. This looks to be the Vanguard account that we were just speaking about. These are the registered payment accounts for the Vanguard account.
Q. And can you please refer us to the first credit card payment account for the Vanguard account and the date that it was added to the selling account?
A. The 21st of June, 2017.
Q. Is that any different than the merchant registration date?
A. No, it looks to be the same. Again, UTC, the United States is earlier than UTC. So that was around midnight UTC, so it would have technically been the 21st of June 2017. And again, same as the credit account.
Q. Is it your understanding that a credit card is necessary to register for an Amazon selling account?
A. That's my understanding, yes.
MR. SGRO: I have no further questions for this witness.
THE COURT: All right. Thank you.

Cross-examination.

While Mr. Chan is coming up, remind me, when did you start working?

THE WITNESS: When did I start working? January of 2019. I actually celebrated by five-year anniversary this year.

CROSS-EXAMINATION

BY MR. CHAN:

Q. Good afternoon, Mr. Smith.

A. Good afternoon.

Q. I have quite a few follow-up questions. Let me just make room here.

A. Could you move the microphone down or speak up? I'm sorry, I'm having a really hard time hearing you.

Q. Can you hear me now?

A. Yeah. If I can't, I'll let you know.

Q. Okay. Let me find the right exhibit.

Let me call your attention to Exhibit 68.

A. Sure.

Q. This account is ending number 7015. It's Twin Horses.

A. The one ending in 7105, is that what you said?

Q. Yes.

Can you read out the original merchant registration

date?
A. January 30, 2014.
Q. Okay. Now, we need to find the corresponding --
A. I'm sorry?
Q. We need to find the corresponding exhibit because when they opened the account they require credit card which you provided. So looks like it's -- is it 73? Looks like it's 71. No, it's Exhibit 72. Document 61-71
A. Okay.
Q. My question to you is: The account was opened 2014. Your record is incomplete because it show 2017 through 2023. Is there a reason why some information is previously left out here?
MR. SGRO: Objection. This exhibit does not show the Twin Horses account.
MR. CHAN: I'm sorry, it's the wrong one. We are on Twin Horses, right? If this were bigger, I would be able to find it a little quicker. Twin Horses.
BY MR. CHAN:
Q. Could you find the date that matches the registration date of January 30, 2014? You got to look at the right column --
A. About halfway down.
Q. So what's the name over there?
A. Basil Mignacca. 42 Courtiers Rd., Cranston, RI.

Q. So it does not say Benjamin Ligeri, does it?
A. It does not.
Q. Okay. So this record would show that Mr. Benjamin Ligeri, who is the plaintiff, did not originally initially register, open this account correct?
A. It would show that his credit card isn't on the original submission of the account.
Q. Right.
Also, from previous testimony I was under the impression that the credit card name has to match the person's ID as the opening registration person, correct?
A. I don't know that.
Q. You don't know. So I can open account and use someone else's credit card?
A. Technically, illegally, yes.
Q. Okay. So there's no -- there's no -- nothing in your system that can detect Mr. A open account and use Mr. B's credit card?
A. Not that I am -- I'm not familiar with that part because I don't do registration.
Q. Okay. But there's a possibility that Amazon will allow somebody's identity using someone else's credit card, you're saying?
A. Are you asking if there's a possibility?
Q. Yeah.

A. Maybe. I don't know.
Q. Okay. Because I was impressed with the system you have, so strict, so tight. And now you're saying there's a loophole that A can open account using B's information? What about the identification verification process that was bolstered earlier this morning?
A. I wasn't here for that testimony, so I don't know.
Q. Because it's outside your department, right?
A. Yeah.
Q. Okay. Let's go to the next one. Account ending 5615. That's the one Health and Household?
THE COURT: What exhibit number are you on right now?
MR. CHAN: Pardon me?
THE COURT: Mr. Chan, what exhibit number are you referring to?
MR. CHAN: That is based on Exhibit 68.
THE COURT: Okay. Thank you.
MR. CHAN: Page 2.
THE WITNESS: Okay.
BY MR. CHAN:
Q. It's the first one. It's ending with -- this is small and it's complicated. So Customer ID 7015 which says is Twin Horses?
A. Yes.

Q. So we need to match the number -- is that the one I just did?
A. That's the one I think we just talked about.
Q. Then I have to go to the next one which is 5615 and it's Health and Household. Would you read out the registration date for that?
A. Yes. The 11th of March 2014.
Q. Now we need to find the corresponding credit card information that you're provided. I'm still looking. Why am I not finding it?
Is it page 2 of Exhibit 69?
A. Yes.
Q. Okay. So the one that's dated 2014, what's the name on the credit card?
A. Jasmines Gifts LLC.
Q. So it does not say Benjamin Ligeri either, does it?
A. It does not.
Q. Okay. Now move on to the third one, which is Vanguard. That one customer ID is 7002?
A. Yes.
Q. And the registration date is 2017?
A. Yes.
Q. Okay. So what exhibit are we looking at?
Bear with me, Your Honor. My eyes are bad.
Vanguard -- I still don't see it.

MR. LIGERI: Can I assist him in turning the pages, Your Honor?
BY MR. CHAN:
Q. It's Exhibit 72, I believe?
A. Correct. I have it here.
Q. I saw a Joseph Ligeri, not Benjamin Ligeri?
A. Correct.
Q. Okay. And last one, who do you have last? Medcare which is 0902 ending?
A. Yes.
Q. Let me find the exhibit. That one -- what's the registration date?
A. The registration date on Medcare Industries is December 8, 2019.
Q. December 8, 2019.
So there is a December something, 2019. What's the name for the credit card opening?
A. Tyra Wilson.
Q. She's not Benjamin -- she's not Benjamin Ligeri, is she?
A. That's not the same name, no.
Q. Who have access to this registration credit card personal information, are you the only one?
A. I'm sorry, what's the question?
Q. Are you the only one that has access to this personal

credit card information opening account?
A. No.
Q. Someone else has access?
A. Many people. There are people in the registrations department that have access to it.
Q. Such as who?
A. I don't know names, but we have a whole department dedicated to registration.
Q. Okay. So you're saying this information is readily available if you ask?
A. I wouldn't say readily available, but it is available to the teams that need it.
Q. Would a paralegal have access to this information?
A. I don't know if they have direct access. I'm not a paralegal. I don't know.
Q. Would they be able to get the information?
A. They would typically reach out to a team like mine, and we would provide that information if it was needed for a legal proceeding.
Q. Do you keep records of who requested any particular information?
A. I'm sure we do keep records of it. I don't have those in front of me.
Q. Okay. The reason is there's a discrepancy in the evidence between this hearing and last hearing. I'm just

curious to how that happened. I think the Judge may want to know too. But you don't have the answer for that, right?

A. I don't believe so. I don't know what the discrepancy is. I don't know.

Q. Okay. Because we're talking about possible perjury here. So, okay, I can't -- I can't ask you for something you don't have. Let me have more follow-up questions.

A. Sure.

Q. You used the word "filter." You filtered the information to create this email. What's your criteria of filtering?

A. What are we talking about, sir?

Q. In the Excel spreadsheet that you put down, you used the word "filtered information." I think that's what you used. And then you copy over. What criteria did you use in filtering? Because in litigation, by filtering you're not showing us the complete information. So from evidence standpoint, we should have a complete -- I know it would be a lot of pages, but my interest is what criteria did you use to filter the email?

A. So I did a word search within Excel for Business Solutions Agreement.

Q. Okay. So you are pulling everything that says Business Solutions Agreement?

A. Yes.
Q. Okay. That's your criteria, okay.
In the appeal process, how is the internal procedure -- because you're the head of that department, whether it's abuse or appeal, what's the procedure to handle an appeal from a seller from some of the email that you receive?
A. I just want to clarify. I'm not the head of the appeals department.
Q. You're in the department where you handle abuses and appeals?
A. We handle escalations.
Q. Okay. Take one of the emails that says they contesting and complaining about something being shut down, the account being shut down. So what's your procedure in handling this kind of appeal by email?
A. So we don't handle these direct appeals. But if we get an escalation from an internal Amazonian, we review the information provided, we will investigate the seller account, investigate any of the claims in that. And then we will make a decision based off of the totality of the circumstances.
Q. So do you know who is the person communicating by email in some of these examples that you show us?
A. In some of these examples, I believe I know some of

them. But I don't have that information.
Q. So you're using someone else's email, copy and paste into here. Isn't that hearsay, Your Honor?
MR. SGRO: Objection, misstates testimony.
BY MR. CHAN:
Q. No, no. You say someone else is sending email. You didn't, right?
A. No, I believe you asked me if I knew some of the people who had sent the emails. And my response was yes, I think I do know some of the people who sent the emails.
Q. I'm not asking whether you know the person. I'm saying you did not firsthand send those emails. You just opened someone else's email, copy it, and paste onto the spreadsheet?
A. That's not what my testimony is. I pulled this from our business records database. I didn't, like, pull an email out of somebody else's inbox, if that's what you're saying. I'm trying to understand the question.
Q. Okay. What is this database? It keeps track of what?
A. It stores and it saves the information on communications with Amazon.
Q. Okay. We still didn't hear the procedure. You say you're in charge of escalated events?
A. Uh-huh.

Q. So what does it take -- or what happened to a point that you get involved? That's what I want to know.
A. So as I explained earlier, if somebody at the company gets, you know, a comment from a seller or notices something like they're an account health representative and they're reviewing an account, they may say, hey, something is going wrong here or this seller is not being treated maybe fairly. Or maybe our SOPs are not working in the way they are intended to work. Or maybe, hey, I was surfing Amazon yesterday and I saw this abusive listing on the store. They can write into us -- any internal Amazonian can write into us and say, hey, we found this issue, can you investigate and look at it. So we look at what they send in. And then we will pull up the seller account or the ASIN that they're saying there's an issue with. And then we investigate the totality of the circumstances surrounding that. So, you know, is the seller stuck in an appeals loop? Or something like that. Is the seller abusing the system in some way?
And then our job is to try and resolve that situation, get the seller out of that loop or take an abusive listing down so that it doesn't hurt customers, right?
Q. Okay. Go back to that particular email where the seller complains by email basically saying --

A. Which email is that?
Q. Oh, boy. The content has to do with the account being deactivated. It does reference a section of the BSA which it's a reference. Let me see if I can find it. It might be difficult now. Give me a sec.
I don't seem to find it. It's so tiny, I can't see.
I'll come back to it. I have another question. I'll come back to that one.
A. Okay.
Q. If you look at page 2 of Exhibit 73.
A. Yes.
Q. I believe it's the first email on top.
A. Okay.
Q. At the very bottom of that first email, looks like it says please note this email was sent from an -- something -- only address that cannot accept incoming email. Please do not reply to this email message.
A. Yes.
Q. Right?
A. Yes.
Q. So you're showing us a communication where you send a response, but there's no way for the recipient to respond to your email. You did not indicate what email he could use, but just don't use this one. So how does the process work? Somebody complain, you responded, and then it ends,

they can't come back to you?
A. So I believe I testified earlier -- and if I didn't, I apologize -- that some communications that we send are through email and some can also be done directly through Seller Central. Some of the seller support emails, they actually open cases within Seller Central. And those cases do send notifications to the seller via email but they don't reply via email. We try to do that to keep a record of the communication going back and forth within, from my understanding.
Q. Okay. So this one is just one example. You say there are other emails that there's a two-way communication?
A. It's usually done through a case. Like you can see here it references case number and it has the case number in the subject line. It's a case within the Seller Central system.
Q. Judging from what you show us here, how does anybody know if this case was actually communicated further in a two-way street? Or is that the end because you can't respond to this email? How can I tell?
A. You would have to pull up the case and look at the back-and-forth on the case ID.
Q. Okay. So some cases you do have notification, okay. I don't see it here.

A. Okay.
Q. And can you again define what is the criteria for any case that will be classified as escalated and that you would be in charge or you would be involved?
A. So for our internal escalations -- there are other escalations teams at Amazon, but I can only speak for the one I'm in. For our internal escalations, it is from an internal Amazonian and they're raising an issue about a seller that there's either abuse happening or they're stuck in some type of situation that they need to be helped out of.
Q. Your department has the authority to deactivate an account?
A. We do.
Q. And what's your criteria? Is it subjective? Objective? In between?
A. Our criteria is more subjective because we are kind of that last line of defense team. So we step in if the standard process isn't working as designed.
Q. Okay. And what is the recourse after they're deactivated? What is their course of action to get reactivated?
MR. SGRO: Objection. It's beyond the scope of his direct testimony.
THE COURT: So you're concerned in terms of

what's the recourse somebody has? Why is this relevant to the arbitration agreement, this question? It sounds like you're looking at the merits or something.

MR. CHAN: Okay. The -- the plaintiff is saying he never agreed to arbitration. So his idea is he contract the service, he pay for the service. But they keep bringing back the BSA. And I just want to understand the process when there's a conflict between a seller and Amazon, how do they resolve? I see a lot of practice that they don't even stick to their own policy defined by the BSA, which makes that the BSA is just a dressed-up piece of paper, they do whatever they want. So I'm not truly fishing, but I want to understand the process of resolving.

This account information is brought up by them. And also there's no end. I just want to understand if there's anything there that I could use related to the BSA.

THE COURT: When you say you're not truly fishing, it sounds like you are fishing, for sure. Because I can't understand why it is that even if you want to say that Amazon sometimes doesn't abide by certain provisions of the BSA or you believe that your clients were not treated fairly by Amazon, that doesn't mean that the BSA is unenforceable and specifically the arbitration

clause there. If we're going to go into all of the issues which you believe Amazon has not kept faith with the BSA, that really doesn't seem to me to be germane to the issue that we're here for, that we're having a hearing about, which is whether there was an agreement to arbitrate, what the scope was, and whether it's enforceable.

MR. CHAN: One of the arguments is the entire BSA is not even valid, enforceable because like a consent. Also because the adhesion nature, if he's doing anything by the BSA which is so one-sided, everything for Amazon, nothing for the seller, that is the extreme adhesion nature of the BSA which would make it unconscionable and therefore not enforceable. So I'm not really too far out, Your Honor. It's the other angle. We're not arguing just consent or no consent. We're arguing the whole adhesion nature, the unconscionable nature of the agreement.

THE COURT: Sir, I think I've asked you this before and if you could point me to something in there that says this. I don't think you're pointing to anything in the agreement itself that is unfair. You're upset, I think, at the way that Amazon has conducted itself over the years. That doesn't make the contract itself a contract of adhesion. So I have a concern about that as well.

MR. CHAN: Since you go there, Your Honor, if

you look at one of the examples of the BSA. I'll just get one.

THE COURT: I'll tell you what. We have a witness on the stand now. If you have further arguments about that, but stick to the facts with this witness that are germane to this hearing.

MR. CHAN: I'll scratch the last question regarding the deactivation process. So let me continue. Because I have more important questions to ask.

BY MR. CHAN:

Q. You have the authority to deactivate and it's subjective. So would it be fair to say if one of your team members made a mistake and apparently deactivate an account not wrongfully but not truly based on the facts, is it fair to say then that seller is pretty much out of luck?

MR. SGRO: Objection, relevance. It goes to the merits.

THE COURT: That's sustained.

Try another question, please. This has nothing to do with the arbitration clause.

BY MR. CHAN:

Q. In the summary of all the credit card accounts, you see name change, account change. Whose duty is that --

A. The seller.

Q. -- to --
A. Oh, sorry. I thought you were done with your question. I apologize.
Q. Shall I repeat?
A. Yes, please.
Q. Back on the seller account, you showed the history of it and the names of the person and the credit card, whether it's a transfer, a change, but they keep changing. What is -- what is Amazon's policy in terms of managing or monitoring these names behind the account?
A. I don't know.
Q. You don't?
A. No.
Q. What department does the monitoring of this transfer?
A. I'm actually not sure.
Q. Pardon me?
A. I'm not sure.
Q. So are you aware there is a portal on Seller Central that allows people to do transfers?
A. Am I aware that there is a place in Seller Central that people can change their payment account; is that what you're asking?
Q. Changing information on the account, correct.
A. Yes. There's a place for them to change their payment account information.

Q. Right. And they can do so without Amazon's consent or blessing, if you may?
A. I mean, they can change the account. But if they change it to like a credit card you can't charge, then we may reject that, right?
Q. Can you say that again?
A. If they changed it, for example, to an expired credit card or something like that and we can't charge it, we will request that they update their payment information.
Q. My question is: You saw the names change, the identity of the person changed --
A. Okay.
Q. -- on all of these accounts.
A. Okay.
Q. And does Amazon do anything about it?
A. I'm not sure what you're asking. Do we do anything about it?
Q. Yeah.
A. If they change the payment information?
Q. And the names.
A. The names that are associated with the credit card that's on there?
Q. Right.
A. I don't know exactly what you're asking. What do you mean by "do anything about it"?

Q. Okay. In your BSA, it says this agreement cannot be assigned without Amazon consent or approval. On top of that your seller's conduct also says the seller's account cannot be transferred. So when you see names change within that account, doesn't it tell you something is happening and you don't do anything about it or you don't know?
A. Just because the payment changes doesn't mean the ownership of the account changes. For example, if you're an owner of an LLC, you might have many different people that you're partnering with and maybe one person has their card on there one month and then another person. Or maybe you have the LLC's card on there, right?
Q. So you're saying it's okay?
A. If they change their payment account information?
Q. Yeah.
A. Yes.
Q. Okay. So you basically look at the account based on the ID, the customer ID of the account?
A. Are you asking when I looked these up?
Q. Yeah.
A. Yes, I did it by the seller ID.
Q. So shouldn't an account, basically a number, this is the number of the account. And you don't care about behind that account number who is the person, what's the

name that's actually running the business?
A. I don't understand what you're asking by we don't care.
Q. A customer ID is an ID. It's a number that you assign.
A. Right.
Q. That's not a live person.
A. A number is not a person.
Q. Correct, correct.
A. Correct.
Q. So when you see a change of name and payment change, it does not trigger anything on Amazon's part to look into if there's a change of ownership, if there's addition of people, or did the person pass away and someone else took over? It doesn't bother you?
A. I mean, I don't know if it would -- I don't know what bother has to do with it. There are checks that are run on credit cards, but I am not familiar with all of the checks that are run on credit cards because that's not my department. There are checks that are run on accounts to make sure, you know, it's not a stolen card or it's not somebody, you know -- that type of stuff.
Q. I asked this question to probably three people. Nobody can answer me. Who authorizes a particular seller to use the features on Seller Central so that they can

list product, that they can use the inventory service, they can use the shipping service and they can sell? Who authorized that seller to use all these nice features? Somebody had to.
A. When they sign up for the account, they gain access to those features, right?
Q. Right. But whoever signed up on the account, as you can see, got changed. It's no longer the same person that's holding the account. Otherwise, the person's name would still be on it. Some of them changed three, four times.
A. The payment accounts you're talking about, right?
Q. Yes.
A. Yes, the payment accounts changed multiple times throughout the life of some of these accounts. Some of them they were the same.
Q. So the payment changed, the name changed. To you, it's still the same account because they're the same account, customer ID account number?
A. Yes.
Q. You verified my suspicion. So you're really strictly looking at the customer account number as the account?
A. Again, for me personally. We have other teams that look at, you know, registration and things like that. But it's not -- I'm speaking from my knowledge. I'm sorry.

Q. Yeah. In some of the records -- actually not just the names, the company name got changed, which means the tax ID would have to change. You can't have two different companies having the same tax ID. So that doesn't affect anything.

MR. SGRO: Objection, foundation. There's no testimony on tax-verified names changing or anything.

THE COURT: I'll sustain it.

But you can set the foundation, if you'd like, sir.

BY MR. CHAN:

Q. In your portal, is there any restriction for a seller to change name, company, tax reporting ID?

A. I don't know what restrictions there are on changing the names. But the seller has the ability to change those things on Seller Central.

Q. If Company A changed to Company B and they're in the same state, since no two companies can have the same tax ID, wouldn't that be a good conclusion to say that the tax ID got changed?

A. Can you ask the question again? I'm not sure what the question was exactly.

Q. Okay. Let me ask the other way.

A. Sure.

Q. At the end of the year when you issue a 1099, what

information do you use?
A. I have no idea. I'm not in the tax department. Sorry.
Q. That's outside your department?
A. Yeah.
Q. As an escalation manager, you're involved in trademark infringement cases?
A. I testified to that, yes. Sometimes.
Q. You do, right?
A. Mostly my team, but yes.
Q. How do you get involved?
A. Again, if internally someone escalates to us about potential trademark infringement or one of the notice cases that was submitted isn't being handled correctly, those can get escalated to us. And then our intellectual property team under me would handle those cases.
Q. If Seller A files a complaint to Amazon and says Seller B is selling bootleg products to compete with my trademark products, what do you usually respond? How do you usually respond?
MR. SGRO: Objection, relevance.
THE COURT: So what's the trademark issues have to do -- I know this is part of your complaint. We're not here to hear the merits of the complaint. We're here to talk about the arbitration clause and whether it's

enforceable here. How does the line of questioning about trademark disputes relate?

MR. CHAN: Amazon has a special IP management policy which in the complaint explains that is actually fraudulent. One of the complaints is IP infringement. And in fact, when plaintiff testifies, he will link everything together. So the IP infringement is an exception to the arbitration clause. That's how I --

THE COURT: Well, there's an exception for injunctive relief. And then it's an exception that doesn't really help you here, because it just means the case gets shipped out to a court in the Western District of Washington, as I recall. I don't see how it has anything to do with -- this questioning has anything to do with what we're here to resolve.

MR. CHAN: I'll get that portion through the plaintiff. He can present better evidence how to link that together.

BY MR. CHAN:

Q. Do you have a review -- this goes back. The email talks about the account being deactivated.

MR. CHAN: So you're saying I cannot ask questions on trademark infringement?

THE COURT: Not the question that you've asked, sir. You're going into the merits of the complaint that

you have, not to the enforceability of the arbitration clause or to the forum selection clause, whichever way.

MR. CHAN: Okay.

THE COURT: Unless you can explain that to me. I've asked for an explanation and I haven't gotten it from you.

MR. CHAN: Well, there is document in the plaintiff's testimony. So I'll just wait at that time to inject that piece in. That's okay.

BY MR. CHAN:

Q. Do you know from the email that you provided for the Court what percentage that is compared to the total email?

A. Off the top of my head, no. If you give me a calculator, I might be able to.

Q. So just to reconfirm, no matter what changes to that particular customer account, as long as the ID doesn't change, nothing happens? In other words, it doesn't trigger any response from Amazon, whether name, company, tax ID?

A. Again, there are triggers when account changes happen, but I'm not familiar with all of the checks that we do.

Q. What kind of change would trigger attention from Amazon?

A. Like, I think I mentioned earlier a stolen credit

card gets put --
Q. Say that again?
A. A stolen credit card gets put on the account. Or I think I mentioned earlier in my testimony if you change the store name to something with objectionable language in it or something, right, there are checks that happen. I'm not familiar with every single check that we do.
Q. In your email to the sellers, some of them do reference the term "BSA." Did any of that email come back challenging you on the terms of the BSA?
A. I don't believe I saw any that were challenging the BSA. Most of them were us communicating that the BSA applies.
Q. So when you filter the email using the terms, did you glance through all of them that has the term and take some out, or did you include all of them with those terms in them?
A. As I said earlier, I searched. I did a word search for the term "Business Solutions Agreement" and I took all of those emails. That's what's in here.
Q. Okay. The company policy gives you absolute authority in terms of responding to seller's complaints or --
A. What do you mean by "absolute authority"?
Q. Do you have to go above another level to take action

or to respond to any complaint made by a seller?
A. We don't respond to seller complaints. Our escalations are internal. So we're responding to our internal stakeholders. But sometimes like if we reverse a decision, for example, we will communicate with the seller. And we use our legally approved blurbs to do those communications.
Q. So there's standardized responses that you are allowed to use?
A. For our teams, yes. To communicate with sellers, we have legally approved blurbs.
MR. CHAN: Okay. I don't have any questions. I have, but not to this witness, because it's outside his scope.
THE COURT: Certainly.
Any redirect examination?
MR. SGRO: Just a few, Your Honor.

REDIRECT EXAMINATION

BY MR. SGRO:
Q. Mr. Smith, do you recall the email that plaintiffs' counsel pointed out that had please do not respond to this email?
A. Yes.
Q. Can sellers respond to that communication from

Amazon?
A. They can respond to it. As I said, they would need to do it on the case to customer service. But as it indicates, they aren't able to directly respond to the email in this instance.
Q. Where would the seller go exactly to respond to that communication?
A. They can go to Seller Central.
Q. And they would -- strike that.
Would that case ID be referenced anywhere in Seller Central?
A. Yes, there is a Messages section in Seller Central and Notifications section. Depending on what type of issue that it is, it might end up in either of those. But the Messages section will usually have their seller support information, and the Notifications section would have any enforcements and things like that.
Q. Does Amazon expect its sellers to abide by the terms of the BSA?
A. Yes.
Q. And are there reasons for a company to change its name on Seller Central, such as --
A. Yes. Let's say you start with a partner, right, and you're running an LLC together. And then your partner decides to leave, right? And you may need to change the

nature of the business, but you still maintain ownership of the account.

Q. If an LLC changes its name but the owners remain the same, can sellers notify Amazon of that change?

A. They could do that as well.

MR. SGRO: No further questions.

THE COURT: Mr. Chan, do you have anything else you want to ask this witness, sir?

MR. CHAN: No, Your Honor.

THE COURT: Thank you for coming. Safe travels.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused at this time.

MR. LIGERI: Your Honor --

THE COURT: Hold on a second.

Mr. Ligeri, are you trying to address the Court?

MR. LIGERI: Yes, Your Honor.

THE COURT: Can you do so through your counsel?

MR. LIGERI: Sure.

(Pause.)

MR. CHAN: We're okay.

THE COURT: Okay. Thank you, Mr. Chan.

Does Amazon have any more witnesses or evidence to present?

MR. MAGLIERY: Your Honor, we rest. And it's the end of the day. I don't know what the Court would

like to do next, but we rest on those witnesses.

THE COURT: So I think at this point we'll turn to plaintiffs.

Mr. Chan, would you like to proceed with your first witness?

MR. CHAN: I would call Mr. Morrow Long.

MR. MAGLIERY: Your Honor, we object to this witness. It appears he's being offered for expert testimony. There's been no report. There's been no disclosure. We're not sure what the topics for the expert testimony are. There's been no Rule 26(f) meet-and-confer. We at least ask that there be a proffer before the witness testifies of the qualifications and the expected opinion so that we can then address the Court if there is reason to object to either the qualifications or the proffer.

THE COURT: I see. Okay.

So, Mr. Chan, I have this witness listed on your witness list.

MR. CHAN: Yeah. That was sent out ten days ago, six-page resumé.

THE COURT: I got the resumé. But it says that he is going to examine and impeach the digital evidence that's offered by the defendants and to additionally establish there was no way that the plaintiffs validly

executed the agreement as defendants contend. Is that what he's going to testify to?

MR. CHAN: Well, whatever IT-related testimony the witnesses offer, they are not IT experts. So my expert will have a chance to basically clarify with the Court to challenge their testimony.

THE COURT: I see. But in what manner is he going to challenge the testimony that we've heard? We basically have gotten computerized business records put in by the Amazon witnesses. What is he going to testify about or say or do, do you anticipate?

MR. CHAN: Witnesses purposely basically ducked the questions and not forthcoming providing information. My witness would basically clarify with the Court that that information is available and they are purposely withholding it by refusing to answer.

THE COURT: So you're calling him to impeach or -- I guess I'm unclear. For example, what is he going to testify to?

MR. CHAN: I'll give you an example. I asked for records of digital signature. They say it doesn't exist. My expert will tell you that even a basic system would have digital signature they should have produced given seven months of time period to produce. So they are avoiding -- well, on top of that, we just saw today right

on record Mr. Ligeri never opened any of those accounts. And the previous declarant -- I guess it's water over the damn -- she literally lied through her teeth. She saw the record that he's the account opener. That's an example of bad faith dealing. So I'm just asking for a chance to further uncover some of these tactics that this vendor is using trying to hide information. And I can't do it because I'm not an IT guy. An IT expert could possibly educate the Court.

MR. MAGLIERY: May I be heard, Your Honor?

THE COURT: Mr. Magliery.

MR. MAGLIERY: Thank you.

As I understand the construct of this hearing, there's been absolutely no pretrial discovery. And it is up to us, the Court's order was very clear, to meet our burden to prove that the plaintiffs are subject to an arbitration provision. If there's an argument that we failed to meet our burden, that's an argument that will be made after the evidence is in. There's been no evidence today, though, about some digital records that this expert could offer anything helpful on. He frankly doesn't meet any of the Rule 702 gatekeeper requirements. We don't know what the testimony is based on. We don't know what methods he's going to employ. We frankly haven't produced any information that he could have examined to come in

here with sufficiently reliable methods and scientific application of those methods. They're just arguing we didn't prove our case, which we of course understand is going to be their argument. But I don't see how the expert is going to offer anything helpful to the Court about the legal issue of whether or not there's been an agreement. The evidence is in. They seem to be arguing it's insufficient, we should have had some digital signature. I don't know how their expert is going to say what systems exist at Amazon and how we ought to have presented them.

THE COURT: I gather there has been no testimony that there was a digital signature in the first place, right?

MR. MAGLIERY: As I think we went through with Mr. Orzbatur, we didn't even know what a digital signature is. I did hear testimony that there is a record kept when a person clicks through the "Agree and continue" box, but we don't use the term "digital signature." So impeaching someone on digital signature seems like it wouldn't meet the evidence in any way.

THE COURT: I was really confused by that argument too, Mr. Chan. I understand sometimes there are digital signatures where someone is required to sign in some way on a digital form. It's commonly done. But the

law doesn't require it, as far as I know. And I didn't hear testimony from Amazon witnesses saying that there was -- anybody, whether Mr. Ligeri or there was reference to a Joseph Ligeri. Do you know who he is, Mr. Chan? You don't know who Joseph Ligeri is?

MR. CHAN: I don't know.

THE COURT: And whether there are references to other people connected to these accounts. I didn't remember any kind of testimony that there was a digital signature even asked for. So for you to put an expert on and talk about why isn't there a digital signature, I can't see how that make a difference if there hasn't been a suggestion in the first place from Amazon that they in fact created a digital signature from your client or this mysterious Joseph Ligeri who you say you don't know who he is. Or anybody else. So why does this witness need to testify about that? First.

The second reason you've offered is you're upset that a paralegal from Amazon offered an affidavit at an earlier point in time in the case which, as you'll recall, I declined to credit. Now, that affidavit is already part of the record in the case. So if you want to point to the affidavit and say, look, Amazon said A at Point 1 and now later it says B at Point 2 and this maybe undermines Amazon's credibility, if you want to make the argument,

fair argument to make. You do not need an expert to take the witness stand to make that argument.

So I'm still waiting to hear from you what is it that Mr. Long is going to testify to that's actually germane to this proceeding.

MR. CHAN: My point was, given the expert witness, that he would testify that there were indeed information regarding the original signature registrant. Not only did the last declarant commit perjury, but the actual signature would show that not only Mr. Ligeri was not the original person. And I guess if they decide not to show it and not meeting the burden of proof, that's fine. I was hoping the Court would compel production of that evidence to further prove that somebody commit perjury.

THE COURT: Do you have a fact witness who is going to testify that they gave a digital signature to Amazon?

MR. CHAN: One of the witnesses on the list, he is actually one of the original account opening person.

THE COURT: Mr. Mignacca?

MR. CHAN: Yeah.

THE COURT: I'm looking at the summary of the testimony. I don't see any reference in the summary -- maybe I'm missing it -- that he furnished a digital

signature. What I mean by digital signature, he would hand sign something in electronic form or mark something that was a signature.

MR. CHAN: He would testify that he transferred the account to Mr. Ligeri. And before that, he has to prove that he is the legally true owner of the account initially opened. Which then, to prove that, he would have to testify that he did indeed click something which would be on record.

I guess I'm trying too hard to show the bad faith dealing on the other side. So if somebody committed perjury and it's proven already today, if the Court wants to let it go, that's fine.

THE COURT: If the Court wants to let perjury go, is that what you're telling me?

MR. CHAN: Obviously, I just had one of the witnesses go through the account and all the names opening the account. None of them show Mr. Ligeri. Yet client used declarant to say that it was indeed Mr. Ligeri on four accounts opened. Until the testimony of witness come out, we say he is not reliable. But not only that, now we know she committed perjury because she said she saw the record, it was him opening the account. We just saw the credit card information, date stamp, and his name is not on it. Maybe I'm just chasing a ghost, but I just want to

point that out.

THE COURT: I see. Well, if you have -- I still am waiting. You've proposed to call an expert here. I haven't -- he doesn't seem to have any factual knowledge about the case, as far as you're describing to me, but correct me if I'm wrong about that. That's what I'm puzzled about is what is it that he could competently testify about.

MR. CHAN: Well, the original plan was to use the expert to address the previous declarant. But the fact that we have evidence today to show that the original account opening person was not Mr. Ligeri because opposing counsel supplied the information. So technically I guess we probably don't need the expert in terms of today.

THE COURT: Okay. Then we don't need the expert.

Who is going to be your next witness besides the expert?

MR. CHAN: That would be Mr. Ligeri.

THE COURT: Mr. Ligeri, okay.

We're up at 5:00 now so we're going to suspend for the day. We'll hear from Mr. Ligeri first thing in the morning at 10:00 a.m.

MR. CHAN: Okay.

THE COURT: But I want to make sure that

Mr. Ligeri's testimony is going to be tailored to the issues in the case. This is not an opportunity for Mr. Ligeri to come and talk about every single problem he's had under the sun with Amazon and why he thinks that Amazon is breaking the antitrust laws or the like. It has to be testimony and evidence that's relevant to the arbitration issues and the surrounding issues in the forum selection clause. Am I clear about that? This is not a trial of the merits in the case. I need you to -- in reading your pretrial submissions, I got the feeling you think it's a trial of the merits. It's not that. So when Mr. Ligeri testifies, you'll need to have him testify about issues that go to the enforcement of the arbitration clause, and I'm going to sustain objections that go beyond legitimate issues that are before us here.

Anything else to take up before tomorrow?

MR. MAGLIERY: Your Honor, I just want to clarify that our witnesses are dismissed and their sequestration has ended; is that right?

THE COURT: Yes, I think so. I can't see why -- I know they have a long ways to travel.

MR. MAGLIERY: Thank you, Your Honor.

THE COURT: All right. Thank you all. We'll stand in recess. See you tomorrow.

(Proceedings adjourned at 5:00 p.m.)

C E R T I F I C A T E

RE: BENJAMIN LIGERI, ET AL. v. AMAZON.COM INC., ET AL.
No. 3:23CV603(JAM)

I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 1 through 225 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/

DIANA HUNTINGTON, RDR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(860) 463-3180