UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

BENJAMIN LIGERI
CENTRAL CONCEPTS, INC
TRADEMARK HOLDINGS, LLC
GLOBAL SPECIALTY PRODUCTS, LLC
MEDCARE, LLC

Plaintiffs

v.

AMAZON.COM, INC
AMAZON, LLC
AMAZON SERVICES, LLC
AMAZON MEXICO SERVICES, INC
AMAZON PAYMENTS, INC
AMAZON CAPITAL SERVICES, INC

Defendants

- - - - - - - - - - - - - - - - x

No. 3:23CV603(JAM)

New Haven, Connecticut
April 9, 2024

HEARING ON MOTION TO COMPEL ARBITRATION

VOLUME II

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

A P P E A R A N C E S:

FOR THE PLAINTIFFS:

LAW OFFICES OF PAULUS H. CHAN, LLC
157 Forest Hill Road
North Haven, Connecticut 06473
BY: PAULUS CHAN, ESQ.

FOR THE DEFENDANTS:

DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
BY: JOHN M. MAGLIERY, ESQ.
ADAM WALLACE SGRO, ESQ.

TABLE OF CONTENTS


| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BENJAMIN LIGERI | | | | |
| By Mr. Chan | 232 | | | |
| By Mr. Magliery | | 320 | | |
| By Mr. Chan | | | 422 | |
| By Mr. Magliery | | | | 462 |
| By Mr. Chan | | | 466 | |

**10:05 A.M.**

THE COURT: We're back for a second day of hearing in the matter of Ligeri v. Amazon.

Appearance of counsel and parties for Mr. Ligeri and plaintiffs?

MR. CHAN: Good morning, Your Honor. Paulus Chan for the plaintiffs.

THE COURT: And I see Mr. Ligeri is here today as well. Good morning, sir.

MR. LIGERI: Good morning, Your Honor.

MR. MAGLIERY: Good morning. John Magliery for the defendants Amazon.

MR. SGRO: Good morning. Adam Sgro, defendants Amazon.

MR. MILLER: Robert Miller here, the client representative for Amazon.

THE COURT: Good morning. Please be seated.

What's our witness lineup, Mr. Chan? Are you going to call Mr. Ligeri?

MR. CHAN: Yes, Your Honor.

THE COURT: Okay, great.

Mr. Ligeri, would you like to come to the witness stand, please.

MR. LIGERI: Yes, Your Honor.

MR. CHAN: Do you prefer the podium, Your Honor?

THE COURT: If you could, yes, please.

If you'll just remain standing for a moment, sir, we'll swear you in.

THE CLERK: Please raise your right hand.

BENJAMIN LIGERI,

called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please state your name and spell your last name.

THE WITNESS: Benjamin Ligeri, L-I-G-E-R-I.

THE CLERK: And give us your city and state of employment.

THE WITNESS: I'm sorry?

THE CLERK: City and state of employment or residence.

THE COURT: Where do you live or work, sir?

THE WITNESS: We'll do 1372 Main Street, Coventry, Rhode Island.

THE CLERK: Thank you.

THE COURT: Please proceed, sir.

Is that sun getting in your eyes, sir? If you sit down, let us know, we can lower the shades.

THE WITNESS: Yeah, probably a good idea.

THE COURT: We'll lower the shades.

DIRECT EXAMINATION

BY MR. CHAN:

Q. Good morning, Mr. Ligeri.

A. Good morning.

Q. As you go forward to testify today, I want to advise, if you need to give a long answer, please speak slowly and break up the content. It's for convenience of the Court for taking notes as well as for the court reporter to record properly.

A. Understood.

Q. You just can't go on and on. It makes it hard.

Can you tell the Court a little bit about yourself in terms of your business background?

A. I've been in retail and brand product development for about 15 years working as a wholesaler, a brand developer, and direct-to-consumer retailer working with Amazon both on the outside as a noncontractual brand purveyor and then also working on their platform.

Q. Okay. In this complaint, the plaintiffs include yourself and four other business entities. What is your position in the four business entities as co-plaintiffs?

A. I would be the majority shareholder of the four business entities.

Q. So you have been deeply involved on the business side of these four businesses?
A. Could you talk a little closer to the mic, Mr. Chan?
Q. Are you involved in the day-to-day business operation of these four businesses?
A. Not necessarily day-to-day, but I do run and operate at the high level.
Q. So is it fair to say you are familiar with the business records of these business entities?
MR. MAGLIERY: Objection, leading.
THE COURT: I'll allow this. This is kind of anticipatory. Foundational, I allow that.
You may answer, sir.
THE WITNESS: Yes, I'm very familiar with the business records, how they're stored and accessed.
BY MR. CHAN:
Q. Would you say sometimes you are a hands-on manager?
A. Yes.
Q. And the details of the business, would you say you have personal knowledge on most of them?
A. Yes.
Q. I'd like to -- pardon me. A little cough there that I wasn't anticipating.
Can I call your attention to Exhibit 5 and I'd like to call the Court's attention. I'd like to admit for

identification it's titled -- I'm sorry, it's Exhibit 8, my mistake.

THE COURT: Is this Plaintiffs' exhibit?

MR. CHAN: Plaintiffs' exhibit, sorry Your Honor.

THE WITNESS: Which exhibit?

BY MR. CHAN:

Q. Exhibit 8, it's titled "Declaration of Natalia Parker"?

A. Yes, I see it.

Q. You found it?

A. Yes.

Q. Okay. This was actually --

THE COURT: This is already part of the record, I assume.

Mr. Magliery, no objection, I assume, to Plaintiffs' Exhibit 8? It's statement of party opponent already admitted.

MR. MAGLIERY: That's right, Your Honor.

THE COURT: Plaintiffs' Exhibit 8, full exhibit.

MR. CHAN: Thank you, Your Honor.

(Plaintiffs' Exhibit 8 admitted in evidence.)

BY MR. CHAN:

Q. Have you had a chance to review this particular

declaration?
A. Yes.
Q. In there, there are specific dates and statements were made that you actually opened these four business accounts that we just mentioned. The statement was personally you opened those accounts. Is that a correct statement?
A. No, that's not a correct statement. And Amazon's well aware that's not a correct statement.
Q. Okay. But you do operate those accounts. So the question is: How do you come about becoming owner and operator of these accounts?
A. If you buy a business, you own the business's assets and liabilities. If I buy a construction company, I get the Home Depot and the Lowe's account with it. Likewise, if I buy -- if I buy the Vanguard business, I get the Vanguard Amazon account, the Walmart account, the Etsy account, they all come with it as well as the debt.
Q. Could you also move the mic closer to you so it's less echo. Closer.
A. Okay.
Q. The farther away you are, the more echo. Thank you.
So you just said you never created or opened the Amazon sales account as alleged by that declaration in Exhibit 8, correct?

A. That's correct. Amazon would have on file the driver's licenses of who opened them.

Q. So did you ever at any time did the clicking of the box that says agree and consent to Amazon's Business Solutions Agreement?

A. No.

Q. Did you ever have the opportunity of clicking that box?

A. No, I never had the opportunity.

Q. So --

A. I should just clarify that just last week I attempted to open a seller account and saw that box. I just want to clarify that. Just last week.

Q. Okay. I'd like to call your attention to the verified complaint which also is on record. I have to figure out what the exhibit is. I believe it's Exhibit 20 or 21. Let me find it.

A. 20.

Q. Is it 20?

A. Yes.

Q. Okay.

THE COURT: Any objection to Plaintiffs' Exhibit 20, the verified complaint already part of the record?

MR. MAGLIERY: Your Honor, I think it will

depend on how it is intended to be used. The declarant here is available. He is on the stand. It's a verified complaint and the declarant is here. So I think it will depend on how it's intended to be used. He can't testify through his own declaration when he's here on the stand.

THE COURT: So what's your --

MR. CHAN: My purpose is --

THE COURT: Hold on just a second.

You're saying it depends on how it's being used. What are you afraid of, sir?

MR. MAGLIERY: I'm afraid that he's going to submit the complaint as is evidence instead of give the testimony here on the stand, which I don't believe is permitted for an available declarant. This is a declaration, I think. It's a verified complaint.

THE COURT: I see. Okay.

MR. MAGLIERY: So I don't think he can have both the complaint and his live testimony.

THE COURT: I see what you're saying.

MR. CHAN: Can I lay my foundation, Your Honor?

THE COURT: I'm sorry, what did you say?

MR. CHAN: Can I explain why this needs to be admitted?

THE COURT: Sure.

MR. CHAN: Because in your order for this

hearing, there's several particular issues that you raised referring to the verified complaint. So I am trying to get the original filed complaint to go to the section where you question and have witness clarify in person to clarify.

THE COURT: Particular statements in there?

MR. CHAN: Yes. The one that you referred to, Your Honor.

THE COURT: Okay.

So, Mr. Magliery, I'm going to allow the complaint to be considered. I'm not saying how much evidentiary weight I would give the complaint. But I think it's material especially since it's come up in the past. And it's been cited by the Court, also I believe by Amazon saying there's certain admissions in there that are relevant to the issue of the enforceability of the arbitration clause. I think it's important that there be testimony about it.

MR. MAGLIERY: I appreciate that, Your Honor. I fully respect the Court's ruling. I do think we're entitled to use the admissions in a different way than the proponent of the statements is entitled to use them.

THE COURT: I agree with that under the hearsay rules. I also think that the proponent is allowed to address the arguments being made by Amazon about the

supposed admissions and to rebut those arguments. And there's really no other way for him to do that except by questioning on the basis of the complaint.

MR. MAGLIERY: Thank you, Your Honor.

THE COURT: Please proceed.

Exhibit 20 is a full exhibit for purposes of the questioning.

(Plaintiffs' Exhibit 20 admitted in evidence.)

BY MR. CHAN:

Q. Mr. Ligeri, may I call your attention to paragraph 5 on page 3 of the complaint.

A. Yes.

Q. Not necessarily the page of the exhibit, because they are not numbered the same.

Can you read the beginning -- can you read the paragraph 5 on page 3.

A. Yes.

"Plaintiff Ligeri also opened the 'Health and Household' Amazon account about a decade ago" --

Q. Okay. That's the statement I need you to put in.

You just testified you never opened any of those four accounts, correct?

A. I never registered a seller account, yes.

Q. And you were present in yesterday's testimony when

Amazon's own witness showed the record that the four original registrants of those accounts were not named Benjamin Ligeri?

A. Correct.

Q. That's on record?

A. Correct.

Q. Then why did you say you opened the Health and Household account, and what do you mean when you say you opened the account when you did not open the account?

A. I think it's just the word "open" wasn't meant to be legalese. It just probably meant open for business. The Health and Household account is really only five years old, not a decade. There's a little bit of confusion in the wording there. Health and Household's five years old.

The Amazon account originally registered by Jasmine Alcantra of Jasmine's Gifts LLC is a decade old. When I took it over as House and Household, it was about half a decade ago. When I bought it with a C Corp. that I was the majority shareholder of, that was about three years ago.

Q. Okay. So, again, to clarify for the Court, which is important, when you used the word "open," what you meant is you purchased the account and therefore you are open for business; is that what you're asserting today?

A. That's correct.

MR. MAGLIERY: Objection, leading.

THE COURT: Make it more open-ended, please, so your question is not leading. Thank you.

BY MR. CHAN:

Q. So when you used the word "open," what you meant is you purchased the account --

THE COURT: That's sustained.

So do you know what a leading question is? That's a question that suggests the answer.

BY MR. CHAN:

Q. Can you repeat?

A. Let me clarify my answer. I already stated what open meant. I said it meant we were open for business.

Q. Clarify again what you meant by "open."

A. That we were open for business after the acquiring of the account, yes.

Q. When you say "open for business," you mean like a grand opening?

A. I don't think the word was used in a scientific legalese. It was just a word that said, hey, we're open for business.

Q. Okay. Thank you. That will explain the discrepancy of the term.

You said earlier you come to purchase those accounts, and I believe you have some document. Let me call to your

attention and also call to the Court's attention Exhibit 2. It's titled "Purchase and Sale Agreement with Plaintiffs and Wholly Wholesale." Did you find the exhibit, Mr. Ligeri?
A. Yes.
Q. Is this a business record during the regular business activities?
A. Yes.
Q. And is that your signature on page 2 that said Benjamin Ligeri?
A. Could you repeat that? Could you talk maybe a little louder?
Q. On page 2, the signature under Benjamin Ligeri, is that your signature?
A. That is my signature.
Q. So you personally executed this agreement, correct?
A. I did.
Q. Okay. And this was done again during regular business and also -- actually, this is recorded as this thing took place, correct?
A. Yes. January 13, 2023.
Q. Okay. Foundation is this is a business record document to substantiate Mr. Ligeri that he did purchase this particular Amazon account from the original owner.
Without going through two full pages --

A. It was not purchased from the original owner. It was purchased from the secondary owner.

Q. Okay. Thanks for clarifying.

A. And this was a purchase of other property, intellectual property and other physical property, including an Amazon account.

Q. Okay. Without spending half hour on the two pages, would you be kind enough just to summarize what exactly did you purchase from this account?

A. I purchased basically any valuable intellectual and physical property that the company had, which was largely trademarks, a Amazon selling account with active inventory, I purchased the inventory in the account as well. And that's about the sum of it.

Q. Did you rely on the belief that the seller at that point has the authority to grant you the assets of this account?

THE COURT: Mr. Chan, can I just stop you for a second?

MR. CHAN: Yeah.

THE COURT: So you've shown the witness a document. You've identified it as Plaintiffs' Exhibit Number 2. You've talked about it being a business record. You have not offered it into evidence so that it could be considered and there could be testimony about it.

Would you like to do that, sir?

MR. CHAN: I skipped a step. Yes, I do want to offer that, submit as evidence, full exhibit.

THE COURT: Okay.

Any objection to Plaintiffs' Exhibit Number 2?

MR. MAGLIERY: I don't believe it's been authenticated yet. May I voir dire or would the Court like to? I think the question needs to be does he recognize it and what is it. I haven't heard those yet.

THE COURT: If you could ask those questions one more time, I think, or ask them directly, if you can. I know you didn't ask them exactly like that before.

Let me just ask, do you recognize this Plaintiffs' Exhibit 2?

THE WITNESS: Yes, I signed it.

THE COURT: Is it your handwriting, signature on it?

THE WITNESS: Yes.

THE COURT: Is this a purchase and sale contract between you, as a buyer, and Timothy Mignacca and two companies, Wholly Wholesale LLC and Medical Collaborative LLC?

THE DEFENDANT: Yes.

THE COURT: It's dated January 13, 2023; is that right, sir?

THE WITNESS: Yes.

MR. MAGLIERY: No objection, Your Honor.

THE COURT: Full exhibit, Exhibit 2.

MR. CHAN: I apologize, I skipped a step and jumped in asking about his signature. So I apologize. I thought I did already.

(Plaintiffs' Exhibit 2 admitted in evidence.)

BY MR. CHAN:

Q. Mr. Ligeri, when you purchased these assets, this account, were you relying on the fact that the seller has the authority to sell you those assets?

A. No. It's public record who owns this stuff. You can look it up online with the USPTO to see the owners. So I'm able to verify who owns it independently, and it was Wholly Wholesale LLC.

Q. My question is: Did you rely and believe that the seller actually owns the assets and has the authority to sell you those assets?

A. Yes, I was sure of it.

Q. At least you believed in good faith that you were buying the assets?

A. Yes.

Q. May I continue to ask you to refer to Exhibit 3.

A. Yes.

Q. It's titled "Transfer Agreement for Account Associated with Merchant Token A18M4UMTJZGP6." This is also another business record recorded during the regular business. It's dated April 26, 2021.

THE COURT: So, can I ask you, maybe you can ask the witness if it's a regular business record. I can only take testimony from the witness, not from you, okay? So you can ask the witness is it a regular business record, okay?

BY MR. CHAN:

Q. Do you recognize this document as a regular business record?

A. Yes, I do.

Q. Can you get closer to the mic and don't turn your head?

A. Yes, I do.

Q. Okay. And this was done properly routinely to record the business activities?

A. Any purchase I make is recorded in a contract, yes.

Q. And this is a true copy of the original that you executed?

A. Yes, it is.

MR. CHAN: Okay. So based on personal knowledge and also the nature of the business record, I'd like to move this exhibit into evidence, Your Honor.

THE COURT: Is there an objection to Plaintiffs' 3?

MR. MAGLIERY: Your Honor, it would be helpful to hear that he recognizes the document. Other than that, I have no objection.

THE COURT: Do you want to ask him --

MR. CHAN: I thought I asked.

THE COURT: -- if he recognizes and he signed the document.

MR. CHAN: I asked if this is a true copy of the original that he knows about.

BY MR. CHAN:

Q. Do you recognize this document on this exhibit? Second time I asked you.

A. I recognize it very well.

THE COURT: Full exhibit, Exhibit 3.

(Plaintiffs' Exhibit 3 admitted in evidence.)

MR. CHAN: It's a matter of wording.

THE COURT: Sure.

BY MR. CHAN:

Q. So, again, I want to confirm, that's your signature "Benjamin Ligeri" at the bottom of that document?

A. Yes.

Q. So he executed.

Could you explain to the Court what this purchase is about?

A. This was the purchase of an Amazon account that had inventory that the seller was having trouble selling. So my company Medcare LLC purchased the account to help them -- to help them sell their inventory so they could have money and so we could have the account and the inventory and market it to our expertise.

Q. Okay. Let me call your attention to the next exhibit, Exhibit 4. It's titled Trademark Assignments Executed by Timothy Mignacca." Do you recognize this document?

A. I do recognize it.

Q. Is this a document that reflects a business record during the regular business?

A. This is a document collected during regular business, yes.

MR. CHAN: Once again, I'd like to move this as a full exhibit into evidence.

THE COURT: This is the trademark assignment agreement?

MR. CHAN: Yes. It's entitled "Trademark Assignment Agreement," correct.

THE COURT: Any objection to Plaintiffs' 4?

MR. MAGLIERY: No objection, Your Honor.

THE COURT: Full exhibit, Plaintiffs' Exhibit 4.

(Plaintiffs' Exhibit 4 admitted in evidence.)

BY MR. CHAN:

Q. On the signature page above the name Benjamin Ligeri, is that your signature? Do you recognize it?

A. It is my signature.

Q. Again, it's a rather long document. In the interest of time, could you summarize what did you purchase through this trademark assignment agreement?

A. The purchase was already mentioned in a previous exhibit. This required a notarized assignment. My IP lawyer asked me to get this done for the USPTO to make the actual transfer of the intellectual property. So this was -- if you want to call it a purchase agreement, it is for trademarks.

Q. Did you follow up and actually submit the necessary document so that you'd become legal owners of this trademark being assigned?

A. Yes.

Q. On the last page of this agreement there is a table that's titled "Schedule I, Assigned Trademarks."

A. Yes.

Q. Are these the trademarks that you have acquired ownership through this assignment agreement?

A. Yes.
Q. And they were reported to PTO?
A. The USPTO, yes.
Q. May I refer you to the next exhibit, Number 5. "Jasmine Alcantra Agreement to Transfer Accounts." This is a very short one.
A. Yes.
Q. Is this copy of the original document, this record, do you recognize it?
A. I do. I had to do a deep dive to find old Jasmine's Gifts records, and I don't know if I have a complete record of them all. But this one came up in my deep dive.
Q. Okay.
A. It's not as recognizable to me as the other documents.
Q. Can you get closer?
A. It's not as recognizable to me as the other more recent documents, but I do recognize it, yes.
MR. CHAN: I move to admit again as business record Exhibit 5, Your Honor.
MR. MAGLIERY: Objection, Your Honor. The document's not authenticated. It's just text on a page. There's been no evidence of how it was collected, whether it was an email, where it was located on the business records servers or in the records. Right now we just have

no foundation at all for this document. It could have been typed up and put in this binder.

THE COURT: Can you try to lay more foundation, Mr. Chan?

MR. CHAN: Yes.

THE COURT: Thank you.

BY MR. CHAN:

Q. Did you have an agreement and also eventually purchase some assets from Jasmine's Gifts LLC whose owner was Jasmine Alcantra?

A. That's how I recall. I did find this document in the Jasmine's Gifts directory, business directory.

Q. So you did pay certain amount to purchase the account?

A. The business and the account, yes, I paid a certain amount, looks like $1,500.

Q. Was this a reminder note that you wrote to yourself, Mr. Ligeri? There's no signature here.

A. No, I just think it wasn't very formal. It might have been an email. We didn't do very formal agreements, me and Jasmine, so...

Q. After you purchased that account, do you have to put your personal information such as credit card, bank account, all that onto this account?

A. I'm sorry?

Q. After you purchased this account, did you go onto Amazon and do the transfer by submitting the required personal information as well as the credit card information and bank account information so that shows that you own the account?
A. I would assume I probably did, yes.
Q. Okay.
THE COURT: Mr. Chan, are you now offering again Plaintiffs' Exhibit 5? Are you trying to offer it as an exhibit, sir?
MR. CHAN: I just --
BY MR. CHAN:
Q. So this is a record of a transaction that you already executed; is that correct?
A. Yes.
Q. So do you want to offer this as evidence of a transaction which you just detailed, described?
A. Sure.
MR. CHAN: Although no signature, but the witness confirmed personal knowledge.
THE COURT: Are you offering it again, sir?
MR. CHAN: Yes, I'm offering.
THE COURT: Any objection?
MR. MAGLIERY: I'm afraid we continue in our objection. I don't believe those questions and answers

authenticated the document. I'm afraid we're going to ask for a ruling on this one.

THE COURT: I overrule the objection. I find that the witness has testified that this record came from the personal files and is evidence of an agreement that he had with Ms. Alcantra for the sale of Jasmine's Gifts for $1,500. And the remaining concerns about the authenticity go to weight, not admissibility.

BY MR. CHAN:

Q. Let me ask the question in another way, Mr. Ligeri.

When you go on the Seller Central portal and get onto the account related to Jasmine's Gifts LLC, would your name be there?

A. Today at present?

Q. Today, yeah.

A. I don't believe so, no.

Q. At any time during the last ten years would your name be on there? Shortly after that December 2014 was your name there?

A. So I believe there was a period of time where I operated this Amazon account as a sole proprietorship in my own name. And I believe that period of time was 2015 to 2017-ish, but I could be wrong on that. There was a period of time where I treated it as a personal entity and put my name as the business name.

Q. Okay.
A. That was before I sold it to Central Concepts Inc.
Q. Okay. So I want to clarify. In other words, if somebody were to go on seller portal, have access to this particular account, between 2014 and now your name would have had to appear as owner at some point in time; is that what you're saying?
A. Yes.
Q. Okay. After you purchased this account, Mr. Ligeri, what did you have to do to gain access to the Seller Central portal to allow you to start listing and selling products on Amazon?
A. When you transfer an account, you usually have to have the previous owner log in. And then you go to the account info tab on Seller Central and you click on change business entity. And then from there it will take you through a series of questions about the new entity name, the new bank account information. So there's where I will type in the new business that's acquired the Amazon account, the new tax ID, the new credit card and banking information belonging to the entity. And then you click submit.
Recently, Amazon will log you out and make you prove that you're a valid buyer of the account. So they'll ask the former seller some questions about their identity such

as the previous last credit card that was on file. You'll answer those questions. It gets processed. And from that day forward, Amazon will issue you tax and 1099 information to the new entity that purchased the account.
Q. Okay. So when you sign on one of these accounts, the original account owner -- the information is already on the account, correct?
A. One more time?
Q. When you sign on the account, before you make any changes, before the transfer, the basic information of the then current account owner, it's already in the system, correct?
A. Yes, of course.
Q. So what you do is you change then current owner and replace it with your information as a new seller; is that what you're saying?
A. Yes. You would replace it with the current buyer's information if it's a corporation or --
Q. Are there questionnaires or restrictions that you have to respond to before you make any change?
A. No.
Q. Okay. So you're free to change anything on the Seller Central portal?
A. Yes. Sometimes there are some verifications asked after the fact. Like the witness said yesterday, they'll

mail you a postcard to verify that the new company is true and authentic. You'll read back the postcard to Amazon. But to do the process is pretty seemless and usually pretty frictionless. One of the more frictionless processes on Amazon is changing your company name.
Q. Okay. So I need you to report or educate us on the list of information that you did change. I'll ask you information and you tell me whether you changed that or not.
A. Okay.
Q. You have to enter a name, the new owner?
A. The new owner, you have the option. You upload or you fill out a W9, I believe. I believe you used to upload them. And now you fill them out and Amazon creates the W9 from the information you fill out. And you have the choice to be a sole proprietor doing business in your name or to choose a business formation.
Q. When you say "W9," are you referring to the document that asks for your tax identification number?
A. If I got the right document. I might be mistaking. But the W9 should be an IRS form that has the name of the taxable entity, the tax ID, the mailing address, and the signature of the responsible party of the entity.
To continue your answer, after you make those changes, then you go to account info, bank account info,

and you change the bank account deposit and charge method to the name of the entity. Then you go to the credit card page and change the credit card to the new entity as well.

Q. So the tax ID, are you referring that to the EIN, employment identification number, if this was a business entity?

A. Yes.

Q. And if that was an individual, do you enter the social security number?

A. Yes.

Q. What other boxes you got to fill out after that?

A. So you got business name, business address, EIN number, email, phone. I don't know if that's on another page, actually. Email, phone may be on another page. That's another thing you have to change when you acquire an Amazon account, you have to change email and phone for verification.

There's not much more before the change takes effect. It usually goes into affect immediately.

Q. Did the portal ask you for an actual proof of your identity such as driver's license, passport, that sort of document?

A. No. Like I said, they send post verification sometimes like a postcard or -- yeah, they don't ask for any identity documents at this stage.

Q. Okay. And you said you have to put your email. Do they require a new password since you're now a new account user?
A. It's been a little while since I've done one. When you change your email, I'm pretty sure you change your password at the same time, yes.
Q. Okay. So the old owner signs on using his or her credentials which then allows you to change your information?
A. One more time. I didn't hear the beginning.
Q. To get on the seller portal that allows you to transfer and change account information, the original owner first have to sign on using his or her email and password, correct?
A. Or give you the info, yes.
Q. You then input the new information, which is your personal or business information, including email. And then you get to pick your new password?
A. Yes.
Q. Okay. And after that, anything else that is required before you get your new account approved?
A. You don't even have to change the email and password. It's an option. But to get the process -- you just really have to do the W9 form to do the change of identity. That's the only process.

Q. Anything popped up or anything that require you to click a box in reference to the Business Solutions Agreement at that point?
A. No. There's absolutely no agreements during an account change or business change. None whatsoever.
Q. Okay. After you changed the information, did Amazon contact you and acknowledge you as a new user?
A. They will send -- I mean, I'm trying to think. They'll start addressing you under the new name, you know. If it was formally Home and Medical and you bought it and changed it to Vanguard, they'll start calling you Hi Vanguard. Does that answer your question?
Q. I'm just curious if anybody send you like a welcome, congratulations email?
A. Not a congratulations email, no.
Q. The reason I ask is yesterday the Amazon witness said that when you first open and register, they have a welcome page that welcome you, make you feel warm and fuzzy. So I'm just curious if you got the same treatment when you transferred the account?
A. I've done a million dollars in sales in a day and I never got anything warm and fuzzy. So I wouldn't expect to get anything congratulatory from Amazon, no.
Q. Okay. After you get your new account and access to the seller portal, do you start then listing products to

sell on Amazon?
A. I mean, you do whatever it is you want to do, you know. You can start managing the existing products. You can close and delete the prior products which is often something I'll do. I'll get rid of the questionable or junkie products, stop selling them, have them destroyed by Amazon, and then proceed to develop a much cleaner. Then I will proceed to develop a much more consumer friendly roster of products from that point on. That's what I do.
Q. When you're starting the process of selling on Amazon, did you receive any email or any identification questioning who are you because you seem to be new to our system? Did you receive any of that?
A. So there's a lot of security throttles from time to time. We don't think you're the proper person or business, answer these questions. Usually, it's arbitrary, like everything with Amazon is 100 percent arbitrary. So if you answer them right, they could say screw you, we don't care. If you answer them wrong, they might say, oh, you're great, you did the right thing. Which is a completely arbitrary software system with no basis in reality. So, yeah, they'll send you security throttles. They'll tell you go reset your password to prove it's you and check your email. And then the email will never come. Or you'll get the email to reset your

password, and when you go reset it, it will say you tried too many times to reset your password, you can't try again ever again. Just a lot of stupid stuff of their security throttles. And ultimately usually break through and succeed in proving who you are, but sometimes you don't. In recent years you seem to never be able to prove anything to Amazon.

Q. So as a brand new account owner, when you list products to sell on Amazon, you're initiating, trying to connect with them, do you consider those activities like an offer and ask for the ability to sell, because they can always turn you down, correct?

A. I don't understand the question.

Q. When you start listing products through the portal, the action of listing the products, do you consider that as your good faith offer to ask Amazon I am new, I'd like to sell these products? Because you don't know if you're going to get rejected or accepted. So I'm trying to get to your state of mind. When you do that, when you're thinking about you really want to have a selling privilege, so that's like an offer to Amazon, I want to sell on your platform; is that a correct description of your state of mind?

A. I mean, my state of mind is --

MR. MAGLIERY: Objection, relevance.

THE COURT: What is the relevance about his state of mind here? Can you tell me?

MR. CHAN: I'm trying to establish that when he do that, he is trying to form a selling relationship through Amazon. So on his mind, it's a way of him contracting some sort of relationship, allow him to sell product. At this point there's no evidence that he even know about the BSA. So I'm trying to distinguish in his mind the contract is he want to sell. And when Amazon allows him to sell, then they are accepting his offer, so there's a contractual relationship in that regard without even knowing the BSA existed.

THE COURT: I see what you're saying. I'll overrule the objection.

You can answer, sir.

THE WITNESS: So just to --

BY MR. CHAN:

Q. It's a simple question. When you do that, trying to initiate to get the privilege to sell, is your state of mind say, okay, I need to get connected, so it's like an offer so that they will accept you as a new seller; is that correct?

A. I mean --

Q. It's a "yes" or "no" statement -- I mean answer.

A. So --

Q. Okay. Let me rephrase.

MR. MAGLIERY: Your Honor --

THE COURT: Hold on.

THE WITNESS: If I can just have a moment to try to answer.

THE COURT: Can you let him answer the question?

THE WITNESS: Give me a breather here.

I mean, you don't think of Amazon as anything that matters. They don't care about who you are or what you're doing. You're just listing products and they're taking their 90 percent of the fee.

So it's not like some kind of a sacrificial lamb to them to say here we are. That's the relationship with Amazon. It's very cold. You list the product, you provide the product to them, you take care of all of the details related to that product, you take care of the customer. And they give you 10 percent of the proceeds. That's the relationship. That's how it's always been and that's how it will continue to be. There's no real relationship with Amazon. You're a dog. That's the relationship with Amazon.

BY MR. CHAN:

Q. Let me rephrase the question for you one for time, Mr. Ligeri.

When you reach out to Amazon in good faith by

beginning to list your products on their platform to sell, is it your hope that they will accept you as a new seller to sell without any rejection, any obstacles? In other words, your good faith reach out is offering yourself and your business as a new seller on Amazon?

A. Yes.

MR. MAGLIERY: Objection, leading.

THE COURT: I'll allow it. And the answer stands.

THE WITNESS: I was going to add something or no?

THE COURT: Let him ask another question.

MR. CHAN: Was that sustained?

THE COURT: No. I'm sorry, I overruled the objection. And the witness's answer stands.

THE WITNESS: I said yes.

THE COURT: Yes. If you'd like to ask another question, please feel free.

MR. CHAN: Okay, thank you. I misunderstood. I thought you wanted me to clarify.

BY MR. CHAN:

Q. So after you reach out and start listing as an offer to sell on Amazon as a new account seller, did you have any communication that could possibly reject this offer or additional requirement that's required before you can

sell?
A. So sometimes you'll get -- this is always automated. Amazon doesn't do anything with real people. But in the automation process, they will instantly tell you you can't list this product. So you'll go to list it, and they'll tell you something like your UPC isn't authentic even though the CEO of GS1 will tell Amazon it is authentic. Their automated system will just kick back an arbitrary, random, and frivolous error to confuse you and cause problems. So you'll try another method. You'll make more UPCs. And ultimately their system won't make the arbitrary mistake.
So there's throttles from them. They're completely unfounded throttles. They never have any basis in reality. And those throttles can prevent you from listing. And sometimes you send them some paperwork, Amazon, in an attempt to be professional on your end. And then you get an answer from a robot that they don't like your paperwork even though it's signed and notarized by an attorney.
So you submit documents, you submit invoices. You keep submitting documents to them to get them to finally back down from their arbitrary ruling, maybe escalate it to an overlord.
Q. Okay. In short, in the end were you successful in

becoming a new seller and start selling various products on the Amazon platform?

A. One more time?

Q. In short, in the end were you successful in qualifying yourself as a new seller and start selling actual products on the Amazon platform?

A. Yes.

THE COURT: Can I just ask you, by way of clarification, I think there's four different entities that are plaintiffs in the case.

MR. CHAN: Yes.

THE COURT: We've heard a little bit about some of them and about some transfer agreements that you put in. When you're asking these questions about him doing business on the Amazon platform, I haven't heard you be specific as to particular accounts at issue and specifically those that are the plaintiffs in this case. And I don't know if you mean to have his testimony apply to that or if you're going to distinguish between different accounts or something like that. I'm having a harder time knowing what significance to attach to the testimony.

THE WITNESS: I take "you" as all of the entities.

BY MR. CHAN:
Q. During the last questioning, they all refer to yourself, Central Concepts, Trademark Holdings, Global Specialty Products LLC, and Medcare LLC, the answers that you give, were they all applicable to these five plaintiffs?
A. Yes, that's how I've been answering.
Q. Okay. So the answers you gave, there's no different amount, these five parties?
A. The answer to the most recent questions?
Q. Well, basically, in the beginning when I asked you -- the questioning start after you successfully transfer the account. I asked: Do they all apply to these five plaintiffs?
A. Yes.
MR. CHAN: Thank you, Your Honor.
THE COURT: Thank you.
And you said five plaintiffs. You mean four, I think, right? Unless I've miscounted.
MR. CHAN: It's himself plus four accounts, so there's five total.
THE COURT: Are you saying -- did he have his own account on Amazon? I thought he only operated accounts or the claim at least in the complaint, I thought was he operated accounts of the four other entities.

MR. CHAN: Well, as a person, I was counting him as a party who is in charge of the four --

THE COURT: Okay.

MR. CHAN: -- entities.

THE COURT: All right. Thank you.

MR. CHAN: I say party, I mean plaintiffs. So he is a plaintiff plus the four business entities.

THE COURT: Okay.

MR. CHAN: Where were we? Could the reporter repeat my last question?

THE COURT: No. Ask another question, if you'd like.

MR. CHAN: Okay.

BY MR. CHAN:

Q. So after you start to sell products, do you automatically get invoice for the various services that you use on Amazon, and how did you pay these invoices?

A. Amazon doesn't send invoices. You can dig in to look at the data of your payments, but it doesn't get sent to you. They give you an overview payment screen that shows you broad strokes of gross sales, net sales, and such.

Q. Okay. Walk us through the process in terms of the financial aspect of doing business at Amazon. The revenue goes directly to Amazon, correct?

A. Yeah, okay. So, um --

Q. Answer the question. All the sales revenue go directly to Amazon, correct?
A. Yes.
MR. MAGLIERY: The objection is to the relevance as to the issue before the Court about the arbitration provision.
THE COURT: Just in terms of the revenues?
MR. MAGLIERY: The question of -- I think the question was walk us through the procedure by which businesses interact with Amazon. The objection is that's not tied to the arbitration provision.
THE COURT: I guess I understood part of your argument on arbitration was that even if Mr. Ligeri himself didn't sign up for these accounts and didn't go through the whole welcome process, he ended up doing business, these accounts. And you put in evidence yesterday I think of the large amount of revenue that was generated by that. And I thought your argument was, well, he went ahead and did business under these accounts, so by direct beneficiary estoppel principles, he can't say he wasn't bound by the Business Solutions Agreement, right? Unless there is some other agreement floating out there. But you've already heard him testify that Amazon is taking 90 percent, according to his testimony. And so I thought that questions about the revenue and his actual operation

of business on the platform would be relevant to your argument that he didn't have to personally sign or even look at the BSA because he's actually benefiting.

MR. MAGLIERY: Thank you, Your Honor. We'll withdraw the objection.

THE COURT: Okay, great.

Go ahead, if you'd like to go ahead with your questions.

MR. CHAN: To avoid further unnecessary objections, I have to remind opposing counsel as well as the Court, we are making argument that the BSA is not applicable because of the adhesion nature and the fraudulent nature of the agreement. And all this evidence is going to the heart of the agreement being of adhesion and of fraudulent -- that plaintiff was induced into a fraudulent act. So I should be allowed to introduce evidence to support those two --

THE COURT: So I'm letting you --

MR. CHAN: I'm just reminding Counsel so we don't have unnecessary objections. If he understands why I'm trying to get to, maybe he would not be opposing unnecessarily. I'm just being courteous.

THE COURT: Okay. Please continue.

THE WITNESS: So I can answer the question he asked?

THE COURT: You can.

THE WITNESS: Just to walk you through, I mean, it's hard to get data from Amazon. They have millions of articles and agreements, the BSA being one of millions of articles and agreements, a grain of sand on the beach of Amazon's document hub. So you just sort of -- it's, you know, you take or leave the process.

BY MR. CHAN:

Q. I'll stop you. I did not ask question about agreement at this point. So you're not responding to my original question.

A. You wanted me to walk you through how --

Q. I need you to answer my question and then we'll ask a different topic when this is done.

A. I'm sorry if I got off track.

Can he repeat the question?

THE COURT: Hold on a second.

Yes?

MR. MAGLIERY: Your Honor, on direct, I don't think that Counsel can treat his own witness as an adversary. His answers need to be recorded.

MR. CHAN: Okay, that's fine.

THE COURT: Okay. Just ask another question. Let's keep going.

BY MR. CHAN:

Q. We're focusing on the financial aspect of doing business with Amazon. You just said that they don't send invoices. So I want to understand, and the Court as well, how the money is handled when you do business with Amazon. Therefore, I ask you a simple question: Do all the sales revenues go directly to Amazon?

A. Yes.

Q. Every penny?

A. Yes.

Q. And then they will deduct whatever fees that they claim they deserve and give you the rest?

A. Yes.

Q. Okay. What fees are there?

A. Um, there's a lot of different fees.

Your main fee is the Amazon commission which is usually about 15 percent of the gross sale price. That's your core Amazon fee.

You then have -- if you're using Amazon for your fulfillment, you have an FBA fee which can be anywhere from 1 percent to 99 percent to 180 percent of the total sales revenue. The FBA fee is, according to Amazon, based on the size and dimensions of the product, although we know it's not really based on that.

And then you have a storage fee associated with the

item.

You have an inbound transportation fee, a shipping fee.

And there's other ancillary fees such as return fees, disposal and removal fees.

There's other fees I'm probably not aware of.

Q. Can you give us approximate percentage of the assortage fees that you mentioned?

A. The which?

Q. Assortage. You say assortage, right?

A. Storage?

Q. Assortage, meaning inbound, shipping, all the handling.

A. One more time on the question?

Q. I thought you said they charge you fees to assort.

A. Assort, no. I think I said storage.

Q. Oh, storage. I heard you wrong.

How much do they charge you for storage?

A. Storage fees are item to item, supposedly based on the size of the item, the cubic volume. Which Amazon routinely lies about.

Q. What's the range, storage fees?

A. Um, it changes all the time so you can't keep track of it. The latest, I believe, was 85 cents a cubic foot for standard size items which you need to be an MIT

professor to know what a standard size item is today. It was simple to figure it out ten years ago.
Q. So the storage fee, it's a variable, then?
A. Yes. Everything is a variable fee on the item. And then also Amazon changes the fee structure randomly all the time.
Q. Is storage fee same as inventory management fee, or separate?
A. Um, storage fee's its own fee. It's separate from any other fees. I'm not aware of a fee that's called the inventory management fee.
Q. How much would the inventory management fee be?
MR. MAGLIERY: Objection.
THE WITNESS: No, I said I'm not aware of that.
MR. MAGLIERY: He's answered.
THE COURT: He said he's not aware. Next question.
BY MR. CHAN:
Q. How much are return fees?
A. Return fees are very tricky. Amazon profits on the returns from a customer at the expense of the seller, which helps them build rapport with the customer at your expense. Instead of breaking even on a return and taking some of the loss, they actually mark themselves up a profit on returns.

Q. Can you explain how Amazon benefits from a returned item?
A. They get their fees for selling it, and then they charge you back all the costs for the return.
Q. So you pay Amazon twice when an item is returned?
A. More or less, that's my understanding of it.
Q. What's the range of actual margin in percentage when you sell with Amazon? Just a range. After all the costs.
A. I know I threw out the 90 percent earlier. To be more scientific and not just random about it, if you're selling -- it depends on the price tag and the class of items. But if you're selling small-ticket items under ten dollars, at the item level you're usually receiving about 30 percent of the gross sales, but that's before the other fees Amazon charges, that's strictly at the item level, the item sale level before it goes through the filter of more Amazon fees. But you're looking at about 30 percent on items between seven and ten dollars. Items under five dollars, usually about 10, 15 percent is a rough estimate. And then your margin gets a little better as the item gets more expensive.
Q. Do you have a number for net margin after all the costs are deducted from the sales revenue? With your experience, the years that you have, do you have an idea what actually nets when you sell a product with Amazon?

A. Are we speaking of the four entities in the complaint, how they actually performed? Or generally?
Q. No, just a range. In other words, the most profitable product, what would be a net margin? And the least profitable product, what would be your net margin? Just a range.
A. Pretty much the most profitable item you can sell on Amazon is a dietary supplement. I would say that you're looking at the best margins there. And I would say that's probably going to be, I don't know, I'd have to do the -- are you asking me dollars and cents right now?
Q. No, net margin. You need a calculator?
A. Sure. Yeah, that would actually help.
MR. CHAN: The Court doesn't have a calculator, correct?
THE COURT: No. He can just estimate, if he'd like to. The Court does not have a calculator.
THE WITNESS: Just to be clear, are you looking for the most profitable type of item on Amazon?
BY MR. CHAN:
Q. I'm looking at a range of net profit so that we know what the high end, the low end are when you sell on Amazon. Just do your best.
A. I mean, like I said, if you want a broad range, it's anywhere from Amazon's charging you to sell an item all

the way up to maybe you're making as much as -- the most you could possibly make on an Amazon item would be 74 percent at the item level before ancillary fees.

Q. What was that?

A. I'm sorry, not 74. 84 percent would be the most you could possibly clear at the item level. And then you can also -- all the way down to being charged for an item to sell it, because the Amazon fee is greater than the sell price of the item.

Q. It sounds like you don't have a definitive answer to my last question, correct?

A. No, I guess not.

Q. Okay. Of all the fees that you just mentioned, as a seller, are you in any position to negotiate these fees?

A. No.

Q. You mentioned earlier the fees change all the time. Were you informed of these changes prior to the deduction of these fees?

A. Amazon will occasionally send out some information about fee increases. But I'm also talking about arbitrary fees that aren't in the book or charging twice as much as what the book says they will charge you for an item. You have situations where you can go to your manage orders page on Amazon and you can see them charging you fees that are not listed in your seller inventory. And then you ask

support. And support will tell you those fees aren't really being charged to you, but they're actually in the itemized breakdown statement. So the fees get very complicated with Amazon.
Q. When you say occasionally there are fee increases, can you negotiate those increases or they just tell you it's coming?
A. I've never attempted to negotiate.
Q. So the notice is basically courtesy to tell you we are increasing fees, correct?
A. Correct.
Q. Have you ever tried to communicate to say the fee increases are unreasonable?
A. No. The only place I get involved with bargaining with Amazon is to get them to remeasure an item that's 6 inches long that they are putting down as 36 inches long to get them to acknowledge that this item is in fact 6 inches, not 36 inches, so that they charge the fee for the 6-inch item and not the fee for a 36-inch item. That's usually the only area I get involved with Amazon on fees, if I do it personally or my staff does it.
Q. When is the very first time you, as a person, get knowledge of the existence of something called the BSA?
A. During our conversations to file a lawsuit, I believe you asked me to scour for any type of agreement we had.

Because I wasn't aware of any agreement that enforced our respective rights. And I went on -- I think you ended up finding the agreement, Mr. Chan. But that's the first I had seen it is when you presented it to me or we together unearthed it. So just before the filing of the lawsuit would be the answer.

Q. Okay. So the first time you get knowledge of the BSA is when you are preparing for litigation?

A. Correct.

Q. Okay. As you were searching for agreement in preparation, did you find any other agreements?

A. Hundreds.

Q. Did you say hundreds?

A. Yes.

Q. Do you remember any of them?

A. Some of the names come to mind. I never knew which agreement was the one that mattered that I'd have to find that -- there's so many agreements. And nobody in their right mind would read any of them, so I never knew which one would be -- like this is going to affect you claiming your rights. There's no arbitration agreement. There's no services business solutions, services Peter Piper peck -- it doesn't make any sense, the naming of it. It doesn't seem like it would even apply to my business. It seems like it would be between Amazon and a vendor like

Walmart based on the name of it. It doesn't seem like an agreement that has any relevance to an Amazon seller. It's not the Amazon seller agreement. It's not called, you know, the Amazon merchant agreement. It's called an Amazon Business Solutions Agreement. I would think that would be the agreement between Amazon and the CIA. You know, I wouldn't consider it with cloud storage or Microsoft and Amazon. I would never pick that document out and say this is the one that matters.

Q. Are you saying that the names of the agreements was confusing you?

A. Yes. Most of their agreements have more of a straightforward name. Like the Amazon shipping agreement, you know that's about shipping. The Amazon fee agreement. They have the Error 3017 agreement, you know that's about Error 3017. The Amazon Business Solutions Services Agreement, what's that about? If you need a business solution? I never needed a business solution from Amazon, so I'm not going to look at that agreement.

Q. You remember coming across something called a SAP agreement?

A. It sounds familiar. I was looking at some of the agreements this morning, actually. So I saw the SAP this morning. But I don't remember what it stands for, actually.

Q. Have you come across Amazon Horizon Agreement?
A. The Amazon Horizon Agreement?
Q. Yes.
A. I actually discovered that one today as well. I'd never seen it before today.
Q. Do you know what an Amazon Imaging Agreement is?
A. The Amazon Imaging Agreement?
Q. Yes.
A. I discovered that agreement today as well. I didn't read it, though. I imagine it's about imaging.
Q. So when you say hundreds of agreements, did you scroll down or just estimating it?
A. I've seen hundreds in my -- today when I looked, I saw hundreds of agreements.
I was talking with AI the other day about what the potential number of agreements and articles in the Amazon hub were. And they thought it was safe to estimate hundreds of thousands. I would think there's over a million agreements and articles in the Amazon hub.
MR. CHAN: Excuse me. I need to go back to my list. Give me a few seconds, Your Honor.
(Pause.)
BY MR. CHAN:
Q. Mr. Ligeri, were you aware that the so-called BSA agreement was not assignable to anyone without Amazon's

consent? Were you aware of that?
A. No.
Q. Did the seller who sold the account tell you anything about the right to assign?
A. No.
Q. Okay. But after you actually transfer -- strike that.
After you actually executed the transfer of account to you and your business entities, did Amazon bring up anything about the issue of assignment?
A. No.
Q. Did you receive any email from Amazon saying that your transfer is illegal and we don't approve it? Did you get anything like that?
A. No.
Q. Okay. Instead, they start letting you sell, take the money, deduct the fees, and leave you with whatever they think you deserve, correct?
A. Yeah, they'll start paying the new entity the net proceeds.
Q. Okay. So there's absolutely no interference or restrictions offered by Amazon after you did the transfer on the Seller Central portal, absolutely nothing, correct?
A. Except the security throttles, yes.
Q. Meaning they have to double check --

A. Correct.
Q. -- your identify.
Did you mind that? Because that's for your own good.
A. It's not an effective process. It's an arbitrary scammy type of process. If it was truly an authenticating process, I would love it. I love security.
Q. At this point I'd like to submit for identification the Exhibit 23 which is the thickest exhibit of all. It should be the last one.
A. Ah, yes.
Q. Could you read off the title of the exhibit?
A. "Exhibit Px023 - US House Subcommittee Report from Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary of the House of Representatives."
Q. Okay. In short, this is a congressional report. The way it's worded, it's an investigative report that Congress conducted; would you agree?
A. Yes.
MR. CHAN: This is a government business record. It's actually signed on the last page, whoever the chairman is of the committee. The reason why it's relevant is I refer Your Honor to the part that's relevant.
This report is saying Amazon has a practice of

forcing seller to arbitration. The word is "forced." And this is done because they have the monopoly power and the market power to do so. And on top of that, it also says that because they are successfully forcing the arbitration, which in turn put all the dirty laundry behind closed doors because it's not on public record, which then enhances them to further exercise the monopoly power. So the two go together.

The arbitration clause is a means for them to overwhelm people, to cover up all the dirty laundry, so it's a result of exercising that monopoly power and enhancing that monopoly power. And this is finding of Congress which later on became an actionable item, and I have served judicial notice on the FDC and 17 states attorney joining in the lawsuit on the antitrust.

So it's not separate because Congress is saying this arbitration clause is forcing people to arbitrate, which means it has adhesion nature, the overpowering, uneven bargaining power. And they use that to get what they want, both based on monopoly and also further enhance their power.

So from that perspective, I believe the findings of this report is relevant in helping the Court to understand the big picture what we're talking about. So based on that, because it's a government business record

signed and also I will refer you to the relevant part of the report. Unfortunately, I can't submit just a few pages. That's why the whole report have to come in. But I'm not asking Your Honor to review the whole report because there's other things in the report. So I'm moving to submit this.

THE COURT: Well, the report's 371 pages long.

MR. CHAN: Yes. But I'm just asking a few pages that's relevant and calls your attention.

THE COURT: What are those pages?

MR. CHAN: One of the pages on the exhibit, 236, which is the report page number 229. That's the most critical page.

THE COURT: Report page 229?

MR. CHAN: Report page 229, but the exhibit page number is 236. Titled "Forced Arbitration." Your Honor can read it and then you can decide whether that's relevant or not.

THE WITNESS: Which page?

THE COURT: Okay. So I see page 229. There is a paragraph headlined "Forced Arbitration."

MR. CHAN: That's correct.

THE COURT: And then there's two paragraphs below it, it looks like.

MR. CHAN: That's correct.

THE COURT: And so other than that page, any other pages you believe are relevant?

MR. CHAN: Yes. There's another one. I'm trying to locate it. Give me a second. I have it in another folder.

It would be page 348 on the exhibit, but the report page would be 341. The paragraph relevant is labeled "3. Private Enforcement."

THE COURT: Okay. I see that page as well.

Any other pages you believe are relevant?

MR. CHAN: Yes, there's another one. I believe it's report page 54 -- I mean page 14 which is --

THE WITNESS: Could I run to the bathroom?

MR. CHAN: -- page 21 --

THE COURT: Hold on a second.

Do you need to use the facility?

THE WITNESS: Really quickly, yeah.

THE COURT: I think what we'll do is I'll allow -- Mr. Ligeri, you're welcome to depart at this time. I'm going to hear from counsel, though, with respect to any other pages, and then we'll take a break as well.

Mr. Ligeri, you're excused at this time to use the facilities.

THE WITNESS: I'll be right back.

THE COURT: What else do you want to show or do you want me to look at, what other pages? Page 14, you said?

MR. CHAN: Page 14 is on the report. There's one more page. Bear with me.

(Pause.)

MR. CHAN: So I give you three pages, correct? I think those are the three that relate to arbitration. But the nature of the report is self-authenticating because it's a government business record. So if Your Honor don't mind reading that and you can decide whether --

THE COURT: That last of the pages, I'm sorry, was it page 14? I'm having trouble finding the last page that you want me to look at.

MR. CHAN: You can't find it? Unfortunately, I did not print out 371 pages for myself. I just -- just give me a few more seconds, Your Honor.

Did you get page 341 on the report?

THE COURT: I think you gave me that already.

MR. CHAN: And you got 329?

THE COURT: I got that page. I'm looking for the last --

MR. CHAN: It's page 14 on the report, which is page 23 on the document.

THE COURT: I see.

MR. CHAN: At the very bottom it basically tells the reader that the committee obtained information from the top executives, so their finding is based on internal Amazon document which they had the authority to subpoena.

THE COURT: So that's page 14 of the report and page 21 of our records. Is that what you mean?

MR. CHAN: 21 of the exhibit, but page 14 of the report.

THE COURT: Okay. I'll take a look at those three.

Let me ask before we take our break, will there be an objection to the Court's consideration of just those three pages of the report? As I understand the request is not the entire report which concerns many other companies other than Amazon, but those three pages?

MR. MAGLIERY: Yes, Your Honor. We would object on the grounds of relevance, unfair prejudice, and what appears to be, I think, unfair propensity evidence. It seems that the purpose is to say that Amazon acts in other cases in a way that is otherwise illegal, which we would contend is unfair propensity evidence. Also, it does not shed any light, it's not probative of whether Mr. Ligeri or any of his companies have consented to or are otherwise bound by the BSA. We recognize that the Court can take

judicial notice of the document, but that grounds of authentication doesn't obviate our other objections to the admission of this evidence.

THE COURT: Okay.

MR. CHAN: I would argue with that, Your Honor. The document shows that the finding was based on extensive interviews and investigation of many, many sellers. And Congress come to the conclusion that Mr. Ligeri is not the only one being victimized and injured by Amazon's philosophy of forcing people into arbitration because by doing so they discourage people to take action because you can't get your day in court. You know, why -- it suppresses potential sellers in filing any claim against them. And they can do that because of their power, because this is about monopoly. And likewise, by doing so, it reduces competition because people are forced to do things and, hence, the antitrust lawsuit being filed.

So because it does focus on arbitration, it does focus on Amazon itself as the party in the report, so I think it's relevant, it's probative.

As far as prejudice, I think Your Honor would be the one to decide how much weight you place on this. But not admitting it will be prejudicial because this is the government, the highest authority of this land that did the report.

MR. MAGLIERY: May I be heard?

MR. CHAN: They did so to inform whoever is interested. In this case, I think plaintiff has interest and Your Honor as the one judging which way we go. So I'll leave it up to you, Judge, in terms of how prejudicial to either side.

THE COURT: Okay.

Mr. Magliery, something else?

MR. MAGLIERY: Thank you. Just one brief addition.

The report is not a binding authority. It's a subcommittee finding. So I just heard him say it's the highest authority. This has absolutely no binding value for the Court. It could only be offered not as law but as fact. And the facts here are a political act. They are a result of a congressional subcommittee and their recommendations to Congress. The facts here are not the Court's findings. They're not any court's findings. They're not collateral estoppel on any factual issue. This is really just irrelevant propensity evidence that we don't know what the investigation involved and we don't know what the purpose of the report is.

THE COURT: Okay, thank you.

MR. CHAN: I want to clarify. When I say highest authority, I meant within our government's legal

structure. Congress is one of the highest out of the three branches. I don't mean it that way. I mean structurally speaking, because Congress makes law and then Your Honor interprets the law. That's what I meant.

THE COURT: I get that. But, of course, this isn't even a report of Congress. It's a report of a subcommittee of Congress, right?

MR. CHAN: But they were empowered by Congress to otherwise --

THE COURT: All right. So I'll take it under advisement right now.

We'll take our morning recess at this point and resume at 12:00 p.m., if we can. Is that good for folks?

MR. MAGLIERY: That would be fine. I wonder if the Court would inquire how much more direct we expect.

THE COURT: Sure.

How much more direct examination?

MR. CHAN: I may have up to one and a half hours. I'll try to make it efficient, but I do have a lot of questions.

THE COURT: You have other questions you want to go through?

MR. CHAN: Yes, yes. Again because, based on our argument, I need to have evidence to support the argument so that Your Honor can make informed decision

based on the evidence.

THE COURT: I see. Okay.

So there you have your answer.

We'll resume in about -- at approximately noontime. And then I'll need to take another recess at 1:00 p.m. as well.

MR. CHAN: So this is a mid-morning recess, not lunch break?

THE COURT: That's right. We'll take a longer break at 1:00 p.m.

MR. CHAN: Thank you, Your Honor.

(Whereupon, a recess followed.)

THE COURT: We'll have our witness come back to the stand, if we can.

I have taken a further look at the document, the public record document that we've mentioned before, the House Subcommittee's report. I conclude I'm going to overrule the objection to its admissibility solely with the understanding that it's offered solely as to those three pages that have been identified by Mr. Chan. I think that they're relevant to the issue of the enforceability of the arbitration clause in the case. I don't think that their relevance is substantially outweighed by unfair prejudice under Rule 403. I think that they're properly non-hearsay as public record

investigative findings. So, therefore, I conclude that it's at least properly admissible here. That's as to admissibility.

Of course, any argument about the weight of the evidence I leave to counsel. I know it's not specific to this case, certainly. I also understand that the committee recommends certain changes in the law. I don't know that -- frankly, looking at the Subcommittee's findings there, I don't know that they raise a concern about, quote, forced arbitration clauses, but I think they also acknowledge at the same time that sellers are or that merchants such as Amazon are allowed to require arbitration as a part of doing business with others. So I think really the concerns that Amazon points out here I think more go to weight rather than to admissibility. So I'm allowing just those portions of the Subcommittee's report that you talked about.

MR. MAGLIERY: Thank you, Your Honor.

MR. CHAN: Thank you, Your Honor.

THE COURT: Are you going to be going into more detail about those aspects with this witness? The report speaks for itself.

MR. CHAN: I do want to reference one page because it would help to clarify one of the major issues that this Court has raised in your order.

THE COURT: All right. I'm just getting my copy from chambers.

MR. CHAN: Okay.

THE COURT: It's coming out in a moment.

If you'd like to proceed.

MR. CHAN: I have a copy that I was going to use.

THE COURT: Okay. Just proceed, if you'd like. Do you want to raise something with the witness?

MR. CHAN: Yeah, yeah.

BY MR. CHAN:

Q. So may I call your attention to Exhibit 23, the exhibit page number is 236 but the report number is 229, which the Honorable Judge has ruled that it could be admissible into evidence. Let me know when you find it.

A. I'm already there.

Q. Okay. Could you read the two paragraphs -- wait, wait. The Judge is getting his copy.

THE COURT: Thank you.

MR. CHAN: Exhibit page 236 and report page 229. Do you have it, Your Honor?

THE COURT: I have it here.

BY MR. CHAN:

Q. Mr. Ligeri, I need you to read the two paragraphs starting with Item (2), "Forced Arbitration."

A. "(2) Forced Arbitration. All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding (forced) arbitration clause, requiring them to sign away the right to their day in court if a dispute with Amazon arises. The Subcommittee heard from sellers who said that if it were not for Amazon's market power over them, they would not agree to this term. As noted by the Online Merchants Guild, 'Through arbitration, Amazon knows it holds all the cards, and in many ways has the final say whenever there is a dispute.' As a result, sellers rarely initiate arbitration actions against Amazon. Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 sellers and 16 vendors initiated arbitration proceedings. Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an action.

"As extensive scholarship has shown, forced arbitration often fails to provide a legitimate forum for resolving disputes and instead usually serves to insulate those engaging in wrongdoing from liability. The case of Amazon sellers is no different. In practice, arbitration functions as a way for Amazon to keep disputes within its control, with the scales tipped heavily in its favor. As

such, Amazon can withhold payments from sellers, suspend their accounts without cause, and engage in other abusive behavior without facing any legal consequences for its actions."

Q. Okay. Now I need to call your attention to the verified complaint. I believe it's Exhibit -- is it 20?

A. Exhibit 20.

Q. Right, okay. Give me a second. I apologize, there's so much documents I have to go through.

MR. CHAN: Pardon me, Your Honor. I'm looking for the specific paragraph that you referenced in your order because you were confused. I want to clarify that. I don't seem to find. Let me check.

(Pause.)

BY MR. CHAN:

Q. Just to remind you of your previous testimony, Mr. Ligeri, you said you never had the opportunity to consent to the BSA because you never opened the account initially, right?

A. Yes.

Q. Okay. And also, throughout the process of selling, you did not have the opportunity to also click and consent to the BSA, correct?

A. Correct.

Q. So if I may ask you to get to I believe it's

paragraph 56 which is on the verified complaint page 29. Look at the complaint page, not the exhibit page.
A. Paragraph 56?
Q. Yes. Could you read that.
A. "Amazon's customer service and treatment toward the Plaintiffs has rapidly and precipitously declined in recent years. Internal Amazon documents suggest that the company's hyper-focus on a cost-cutting strategy" --
Q. Go ahead. Go ahead.
A. "Internal Amazon documents suggest that the company's hyper-focus on a cost-cutting strategy to adopt automated processes for nearly everything - which Amazon refers to as 'HOTW' or 'Hands off the wheel'" --
Q. I apologize to you, Mr. Ligeri, and also to the Court. I meant to ask you to read paragraph 62, which is on page 33 of the complaint.
A. "All of Amazon's third-party sellers" --
THE COURT: We'll take a brief recess. Thank you.
(Whereupon, a recess followed.)
THE COURT: Please be seated. My apologies for that interruption.
If you'd like to continue.
THE WITNESS: Shall I proceed to read?

BY MR. CHAN:
Q. Did you read 62?
A. Not yet. I was about to.
Q. Okay.
MR. CHAN: Your Honor, are you at the page, paragraph 62 of the complaint?
THE COURT: I have it.
THE WITNESS: "All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding arbitration clause, requiring them to sign away the right to their day in court if a dispute with Amazon arises. If it were not for Amazon's market power over them the Plaintiffs and those similarly situated would not agree to these terms."
BY MR. CHAN:
Q. Mr. Ligeri, were you one of those sellers that were contacted and interviewed by the Subcommittee?
A. No.
Q. Okay. In paragraph 62, there's a phrase that says "the Plaintiffs and those similarly situated." Do you mean to say you feel like you belong to the same group of these sellers who were interviewed?
A. One more time?
Q. Okay. When you say "the Plaintiffs" -- excuse me -- "and those similarly situated," are you saying that the

plaintiffs feel like they belong to the group of sellers who were interviewed and being forced into arbitration?

A. No. This is a quote from the Subcommittee report that we just read just to add credence to the adhesion clause argument. Do you want some water?

Q. Wrong pipe.

We can see from the wording it seemed to be a quote from the Subcommittee report. But since you make that as part of your complaint, so it's a statement that you make. So I need to clarify when you say "the Plaintiffs and those similarly situated," are you referring to the fact that you feel like you belong to this group of sellers who stated that they were forced into arbitration?

A. No.

Q. What do you mean no? Then why would you say you guys are similarly situated?

A. Because it's a quote to prove the adhesion agreement argument.

Q. Okay.

A. Are we talking before the complaint was filed? Because I just discovered the BSA at the time of talking about the complaint.

Q. Okay. So you never consented to the BSA with the arbitration clause, correct?

A. Correct.

Q. So you could not have agreed to these terms if you had not consented?
A. Correct.
Q. So the only way to interpret that is when you say "the Plaintiffs and those similarly situated," you are throwing yourself in as if you were in the same boat feeling that mistreatment for them; is that what you mean?
A. Yes, I think so.
Q. Okay. Because there's two ways to interpret this. Either you agree to it or you feel like you're the same kind of victim like the seller being interviewed. So which way is it?
A. I see what you're saying now. I was confused.
Yeah, I would feel the same way as them if I were in that situation, you know, that there was a large power over me. And I would never agree to the terms had I known about them and actually read them, which I haven't to this day read them. But I've glanced at a few and I would never agree to them.
Q. Okay. It's helpful clarifying because the paragraph was confusing to the Court.
There were a couple emails that were shared. I don't have the exhibit with me, but it was an email from you to Amazon complaining about the account being deactivated. My question is, there were BSA references made in the

email by you. So I want to know when you do that, are you challenging Amazon's authority to close down your account based on the BSA, or are you agreeing to the BSA?

A. I don't know of any email where I mentioned the BSA. So I'd have to see that and authenticate it.

Q. Okay. Then I will have to borrow the defendants' exhibit.

Apologize, because we have so much documents. To find the right one back and forth is extremely difficult.

A. Exhibit 73? All the emails in Exhibit 73; is that what we're looking at?

Q. No, it's in the defendants' exhibit which they reference -- I'm really sorry.

THE COURT: I think it's Defendants' Exhibit 73, if I remember.

MR. CHAN: Is it 73? It's not my exhibit so I was not very familiar with it. But I do need to reference it.

THE WITNESS: Maybe the defense can find it.

BY MR. CHAN:

Q. Okay. Let me bring this over to you.

MR. CHAN: May I? Because --

THE COURT: To the witness? I think he has it.

THE WITNESS: I have it. Just tell me what page of 73.

BY MR. CHAN:
Q. Okay, you do?
A. Yeah.
Q. Okay. That's not the one. Give me ten more seconds.
(Pause.)
Q. Do you recall -- do you recall emailing Amazon questioning the deactivation of your medical cooperative and also -- it was deactivating of your account. Do you recall that?
A. I mean, it was probably done by staff at the company using an autofill of my name. So I probably didn't send the email that we're talking about. But if you show it to me --
Q. So you have no personal knowledge of that email, then? Or you don't recall?
A. I don't recall at this time.
Q. That's fine. That's good enough for me. So you don't recall the email?
A. No.
Q. Okay. When you purchased those accounts going back, did you do any research on whether the purchase needs to be approved by Amazon?
A. No.
Q. Okay. So at the time you purchased, you have no reason to believe that that purchase may not be proper

based on Amazon's interpretation, correct?
A. I had a lot of experience with purchases, so it was common practice. So I wasn't concerned.
Q. You recall there's about 70 emails that were sent. It was the testimony of Mr. Eric Smith. We don't need to go there because they're so fine printed, you can barely read it. But based on your personal knowledge with all the four accounts that deal with Amazon, in the last, say, five, six years, how many emails do you think you have had between Amazon and those accounts?
A. I would say hundreds of thousands.
Q. Can you be more specific?
A. As I understood it, this was supposed to be all of the communications between all of the accounts and Amazon shrunk into the ones that mention the BSA. Out of all -- if you unshrink it, all of the communications with Amazon and all of those accounts would be several hundred thousand.
Q. Okay.
A. And only, obviously, an infinitesimal amount mention the BSA.
Q. Okay. So you're saying it's a very, very minute percentage of emails that reference the BSA out of the hundreds of thousands of emails that you have had with them?

A. That's what the defendants have said, that it's only the 70 emails here out of several hundred thousand. I would agree with that.
Q. Okay. And that's based on personal knowledge because you are in charge of the communications?
A. Yes. I'm aware of the amounts of communications that usually take place with an account. And you're talking about ten years, four accounts. You're looking at least a few hundred thousand, if not a million. I would say that's a bottom estimate, a few hundred thousand. Or maybe the bottom estimate could be a little lower, maybe. Maybe 100,000, 150,000. It's hard to estimate, but the defendants probably know.
Q. Okay. Now I'd like to go back to the exhibits. May I ask you to get to Exhibit 11. The title of the exhibit is "Amazon material representing that it fights IP infringement."
A. Okay.
MR. CHAN: Okay. This is an article published by Amazon dated April 2023. So first I want to submit that as for identification.
The relevance is that Amazon has a different publication that make promises of protecting sellers from being infringed on their intellectual property rights, which completely contradicts their authority under the

BSA. In the BSA, it says sellers would unconditionally license their right to Amazon. And they do promise to do some sort of policing. But --

THE COURT: Can you hold on just a second?

MR. CHAN: But the action --

THE COURT: Hold on.

Mr. Magliery, you don't need to stand up. I'm going to hear from you before I rule on the admissibility of the exhibit.

MR. CHAN: I'm still laying the foundation.

So the reason why this is relevant is we are arguing that the BSA is a fraudulent document inducing sellers into certain relationships where Amazon will take benefit of that seller Amazon platform relationship. And the more evidence of how Amazon fail to protect the seller, worse yet, they actually infringe seller's intellectual property rights themselves. Amazon did the wrong thing themselves. Which is totally contrary to what they promise the public with this open publication. So the BSA itself could be proven as a fraudulent document inducing sellers into agreement through which they are paying the IP rights as well as trade secrets, and then they take advantage of them once they got the data. Amazon is a data company more so than a product selling company. Therefore, this document is relevant because it

would prove that the BSA has a fraudulent nature by making the agreement and the clauses as if they were protecting the seller, which is also reinforced by this document. But the reality is we have evidence to show they did the contrary, which makes the BSA a fraudulently presented, inducing instrument to get people to suck in to sell on Amazon. I know it's a lengthy explanation.

THE COURT: All right. Your client is testifying -- Mr. Ligeri has been testifying that he never looked at the BSA and didn't learn about it until the litigation of this case.

MR. CHAN: Right. But he did look at this as advertising from Amazon. Which together -- well, actually, this one is inducing them, inducing the seller because they saw all these benefits, oh, Amazon is going to protect me, they're going to do all these right things acting as a police.

This is relevant because it further makes the BSA attractive to other potential sellers. Regardless of -- it's actually after the fact. He is induced by this document. And this acting together with the BSA would have promises to seller that they would protect your IP right and they would be the police of the IP right. But in fact, they are not. They were ignoring bootleg products. They were actually selling products compete

with the plaintiff. So I'm just trying to relate how relevant it is to the BSA itself.

THE COURT: Just to be clear, the document we're talking about is Plaintiffs' Exhibit Number 11. It's a report that's issued apparently by Amazon, states "Brand Protection Report" published April 2023; is that correct? Is that the document we're talking about?

MR. CHAN: Yes, Your Honor.

THE COURT: And you say the document is fraudulent, makes a fraudulent promise; is that what you're saying?

MR. CHAN: It's a -- it's partially fraudulent. It's a marketing tool they use to make you think that Amazon is talking at your best interest and to protect your IP rights, which then would justify the terms of the BSA to allow Amazon to get license rights to the IP trademark and all that. Which, in turn, they turn around and use to their benefit.

THE COURT: I see.

MR. CHAN: Whether you seen the BSA or not, this one is actually a tool of that system to lure people into the BSA, which is the fraudulent document.

THE COURT: I see.

But Mr. Ligeri's testified repeatedly he never saw the BSA, right?

MR. CHAN: Right. But that doesn't -- but that doesn't eliminate -- that doesn't eliminate me, as counsel, to argue on his behalf that the document is fraudulent.

THE COURT: It stops you from arguing that he was defrauded by the BSA, right, because he said he never saw the BSA, right? You can't be defrauded by a document you never read, can you?

This is not a class action. It's not like you're representing a whole bunch of other people in the case who actually read the document who say that they read the BSA and were defrauded because they read the BSA. You're arguing here Mr. Ligeri never read the BSA. So it seems strange for you to be arguing now that the BSA is fraudulent in a way that's damaging or injuring your client.

MR. CHAN: I don't think he said he never saw the BSA. He became aware of the BSA in preparation for litigation. So all the years he do business, while he do business as a seller, he was not aware of the BSA while he was doing business. And when he failed to resolve some issues, he came to conclusion that the only way to resolve this is through litigation because he wasn't going anywhere with the issues.

THE COURT: So you're offering Plaintiffs'

Exhibit 11?

MR. CHAN: Yes, I am, Your Honor.

THE COURT: Any objection from Amazon?

MR. MAGLIERY: Yes. Your Honor, we object.

First of all, I don't believe that any foundation has been laid at all. I don't think the witness has been asked a question. I don't think it's been even authenticated.

THE COURT: It hasn't even been identified by name until I --

MR. MAGLIERY: It hasn't even been identified.

Secondly, we would contend that a document that's about Amazon's brand protection is beyond the scope of this hearing.

And third, the document is dated April 2023 after all of the accounts had been terminated and this lawsuit had been filed. So the idea that it's probative of any type of inducement into the BSA is completely unfounded.

And I'd just like to ask if there could first be a proffer of something from the witness because all I've heard so far, as the Court has, is just an argument about fraudulent inducement from Counsel. Thank you, Your Honor.

THE COURT: And I gather -- you know, it strikes

me that this goes to the concern I raised yesterday that it seems like you're trying to argue the merits. You're using this hearing as an argument on the merits of your trademark infringement claim or your anticompetitive claims. And that's not the same as to whether there was an enforceable arbitration agreement in the case. So I have that additional concern other than those concerns just stated by Amazon, I have to say.

MR. CHAN: Can I try one more time?

I think in the BSA itself it did pose an exemption stating that if there was an IP infringement issue, then sellers may, could take action, not arbitration but take legal action. So IP, intellectual property, rights are viewed by Amazon as expressed in the BSA as something different.

So this document was published by Amazon itself. This version is dated 2023. So I don't know if there are ones dated earlier, if they like to update their documents. This document would help the Court to shed light on how Amazon pretends to view the rights of sellers of their intellectual property rights. But in fact when the witness can show you evidence of the contrary, that together what they promote and what they promise in the BSA together would show that the BSA itself was outright fraudulent in the first place. That's how I relate to it.

Without this, you can still -- but this reinforces the public image of Amazon, I am the IP protector, I am the policeman, and I'll do everything to protect you as the seller. That's how they lure people into the business and give them all this trademark that they can copy and sell products when the product becomes a top-notch seller.

I know that goes to merit. I don't oppose the merit but I'm trying to explain the mechanisms and the schemes underneath the BSA, whether he's seen it or not. And the reason is in the event that the Court rules that regardless he is bound, I'm saying even though he's bound but it's not enforceable because of the adhesion and the fraudulent nature of the BSA. That's why I think it's relevant because it goes to a second layer of the analysis, because even if you rule he's bound, plaintiffs are bound, you still need to look at should this Court enforce this particular clause in the name of justice, fairness, and is it a good public policy.

So I know I've gone a long way. I'm hoping you can see my point of view and see how this would aid the Court in determining the nature of the BSA.

THE COURT: I see. Okay.

I sustain the objection for the reasons stated to Plaintiffs' Exhibit Number 11. I conclude that it's not properly relevant to this action concerning the

enforceability of the arbitration clause.

THE WITNESS: You can still ask questions about it, if you'd like.

THE COURT: I don't intend to allow questioning into the merits of this case. I couldn't have been clearer about this. And I'm not going to allow you to proceed on some theory of fraudulent inducement on the basis of fraud in a document that your client says he never read in the first place. So I can't state the reasoning more simply than that. So move on to your next issue, if you want.

This document, Plaintiffs' Exhibit Number 11, is sustained and will not be allowed into evidence.

MR. CHAN: Okay. One of the defendants' witness, Mr. Smith --

THE COURT: Do you have another question for the witness or do you want to argue?

MR. CHAN: I'm trying to transition into different questioning, because this thing is -- the objection is sustained. So I'm giving up on it.

THE COURT: Thank you. Move on to the next area.

MR. CHAN: Okay. Thank you, Your Honor.

I'm trying to change subject. But before Counsel raised an objection, which kind of use up all the

time, is defendants' witness Mr. Smith opened up the subject of email exchange when he introduced only the filtered email with the "BSA" word in it. I would hope that plaintiff would be allowed to share his side of story in terms of email exchange that would shed some light on their communication history. So I'm switching to emails.

BY MR. CHAN:

Q. And may I call your attention to Exhibit 12?

A. Yes.

Q. The relevancy is --

MR. MAGLIERY: Your Honor --

THE COURT: Yes.

Lay a foundation. Do you know what I mean by that? It means asking the witness what is the document, having the witness describe the title of the document, the date of the document, what knowledge he has of the document. You're going into your own argument about relevancy. So just ask the witness, please lay a foundation. This is very basic trial practice.

BY MR. CHAN:

Q. You're looking at Exhibit 12, Mr. Ligeri?

A. Yes.

Q. Could you state the title of the exhibit?

A. Um, it's one of my --

Q. No. State the title of the exhibit.

A. "Fwd: [CASE 13018539881]."
Q. No, the title on the page of the exhibit.
A. Oh, I'm sorry. "Exhibit Px012 - Email re inability to permit selling of Green Sky Brand."
Q. Now can you look at the document itself?
A. Yes.
Q. Do you recognize this document?
A. I do.
Q. Is this a standard business record while you're doing business?
A. Yes. For Global Specialty Products LLC.
Q. And you have personal knowledge because it's your email on the -- it's your email address on the email itself. And which one is it?
A. I usually answer to the ceo@gsp.llc email. This email came from one of my clients.
Q. This is your email. So you personally received this email through this email address, correct?
A. Yes. Me and my operations manager received the email.
Q. Okay. So your knowledge -- you know the document is a business record and you personally received it, so you have seen it?
A. Yes.
MR. CHAN: Okay. So I'd like to first offer

that for identification. It's email regarding inability to perform selling of Green Sky brand. It's labeled Exhibit 12.

THE COURT: Is there an objection to Exhibit 12?

MR. MAGLIERY: Your Honor, if it's being offered for the purpose of the issue of the trademark infringement, then we object as outside the scope.

THE COURT: Okay. What is it being offered for?

MR. CHAN: Is to show, again, Amazon is not following its own promise and policy in the BSA because bulk of the BSA is terms of adhesion nature as well as fraudulent nature. So I would ask that the Court listen to what the witness have to say and then decide whether it's relevant or admissible. Because outright cutting it because, like you say, I cannot testify on his behalf. I'm asking a chance for him to testify, explain to the Court before you rule that it was irrelevant. And if you decide it's not relevant, then that's fine.

THE COURT: That's why we have rules of admissibility of evidence. It's not to have the witness testify about everything and then make a determination of relevance. Usually counsel should be prepared to state why it's relevant and to make what's called a proffer of its relevance. And the concerns that I have here, I'll tell you, with this document is it concerns an email

communication I think that postdates the filing of this lawsuit. This lawsuit I believe was filed on May 9th of 2023. And this email communication concerns emails in June, in other words, after the filing of this lawsuit. The communications don't appear to involve the arbitration clause or the Business Solutions Agreement. So it strikes me that the email is not properly relevant, that it goes to your trademark infringement claims.

I know you feel strongly about those. You could have been in court on your injunction relief for trademark infringement a year ago. You know that, right? You know under the arbitration clause. I trust your client knows this. You could have pursued and had a judge in the Western District of Washington hearing this case basically almost a year ago. So I don't understand how it is this particular document is relevant to the issue of the arbitration or the enforceability of the forum selection clause.

MR. CHAN: May I ask, when you say the trademark infringement, only the plaintiff entitled to injunctive relief, are you base that on the BSA agreement which says so?

THE COURT: Sir, that's what the BSA says. And Amazon's, I think, position has been clear -- I'll be corrected by Amazon -- but Amazon's position has been

clear is that you could seek trademark injunctive relief in the Western District of Washington.

Is that correct, Mr. Magliery?

MR. MAGLIERY: That's correct.

THE COURT: So you could have sought this a year ago. So for you to bring in now communications after the filing of this lawsuit about these concerns strikes me as just not germane to the enforceability of the arbitration clause. I know you have other arguments about that. But I don't see that this particular document is germane or relevant to the enforceability of the arbitration agreement from the BSA.

MR. CHAN: I did file a notice to the Court that the irreparable harm continues since this lawsuit starts. The time loss is one thing, but the reason we're going this route is the plaintiff truly believed that all the 13 claims together is a coordinated scheme of Amazon. Certainly it's not easy to prove. But that's not for today. So we're just trying to win over Your Honor's position so that we can proceed with all 13 counts of the complaint. But I understand what you're saying.

Again, the plaintiff truly believed he's been injured multiple ways, not just that one. Because the injunctive itself is not going to repair his damages. So -- but I appreciate Your Honor pointing it out.

So based on that, if you don't want to allow that --

THE COURT: I'm sustaining the objection to Plaintiffs' Exhibit Number 12.

It looks like it's 1:00. We'll take our lunch break at this time. And plan to resume at -- hold on just a second, sir.

We'll plan to resume -- I'd like to try to finish today, if possible. Is there going to be another witness, Mr. Mignacca?

MR. CHAN: No. He had some issues so he could not. I'll just have one witness. I should be able to wrap up and allow cross-examination. So I think we're good.

THE COURT: So I'm hoping we might be able to finish today. I don't know that for sure.

Mr. Magliery, did you have something to add?

MR. MAGLIERY: I thought you were going to ask a question.

THE COURT: So I think maybe we'll take a half hour, if that's okay. Is that enough time for people --

MR. MAGLIERY: Yes.

THE COURT: -- to get a bite to eat or something like that. And then we'll start up at let's make it 1:40 we'll reconvene here in the courtroom --

MR. CHAN: 1:40?

THE COURT: -- for the continued examination --

MR. CHAN: Okay.

THE COURT: -- of Mr. Ligeri. Thank you very much.

(Whereupon, a recess followed.)

THE COURT: Please be seated.

Mr. Ligeri, if you'd like to come back up and take the witness stand.

THE WITNESS: Yes, Your Honor.

THE COURT: Do you have water there, sir?

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. Whenever you're ready, Mr. Chan.

MR. CHAN: Yes. I'm getting organized. Thank you for your patience, Your Honor.

THE COURT: There's a background drumming noise. Are you all right? I can hear fine.

MR. CHAN: On second thought, I think I'll rest for now. And then, depending on the cross-examination, I'd like a chance to redirect.

THE COURT: Okay.

So cross-examination.

MR. MAGLIERY: May I proceed, Your Honor?

THE COURT: Please.

CROSS-EXAMINATION

BY MR. MAGLIERY:

Q. Good afternoon, Mr. Ligeri.

How many Amazon selling accounts do you own or control?

A. Good afternoon.

Are we counting the deactivated ones?

Q. Whatever you own and control.

A. And this would include an Amazon account that was owned by a corporation that I was a majority shareholder?

Q. Yes, let's include those.

A. I would say probably six.

MR. CHAN: Did Counsel specify time frame, Your Honor? It was open question. I didn't hear the time frame.

BY MR. MAGLIERY:

Q. Is that how many you currently control?

A. If you count former and deactivated ones, yes.

Q. And four of those accounts are the accounts that are the plaintiffs in this case, right?

A. Yes.

Q. And what are the other two?

A. The names of the Amazon accounts?

Q. Yes.

A. I wouldn't be authorized to give that information

given the sabotage that Amazon does to friends' and families' accounts. I wouldn't want to give that information.

Q. These are accounts you own and control, right? The other two?

A. Yeah, but I wouldn't be -- I would take a privilege exemption to that, especially given the nature of Amazon's activities towards accounts that me and my friends or family own. If I revealed them, Your Honor, they'll shut them down and then what are we going to do, wait ten years for the courts to give me damages? No.

Q. What privilege are you asserting?

A. I would assert a business privilege, for one, to be anonymous. And then I would assert the fact that Amazon has unjustly, without reason, gone after any account that I own or a friend or family or a coworker owns and shut them down. I wouldn't be revealing that information to be shut down.

MR. MAGLIERY: Your Honor, I move to compel the answer.

THE COURT: And tell me the relevance of his ownership or affiliation with the two other accounts.

MR. MAGLIERY: We will show that he has continued to operate two seller accounts in full knowledge of the BSA.

THE WITNESS: I can just admit that.

THE COURT: Hold on just a second.

So he's done so in full knowledge of the BSA, you say. And how will that, I guess, affect the argument about the enforceability of the arbitration clause with respect to the four other accounts?

MR. MAGLIERY: Because we'll place the facts of this case firmly in the facts of *Nicosia* too where the Second Circuit found that continued use and consent to the terms once knowledge of the arbitration provision was within the possession of the user, that that constituted notice and consent of its terms.

THE COURT: Okay. But as to the other two accounts, I see that, right. But those two accounts aren't the subject of litigation in this case.

MR. MAGLIERY: We're going to show, Your Honor, first of all, that he personally owns all the accounts. I think he's already given testimony about that. And we don't know the answer to the other two counts until he answers the question.

MR. CHAN: Your Honor, objection. Two grounds.

THE COURT: If you can stand, sir, if you have an objection.

MR. CHAN: One, as you mentioned, relevancy.

And second, Counsel is borderline badgering the

witness the way he approach the question. That's not nice.

THE COURT: I don't think he's badgering or acting improperly towards the witness at all. He's seeking information that may be relevant to the inquiry.

I guess I really don't know how long these two accounts have been in operation at this point. Could you -- it might put it in a different light if I find out more about how long these other two accounts have been in operation. Could you inquire about that, please.

MR. MAGLIERY: Yes. May I withdraw and ask a completely different question?

MR. CHAN: Can you speak louder, Counsel? I'm behind you and I can't hear.

MR. MAGLIERY: May I withdraw and ask a different question?

THE COURT: Yes, you may.

BY MR. MAGLIERY:

Q. Are you aware of an account called Tiberias?

A. Yes.

Q. Is that one of the two other accounts?

A. Yes.

Q. Are you familiar with an account called Melbourne?

A. Yes.

Q. Is that one of the two other accounts?

A. I recently sold that one off. Yeah, but it is one of the two, yeah.
Q. Okay. And sometime during the course of your dealings with Amazon, you became aware of the BSA, right?
A. Yes.
Q. And you claim that was recently, right?
A. At the time of the filing of the suit, yes.
Q. At the time of the filing of the suit?
A. The time of the preparation and filing of the suit, yes.
Q. Okay. And how long have you been a seller on Amazon, either personally or through accounts you control?
A. Or as an employee as well?
Q. Yes.
A. Fourteen years.
Q. And during that time have you personally, in your personal capacity, been a seller on Amazon.com?
A. As I mentioned before, I at one point put the Health and Household account in my personal name in between having it in corporate identities, yes.
Q. Are you familiar with a lawsuit called *Benjamin Ligeri v. Bonzai, LLC*?
A. Yes.
MR. CHAN: Relevancy, Your Honor.
THE COURT: I'm sorry? Relevancy?

MR. MAGLIERY: I haven't offered the exhibit.
THE COURT: I'll allow the questioning.
BY MR. MAGLIERY:
Q. In that lawsuit, did you bring a claim against Bonzai for trademark infringement?
A. Yes.
MR. CHAN: I --
BY MR. MAGLIERY:
Q. Did you --
MR. CHAN: I cannot hear, Your Honor.
THE COURT: You can't hear?
MR. CHAN: Because Counsel is far from the mic and I'm behind him.
THE COURT: Mr. Chan, there's a seat right up there. See that front jury seat? If you want to sit there, you're welcome to and then you can see him.
MR. CHAN: Okay. Thank you.
THE COURT: Let's let Mr. Chan reposition.
MR. MAGLIERY: Take your time.
THE COURT: That's great.
BY MR. MAGLIERY:
Q. In that lawsuit, did you claim that you are an Amazon.com online merchant?
A. I don't recall the contents. I didn't write the lawsuit. I'd have to review it. But if you say it's

quoted there, I'll accept it.
Q. Well, let me just ask you: Have you conducted business as an online merchant personally?
A. As an online merchant with Amazon?
Q. Yes.
A. Didn't you just ask me if I had an account in my name?
Q. If that's the same question for you, yes, personally in your name?
A. Yes.
Q. And let me ask you: Are you familiar with a company called Yagoozon?
A. Yes.
Q. That's a company that you were involved in that was an online merchant at Amazon, right?
A. I was an employee, yes.
Q. You were an employee of that company?
A. Yes.
Q. You didn't own it with your brother?
A. I had a minority share at one point in the company. Never a majority share.
Q. But you owned it?
A. I had a minority share, yes.
Q. Okay. You weren't just an employee, you were an owner, right?

A. Correct.
Q. And you were the CEO of that company, right?
A. Yes.
Q. And in a lawsuit about that company in 2013 you acknowledged that you had an agreement with Amazon as a third-party seller, right?
A. I don't know what you're referring to.
Q. Do you recall acknowledging you had an agreement with Amazon in a deposition in the *Yagoozon* case?
A. No. I don't recall a deposition in the *Yagoozon* case.
MR. MAGLIERY: May I ask this be marked?
THE COURT: Yes.
MR. MAGLIERY: This is Defendants' Exhibit 76.
THE COURT: Maybe we'll close the doors now. The drumming seems to be getting louder.
MR. MAGLIERY: May I? Thank you.
May I approach the witness?
THE COURT: Yes. Did you give a copy to -- I'd love a copy too.
MR. MAGLIERY: I'm sure you would, Your Honor. Apologies.
THE COURT: I've got a courtesy copy here of it looks like excerpts of a deposition.
MR. MAGLIERY: That's correct, Your Honor.

BY MR. MAGLIERY:
Q. I've put before you, Mr. Ligeri, a file-stamped copy of a public record from a case called *Lions Gate Entertainment v. Yagoozon.* And the date of the filing was September 30, 2013. It's entitled "Excerpts from Deposition of Benjamin Ligeri in Support of Plaintiff's Motion for Summary Adjudication on Defendant's Liability on Claims I, II, and V." Do you see that?
A. I'm sorry, what page?
Q. I'm just asking if you see the title of the document.
A. Oh. Yes.
Q. Okay. And do you recall that you gave a deposition in that case?
A. I do. The Lions Gate, yes.
Q. And take a look at the last page, if you would.
Do you see that -- I beg your pardon. The -- yes, the last page shows a certificate of service that this document was served and filed in connection with that lawsuit?
A. What?
Q. Do you see the last page that says that the document was served and filed in the lawsuit?
A. Yes.
Q. Okay. Could you take a look at page 5 at the bottom of the exhibit which lists the deposition pages, page 84

in the middle of the page.
A. Yes.
Q. And you were asked a question --
A. What?
Q. I'm going to read something into the record and then I'll ask you a question, sir.
A. Okay.
Q. Just stick with me, please.
A. Yep.
Q. It says at page 84, line 14: "What is Yagoozon's line of business?"
And the answer was: "What is Yagoozon's line of business? Whatever they say at Amazon I guess will fully conclude that, but we are a partner with Amazon to retail goods."
Question: "Do you have a partnership agreement with Amazon?"
Answer: "We have several agreements with them. We've signed off on but probably never read in full. And it's -- I think they call us something -- I don't know what they call us. I forget what they call us. They have a name for us. Those people. We are certainly a form of affiliate in partner with them. They're shipping our goods, storing our goods. I mean, once -- when you become fully FBA fulfilling by Amazon, once you ship them your

goods, you're really only at the price setting business after that and customer service."

Do you see that?

A. I do.

Q. Were those true statements?

A. Um, yes.

Q. You had several agreements with Amazon, right?

MR. CHAN: Can you repeat that, Counselor?

BY MR. MAGLIERY:

Q. You had several agreements with Amazon, right?

A. That's what it says. And it goes to elaborate confusingly about it, but yes.

Q. Are those your words?

A. Looks like it, yeah.

Q. And you say that you were a form of affiliate in partner with them, right?

A. Yes.

Q. And that you were using Fulfillment by Amazon, right?

A. Yes.

Q. And who was the other owner of Yagoozon?

A. At the time of this deposition, I think Justin Ligeri was the hundred percent owner. I don't think I was still working there. Before that, he was also the majority owner.

Q. Can you turn to page 2 of the exhibit.

A. Yes.
Q. Which is page 39 of the deposition. I'm at page 39, line 19.
Question: "And who are the owners?"
Answer: "Benjamin Ligeri and Justin Ligeri."
Do you see that?
A. I do.
Q. Were you one of the owners of Yagoozon?
A. Yes, I was.
Q. What is -- I'm sorry. Withdrawn.
Fulfillment by Amazon is the system by which Amazon will stock your inventory in its warehouse and then ship the goods when they're sold on the Amazon store; is that right?
A. Yes.
Q. Let's take a look at the BSA. It's in the big book and it's Number 74.
THE COURT: Can I ask, this exhibit here, the deposition, I don't know if you're still using it or not, but are you intending to offer it?
MR. MAGLIERY: Yes, Your Honor. We move the deposition excerpts into evidence because I understand that the deposition can be offered for any purpose.
THE COURT: And it's statements of a party opponent, I assume.

MR. MAGLIERY: Yes. Thank you, Your Honor.

THE COURT: So this looks like a 19-page exhibit, I think, which is *Lions Gate Entertainment Inc. v. Yagoozon* Excerpts of the Deposition of Benjamin Ligeri.

Any objection to this?

MR. CHAN: No, Your Honor.

THE COURT: Okay. So Defense Exhibit -- is it --

MR. MAGLIERY: It was 76, Your Honor.

THE COURT: 76 is a full exhibit.

MR. MAGLIERY: Thank you.

(Defendants' Exhibit 76 admitted in evidence.)

BY MR. MAGLIERY:

Q. And are you at Exhibit 74, sir?

A. Yes.

Q. Thank you. Could you please turn to page 28 of 47 as numbered in the blue line at the top, the court index line.

A. I got it.

Q. And do you see in the middle of the page "Fulfillment by Amazon Service Terms"?

A. Yes.

Q. And it says -- well, could you read into the record the line after "Fulfillment by Amazon Service Terms" in

bold.
A. "Fulfillment by Amazon ('FBA') provides fulfillment and associated services for Your Products."
Q. And then it goes on to say, "These FBA Service Terms are part of the Agreement," right?
A. Yes.
Q. Okay. Let's turn to page 2 of 47, the beginning of the exhibit.
A. Okay.
Q. What is the agreement that it's attached to?
A. What's that?
Q. What is the agreement that the Fulfilled by Amazon terms are attached to?
A. This is called the Amazon Services Business Solutions agreement.
Q. Okay. So in 2013 when you were using Fulfilled by Amazon, you understood you were using a service that was prescribed by the Fulfilled by Amazon terms, right?
A. Come again?
Q. In 2013 when you gave that deposition and you said we're using Fulfilled by Amazon, that's a service that's part of the agreement we're looking at, right?
A. One more time? The second part of your question is throwing me off. I get the first part.
Q. The terms are set forth in this agreement that we're

looking at, right, 74?
A. There's terms in this agreement as we just read about Fulfillment by Amazon, yes.
Q. Okay. Let's discuss the four selling accounts that are the plaintiffs in this lawsuit other than you.
Who owns the Twin Horses selling account?
A. Um, it's either myself or Trademark Holdings LLC. I'd have to look at the business records.
Q. Okay. As you sit here today, you don't know who owns the Twin Horses selling account?
A. What's that?
Q. As you sit here right now, you don't know who owns the Twin Horses selling account?
A. It's either in my name or a company I own. So you could attribute it to me. Legally. I don't have access to it.
Q. How did you come to own the Twin Horses selling account?
A. I purchased it through the current owner at the time, which was Wholly Wholesale LLC.
Q. And who controlled the company Wholly Wholesale?
A. Timothy Mignacca was the sole owner.
Q. And he was on your witness list for today, right?
A. Yes.
Q. And he's not here?

A. Correct.
Q. Is Mr. Mignacca your neighbor?
A. He's a cousin. Not a neighbor.
Q. Let's take a look in the plaintiffs' book, the smaller stack of papers or book. Do you have a book there, sir?
A. Yeah, yeah. It's on the floor.
Q. Take a look at Exhibit 2. When you're ready, let me know.
A. Exhibit 2, got it.
Q. Plaintiffs' 2. Are you there?
A. I am.
Q. And earlier you testified that this is a purchase and sale contract between you and Mr. Mignacca signing on behalf of Wholly Wholesale and Medical Collaborative, right?
A. Yes.
Q. You personally, Benjamin Ligeri, are the buyer, correct?
A. Yes.
Q. So after this transaction was consummated, the selling account was owned by you personally?
A. Yes. I think it was a licensing with Trademark Holdings, now that I recall.
Q. You purchased this account in January of 2023, right?

A. Yes.
Q. Do you see in Section 2.1 where it says, "The Sellers are conveying to the Buyer access to and complete right, title and usage of the following Amazon page located at" and then gives a URL?
A. Yes, I do.
Q. Is that the seller account that's accessible on Seller Central for the Wholly Wholesale selling account?
A. Yes.
Q. And all of the rights and title to the account were transferred to you, right?
A. This contract denotes that, yes.
Q. Okay. And did you undertake any kind of investigation or diligence to determine whether the seller had a selling account?
A. Meaning?
Q. Did you determine whether they were selling you a seller account they actually owned?
A. Yes, they --
MR. CHAN: Objection.
THE COURT: It's proper.
Go ahead.
THE WITNESS: Yes, they logged in and showed me the ownership was Wholly Wholesale LLC.

BY MR. MAGLIERY:
Q. By this point you had already been a seller on Amazon for at least 11 years, right?
A. Yes.
Q. And you knew that there are rules and policies and procedures the seller needs to abide by, right?
A. Yes.
Q. And did you know you could find the rules and policies and procedures on Seller Central?
A. I mean, you could look up a lot of different things on Seller Central depending on what area you're looking for.
Q. And I sincerely appreciate your answer, but can you just answer my question. Are you aware that you can go to Seller Central and look up the rules, policies, and procedures?
A. Yes.
Q. And you personally received the login credentials for this account, right?
A. What's that?
Q. You personally received the login credentials for this account, right?
A. Yes.
Q. And I think you said earlier the way you are able to obtain a seller account is that you're given the email

address and password; is that right?
A. I said that or the prior owner logs you in and does the transfer with you.
Q. Okay. Now, the Amazon seller page -- and we can go there if you want to see it, it's Exhibit 68 -- lists the account holder as Trademark Holdings LLC?
A. Okay.
Q. Want to take a look at it, or do you remember that?
A. Yeah, I remember them buying it from me or licensing it from me, one of the two.
Q. I didn't quite catch your answer. I think you said they bought it from you in a license agreement?
A. I can look up the agreement. It was either an outright purchase or license purchase that Trademark Holdings took over the Amazon account.
Q. Let's take a look at Exhibit 68 just for completeness. That's in the big book. And just tell me when you're there, sir.
A. All right, 68.
Q. Am I correct that the first record ending in 7015, Customer ID 7015, that's the former Wholly Wholesale account that's now Twin Horses?
A. Yes.
Q. And Trademark Holdings is one of the plaintiffs in this action, right?

A. Yes.
Q. The name in the account is Ben Joseph Ligeri/Twin Horses, right?
A. That's what it says, yes.
Q. And you're Ben Joseph Ligeri, right?
A. Yes.
Q. Who owns Trademark Holdings?
A. I do.
Q. Are you the sole owner?
A. Um, yes.
Q. Does it have any employees?
A. No.
Q. And why is Trademark Holdings listed as the tax verified legal name if you are the owner of the seller account?
A. Like I said, we sold to or licensed to Trademark Holdings LLC. In the brief 20 minutes we were able to access the account.
Q. Do you know whether you sold it or you licensed it?
A. Um, I think it's an exhibit. I'm trying to think. Let's see.
Q. Are you looking in the plaintiffs' book now?
A. Yeah, I thought we had it as an exhibit in the case, the agreement between me and Trademark Holdings.
Q. I don't see one.

Let me ask this question, if I could, sir: You have in some way granted permission for Trademark Holdings to be listed as the tax verified legal name for that account, right?
A. Yes.
Q. Okay. Let's next consider Medcare. Who owns the Medcare selling account today?
A. Medcare LLC.
Q. And how did you come to own the Medcare account?
A. Um, this account was purchased from a Stephen Mignacca.
Q. Is Stephen Mignacca also a relative of yours?
A. Yes.
Q. And how is he related?
A. He's a cousin as well.
Q. Is he also Tim's cousin?
A. He's Tim's brother.
Q. Tim's brother.
When did you acquire the Medcare account?
A. It's in one of the exhibits. I think it was 21.
Q. Let's take a look at Plaintiffs' Exhibit 3 in the smaller book.
A. 3. April 26, 2021.
Q. Okay. And you personally own that account, right?
A. It lists the buyer as Medcare LLC.

Q. And do you own Medcare LLC?
A. Yes.
Q. Does it have any other owners?
A. What?
Q. Does it have any other owners?
A. No.
Q. Could I direct you to the second paragraph -- I'm sorry, let me just ask, first of all, do you have all the exhibits you need?
A. Oh, you're back on 68?
Q. I'm actually in the small book and I'd like to direct you to Exhibit 3. I'm sorry if I've been confusing.
A. Hold on a second.
Q. Take your time. It's okay. Take your time.
A. I'm trying to fix the book.
Small book? Which exhibit?
Q. Exhibit 3, sir. Thank you.
A. Okay.
Q. And do you see in the second paragraph where it says -- well, let me start with the first paragraph. The seller is defined as Stephen Mignacca, right?
A. Yes.
Q. Am I saying his name correctly?
A. Yes.
Q. And the buyer is identified as Medcare LLC, right?

A. Right.
Q. It says "Seller hereby grants, sells, assigns, transfers, and conveys to the Buyer, his successors and assigns, all of Seller's right, title and interest in and to the Amazon Merchant Account" and then lists a token. Do you see that?
A. Yes.
Q. And did you take that to mean that Mr. Mignacca conveyed his seller account and all the rights to you?
A. Yes.
Q. And by this point, you'd been a seller on Amazon for at least 11 years, right?
A. Yes.
Q. And you knew that there were rules, policies, and procedures that sellers must abide by on Amazon, right?
A. Yes.
Q. And you knew you could find those on Seller Central, right?
A. Somewhere, yes.
Q. And did you personally receive the seller login credentials for this account?
A. Um, yeah, or it was logged in for me.
Q. You mean in the process where Mr. Mignacca would log in and then you would reset the credentials?
A. Correct.

Q. Okay. And what about Medcare LLC, when did you come to acquire that company?
A. Medcare LLC, I don't recall.
Q. Did you form that company?
A. I did.
Q. Does that company have any employees?
A. Not at present, no.
Q. Did it have any employees at any time?
A. Um, I don't think it had any W-2. Might have had some contract employees.
Q. And what did the contractors do?
A. Handle the account, restock, and case flow, policies and procedures.
Q. You were the sole owner, though, the whole time, correct?
A. Yes.
Q. And you were the sole officer of the company?
A. Yes.
Q. Okay. Next let's consider the Health and Household account, please.
Who owns the Health and Household account?
A. Central Concepts Inc.
Q. And how did Central Concepts -- withdrawn.
Take a look at -- I'm sorry to do this -- Exhibit 68 in the big book. If there's a way for you to keep both on

your ledge, that would be helpful.
A. Very small ledge. All right.
Q. If you go back to Exhibit 68 and turn to page 3 of 5 in the blue case filing text.
A. Uh-huh.
Q. Do you see that?
A. Uh-huh.
Q. That's customer ID ending in 5615?
A. Uh-huh.
Q. And do you recognize -- well, withdrawn.
Is that the customer ID for the Health and Household account?
A. Yes.
Q. And do you see where it says name Benjamin J. Ligeri/Health and Household?
A. Yes.
Q. Is it correct that you are both the owners of the Health and Household account?
A. That name doesn't signify anything, to my knowledge, where that was derived from. There's no spot on Amazon where that's located. The seller name is one field. Credit card name would be another. My name wouldn't appear there unless it was derived, taken out from credit card statement and put there. I never filled it out there.

Q. And so who -- is Central Concepts Inc. the owner of the Health and Household account?
A. Yes.
Q. Did you ever own it personally?
A. What?
Q. Did you ever everybody own it personally?
A. Yes.
Q. Okay. When you acquired the account, who acquired it? Withdrawn.
When you acquired the account from Jasmine's Gifts, who acquired it?
A. So at that time I believe that's when I acquired it in my personal name.
Q. Okay. You think that you personally acquired it from Jasmine Alcantra, right?
A. Yes.
Q. Then when did you change the owner to Central Concepts?
A. Central Concepts Inc. purchased the account and the assets I believe somewhere in 2020.
Q. Okay. Who owns Central Concepts?
A. I have, I believe, 10 percent of the shares, and there's no other shareholder outside of the company retaining shares. So I would probably be considered the majority owner.

Q. You're the only owner of shares other than shares that have been recontributed to the company?
A. Retained. Never distributed out from the company.
Q. So is it fair to say you're the sole owner, then?
A. Yeah, I think so.
Q. And you make the decisions for that company, right?
A. Absolutely.
Q. Okay. Let's take a look in the small book, Plaintiffs' Exhibit 20, the complaint in this lawsuit.
A. 20?
Q. Yes, 20.
Are you there, sir?
A. Yes.
Q. Great. Do you recognize this as a verified complaint in this action?
A. It is captioned as such.
Q. I'm just asking you if you recognize it.
A. Yes.
MR. MAGLIERY: I'm going to give opposing counsel a minute since he had trouble hearing.
MR. CHAN: I'm ready.
BY MR. MAGLIERY:
Q. And do you have an understanding of what a verified complaint is?
A. Yes.

Q. What's that?
A. I'm under the understanding that your factual allegations are considered made under oath.
Q. Okay. And if you turn to the last page of the document, which is page 63 of 63 in the blue court filing heading, is that your verification?
A. Yes.
Q. Is that your signature?
A. Yes.
Q. And did you have it notarized?
A. I did.
Q. Did you understand that you were attesting to the truth of the contents of the complaint when you signed this?
A. Yes.
Q. Let's take a look at paragraph 5. It says in paragraph 5, "Plaintiff Ligeri also opened the 'Health and Household' Amazon account about a decade ago." Do you see that?
A. I do.
MR. CHAN: That was asked and answered, Your Honor.
THE COURT: He can ask, cross-examination.
BY MR. MAGLIERY:
Q. Is that a true statement?

A. I explained that earlier as, you know, wording that you're analyzing very deeply to prove a legal contract assent when it was just open for business, as I explained.
Q. It's not true that you opened the account on the Amazon system, right?
A. Correct.
Q. Okay. Let's take --
A. That's not true.
Q. Take a look at paragraph 56. Do you see the second sentence that says: "Internal Amazon documents suggest that the company's hyper-focus on a cost-cutting strategy to adopt automated processes for nearly everything - which Amazon refers to as 'HOTW' or 'Hands off the wheel'. This is precisely the approach that has led to a functional breakdown in the Plaintiffs' variability to do business for which they contracted with the defendants to do"? Do you see that?
A. I do.
Q. Okay. Did you contract with the defendants?
A. So I'm under the impression that we're in a working relationship, which would constitute contracted relationship --
THE COURT: Hold on a second.
MR. CHAN: This was asked and answered in the presence of counsel previously on direct examination.

THE COURT: So the way trials work is a person does direct examination and then the opposing attorney can ask questions about the same subject matter, try to challenge the testimony. So it's not really much of an objection to say it's been asked and answered because the whole purpose of cross-examination is for the cross-examining attorney to challenge the answers that were given. Do you understand that, sir? Okay.

THE WITNESS: Continuing on, the -- as we've stated -- I've stated before, the doing business with Amazon sets up a relationship in itself. It doesn't specifically mention a certain type of contract or agreement. Is that your question?

BY MR. MAGLIERY:

Q. There is, according to your words, a contract between the plaintiffs and defendants, right?

A. The wording is "which they contracted with the defendants to do." So we're looking at that as, you know, the relationship of doing business with them. Not an actual written contract that we negotiated and signed together. So I think you're taking that literally like the opening literally.

Q. Mr. Ligeri, I'm asking you, so I'm giving you the opportunity right now to tell me. The words on the page say that plaintiffs -- there was interference with the

plaintiffs' ability to do business for which they contracted with the defendants to do. I'm asking, does the allegation truly recite that there was a contract between plaintiffs and defendants?
A. I think it's a legal argument of a breach of the general nature of the contractual relationship of working with Amazon. That's how I see it.
Q. Okay. There's a general contractual relationship, right?
A. Correct.
Q. Okay. Please turn to page 62 -- I beg your pardon, paragraph 62. I'm sorry, I misspoke. Paragraph 62, which your counsel did already ask you about.
That paragraph reads: "All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding arbitration clause"; do you see that?
A. I do.
Q. Is that a true statement?
A. According to the Subcommittee report which we're quoting here, it is a true statement and it's certainly Amazon's allegation. Whether we think that's valid or not is another question. So if you want to be specific.
Q. But your statement signed under oath is that all third-party sellers are parties to a binding arbitration provision, right?

A. So the factual elements of the verified complaint are under oath. The legal arguments and quotations of Subcommittee reports are, to the best of my knowledge, what the Subcommittee stated. You could call it hearsay, if you'd like. But that's what we learned reading that report, that Amazon's third-party sellers, according to Amazon, are subject to a pre-dispute binding arbitration clause.
Q. And without citation, you cited those words in your complaint that you signed under oath, right?
A. Correct.
Q. Now, going back to Jasmine's Gifts -- which is now Health and Household?
A. Yes.
Q. In that instance, you purchased the business Jasmine's Gifts LLC; am I right?
A. I believe so.
Q. Why did you need to change any of the information about the entity name if you now owned Jasmine's Gifts LLC?
A. I have a very bad recollection of this. This is a very long time ago. I don't recall if I kept it as Jasmine's Gifts LLC for a time before making it my own, transferring it to myself before transferring it to Central Concepts. If you go back to that day, I have a

very bad recollection of the exact corporate identity and all that. I think the credit card exhibits might lend some knowledge to it.
Q. That account -- according to Exhibit 68, that account was begun March 11, 2014. Does that sound right to you, or would you like to look at the exhibit?
A. No, I'll take that.
Q. Okay. Now, if Jasmine's Gifts registered a seller account, then you are bound by all of Jasmine's Gifts' contracts, right?
A. One more time?
Q. If Jasmine's Gifts registered for an Amazon seller account, you're bound by Jasmine's Gifts contracts, right?
A. I feel like you're really confusing me.
Q. Well, in the other instances, sir, you acquired, in the words of the agreement, the Amazon merchant account, for one, and for the other, right, title and usage of an Amazon page. But in this instance, in Jasmine's Gifts you acquired Jasmine's Gifts LLC, right?
A. I'd like to review that exhibit briefly.
Q. It was not accepted into evidence, but you're welcome to look at it. It's Exhibit 5 in your book.
A. I thought it was accepted into evidence.
Q. I stand corrected. It was. I beg your pardon.
A. It says she's selling two things here. One is any

interest she has in Jasmine's Gifts LLC and also her Amazon business named Prime Shipping Direct at the time.
Q. Okay. Let me just read it into the record.
A. It doesn't say that Jasmine's Gifts owns the Amazon account.
Q. It says, "Jasmine Alcantra wishes to sell her business Jasmine's Gifts LLC and her Amazon business named 'Prime Shipping Direct' to Benjamin Ligeri for $1,500." Right?
A. Yes.
Q. Did you acquire Jasmine's Gifts LLC?
A. Yes.
Q. Was that the name of the business that owned the Jasmine's Gifts selling account?
A. I believe so, yes.
Q. And so when you buy a business, you remain bound by its contracts, right?
A. Calls for a legal --
MR. CHAN: Is that a question or is Counsel testifying?
THE COURT: I heard a question. When you buy a business, you remain bound by its contracts, right? That was the question.
THE WITNESS: I mean, it does call for a legal conclusion. I don't think that you inherit every

agreement that a company or its staff made with another company, per se. Is there an agreement with Jasmine's Gifts LLC and Amazon? Did they sign off on the BSA?

BY MR. MAGLIERY:

Q. So you don't believe that when you buy a company, you're subject to and bound by the contracts it has?

A. No, I mean I just said it called for a legal conclusion. I would say that you are, to some extent.

Q. Mr. Ligeri, the Judge is going to rule on it. But I'm asking your understanding. So maybe that would be more clear. Is it your understanding that when you buy a company, you can choose to accept and reject the contracts it's bound by?

A. I would say you're bound by them, yes, that would probably be my conclusion there.

Q. And do you recall when you first became involved in the Health and Household account?

A. Um, when -- so I know I named it that at a certain point I think in 2017, 2018 I became pretty heavily involved. The first point I was involved with this account, in general? Like since its inception?

Q. Yes.

A. I believe I was involved pretty early on with Jasmine and the account.

Q. And how is Jasmine Alcantra known to you?

A. H'm?
Q. How is Jasmine Alcantra known to you?
A. She was also a former employee of Yagoozon. We lost touch probably seven years ago. I haven't been able to talk to her since.
Q. Okay. Could we take a look at Exhibit 69 in the big book. Sorry, it's in the big book.
A. Let me get the magnifying glass for this one.
Q. Yes.
Mr. Ligeri, do you have it?
A. Yes.
Q. Exhibit 5 in the plaintiffs' book, which I'm not asking you to look back, says that it was dated December 12, 2014. That's when you -- withdrawn. Is that when you acquired the Jasmine's Gifts account and business?
A. That seems about right.
Q. Okay. Take a look at Exhibit 69.
Am I correct that there's no entry for any credit card other than a Jasmine's Gifts credit card until 2016?
A. Yes.
Q. From 2014 to 2016 you did business with Jasmine's banking information and credit card without updating any of the information, right?
A. One more time?

Q. From 2014 to 2016 you did business in this account using Jasmine's Gifts credit card and banking information without making any updates, right?
A. Yes. Yes, exactly.
Q. All right. Finally, let's consider the Vanguard account, please. That's the only account for which there are no exhibits you've introduced for the creation or transfer of ownership.
Who owns the Vanguard selling account?
A. I introduced the purchase and sale agreement for that. That account was created by my father.
Q. Is your father Joseph Ligeri?
A. Yes.
Q. You want to look through the plaintiffs' book and identify any document about the transfer of that account?
A. It does seem like it's missing, but I submitted this to counsel. It's a transfer. A Global Specialty Products LLC purchased from Robert Ligeri, if I recall.
Q. Is that who owns the Vanguard selling account today?
A. Yes.
Q. And when was that account set up?
A. Um, I believe it dates back to 2016 sometime, the original formation. And then it was sold to companies that I owned around 2020, I believe.
Q. Take a look at Exhibit 72 in the big book, please.

A. I'll use this ledge.
I'm going to need a bathroom break soon, brief one.
Okay.
Q. Do you see the earliest entry for credit card information in the account ending in 7002?
A. Yes. It was June 21, 2017. My mistake.
Q. And that's Joseph Ligeri's credit card information, right?
A. Correct.
Q. And his address 39 Wheaton Ave., Rehoboth, Massachusetts, right?
A. That was the billing address of the credit card he used, yes.
Q. And you used the same credit card -- I beg your pardon.
You used the same address at the same time, right?
A. No. Where do you see that?
Q. I'm asking.
A. Oh, do I -- excuse me?
Q. I'm just asking if you used the same address.
A. Oh, as my residential address?
Q. Yes.
A. It was my -- it was on my driver's license. I wasn't living there at the time, but that was my driver's license address.

Q. What is that address? Is it a single-family home?
A. Yes.
Q. Bear with me.
Take a look at Exhibit 70, please. Can you match the seller accounts ending in 7015?
THE COURT: We're going to have to take a brief recess.
(Whereupon, a recess followed.)
THE COURT: We'll wait for counsel to come back. Thank you all for your patience. I'm sorry, I have to get those queries when I get them from the hospital.
MR. MAGLIERY: Of course.
THE COURT: So Mr. Ligeri, take your time. Are you all set, sir?
THE WITNESS: Yes.
THE COURT: Please continue.
MR. MAGLIERY: Thank you, Your Honor.
THE WITNESS: I have 71 open.
BY MR. MAGLIERY:
Q. Thanks. Actually, I misspoke and it should be 69, so if you could flip to that. Thanks.
Do you have 69?
A. Yes.
Q. Okay. And could you take a look at the entry in the Created On column that says 6/16/2017.

A. Yes.
Q. You see it says "Benjamin J. Ligeri" and lists "39 Wheaton Ave., Rehoboth, MA"?
A. Yes.
Q. That's the same month that the Vanguard credit card was entered by Joseph Ligeri at the same address, right?
A. Um, I don't recall. But this doesn't make any sense. I don't feel like this is accurate data. Because I never put -- is this the Vanguard account?
Q. No, sir. This is the Twin Horses account.
A. No, this isn't -- that has got Jasmine's Gifts LLC. Is this the Health and Household account?
Q. Yes. Yes, it is. I'm sorry.
A. Oh, the Health and Household account. That makes sense. That's what I said earlier. 2016 I put it in my name for a few years, yes.
Q. But I'm asking if that's the same address inputted in the same month as Joseph Ligeri inputted into the Vanguard account.
A. Oh, it seems to be the same billing address for the credit cards, correct. Yes. Good point.
Q. And were you living there?
A. What's that?
Q. Were you living at 39 Wheaton?
A. No. I had no address at the time. I was -- the last

time I lived officially at Wheaton Ave. was like 2005.
Q. Okay. Going back to the Vanguard account, then, did you assist Joseph in setting up the Vanguard account?
A. No.
Q. How did you come to acquire the Vanguard account?
A. Um, so I believe -- so my company Global Specialty Products LLC I believe purchased it directly from Joseph Ligeri.
Q. When did that occur?
A. 2020 somewhere.
Q. Was Global Specialty Products created in 2020?
A. Um, I believe it was, yes.
Q. Did you organize that company?
A. Through my lawyer, yes.
Q. Are you the sole owner of that company?
A. I currently am, yes.
Q. And who else owned it over the course of time?
A. At one point -- Central Concepts Inc. owned it as a wholly owned subsidiary. And then they sold it to me. So I think it was from the onset. I think it was created as a subsidiary of Central Concepts and then spun off to me. I'd have to look detail at the records to give you a hundred percent on that.
Q. And you were the sole owner and controlling officer of Central Concepts during that time, right?

A. Yes.
Q. And so your testimony is you did not work with Joseph to set up the Vanguard account, right?
A. I was stuck on the last question, you said sole officer. There have been other officers, to be clear, on Central Concepts Inc. I kind of rushed that answer.
Your new question? Sorry.
Q. Let's go back to that one. You'd already testified that you were the sole officer and the owner of all of the outstanding shares of Central Concepts?
A. As far as ownership, yes. I'm just saying officership, as far as who held the C-level position, if that's what you're referring to, I just want to be clear.
Q. You testified that that company only had contractors and no employees, right?
A. That was Medcare, not Central Concepts Inc.
Q. Who were the officers of Central Concepts?
A. Central Concepts Inc. had a lot of employees. There was a Laura McAdam who was chief of operations. There was a Jeff Jutras who was chief technical officer. Do you want me to list them all?
Q. If those are all of them.
A. No, there's definitely more employees. There was Kyara Robaro (phonetic). She was the U.S. chief shipping manager. And then we had Shirley Leong who was our

Chinese chief shipping manager. And we had a Chris Davis who was a warehouse manager. There was a few others that aren't coming to mind, probably.

Q. Okay. Thanks for that clarification.

So back to the Vanguard account. You did not assist Joseph in registering that account?

A. No.

Q. So the four seller accounts associated with the plaintiffs in this lawsuit and yourself, the four entity plaintiffs and yourself, you didn't participate in the registration of any of them?

A. No.

Q. Okay. Now does Central Concepts operate a website?

A. Um, I believe their website was taken down. It might still be up, possibly. Centralconcepts.com. Would have been the website if it's still up.

MR. MAGLIERY: May have we mark this as Defendants' 77, please. This is a copy for the Court. Thank you.

THE WITNESS: Do I get a copy? Thank you.

BY MR. MAGLIERY:

Q. Mr. Ligeri, I've put before you what the Court has marked as Defendants' Exhibit 77. Do you recognize this document?

A. This screenshot from the website?

Q. Is that an answer?
A. Yes.
Q. Okay. You recognize it, right?
A. Yes.
Q. And are the people depicted at the bottom the team you just described?
A. With some comical exception, yes.
Q. Who is Bretton?
A. That was a joke. He's not a real employee. That's the character on Wall Street: Money Never Sleeps.
Q. I see.
Who is Laura?
A. Laura is there.
Q. Who is Laura?
A. Who is she?
Q. What does she do for the company?
A. Well, at the time of this screenshot, it says she's the operations manager. She did have a C-level role at another time.
Q. Is it Kyara?
A. Kyara, yeah.
Q. Who is that?
A. She was an employee of Central Concepts, as I specified already.
Q. And what was her role?

A. In this screenshot she's given the title logistics manager. And like I said, she was also chief shipping manager for a time.
Q. What about LeeAnn, what was her role?
A. She had a brief role in -- I don't even remember, honestly.
Q. Okay. And what about 007?
A. 007, he was the Amazon case flow manager. We wanted to get someone right in the Philippines to understand the local nuances.
Q. Okay. Thank you.
MR. MAGLIERY: Can we mark this as Defendants' 78, please.
THE WITNESS: I can't read it, though.
THE COURT: Do you want to offer 77?
MR. MAGLIERY: I beg your pardon, Your Honor. Yes, thank you.
THE COURT: Objection to 77, which is the website for Central Concepts?
THE WITNESS: It's an old version is all.
THE COURT: Any objection, Mr. Chan?
MR. CHAN: I personally have no way of authenticating. Is this a printout from five years ago or yesterday?
THE COURT: You'll have redirect. I think the

witness has already identified these people on the website. On redirect, if you want to go into more about this and any --

MR. CHAN: So for the purpose of the personnel only?

THE COURT: It's offered as a full exhibit. So you're welcome to ask the witness about it.

MR. CHAN: Right. But I understand he had to authenticate that that is indeed current -- it depends what he's using it for. This is five years ago, then doesn't have to authenticate what -- in other words, is it relevant to the time that we are discussing?

THE COURT: Well, I think five years ago is relevant, certainly, in light of the allegations concerning when certain accounts were open and started and run in a case.

MR. CHAN: No objection.

THE COURT: Okay. So is this Number 77?

MR. MAGLIERY: That was 77.

THE COURT: So 77 is a full exhibit.

(Defendants' Exhibit 77 admitted in evidence.)

BY MR. MAGLIERY:

Q. I've now put before the witness and hopefully the Court has a copy of Exhibit 78 which is titled at the top

"Global Specialty Products." Do you recognize this document, sir?
A. What is that?
Q. Are you looking at the blue --
A. No, I have the red one.
Q. Did I not bring it over? I beg your pardon. Sorry about that.
A. We've been talking about 77 all this time.
Q. The colloquy we had was about 77. I've now put before you 78 which says "Global Specialty Products" at the very top in blue. See that?
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. It looks like a page that was on the website at some point.
Q. For Global Specialty Products?
A. Yes.
Q. And that's a company that you own, right?
A. At the time I believe this was owned by Central Concepts, which I owned.
Q. Okay. And looking at the team, am I correct that Laura is the same Laura at Central Concepts?
A. Yes.

Q. Does she work for both companies?
A. Not at -- I don't believe at the same time. But when Central Concepts went out of -- well, stopped being a company that could pay a staff and had its funds confiscated by Amazon, Global Specialty became the main entity I was operating as an Amazon retailing company.
THE COURT: I'm sorry, was there an objection?
MR. CHAN: I ask the relevancy of this to the arbitration clause. It's a website with personnel with pictures. How is that relevant to the arbitration?
THE COURT: Is there an offer of relevance?
MR. MAGLIERY: Yes, Your Honor. We've argued and we've cited case law in the pretrial brief that closely related companies or entities can be bound by an arbitration provision. There's obviously a theory of direct contract. There's a theory of notice and assent. And then there are the so-called nonsignatory theories. We've offered that Mr. Ligeri and his companies are either agents and principals of each other or they're subject to the arbitration provision because they're closely related or, of course, the direct benefits. We intend to show the close relation between Mr. Ligeri and the teams and perhaps even that they are one and the same, that they are alter egos. I think the testimony here is there was an enforcement against one company, he started another

company and moved all the people over. And to us that is probative of whether the non-signatory theories are viable.

THE COURT: Any response on that?

MR. CHAN: He said closely related business, meaning the business side is closely related. But he's claiming because they're the same employee that's how establish the business side being closely related?

THE COURT: I'm satisfied that it's relevant. I overrule the objection.

MR. CHAN: Okay.

THE COURT: So Defense Exhibit 78, full exhibit.

(Defendants' Exhibit 78 admitted in evidence.)

MR. MAGLIERY: Thank you.

BY MR. MAGLIERY:

Q. To clarify or to be sure I understand, Laura is the same Laura in the Global Specialty Products website and the Central Concepts website, right?

A. Yes.

Q. And Kyara is the same person in both websites, right?

A. Yes.

Q. And did I hear you correctly that there came a time when Central Concepts was disallowed from selling on Amazon?

A. Yes.
Q. And when that happened, did you move the operations of Central Concepts to Global Specialty Products?
A. No. Global was already selling on Amazon at the same time. They both had Amazon businesses. So it just -- we stopped employing people under Central because it didn't have any assets and money wasn't coming in.
Q. And how were their businesses different?
A. I'm sorry?
Q. The things that Central Concepts sold, are they different than what Global Specialty Products sold?
A. They both had a licensing deal with me to sell items that I had the rights to. So they mainly sold similar items.
Q. Okay.
A. Global is now a wholesale only company.
MR. MAGLIERY: May I ask this be marked as Defendants' 79. And Defendants' 80. These are for the Court. Thank you.
BY MR. MAGLIERY:
Q. Mr. Ligeri, I'm putting before you two exhibits. The red titled one is Defendants' Exhibit 79. And the blue bannered one is Defendants' Exhibit 80. Let's start with 79. Do you recognize this document?
A. Yes.

Q. What is it?
A. These are pictures of brands that I personally own.
Q. And do you recognize this as a screenshot of the Central Concepts website?
A. Um, possibly, yes.
Q. And 80, do you recognize that document?
A. Yes.
Q. And do you recognize that as a screenshot of the Global Specialty Products website?
A. Yes.
Q. Is it accurate to say that they are selling substantially the same products?
A. Yeah, they took over the same licensing deal with some exceptions. Yes.
Q. Were the vast majority of the offerings the same? Can you put an order of magnitude to that?
A. I would think so, yeah.
Q. Okay.
A. They historically had a different product line with minor overlap, the two companies. They historically had totally different product lines. But with the absence of Central Concepts, Global purchased their inventory to sell it, so they ended up getting a more identical product line.
Q. There came a time after the Central Concepts selling

account was disallowed that Global Specialty Products assumed the brand catalog, right?

A. One more time?

Q. After the Central Concepts website was disallowed, did Global Specialty Products begin selling those same type of products that Central Concepts had been selling?

A. When you say website disallowed, do you mean Amazon deactivation?

Q. Yes, I beg your pardon. Let me ask it again.

After the Central Concepts seller account was deactivated, did Global Specialty Products begin selling substantially the same products that had been offered by Central Concepts?

A. Yes. They bought the products from Central Concepts, entered a licensing deal with me and sold them.

Q. Sir, could you take a look at in the plaintiffs' book, which is the smaller book, Exhibit 12.

THE COURT: Are you offering 79 and 80?

MR. MAGLIERY: Your Honor, I beg your pardon. Yes, we're offering it.

THE COURT: Any objection to 79 and 80?

MR. CHAN: No objection.

THE COURT: Okay. So 79, 80 as well as previously admitted 77 and 78, full exhibits.

(Defendants' Exhibits 79 and 80 admitted in evidence.)

THE WITNESS: Okay. Exhibit 12?

BY MR. MAGLIERY:

Q. Yes.

We talked about this in your direct testimony, but there was an objection. I have would like to ask you about it for a different purpose. Do you recognize Exhibit 12?

A. I do.

Q. And what is it?

A. This is one of our wholesale clients sending us an email saying they can't get approved to sell Green Sky brand items that we're trying to sell to them.

Q. Who is the wholesale client you're talking about?

A. Duke's online store, Duke's Deals on Amazon.

Q. Am I correct that the email is from dukesonlinestore@gmail.com?

A. Yes.

Q. And it's to kyara@gsp.llc and ceo@gsp.llc, right?

A. Yes.

Q. Am I correct that you obtained this email from Central Concepts support, billing@jasminesgifts.com?

A. So the billing at Jasmine's Gifts is a G suite directory with Google that hosts several emails and .coms

and manages the .com email. This was definitely not a Central Concepts email address. But for some reason it prints out with the G suite name at the top, the billing@jasminesgifts.com as the mothership email for the G suite account.

Q. Okay. All of your selling account emails are consolidated into one top-level email box and that's billing@jasminesgifts.com?

A. No. Just Central Concepts and Global, because they were the same company at one point.

Q. Oh, all right. I understand. Okay.

Now, just to understand your claims in this action, sir, are you contending that arbitration provisions, generally speaking, are illegal?

A. No.

Q. There are circumstances where arbitration provisions are enforceable, right?

A. Yes.

Q. And also you're not contending that choosing the place where the parties will bring a dispute is illegal, right?

A. I'm sorry?

Q. You're not saying to the Court that a choice of forum, choosing where to bring a dispute, that that's illegal, right?

A. If two parties make an election to bring a dispute in the same forum, no, I feel that's legal to do that.
Q. Okay. And am I correct that you want to do business on Amazon?
A. No, you're not.
Q. Okay.
A. You're not correct.
Q. Was there a time you wanted to do business on Amazon?
A. Yes.
Q. And then was that from at least 2012 to 2023?
A. I mean, I would say I was looking for ways to get off Amazon in 2020-ish, 2021-ish.
Q. But you had a choice of whether or not to sell on Amazon, right?
A. Yeah, legally.
Q. No one forced you to do business on Amazon, right?
A. Not physically.
Q. Did they force you in any other way?
A. I mean, it was the sole source of revenue. Financially forced to maintain the platform until another alternative means which I invested a ton of money in finding alternative means.
Q. There are other retailers where you can sell your goods, though, right?
A. There are other retail outlets besides Amazon, yes.

Q. In fact, you currently sell your goods on Walmart, right?
A. Global Specialty does operate on Walmart, yes.
Q. And you can also sell goods direct to consumer, right?
A. That's correct.
Q. So there are a variety of choices for how to get your products to a consumer, right?
A. There are.
Q. And from 2012 to 2023, at least, you chose to sell your goods on Amazon, right?
A. Yes.
Q. And you believe that seller accounts have value the longer they're on the Amazon store, right?
A. Um, yes. Especially legacy accounts.
Q. What is a legacy account?
A. An account created before I believe it's June of 2016 Amazon let the seller receive a hundred percent of their net proceeds, whereas after they take all of your net proceeds and hold it and let you get your next net proceeds amount while holding each successive net proceeds for another two weeks.
Q. Okay. Even if there's not a legacy account, you still think that older accounts have more value, right?
A. They have less throttles if they're very old, yes.

Yes.

I don't think that anymore so much as I thought it in the past. Because Amazon has been attacking those older accounts. So it's a little bit less exciting to have one than it was.

Q. Okay. And I think you said they have less problems. But I'm just asking, do you think that they are more valuable?

A. Yes.

Q. Okay. And you're aware that Amazon has policies that govern its products including, for example, that sellers do not infringe intellectual property rights of other sellers, right?

A. Amazon claims to have these policies, yes.

Q. And you're aware that Amazon allows sellers to make complaints against each other, right?

A. Yes.

Q. And you took advantage of Amazon's dispute resolution procedure --

THE COURT: My apologies one more time. Brief recess.

MR. MAGLIERY: Thank you, Your Honor.

(Whereupon, a recess followed.)

THE COURT: Please be seated.

Thank you again for your patience. It looks

like we're good to go.

MR. MAGLIERY: Thank you, Your Honor.

BY MR. MAGLIERY:

Q. The last question, I think, either it was placed on the record or I will again: You took advantage of Amazon's dispute resolution procedures about infringing intellectual rights, correct?

A. I want to clarify. A seller is not allowed to report another seller on infringement. Infringement reports take place outside of the Amazon seller system. They take place on Amazon.com outside of Seller Central by IP owners. So I'm not acting in the capacity as a seller when I report counterfeit products; I'm acting as an IP owner filling out the infringement form on Amazon.com. You can't use the Seller Central platform to issue an IP complaint.

BY MR. MAGLIERY:

Q. Mr. Ligeri, thank you.

Did you avail yourself of Amazon dispute resolution procedures --

MR. CHAN: Can you speak louder?

BY MR. MAGLIERY:

Q. Did you avail yourself of Amazon dispute resolution procedures respecting intellectual property?

A. I don't understand the question.

Q. Did you ever use Amazon's dispute resolution procedures respecting claimed infringement by other Amazon sellers?
A. I've used the Amazon infringement page to tell Amazon about bootleggers. And when they failed to act, I filed lawsuits like the one against Bonzai LLC.
Q. Did you use the dispute resolution procedures respecting password resets?
A. No.
Q. Did you use it respecting technical issues?
A. Dispute resolution procedures regarding these things, you're saying?
Q. Yes.
A. I'm not aware of what you're referring to.
Q. Did you ever use it respecting disbursements made by Amazon?
A. No.
Q. Take a look in plaintiffs' book at the complaint in this action, which is Exhibit 20, paragraph 12.
A. All right. Plaintiffs' book?
Q. Yes.
A. Verified complaint?
Q. Yes.
A. Okay. Definitely confused on this terminology, but go ahead.

Q. Tell me when you're there.
A. Yeah, I'm at 20.
Q. Paragraph 12.
A. Okay.
Q. It says, "Plaintiffs's submission to Amazon regarding Plaintiffs' disputes concerning password resets, intellectual property disputes and technical issues are dealt with at weeks-long intervals," do you see that?
A. I do.
Q. Does that mean that you submitted password resets, intellectual property and technical issue disputes to Amazon?
A. Yeah, we filed reports of it. I wouldn't call it what you were calling it, a dispute resolution process. It's just a complaint or a case filing concerning these matters.
Q. Is a case filing a dispute resolution process?
A. Um, I never looked at it like a dispute resolution process. I look at it as a filing with Amazon to get them to accomplish an action that's proper.
Q. Well, take a look further in that paragraph where you say, "Moreover, when the Defendants' systems end processes result in arbitrary deactivation of accounts," were you describing a process?
A. Yeah, where they just deactivate an account and you

try to appeal it internally within their system. Now, that process you could call a dispute resolution process, the appeals process.

Q. And also you describe here disputes about funds disbursement, and you list an email address for appeals about fund disbursements, right?

A. Yes.

Q. And all of these are mechanisms that Amazon has made available to sellers in order to allow the functioning of Seller Central, right?

A. Yes.

Q. And you availed yourself of those, right?

A. I tried to use these processes, yes.

Q. And if you wanted to find out where the Amazon policies and procedures for these things are located, you would go to Seller Central, right?

A. Usually, you go to -- yeah, whatever page the issue is on. And deal with it there. Like the instructions for appeals are usually on the page where the appeals are. It will tell you to file a written appeal with these items in it. So most of the processes are outlined right on the page dealing with the issue. You're not referred to something to consult like a BSA.

Q. Okay. Could you take a look in the big book at Defendant's Exhibit 66.

A. Yes.
Q. Do you recognize this document?
A. "Selling policies and seller code of conduct." The G1801?
Q. Our witnesses talked about it. I'm just asking if you recognize it.
A. Yes.
Q. Okay. Have you ever viewed the seller code of conduct before?
A. Um, I know I looked at it the other day, yes.
Q. And before that had you ever, in the course of doing business with Amazon, viewed the seller code of conduct?
A. Let me take a peak at it.
I feel like I've seen that before. I don't know when or where.
Q. Okay. Take a look at the second page, which is the last page, I mean. Do you see where it says "Filing infringement notices as an agent or brand protection agency"?
A. Yes.
Q. And feel free to review that paragraph.
Does that describe the process by which you would make a complaint to Amazon about infringement by other sellers?
A. Give me a moment. It's very tiny.

MR. CHAN: What exhibit?
MR. MAGLIERY: We are in Defendants' 66.
THE WITNESS: Yeah, it's what I said. They don't allow you to file as a seller brand reports. I just said that.
BY MR. MAGLIERY:
Q. Okay. And my question, though, is: Does it describe the brand dispute resolution or infringement process that Amazon makes available?
A. No. It just notices you about third parties and sellers having access to the procedure, not the actual procedure itself.
Q. Okay. It describes that there is a procedure to file brand protection claims but that it's outside of the seller portal, as I understand you're describing it?
A. It really leads off talking about third parties and agents handling brand protection as opposed to sellers filing notices to benefit their accounts. I don't know. It is what it -- it speaks for itself, I guess.
Q. But I'm asking your understanding. Is this a description of the process you would utilize when you made a claim as a trademark owner?
A. No. There's no process outlined here. It doesn't tell you where to go or where you would file the report. It just speaks of third parties and agents, authorized

agents, who can file them. Not where to file or how to file. I happen to know the URL where you do file them, so. And I haven't seen this before.

Q. Do you see that it says Amazon accepts -- Amazon accepts brand protection -- or property infringement claims on behalf of brands in the first sentence?

A. "Amazon understands that many brands may choose to have brand protection agencies or agents report intellectual property infringement on their behalf and accepts submissions from authorized agents."

Q. Okay. Is that a description of a process that you've used before?

A. I've never -- I don't know if I've -- hold on.

Have I had a third party -- I think I have had an attorney do the process, yes. So I have used that process of having a third party file for you. I usually file them myself in the Amazon.com portal, not in the seller portal.

Q. And do you see at the top of this document it says "All sellers are expected to adhere to the following policies when listing products on Amazon. Seller offenses and prohibited content can result in suspension of your Amazon account"?

A. Wait, where are you?

Q. I'm at the very top under the "Selling policies and seller code of conduct."

A. You're back at the top of the exhibit?
Q. I am. I'm on -- it's only two pages. I'm on the first page.
A. Oh. "All sellers are expected to adhere to the following policies when listing products on Amazon." Yes, I see it.
Q. Okay. And under "Acting fairly," do you see the words "You must act fairly and lawfully and may not misuse any service provided by Amazon. Examples of unfair activities include" -- do you see that?
A. Yes, I do.
Q. And then the last bullet point is "Allowing other people to act on your behalf in a way that violates Amazon's policies or your agreement with Amazon"?
A. I do. I've never done that.
Q. But your transferors have, right?
A. How so?
Q. You said you'd seen the seller code of conduct, right?
A. I have.
Q. And you contend that you don't have an agreement with Amazon, right?
A. I have an agreement outside of the BSA.
Q. You have a broader contractual relationship?
A. Correct.

Q. And so whose agreement with Amazon do you think this refers to? The registrants, right?
A. I mean, what was the question?
Q. The prohibition on allowing other people to act on your behalf in a way that violates your agreement with Amazon, that's referring to the parties to the BSA, right?
A. I don't know if it is or not. I know that no one's acted on my behalf in a way that violates Amazon's policies.
Q. Let's take a look at the BSA.
A. Okay.
Q. Exhibit 74.
A. Which version?
Q. We'll look at the live version, but we can trace back to any versions you want.
A. Okay. I'm here.
Q. Okay. First of all, you mentioned, I think, you are now familiar with the BSA, you've come to know about it?
A. Oh, yeah. I've definitely come to know of it.
Q. Okay.
A. I still haven't given it a top to bottom.
Q. Did you view the version that's currently available in Seller Central recently?
A. I haven't been able to locate it. I tried this morning.

Q. Okay. But you have viewed it before; is that right?
A. Yeah, I've skimmed through this yesterday in court a few times before, yes.
Q. Okay. Let's take a look, first of all, at Section 1, Enrollment.
A. Okay.
MR. CHAN: Exhibit Number?
MR. MAGLIERY: 74.
MR. CHAN: 74.
MR. MAGLIERY: Do you want to get a book? You have one? Okay.
BY MR. MAGLIERY:
Q. It says, "To begin the enrollment process, you must complete the registration process for one or more of the Services. Use of the Services is limited to parties that can lawfully enter into and form contracts under applicable Law." Do you see that?
A. Yes.
Q. Did you ever undergo the registration process for one or more of the services as Mr. Orzbatur described yesterday?
A. What did Mr. Orzbatur describe that you're referring to?
Q. He was the first witness who described the registration and verification process. Do you remember

that?
A. Vaguely, yes.
Q. Did you ever undergo that process?
A. No. Not for a seller account.
Q. Let's take a look at Section 2. I'm jumping down to the third line. "To use a service, you must provide us with valid credit card information from a credit card or credit cards accepted by Amazon ('Your Credit Card'). As well as valid bank account information for bank account or bank accounts acceptable by Amazon."
I'm skipping ahead.
"You will use only a name you are authorized to use in connection with the Service and you will update all the information you provide to us in connection with the Services as necessary to ensure that it at all times remain accurate and complete."
Do you see that?
A. Yes.
Q. Okay. Does this give a party to the BSA the right to transfer the account to someone else who is not authorized to use the service?
A. I want to ask, is "service" defined? I keep getting lost when I see "service." I don't see it in the definitions.
Q. Can you answer my question without that answer?

A. Ask it again, please?
Q. Does this give the person who is a party to the BSA the right to transfer the account to someone who is not authorized to use the service?
A. What's the service?
Q. Okay. Take a look at page 17 of 47, the blue court line text.
A. Oh, definitions. Okay.
So account is under the umbrella "Service," is that where we're at?
Q. As is Selling on Amazon and Fulfillment by Amazon and a number of other things, right?
A. Yes.
Q. So the parties to the BSA agree that they would abide by this term to let authorized people only register for the selling account, right?
A. All right. So just run it to me again so I can make sure I understand.
Q. Let me ask you this: You don't dispute that somebody registered the four plaintiff seller accounts, right?
A. No, I don't.
Q. Someone registered them, right?
A. Right.
Q. And do you dispute that they agreed to the BSA when they registered?

MR. CHAN: Objection, Your Honor. How would he know? He's asking if he knew anybody consent to the agreement.

THE COURT: The question is a fair one.

THE WITNESS: I mean, I don't know what they saw at the time, if they clicked the box, if that box was there, et cetera, et cetera. But I would assume there was probably a box that they clicked when they registered it, to be fully transparent with you.

BY MR. MAGLIERY:

Q. I'm just asking about really what you're arguing here, what your contentions are. You're not contending that the original applicant didn't sign up and agree to the BSA, right?

A. I mean, are you asking me to conclude that the check mark was a valid assent and contract, it wasn't an adhesion contract, all of that? Or are you just asking me if they checked the box?

Q. Let's just ask whether they checked the box or pressed "Agree and continue."

A. I would assume that whoever registered checked the box that signified agreement to a BSA.

MR. CHAN: Objection. Counsel asking witness an opinion of what in fact is burden of proof on the defendants, which is a key issue of this discussion. So

it's up to them to prove that somebody, whoever it is, did consent to the BSA. And he's asking witness his opinion.

THE WITNESS: I'm giving an opinion.

THE COURT: The question is a proper one. So I'm allowing it. Overruled.

BY MR. MAGLIERY:

Q. Mr. Ligeri, if you would please turn to the next page. In bold in the middle of page it says, "To be eligible for fund disbursement, you must refrain from deceptive, fraudulent, or illegal activity and remain in compliance with our Program Policies." Do you see that?

A. Yes.

Q. And is it your understanding that the original applicant agreed to those terms?

A. I would -- like I said, I would guess they did click the check mark that led to this agreement and was probably in some form a version of this. That's all just conjecture, but yes. And I don't believe anyone I've ever worked with would violate any of these rules anyway.

Q. Okay. Let's today a look at Section 9, which is on page 8 of 47.

A. "Insurance."

Q. And there do you see a provision that governs when a party to the BSA that's a seller has to obtain insurance?

A. Yes. This is something Amazon tells you separately

from the BSA from time to time.
Q. And in sum and substance, does it say if your gross proceeds reach a certain threshold for three consecutive months, you have to provide Amazon with proof of insurance?
A. I'm going to read it just so I can answer.
Q. Sure.
A. Or otherwise if requested by them, yes.
Q. Okay. And when you've received notifications from Amazon that you were not in compliance with this provision, you brought your accounts into compliance with this provision, right?
A. Me or my staff obtained insurance to satisfy a request by Amazon, yes.
Q. When you were --
A. Or obtained proof of insurance for Amazon.
Q. And when you were told you were not in compliance with this provision, you were told it was because the BSA required it, right?
A. I don't recall what you're referring to.
Q. Let's take a look at Exhibit 73.
If you could go to page 19 of 30.
A. Okay.
Q. There's an entry -- two entries for Health and Household. The bottom one says, "Hello from Amazon Seller

Partner Support. We understand that you would like us to clarify about the new insurance requirements." Let me -- excuse me, Your Honor, I beg your pardon. I see that in time I've reversed them. Let's go to the earlier email first, I beg your pardon.

The earlier email is dated 8:58 on October 17, 2021. Let me start with the top email.

THE COURT: Is that the same page?

MR. MAGLIERY: Same page, top email. I apologize.

THE COURT: I have it here, yes.

BY MR. MAGLIERY:

Q. It says, "DID YOU RECENTLY CHANGE YOUR REQUIREMENTS? AMAZON SYSTEM IS ASKING FOR COMMERCIAL LIABILITY INSURANCE NOW AND NOT PRODUCT LIABILITY AS WELL AS THE VENDOR. Insurance" -- and then it goes on.

THE COURT: Hold on just a second.

MR. CHAN: Mine is in a larger size for myself.

BY MR. MAGLIERY:

Q. Then it says, "Insurance requirements. Commercial liability insurance will protect you from incidents resulting from the products you sell and give you peace of mind while you focus on growing your business. Under section 9 of the Amazon Services Business Solutions Agreement, you are required to obtain and maintain

commercial liability insurance within 30 days after exceeding $10,000 in gross proceeds and sales in one month on Amazon.com, or if otherwise requested by us." Do you see that?
A. Yeah, I'm looking at it.
Q. And is the text from the Health and Household account in bold -- in all caps, I should say?
A. It looks like someone at Central Concepts Inc. wrote that in bold -- I mean caps. And they were replying to something, that big blob of stuff below it.
Q. And the message they're replying to says you have to have insurance pursuant to Section 9 of the BSA, right?
A. Yes.
Q. And then the next communication, which is below it -- that's the one I accidentally began reading before -- gives further clarification that as of September 1, 2021, sellers are required under their selling agreement with Amazon to carry commercial liability insurance and explains it.
A. Okay.
Q. You had correspondence back and forth with Amazon about a requirement for insurance that's included in the BSA, right?
A. The company seems to have -- this looks like a one-way email here, the product liability insurance. You

know, something like this just probably gets read the first line by the staff, they go to me, do we have a policy, I email it to them, they upload it to Amazon. That's probably the procedure in a situation like this without diving into all the fine print and hyperlinks.
Q. Well, it's only the second line of the Amazon email that says under Section 9 of the BSA you have to have insurance, right? I'm looking at the top email, Health and Household, 8:58 is the date. Just the second line of want email says you have to have insurance pursuant to Section 9 of the BSA?
A. Yes, it does say that. Yes.
Q. You were aware that Amazon makes changes to its policies and procedures over time, right?
A. Yes.
Q. And in fact, this is an example of one of the changes, right? Because as of September 1, 2021, a change was made to the insurance requirements, right?
A. Well, reading that, we don't know if that whole thing is just about insurance, in general, and they're just telling us what it means. So we're going to get insurance because they're demanding it. Everything at Amazon is treated as on demand. If they ask you for something, you go get it. Not really digging into what that might mean outside of a need for insurance.

Q. Well, you could have looked at Section 9 of the BSA, right?

A. If I read that, I could have gone and looked at Section 9, yes. I never did, though.

Q. And you continue -- withdrawn.

You had other correspondence about the requirements. Take a look at page 17 of 30 of Exhibit 73. There's an email at 13:30 which I take to be military time. And you or someone from Health and Household writes, "A few more questions on the product liability" and asks where to submit the insurance policy. Do you see that?

A. Yes.

Q. And then that appears to be in response to an email that begins on the second line, hello, we are writing to remind you to provide liability insurance. Why did I receive this message? I'm paraphrasing.

"You are required to provide proof of liability insurance and our records show you have not done so. As of September 1, 2021, Section 9 of the Business Solutions Agreement" -- and there's a link -- "requires you to obtain and maintain at least $1 million of commercial general, umbrella, or excess liability insurance, within 30 days after exceeding $10,000 in gross proceeds in sales in one month on Amazon.com or if otherwise requested by Amazon." Do you see that?

A. Yeah. The insurance requirement seems to be the time we were hearing about this.
Q. And there's a link provided in that email to the BSA, right?
A. It appears to be a help/G1791 link.
Q. Well, it says Section 9 of the Business Solutions Agreement, and then there's an https://sellercentral.amazon.com/gp/help/G1791. Do you see that?
A. Yeah. I don't think you'll find we clicked on that link.
Q. But it was sent to you, right?
A. Sent to the account email along with 200,000 other emails, as we've discussed.
Q. And take a look, if you would, at Exhibit 74, the next exhibit.
A. Okay.
Q. Could you read into the record at the top right corner the URL for the live version of the BSA?
A. It seems to be different. It's sellercentral.amazon.com/help/hub/reference/external/G179. Maybe they were linking just to the insurance provision directly with that other URL.
Q. Okay. And you already said you're aware that Amazon makes changes to its policies and procedures, right?

A. Yeah, I've been made aware.
Q. And how would you learn about those changes?
A. Um, I don't know that I would ever care to learn about them. I don't know how you would learn about them, no.
Q. You don't know how you learn about them?
A. No.
Q. You know that they exist, but you don't know how you learned about them?
A. Well, I mean, I mentioned the fees. They will send you an email quarterly or semiannually about fee changes. They send emails about this and that. I don't ever recall getting an email about a BSA being a binding seller agreement and any updates to it.
Q. Okay.
A. If you have one, please share it.
Q. Let's take a look back to 73, the communications. Let's take a look at page 22 of 30.
A. Okay.
Q. It says, "Submission type: appeal." This is dated February 14, 2023.
A. Okay.
Q. It's regarding the Health and Household account?
A. Right.
Q. Was that around the time there had been an

enforcement against the Health and Household account?

A. Yes.

Q. It says, "Submission type: appeal. Additional information. Dear Amazon, we are writing in response to the deactivation of our seller account Health and Household. We understand that the account was deactivated due to a violation of the seller code of conduct and would like to assure you that we did not engage in any deceptive, misleading or unethical behavior. We have reviewed the seller code of conduct and can confirm that our account has not violated any of the policies listed. Our account was previously associated with another account that was deactivated but we only served as an admin rights holder managing their shipments and inventory. We no longer have any association with that account and we only operate under our own account Health and Household. We understand the importance of following Amazon's policies and take full responsibility for ensuring that our account remains in good standing in order to prevent any future violations. We would like to provide the following action plan: Regularly review Amazon's policies and guidelines to ensure our account remains in compliance."

Do you see that?

A. This appears to have been written by Jeffrey Jutras, CTO. It seems to be his writing.

Q. Did you authorize this appeal to be made to Amazon?
A. CTO usually deals with the complex technical systems such as the appeals process, which is an automated process. He may have been doing research to try to figure out what wording he could use to please the robots and get the account reactivated.
Q. Did you authorize the CTO to make this appeal?
A. I authorized the CTO to attempt to reinstate the account with the Amazon system, yes.
Q. And he wrote this with your authority, right?
A. Are you asking if I reviewed it before he submitted it?
Q. I asked if he wrote it with your authority.
A. He did the appeal process with my authority. I already answered that.
Q. And is it true that you reviewed all of Amazon's policies and procedures?
A. He's claiming here to have reviewed the seller code of conduct which could have been just that code of conduct emailed to him separately from the BSA. He's claiming to have reviewed it. He may just be doing that to please the bots at Amazon. I don't believe he really did review it, but...
Q. I see. You're saying he was actually making misrepresentations to Amazon to reinstate the account?

A. It's a very common practice when you're dealing with robots to make -- you say whatever it is those robots might need to hear to do the right thing at the end of the day. Since we've never done anything unethical in the history of operations with Amazon.

Q. Except lying to Amazon to get your account reinstated?

MR. CHAN: Objection.

THE COURT: Overruled.

THE WITNESS: Saying -- I'm saying if he just made that up to try to act like a good boy, yes, we reviewed your seller code of conduct. It's ridiculous, to begin with, to review it. Because it has nothing to do with anything here. The account was taken down due to managing a third-party account in Arizona, had nothing to do with anything to do with what we did on a daily basis. So at this point we're desperate for words. Whatever it is he comes up with to try to win this appeal is fair game and it's completely legitimate even if it is a lie. It's an honest tactic.

BY MR. MAGLIERY:

Q. So anything goes once you're trying to get your account reinstated?

A. Absolutely 100 percent.

Q. And you can make material misstatements to Amazon,

you can tell them things that aren't true?

A. If going through the proper channels doesn't work and the robot just keeps saying sorry, we need more, we need more, you're going to keep saying things to trigger their soundbites to potentially act properly, yes. We use AI to write those appeals sometimes. So AI spits out -- this actually looks like it was written by ChatGPT. He probably asked ChatGPT what can we say to Amazon to reinstate the account. Not to mention there's dozens of third-party law firms and companies that work to get people's accounts reinstated, to try to find the right words and methods to get their accounts reinstated because they know they're dealing with robots and they know that the reasons are always unjustified. There's almost never a legitimate reason for this.

Q. Is that statement about what duty of veracity you owe to Amazon consistent with your general business ethics respecting Amazon?

A. Can you repeat that?

Q. Do you think that is the degree of business ethics you owe to Amazon?

A. What's "that"? Define "that."

Q. How honorable you think you need to act in order to continue doing business with Amazon.

A. I'm going to need you to try again with that question

so I can understand it. I'm sorry.
Q. Is the manner in which you just described, how you would say anything to make an appeal, consistent with how you think, in general, it's appropriate to treat your relationship with Amazon?
A. Yes.
Q. Okay. Now, you were aware at the latest by the time Amazon filed the motion to compel arbitration in this case that Amazon contended there was an arbitration provision, right?
A. Yes.
Q. And that was last summer that we made the motion to seek to compel arbitration, right?
A. I believe that.
Q. And now, as you sit here today, you acknowledge there's an arbitration provision in the BSA, right?
A. Yes.
Q. Now, you contend that you did not engage in any formation of the BSA respecting any of the seller accounts, right?
A. One more time?
Q. You didn't engage in any contract formation of the BSA respecting any of the seller accounts?
A. Contract formation of the BSA?
MR. CHAN: Objection to the form, Your Honor.

THE COURT: Overruled.

If you can answer the question.

THE WITNESS: I can't. I don't understand it.

THE COURT: All right.

Reframe the question. Thanks.

MR. MAGLIERY: Thank you, Your Honor.

BY MR. MAGLIERY:

Q. Did you engage in making a contract -- withdrawn.

Did you engage in making and consummating the BSA for any of your seller accounts?

A. No.

Q. Someone else did that?

A. If it was done, yes.

Q. So Amazon did not exert any pressure on you respecting making the BSA, right?

A. Correct.

Q. Your contention is that somebody else made the BSA?

A. If it was made at all, yes.

Q. So there's no way Amazon exerted any pressure on you to adopt any particular terms in the BSA, right?

A. Exerted any pressure on me to adopt any terms in the BSA?

Q. Amazon didn't force any terms on you contained in the BSA, right?

A. Well, you've noted that there were some terms they've

referenced in these emails that were also contained in the BSA. You've already demonstrated that in the last 20 minutes.
Q. I'm asking, though -- one of the things you've contended in this case is that there was some unfairness. And I'm asking: Did Amazon exert any pressure on you in forming the BSA?
A. I don't know that I fully understand. I think the answer is no.
Q. Okay.
A. Based on how you're phrasing it.
Q. And you've already mentioned that there is an Amazon seller account called Tiberias, right?
A. Yes.
Q. Is that an active selling account on Amazon right now?
A. Um, we can't access it at present, but it is actively selling merchandise on autopilot.
Q. When was the last time you could access it?
A. Um, we hadn't accessed it for several months. And then we were issued a new credit card which allowed us to access it again. And that was like a couple weeks, a week ago we accessed it for maybe ten minutes.
Q. But Amazon has not suspended or terminated that account, right?

A. No.
Q. The access problem is something different than an enforcement by Amazon?
A. Yes. The credit card issue.
Q. Okay. That is a currently active selling account on Amazon, right?
A. Yes.
Q. Have you had sales in that account since June of 2023?
A. Have I had sales?
Q. Yes.
A. The account has had sales, yes.
Q. So after we made the motion to compel in this case, you continued doing business on Amazon, right?
A. I just want to be clear. That company came to me through probate, that company and seller account. And I took it. And used it under the Tiberias Holdings LLC. That whole company and its assets came to me through probate.
Q. Who owns that?
A. It was owned by my father until he passed away.
Q. And do you own it now?
A. I currently own Tiberias Holdings LLC.
Q. Have you had sales in that account since June of 2023?

A. Um, yeah, up until the present moment there's sales in the account.
Q. So after you became aware that there's an arbitration provision in the BSA, you continue to do business with Amazon, right?
A. I would presume Tiberias to be under the -- potentially under the BSA since I'm aware of it now.
Q. And is the same -- withdrawn.
Are you aware -- you already said, I think, you're aware of selling on Melbourne, right?
A. Yes.
Q. And do you personally own that account?
A. No. I don't personally own it, no.
Q. Who owns that account?
A. Colby Ross.
Q. Who is Colby Ross in relation to you?
A. Um, he's just a friend, acquaintance.
MR. MAGLIERY: Could you mark this Exhibit 81, please. Thank you. That's for the Court.
BY MR. MAGLIERY:
Q. Here you are. Mr. Ligeri, I've put before you what's been marked as Defendants' Exhibit 81 which is a copy of the Secretary of State of Connecticut Foreign Registration Statement for a company called Melbourne Retail LLC.
A. Yes.

Q. Do you recognize this document?
A. Yeah, it looks like a foreign registration statement for the company.
Q. And do you see that the business that's being registered is Melbourne Retail LLC?
A. Yes.
Q. The agent of registration is Paulus Chan, do you see that?
A. Yes.
Q. He's your attorney in this case, right?
A. Yes.
Q. And on the second page you're listed as the president of that company; do you see that?
A. Uh-huh.
Q. And are you the president of that company?
A. Um, kind of a gray area, honestly. I recently gave this to an associate, this company. But according to the filing, I'm last known as the president, yes.
Q. Okay. And for some time, from the time of this filing until the present have you been responsible for the control of that company?
A. Yes.
Q. And is that company currently doing business on Amazon?
A. Yes.

Q. That account has not been blocked or subject to any enforcement by Amazon, right?
A. Not yet.
Q. Have you had any sales in that account since June 2023?
A. Yes.
Q. And since you first became aware of the arbitration provision last summer when we made our motion to compel arbitration, you've continued to do business with Amazon, right?
A. I'm sorry?
Q. Since you first became aware of the arbitration provision from our motion to compel arbitration, you've continued to do business with Amazon, right?
A. I have.
MR. MAGLIERY: Your Honor, may I ask for a three-minute colloquy with my colleagues before I cease questioning?
THE COURT: Of course. Hold on just a second.
THE WITNESS: Could we have a ten-minute, perhaps?
THE COURT: Maybe we'll take a good recess. Ten minutes or however much or court reporter wants. Thank you.
(Whereupon, a recess followed.)

THE COURT: Are we set to resume?

MR. MAGLIERY: May I proceed, Your Honor?

THE COURT: Please.

MR. MAGLIERY: I'll be very, very brief in these last few questions. Thank you.

BY MR. MAGLIERY:

Q. Mr. Ligeri, please could I ask you to turn back to Exhibit 73, the communications in the big book.

A. Yes.

Q. And if you would go to page 21 of 30.

A. Okay.

Q. And do you see at the bottom the last entry a Health and Household email from February 10, 2023, the timestamp is 17:54? Do you see that?

A. Yes.

Q. It says "New appeal/dispute submission for merchant"?

A. Yes.

Q. The text says, "Submission type: appeal. Has your account been deactivated in error? Subject: Request for Reinstatement of Seller Account - Health and Household. Dear Amazon Support Team, I hope this email finds you well. I am writing to request the reinstatement of my seller account Health and Household which was deactivated in accordance with section 3 of Amazon's business solutions agreement. I understand that my account was

deactivated due to a violation of Amazon's Seller Policies and Seller Code of Conduct." Do you see that?
A. Yes.
Q. Did you write this email?
A. No.
Q. Did someone with your authority write this email?
A. Yes.
Q. And it refers to Amazon's Section 3 of Amazon's BSA, right?
A. Yes.
Q. Mr. Ligeri, I think you mentioned that you recently, perhaps in the last week, attempted to sign up for another Amazon seller account; is that right?
A. Yeah, I was using my Amazon buyer account to sign up for a seller account to see what -- not to actually have one, but to see if there was a BSA questionnaire on it.
Q. Did you go to the registration page for Amazon selling accounts?
A. I never finished the application, but I went to -- I went through a couple steps in the process.
Q. Did you input your email and password?
A. Um, I think so. Yes.
Q. Did you see -- excuse me.
A. I think so, yes.
Q. Did you see the welcome page that described what

would be required to sign up for a seller account?
A. Yes.
Q. Did you see the business information page that requires the business entity and the business location?
A. Yes.
Q. And did you see the words "by clicking 'Agree and continue' I agree to the Amazon BSA"?
A. Yes.
Q. Did you see an "Agree and continue" box at the bottom of that page?
A. Yes.
Q. Did you click it?
A. No. That's where I stopped.
MR. MAGLIERY: No further questions, Your Honor.
THE COURT: I have a question or two for the witness, and then I'll let you all follow up.
Sir, do you have Exhibit 73 there?
THE WITNESS: Yes, your Honor.
THE COURT: Could you take a look at -- let's see if I can find it here. Thank you. I believe it's on page 12.
THE WITNESS: Okay.
THE COURT: And there's an email there of October 12, 2020, from Twin Horses, it looks like.
THE WITNESS: It looks like November 16, 2020?

THE COURT: I'm sorry. It looks like it's October 12 of 2020.

MR. MAGLIERY: Your Honor, it may be a different page. Is it page 12 of 30 in the header?

THE COURT: I think so.

THE WITNESS: The one I see from Twin Horses says 11/16/2020, 1733 on the top of page 12.

THE COURT: Let me switch up for a moment. I apologize. It's on page 9 of 30 and it's an email ostensibly from Twin Horses of October 26 --

THE WITNESS: Yes, I see it.

THE COURT: -- 2020. And it looks like it's from somebody named Ben Joseph, CEO. Are you aware of who that person is?

THE WITNESS: Yeah. So if someone's filing something on Amazon, it would probably keep the subject. If they're using my login as the CEO, it would probably just say Ben Joseph, CEO. That's how I identified myself, as CEO. I wasn't an owner at the time, I was just an employee of this company.

THE COURT: Of Twin Horses.

THE WITNESS: It wasn't Twin Horses in 2020. It wasn't Twin Horses until 2023 when I bought it and changed the name in 2023. It still says Twin Horses here for 2020 because they're using the updated name even on the old

email, just to be clear.

At the time it was called My Medical Warehouse. It says in the subject appeal from My Medical Warehouse.

THE COURT: So you were using the name Ben Joseph to pursue an appeal for My Medical Warehouse; does that sound right?

THE WITNESS: Yeah. It doesn't mean I wrote this, but yes.

THE COURT: Maybe I lost you on that. You didn't write that, then?

THE WITNESS: That was my name, Ben Joseph. But I'm saying I didn't usually do the case flow for My Medical Warehouse as the CEO. I had a staff of 20 people there. If they're using my account, my login, it will have my name in there. So I got to read it and tell you if I actually wrote it, but I don't think I wrote any appeals for Amazon.

THE COURT: Okay. But, for instance, there's another one that appears at the bottom of -- bottom of page 8, just to flip up one more page.

THE WITNESS: Yep.

THE COURT: Do you see it says -- I think it says, again, it has the name Ben Joseph that you were using. Is that your real name, Ben Joseph?

THE WITNESS: In business, I used to own

Benjamin Joseph Inc. So in business, I've always been in sales and been using the name Ben Joseph for quick and easy speaking on the phone. "Hey, this is Ben Joseph." So I used the name Ben Joseph in business a lot.
THE COURT: Then it says "I use the Account to sell products for my business, Medical Collaborative." Do you see that?
THE WITNESS: Yes.
THE COURT: Right. And then it goes on and says it was delisted on September 23, 2020. Do you see that?
THE WITNESS: One of the listings on the account was deactivated.
THE COURT: The listing was deactivated.
Then it says "in accordance with Amazon Services Business Solutions agreement due to the following issue"; do you see that?
THE WITNESS: Yes.
THE COURT: So you have a communication to Amazon under a name you're telling me you're using that expressly references the Business Solutions Agreement back in October of 2020. Does that look like what it says?
THE WITNESS: Yes, but I didn't own this company or the account. So I wouldn't be the one engaging in agreements on behalf of it. This would have been done by the owner of the company, any type of agreements.

THE COURT: But you're the CEO, right?

THE WITNESS: Correct.

THE COURT: And as CEO, you're writing and using this name Ben Joseph and you're expressly referring to the Amazon Services Business Solutions Agreement, right?

THE WITNESS: Yes.

THE COURT: Okay.

Now, you've now looked -- I know you've told us you've looked at the business services agreement, the BSA. Tell me, is there any provision of the BSA that is, in your view, unconscionable?

THE WITNESS: Um, yes. I would probably use that term for certain pieces of the BSA.

THE COURT: All right. What provisions, specific provisions of the BSA are unconscionable?

THE WITNESS: I read something yesterday. We may, in our sole discretion, withhold any payments to you for as long as we determine any related risks to Amazon or third parties persist. It's not really a real risk. I just feel like it's the kind of a clause that allows them to take your money and claim that you did something wrong.

THE COURT: So I have the agreement in front of me. It's Exhibit 74. What provision are you talking about there?

THE WITNESS: So this would be under Section 2

on page 2, "Service Fee payments: Receipt of Sales Proceeds." And then on the second page of it, it mentions "we may in our sole discretion withhold any payments." I think that language itself is a bit unconscionable, to withhold payments. Why withhold payments if they're accrued and earned payments under some kind of subterfuge like you did something wrong that we're really not going to identify or you didn't really do anything wrong?

THE COURT: Okay, that's one provision you believe is unconscionable. Are there other provisions of the BSA that are unconscionable?

THE WITNESS: I mean, I never really gave it a deep dive. But I think I don't -- let me just get a minute with it.

MR. CHAN: Your Honor, may I ask a question?

THE COURT: After I'm done --

MR. CHAN: A question for the Court.

THE COURT: -- you'll have an opportunity.

MR. CHAN: Okay.

THE WITNESS: Insurance is required either or. If you do earn a certain amount of revenue or if otherwise requested. So even if you're doing like three dollars a month like with the Medcare account. The Medcare account has been restricted to only being able to carry five units of inventory rendering it useless and they're requiring it

to carry insurance which costs more than the five units it can store, and it can't do business. So would have been unable to satisfy that. It seems a bit unreasonable.

THE COURT: So which provision? Tell me.

THE WITNESS: This is Section 9, "Insurance."

THE COURT: Section 9, the insurance, okay.

And you think that's a bit unreasonable, I think you're saying?

THE WITNESS: Yes.

THE COURT: Okay. Is it unconscionable in terms of representing a gross violation of a seller's rights?

THE WITNESS: The portion where it says if you do the gross proceeds, that part isn't. But the portion that says or if we just ask for it for no reason. That's the part I find unconscionable. Where they would just ask for the insurance even if you're not doing any business, which they did with the Medcare.

The next portion, 10, "Tax Matters," it says you will be responsible for collection, reporting, and payment of all taxes. But Amazon doesn't even allow you to be responsible. So they're giving you responsibility over an area where they take complete control, they collect the taxes and pay them to the governments. But they're putting the responsibility on you if they screw up, that you would be responsible for having not paid the taxes.

But they expressly collect and remit taxes.

MR. CHAN: Your Honor, I don't mean any disrespect.

THE COURT: Yes.

MR. CHAN: But the questioning by the Court of a layman of a technically legal term applying to a legal document, whoever is questioning should try to understand if the witness even understand the term "unconscionable."

THE COURT: Okay. I thought I explained it. But you're welcome to go into that.

MR. CHAN: No, in terms of his understanding of intentional. That's the point.

THE WITNESS: Would be good to get a definition.

THE COURT: Sure.

I'll just ask, what's your view, sir, of what "unconscionable" means?

THE WITNESS: I mean, I take the word to be grossly unreasonable. I don't know if that's the proper legal definition.

THE COURT: All right.

Last kind of question. It sounds to me like you're saying that you believe you had some -- well, let me back up for a second.

I was struck by your testimony that Amazon would take out fees from you, you said sometimes like

90 percent?

THE WITNESS: Correct.

THE COURT: I even heard you at one point say 180 percent.

THE WITNESS: Yes.

THE COURT: So what was your understanding of -- and you were selling, you told me I think you said a million dollars plus a year, right, on some of the accounts --

THE WITNESS: Yes.

THE COURT: -- is that right?

So what was your understanding of Amazon's authority to take out any fees at all?

THE WITNESS: Well, historically, the fees changed very mildly.

I'll give you an example. Last year we had thousands of felt cowboy hats in stock at Amazon. And the fee was three dollars to sell a cowboy hat. Then overnight it changed to $12. We were only selling them for 11.99, so we would lose money every sale. At the same exact time frame, we weren't able to destroy them. That would have been the proper move, to destroy the hats. Amazon historically charged 15 cents to destroy a hat. And then they went up to four dollars a hat. So now to destroy the 5,000, it costs $20,000 for what amounts to

$20 in disposal costs. So there's an overnight change that just suddenly became very dramatic in the recent years. And there was no predictability on them just going from three dollars to $13 or $12. And then every color had a different fee even though they were all the same size, shape, and weight, showing it's an arbitrary provision.

So we just sort of roll with the punches with Amazon until it becomes so extreme that you can't do business.

THE COURT: How did you learn about the change of fees?

THE WITNESS: It just shows in the dashboard where. You go and look at your inventory, the Manage Inventory section, it shows next to each item the Amazon FBA fee. One day you're looking, it's not three dollars, it's 11.87. With the commission, maybe 13, 14. And you're realizing that you now have to raise your price to $18 and no one's going to buy it. So that becomes available just through their charging it and showing it on the inventory page.

THE COURT: So you did not receive advance notice of what the fees would be that Amazon would charge; is that what you're saying?

THE WITNESS: That's correct. They have, from

time to time, sent an annual notice that, you know, come the new year fees will be going up or down 10 percent, sort of a generic update. But never a situation like this. Because usually the fees are based on size and weight. Like I said, every color of this hat was a different fee. There's really no way to predict that they would just randomly charge more than the fee that they list in their email circular every year.

THE COURT: Did you ever get curious about looking on Seller Central to see if there was some document that governed how much Amazon could charge for fees?

THE WITNESS: Yes. So I had my staff research how they come to these fees. And you would go to help and you would type in "FBA fees," and it would pull up a table of size tiers. And fees for those size tiers. We would examine that, had to make an Excel what Amazon says the fee would be if this weighed 2 pounds and was 10 X 12 X 2. And then I'd have them put in the table what they were actually charging. So this is a specific table you would just type in "FBA size tiers," the table would come up, you'd see $1.50, $3, 7.50, $12, and you'd look at the table.

THE COURT: That's how you learned about it?

THE WITNESS: Yes.

THE COURT: I don't have anything else.

So, Mr. Chan, if you have questions --

MR. CHAN: Yes.

THE COURT: -- please proceed.

MR. CHAN: I have questions about legal issues there.

THE COURT: Of course. And feel free, anything I raised as well to follow up on that, clarify or correct.

MR. CHAN: Yes, I will. Thank you, Your Honor.

THE COURT: And our courtroom deputy asked about Exhibit Number 81. Was that the Melbourne? Did you want to offer that?

MR. MAGLIERY: I'm sorry. Yes, Your Honor.

THE COURT: Any objection to Exhibit 81?

MR. CHAN: No objection.

THE COURT: Okay, full exhibit.

(Defendants' Exhibit 81 admitted in evidence.)

MR. CHAN: I do have a cough, but it's basically a residual cold that I had. No cold, nothing.

REDIRECT EXAMINATION

BY MR. CHAN:

Q. I believe the new exhibit on the deposition is Exhibit 76; is that correct? Do you have that?

A. Yes. Oh, 76, the one that was handed out?
Q. The copy. Do you have that? Let me know.
A. 77 through 80.
Q. It's a thick, multiple page of deposition.
A. Oh, the deposition. Yes, over here.
Q. You have it?
A. Yes.
Q. So the deposition is dated October 28, 2023. The complaint was filed December 12, 2012.
May I ask you, on the complaint, the timing of the facts that you're complaining about. Do you remember time frame of those events that you base on when you filed the complaint? Had to be before 2012.
A. Yeah, the complaint was filed at the end of 2012, probably about events in the previous six months, I would imagine.
Q. Okay. And Counsel has pointed out that in your deposition you claim on page 5 that you have several agreements with them, meaning Amazon.
A. Yes.
Q. You also mention further down, line 24, they have name for other people. "We are certainly a former affiliate and partner with them." Do you see that?
A. Yes.
Q. At the time of the deposition you believed those

statements were true, right, because you were under oath?
A. Yes.
Q. Okay. Now, we need to go to the BSA in that time frame. I'm trying to figure out what's a good -- look at the exhibit and the timing of it.
Exhibit 6 is 2013. That's the year -- that's the earliest we got. So I do have one from previous memorandum, I think that was 2014. So we're close enough.
Any objection if I use one of these BSA to --
MR. MAGLIERY: They're already in evidence.
THE COURT: You're welcome to use whichever BSA you feel is helpful.
BY MR. CHAN:
Q. So can you find something that's dated 2014? I think it's either 6 or 7 on the exhibit. They are very similar in terms of the section that I will refer to. Let me know when you find the BSA right around 2013, 2014.
A. 2020, 2019.
Q. Would be earlier.
A. That's 2019, 2017. I don't know if they had one back then. Oh, yeah, 2014, 5/20, Exhibit 9.
Q. Okay.
A. Exhibit 8 is 2014, April 30th.
Q. You don't have to take it out. Just open it.
A. Exhibit 9, May 20, 2014.

Q. That's fine. So what exhibit number is that, 9?
A. 9.
Q. We need to wait until the Judge gets to his.
THE COURT: I'm good.
BY MR. CHAN:
Q. So if you would go to that document, go all the way down to item 13, it says "Relationship of Parties." Item 13.
A. I see it.
Q. Do you see it? Okay.
Could you read that out to the Court for the Court?
A. "Subject to the Transaction Processing Service Terms" --
Q. No, I'm looking at the Relationship of Parties.
A. Yeah, "13. Relationship of Parties."
Q. Okay.
A. "Subject to the Transaction Processing Service Terms, (if the Elected Country for a Service is the United States), you and we are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between us."
Q. Okay. Stop right there.
It says nothing in this agreement will create any partnership, joint venture, agency, franchise, sales rep,

or any employment relationship with us. So at a time when you make the statement and in the deposition you say that you are some form of affiliate in partner with Amazon, you still think that is a correct statement, not knowing how Amazon sees their relationship with the sellers?
A. Not after having just read paragraph 13 of the BSA.
Q. Okay. Because they used the word "independent contractor," they specifically said nothing in this agreement would create any partnership, joint venture, et cetera?
A. I was just theorizing during the deposition on the relationship.
Q. There's two possibilities: either you lie under oath and pretend you are partner or you are pretty dumb thinking that you are a partner but you are not. So which way is it?
A. I guess I was pretty dumb. I guess I was ignorant to the relationship as seen by Amazon.
Q. Okay. You also said that we have several agreements with them. Are you referring to the Fulfilled by Amazon agreement, the shipping fee, inventory fee agreement?
A. I mean, I don't agree --
Q. Are you referring to the BSA agreement at that point? According to your past testimony, you didn't know anything about BSA. So what agreement is this?

A. Well, it asks if we have a partnership agreement. And as you pointed out, we're not partners with Amazon. And I said we have several agreements with them. So I don't know what I was referring to. I'd have to read this eight-hour deposition to get the context.

Q. I apologize making you feeling dumb, but I have one more for you to read. That would be all the way to "18. Miscellaneous." Same document. You shouldn't have closed it. I wasn't done.

A. I'm here.

Q. See there?

A. "Miscellaneous," I see it.

Q. All the way to 18, there's a big long paragraph. But there is starting with second one, it's much smaller, it starts with "You may not," see that?

THE COURT: What exhibit are you on?

MR. CHAN: Same exhibit.

THE WITNESS: BSA still, Exhibit 9, paragraph 18. Couple sentences deep in here.

BY MR. CHAN:

Q. Okay. You see a big paragraph with bold letters and then after that there's another paragraph starting after that big paragraph. Do you see one?

A. What does it start with?

Q. H'm?

A. What does it begin with?
Q. Starts with "You may not assign." Do you have it?
A. I'm looking for it. Hold on.
Q. Clause 18 under Miscellaneous.
A. Yeah, I don't see the "You may not assign." I'm looking for it.
Q. You can't find 18?
A. I find 18. I can't find "You may not assign."
THE COURT: If you go to the next page, top of page 10.
THE WITNESS: Oh, it's on the other page. You may not assign this agreement without our prior written consent.
BY MR. CHAN:
Q. Can you read the whole thing?
A. "You may not assign this Agreement by operation of law or otherwise, without our prior written consent. Subject to that" --
Q. That's it. That's it. Okay.
My question is --
A. So it doesn't --
Q. All along you claim to be Amazon seller account owner. But you also testified there was never any assignment made between those people who sold you the accounts, yourself, or Amazon. Because assignment takes

three parts. The most important part would be Amazon. So unless you change your story, you never executed an assignment and prior written consent by Amazon, did you?

A. No. It seems like --

Q. So, sorry to make you dumb for a second time, you never actually had a legal transfer of those accounts because you did not obtain prior written consent, so according to Amazon, you are really not legit, and in fact opposing counsel used a term "black market" several times in previous hearings. So do you feel -- do you feel that you really don't know the agreement, do you?

A. It's interesting. Because it says the agreement doesn't transfer when you transfer an account without their consent. So the agreement doesn't follow along with the business. It doesn't --

Q. Your testimony shows all your knowledge about Amazon, the business side. But when it comes to agreement, these two statements and the meaning behind it apparently, according to your answer to some of the questions, you did not really fully comprehend, did you, now that you know what is there?

A. No, I did not.

Q. Okay. Now, can you go to the verified complaint. I think it's document Exhibit 20 because I've used this so many times.

A. No, it's not 20 -- oh, in your book?
Q. It's in the plaintiffs' small book. Sorry.
A. Yes, 20 in the plaintiffs'. I'm there.
Q. Okay. We did this earlier this morning, but Counsel asked you a question. It wasn't clear enough, so I need to ask you, hopefully clarify.
And you did say on paragraph 5, you say "Plaintiff Ligeri also opened the 'Health and Household' Amazon account after a decade ago." The key word is "opened." Since you already testified with evidence submitted by defendant that you never literally opened being the first registered for the account, so exactly what do you mean by "opened" here? The Court really needs to know. It's important.
A. I think we established that. I know you wrote the wording, it's not the best wording. It just means we were open as Health and Household, in business as Health and Household after acquiring the account.
Q. Okay. So basically you bought the account and now you opened the business. But you did not physically open the account as a first account owner, right?
A. No. If it said registered --
Q. I just need to clarify.
A. It didn't say registered. It said open.
Q. You did not say register, you said open?

A. Correct. Correct.
Q. The next one would be -- excuse me.
THE WITNESS: Can I follow up on a question you asked me? More information.
THE COURT: If your attorney asks you.
BY MR. CHAN:
Q. My next would be same document, would be paragraph 56. Again, we focus on one very key word. It's another legal term.
It says in the second sentence that this is precisely the approach --
A. Where are you, by the way?
Q. Paragraph 56 of the complaint, which is Document 20.
A. Okay.
Q. Skip the first one. Go down to the second sentence. It starts with, "This is precisely the approach." You got that?
A. That's the third sentence, yes.
Q. Okay. Third sentence.
Can you read that one sentence?
A. "This is precisely the approach that has led to a functional breakdown in the Plaintiffs' very ability to do business for which they contracted with the Defendants to do."
Q. I asked you this morning, you clarified it. But

opposing counsel seems to be still confused. And so I need you to clarify one more time for the record.

When you say contract the defendant to do business, what do you exactly mean?

A. So the general offer and acceptance of selling items on the platform and getting paid a percentage of those sales, just the general doing business with Amazon.

Q. Are you referring to the ability to list products and then pay the fees that you need to pay for using those services?

A. Yes.

Q. You don't have any specific written contract, per se?

A. Correct.

Q. Thank you for the clarification.

One more is one that we already did. Same document, paragraph 62.

A. Okay.

Q. Could you read that again. This is the third time you're reading it.

A. "All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding arbitration clause, requiring them to sign away the right to their day in court if a dispute with Amazon arises."

Q. Keep going.

A. "If it were not for Amazon's market power over them

the Plaintiffs and those similarly situated would not agree to these terms."
Q. Okay. The phrase "the Plaintiffs and those similarly situated," who are those that you refer to?
A. Well, again, this was a quote from the Subcommittee report. But I would say that the plaintiffs in that FTC complaint and those similarly situated, sellers on Amazon. If they, you know, if they had any option, they wouldn't agree to the terms.
Q. You say FTC complaint. That was not admitted in evidence. Are you referring to another document by the federal government?
A. Maybe the Subcommittee report.
Q. Subcommittee report, okay, which the Court allow admission. And not quite word for word, but this is a statement or finding the report shows. And by repeating the same statement, are you basically stating that you feel like you're in the same position with those similarly situated?
A. I mean, yeah, I guess I'm in a position where I wouldn't agree to the terms.
Q. Are you referring to the sellers that the report referred to?
A. Yes.
Q. Okay. But do you in any way in this paragraph admit

that you have agreed to any of the terms?

A. No.

Q. Okay. I need to move on because there's a lot of issues that -- how are we doing with time?

THE COURT: If we can, I'd like to try to continue, but I don't know how much longer you have to go.

MR. CHAN: Well, that's why I'm asking. It might be another 30 minutes. Counsel asked more than two hours' worth of cross. So I'm using one quarter of his time.

THE COURT: I understand you want to get into things. I'm going to let you continue. Do the best you can. Let me check with our reporter.

Our reporter is okay. Does anybody have flights and things like that?

So keep going. We may have to stop a little bit -- well, I'll let you know if we need to stop.

MR. CHAN: Is this a good time to ask the question whether this Court would prefer or require a post-trial brief or you would just rule on the evidence and the testimony and arguments?

THE COURT: I was going to take that up with counsel after the testimony's over in terms of your preferences for next steps.

MR. CHAN: Okay. I raised it because Counsel

and I discussed. We wanted to know.

THE COURT: Let's talk about that before we recess for today.

MR. CHAN: Okay. Thank you, Your Honor.

THE COURT: Sure.

MR. CHAN: I have to go all the way back.

BY MR. CHAN:

Q. Let me ask you about the two latest accounts which is Tiberia and Melbourne.

A. Yes.

Q. How old are these accounts?

A. Um, when they were created or when I acquired them?

Q. Well, how long you had it, acquired?

A. Tiberias I've had for -- since like March of 2022. Melbourne somewhere in '23.

Q. Okay.

A. I believe. I believe. I can't verify that. I believe Melbourne was acquired in 2023, yes.

Q. Okay. You mentioned earlier Tiberias was inherited through probate because of the death of your father; is that correct?

A. Yes.

Q. Okay. And Melbourne is registered as a Wyoming foreign LLC; is that correct?

A. Yes.

Q. Since Tiberias was operated not by you until the passing of your late father, would it be simple to say that account had nothing to do with you until his death?
A. I didn't have any ownership in it.
Q. Okay. Likewise, Melbourne was incorporated in 2023.
May I ask you a personal question? Are these accounts a way of you sustaining your living expenses at this point?
A. I mean, we mainly -- yeah, we mainly do -- Global is the main company does wholesale now off Amazon, not on Amazon. Melbourne is one of the wholesale buyers and a couple other accounts that do sustain the brands on the internet and on Amazon because, you know, the other accounts aren't able to sell anymore.
Q. Okay. Would it be correct to say these two particular business entities do not have close relationship with the four plaintiffs on record?
A. Yes. That would be fair.
Q. Okay. And the two accounts, you do not intend to use them to seek any damages within this suit, right? You don't intend to join as additional plaintiffs, do you?
A. I do not intend.
Q. So separate, nothing connected --
A. Correct.
Q. -- to the plaintiffs? Okay.

Now knowing -- now knowing that in Amazon's eyes you're really not a legally approved account holder because you did not receive prior written consent before the transfer, yet you're still doing business on the Amazon platform, correct?
A. Yes.
Q. Okay. So you think you enjoy some benefit from selling on Amazon?
A. One more time?
Q. You think you enjoy some benefits by selling on Amazon?
A. Yes.
Q. But do you also think that you are giving quite a bit of benefit to Amazon because all the revenues that they brought in because of you?
A. I know that I provide a better benefit to Amazon than they provide to me, yes.
Q. Would it be reasonable to state that the benefits are mutual between your accounts and Amazon?
A. Yes.
Q. Okay. So definitely not one-sided. Definitely not you taking the benefit and they get nothing, correct?
A. Correct.
Q. What is your experience like in dealing with issues relating to selling products on Amazon? In other words,

trying to resolve issues, is it a good experience? Bad experience? Mutual?
A. Myself and all my staff would agree it's a very miserable and difficult process.
Q. Can you elaborate?
A. Well, things like having to prove to Amazon that a stuffed animal had its veterinary shots are just really tiresome things. Having to tell Amazon that a stuffed animal isn't a real living bear in the Bronx Zoo. You have to go on these ridiculous explanations with them over and over again. That's why I said we just use whatever words we can to get through the process because it's a completely asinine process. Things like telling us, you know, hey, your plastic cup doesn't have the right batteries in it. It doesn't take batteries, it's a plastic cup. So -- sorry, I'll talk a little louder.
The processes with Amazon are obscenely ridiculous, they don't have any basis in reality. They're handled robotically. And when we quote policies and procedures of Amazon, it's à la carte. We're looking for whatever blurb they might have that might help align with getting their systems to see they're being ridiculous.
I can give countless examples of being stuck in a loop. Like for the Twin Horses account, I only accessed it after purchase for 20 minutes. I put my company's

credit card in, and then the account was shut down. And the reason given was password verification. So when we filed a password reset, Amazon sent us a password reset link. When we clicked it, it said you've reset your password too many times and just kept us in a block. My tech team spent months on the phone trying to reach someone at Amazon, the prior owner as well to let them know we are the real people trying to access the account, the password reset doesn't work. And you're stuck in months of toil, just busy work. Getting nowhere. In a system that does not work at all. It's just designed to frustrate you and stress you out.

MR. MAGLIERY: Your Honor, move to strike. This is far afield of the motion to compel. And also at this point, respectfully, something of a distraction.

THE COURT: So I'm going to allow the testimony as already stated. But I do think it's kind of getting out there in terms of I don't think the trial here is about his general relationship with Amazon.

MR. CHAN: I'm redirecting because Counsel literally accused -- not accused, say that the plaintiff is using disrespectful tactics with dealing with issues. So that goes to redirecting how he deal with issues at Amazon and why he did the way he did. So it's a direct relationship, Your Honor.

THE COURT: I get that. I get that. I just don't know how much further you intend to go down this road.

MR. CHAN: No, I just want to make sure it does not get stricken, that's all.

THE COURT: I did not grant the motion to strike.

MR. CHAN: I will keep close, promise.

BY MR. CHAN:

Q. I want to follow up on a question the Judge asked which is try to understand pricing, fees, and all that as a seller. I believe you have a very good example you can demonstrate, which is some of the hat products that you're trying to sell and have been giving you headaches and problems and you're losing money. Would you be able to elaborate so that the original question that the Judge asked could be explained even more thoroughly.

MR. MAGLIERY: Objection, relevance.

THE COURT: For whatever it's worth, it's germane to the question I asked, I think. I'll allow the answer.

THE WITNESS: Exactly what am I commenting on, just so I'm clear?

BY MR. CHAN:

Q. You say you have example you can use. I'm asking you

there's examples of your difficulty trying to sell hats because Amazon had all kinds of rules and changes and fee changes. And I just want you to paint a true picture of what your everyday real world struggles are. It's not all fancy and paradise selling on Amazon?

A. Amazon went from a great place to sell to exponentially worse over time.

Q. Just give the hat example.

A. Okay. With the hat example, I mean, for ten years the fee was two, three dollars, in that ballpark. There was a small and light program that allowed you to be under $12 on your price and therefore get a reduced FBA fee. They did away with that program after making you do so much work to enroll in it and authenticate products into the program. The fees literally overnight went from not a 20 percent increase but a 400 percent increase from three dollars to anywhere from -- we had the hats anywhere from nine to $15. The fee went from three dollars to the range of nine to $15 on cowboy hats depending on the color, arbitrarily. Like everything with Amazon, it's a hundred percent arbitrary, not based in any form of reality. So you're stuck.

They also made it so you can't get your inventory back. Getting your inventory back used to be simple. You'd pay them 30 cents, they'd send the unit back to you.

Now they want four dollars for a unit that's only worth 25 cents. So it's impossible to get your inventory back.

It's also impossible to have them throw it away, because they're marking up trash services by thousands of percent. Where it cost a penny to throw away a hat for them, they're going to charge you four dollars to throw away a hat. So you're forced to sell it even though you don't want to sell it and pay the outrageous fee to Amazon.

This is stuff in the last few years. I want to be clear. Amazon was a beautiful environment to sell a decade ago. In the last few years they've suddenly gone crazy. I think maybe with the departure of Bazos.

Q. Wasn't there some discrepancy on how to measure the hats and how to set pricing that you were struggling with?

A. One more time?

Q. Wasn't there an issue of the discrepancy of how Amazon measures hats and how you measure hats and how they priced certain items that you're having trouble with?

A. They're supposed to have a very expensive machine that measures things. But it somehow finds a 6-inch item to be 18 inches in length. It's very confusing how they could make the mistake.

With the hats, they're all the same size, shape, and weight, just different colors. And every one has a

different fee: $8, $9, $10.43, $11.28, $13.42. You're allowed to ask them to remeasure. Sometimes they come back and say, you're right, we're $3 over. But a lot of times they stick to their guns even when they're clearly wrong.

Q. You used the specific word "arbitrary" when it comes to pricing just earlier. When you used the word "arbitrary," do you mean to say that you have no input in Amazon's decision on pricing?

A. No, I mean to say that Amazon is making a decision outside of their terms, out of their agreements for fees. They're making a decision randomly with no basis at all. They're just making an arbitrary decision, a random decision.

Q. So arbitrary, you mean to say it's random and not quite justified?

A. Not backed by their table of fees. Their table of fees would probably put the cowboy hat at -- their new table of fees might put it at $7, whereas their old table of fees put it at $3. But they're still charging 7, 8, 9, 10, 11, 12, 13 when their table of fees says it should now be 7.

And also, their table of fees used to be simple like Walmart's is now. If it's 1 to 2 pounds, it's this much. If it's 2 to 3 pounds, it's this much. Now they have

brackets of sizes. They start with tiers. If you're in a tier, this set of fees applies. But if it's April or May, a different set applies for spring for that tier. They've made it a paradox of just massive amounts of moving parts that I've had like trained professionals try to understand the fees. And it takes them forever to figure it out. What's interesting is once you finally figure it out, they don't even apply it based on how they say they're going to apply it.

Q. Okay. There was a couple emails that opposing counsel referenced to. The content was that somebody, you or somebody you authorized send email to request reactivation of an account that was deactivated. I don't know if you need to look at an email or do you remember what was discussed just a half hour ago?

A. I've seen a few emails of the sort. It's a common request to reactivate a listing or an account.

Q. My question is this. You did reference some section in the BSA when you requested them to consider reactivating it. So my question is: When you referenced the BSA referring to section, are you using that to contest and challenge that they don't really have the authority? Or are you agreeing by sending the email that they have the authority but now you're begging for reinstatement. Are you challenging or are you begging?

A. Well, we're definitely begging. But like I said, those terms are coached. They could come from AI. They could come from Amazon's account help team saying write these words and you'll get approved. So we write these words, we regurgitate what they tell us to write, or we look online for a paragraph that someone wrote that was successful, we copy and paste it and use it. You're just trying whatever wordage and vernacular you can to try to get them to undo something that has no real basis.
Q. Okay. You do that and your choice of word is based on experience what may or may not work?
A. The staff would do research and look for ways to appeal to an arbitrary opponent's decision in a way that would get them to assent to doing the right thing such as reactivating the account or listing.
You've got to keep in mind none of these accounts ever did the slightest wrongdoing. They're the most purest accounts in Amazon. They helped to serve to build Amazon to what it is today, clean the platform, make the platform look beautiful, treat customers with respect. We have an average 4.8 star rating on our prime med products that's beyond anyone's rating average. We are just an incredible pillar of the Amazon community. So when we're taken down for an accusation of doing something wrong, it's obscene to us because we're the most upstanding form

of seller you can be on Amazon.
Q. When somebody reads those emails that you initiated referencing particular section of BSA, should they construe as something that you're consenting to because you referenced it? Or are you just using it to challenge and try to get the account reactivated?
A. As I already stated, it would just be language used to try to manipulate an already dead system.
Q. So by referencing it, you do not necessarily agree or consent to that particular --
A. Or even know what we're saying, correct.
Q. How many accounts do you have that are in the legacy status?
A. There's two of the defendants, the My Medical Warehouse/Twin Horses and the Health and Household account were both in that legacy status that we referred to. Twin Horses and the Health and Household.
Q. Based on your experience and knowledge, how long does it take to achieve the legacy account status?
A. It's just age. You can't achieve it with a new account today even 20 years from now. The older accounts, Amazon just didn't give them as much crap -- sorry about the wording -- but didn't give them as much nonsense. The biggest thing, didn't create the accounting nightmare that reserve proceeds creates. They gave you 100 percent of

your net proceeds. Whereas, now you could net 25,000 and Amazon will hold 24,000 and only give you a thousand. People with new accounts complain about it all the time. They may have accrued 50,000 in net proceeds, but Amazon is giving them $10 a day, withholding their money under the guise that they might get a return some day and have to owe that money. It's just a guise they use. I don't know why they use it only with accounts opened after 2016. But with accounts opened prior to 2016, they don't use the guise and they give you the full amount of your net proceeds.

Q. So your two legacy accounts are making more money based on gross sales than the non-legacy accounts, correct?

A. That's correct.

Q. Which also means Amazon makes less money on the legacy accounts because the pie is only so big?

A. Which is why I think they deactivate them.

Q. And did you say you think that's why they deactivate it?

A. I do think it's a contributing factor, yes.

Q. Is that your -- you're guessing it or you think --

A. There's no other basis to block us out of the Twin Horses account or deactivate the Health and Household account. I think they look for something they can use

potentially as a justification to try to rid the legacy accounts. I don't think they want anyone to have an account created before 2016.

Q. Do you recall the reason that they gave you when they deactivate those legacy accounts?

A. So I remember with the Health and Household account, Amazon stated that our account was being deactivated because another account in Arizona was deactivated. And we were an authorized user of that account. Um, which you could be an -- we were an authorized user of tons of accounts where we'd help with things like case flow, order reports, just helping out -- we did a lot of services for third-party Amazon businesses helping them with their financials, their order history, and understanding. So by being a user of this account, we weren't operating it, we weren't in control of it. We were just granted permission by the Arizona company to help them process a shipment on their behalf.

So Amazon's doing something now where if you have permissions to use other Amazon accounts, when one gets deactivated, they'll potentially deactivate all the accounts in association with the user permission, which makes no sense at all.

Q. Are you implying that the account was shut down not for legitimate reasons but some excuses that they make up?

MR. MAGLIERY: Objection.

THE COURT: I think we've been down the road on this. You're just repeating yourself. Next area, please.

BY MR. CHAN:

Q. There were questions about the dispute resolution procedure, the DRP. A question was asked by previous opposing counsel. And you had mentioned something about sellers cannot file against another seller; is that what you said?

A. Yes. IP infringement reports are done outside of the seller account. They're not done in the capacity of a seller. They're done in the capacity as a rights owner. And you do not use the seller portal to do them. You use the Amazon.com buyer portal to do them. You don't use the portal that Amazon claims is subject to the BSA, if that helps.

Q. So when you do file complaints regarding IP infringement, do you follow the procedures and use the proper channel to file those complaints?

A. I do.

Q. Do they generate different or better results?

A. It's arbitrary, like everything with Amazon. The enforcement's arbitrary. It's random. Sometimes they honor the request and they take down the bootleg seller. Sometimes they tell you we're not going to take any

action. So you're just subject to an arbitrary decision.
Q. Is it fair to say that Amazon's action of protecting intellectual property rights is not quite as good as they advertise?
A. Yes, that's fair.
Q. That's correct, right? Okay.
And you confirmed the statement based on experience and knowledge?
A. Yes. A lot of experience.
Q. You did admit you go on the Seller Central portal because you have to, that's how you do business. Do you ever search for news, help, or anything that you may be interested in?
A. No.
As far as help, you know, there's -- like I said before, tens of thousands, hundreds of thousands of help articles and terms and agreements. You look for things on Amazon when you need them. When you need to confirm something, you look.
So, like I told His Honor, when you're looking -- when you want to confirm the latest fees, you type in "fees" and the fees pop up. And you read the table of fees. I don't know if those are also in the BSA or not. But I know that we're just looking at the fees table. Or whatever it is that we're interested in finding. I've

never searched for an arbitration clause on the help section. I was never interested in looking for one of those, to be cavalier about it.
Q. As an experienced knowledgeable seller on Amazon, have you ever intentionally violated any rules that you know of and take a chance, maybe you don't get caught? Have you ever done that?
A. I don't think so, no.
Q. So if something that they accuse you of doing wrong, most likely it's mistake, not intentional?
A. It's most likely unfoundational on the part of Amazon. At least 99 out of 100 times it has no basis or foundation in any form of reality.
Q. Okay. Doing business at Amazon has been your bread and butter, provide for the family. Are there reasons that you would want to jeopardize that and do hateful things to Amazon?
A. No.
Q. Before you decide to file lawsuit, have you exhausted all means and all options that you know of that you are capable of resolving difficulties that you're experiencing with Amazon?
A. Yes. A lawsuit is always the last resort. We must have spent almost a year trying to resolve the issue prior to filing.

Q. Okay. Being the small guy versus a giant company, what makes you make the decision to go after this business giant? That's a very legitimate question.
A. I have a legal obligation to Central Concepts Inc. who owes a ton of debt to pursue the people who took the money from the company, the accrued net proceeds. So when Amazon took all of Central Concepts Inc.'s funds and inventory, creditors such as the Small Business Administration and other creditors were seeking to get that money from Central Concepts Inc., I have a duty to those creditors to get that money back from the company, Amazon, that stole that money. That's the major motivating factor here.
Q. With all your experience, do you know of a way that you can avoid Amazon taking all your money, every penny, and then give you whatever is left over? Is there any way to do that, to escape that fate?
MR. MAGLIERY: Objection, Your Honor, relevance.
THE COURT: It sounds like we've gone -- we're getting into reasons that he's filed a lawsuit and all sorts of things that don't have to do with the arbitration forum selection issues.
MR. CHAN: Well --
THE COURT: His motivation for filing a lawsuit, those things I can't see how it's really within the scope

of redirect or that it's really germane to what is before us right now.

MR. CHAN: It points to his state of mind and knowledge, because if he knew there was a binding arbitration -- he just tell you he's been doing honestly to his best knowledge. If he knew, he would have taken that route and tried to resolve it and to get compensation. The fact is he does not know there's a binding arbitration, so he thought his only option was to take legal action to recover damages. So it basically goes to state of mind and his knowledge at the time.

THE COURT: I guess so. And he's testified about that.

THE WITNESS: That's a good point.

THE COURT: It just seems to be going after the same issue again. You're asking him is there some way he can avoid Amazon taking every penny, to escape that fate. I don't see how that is germane to where we're at right now. So let's keep it focused.

MR. CHAN: I did ask question, but it was a different format. It was really to understand the financial side. It was not the exact same question. I understand, Your Honor.

THE COURT: Okay. Let's go on to something that's clearly relevant, please.

THE WITNESS: Just stretching for a sec. Go ahead.

BY MR. CHAN:

Q. Opposing counsel referenced many times about email they sent you referencing BSA. Not the one you sent them, but the one they sent you referencing BSA. Do you recall how many of those emails that you can actually reply and respond to them?

A. None of those emails are respondable. Those are email notice of case log entries. You can react to them from within the Seller Central dashboard but not via email.

Q. Okay. So, technically speaking, they generate email records to show they contact you referencing BSA, but you did not have a chance to even communicate further to resolve the issue?

A. Come again, sir?

Q. So, practically speaking, because the way the emails are sent with no return reply address, they are basically using that email to create a record that they sent something to you referencing the BSA; therefore, you cannot deny you know of the BSA. Would that be a true statement?

A. That was clearly the motivation in reducing the hundreds of thousands of communications to 70 that had the

word "BSA" in them.

Q. Counsel asked you about the liability insurance requirement. Would you have bought the liability insurance regardless of what Amazon claims the BSA dictated it?

A. We already had policies prior to Amazon's policy that they claim you now have to give them a copy of the policy. We already had insurance policies in affect. We didn't go and get them. We just had to tailor them to Amazon. And it was just another issue where Amazon always rejected the policy due to the placement of a period or a comma, something really ridiculous. Eventually, you'd get them to agree that the policy fits whatever they're looking for and they accept it after usually ten or twelve submissions.

That's probably why you're seeing insurance a lot. You go in there a lot and they say, sorry, this isn't good enough. You submit it 20 more times. And eventually they say, oh, yeah, it is good enough. It's the same document you. Submit 20 times to them, and eventually they realize it's the right document.

Q. Counsel also asked you and actually alleges that you are aware of changes on the BSA because you have notice. Do you recall receiving any email relating to that subject telling you updates available?

A. No, there's no emails about the BSA specifically. They have shown emails where it's mentioned in one of the links below that nobody reads beyond the subject matter of the case to read all the links that Amazon provides. They've shown it there. But they've never sent an email, hey, this is the BSA. Or there's an update to the BSA. Or even a link that shows that the BSA is the term of your seller agreement. Because it's called the BSA. It's not called your Amazon seller agreement which would be a name that you might want to go read the document if it had that name. Because it has the name Amazon Solutions Business, it seems like a deal between Raytheon and NASA, it doesn't seem like a real agreement between sellers and Amazon, by name. It's kind of hidden in the name is what it really is.
Q. Okay. I'm not sure I asked you before, but I'll risk being yelled at.
All of the years you become, you know, whole account selling on Amazon, when you sign on Seller Central, have you ever seen a pop-up? Have you ever seen a pop-up to notify you something you need to check?
A. No.
Q. Not once?
A. No. I don't believe Amazon does pop-ups.
Q. Would it be nice to see a pop-up?

A. What's that?
Q. Wouldn't it be nice to have a pop-up to tell you something you got to look at?
A. It would probably get my attention, yes.
MR. CHAN: How are we doing with time, Your Honor?
THE COURT: It's getting late.
MR. CHAN: Well, I apologize. I have to cover what's on the cross.
THE WITNESS: How much?
BY MR. CHAN:
Q. Have you ever received a full complete version of an updated BSA directly to any of your accounts?
A. Not -- not -- no.
Q. So no document.
How about any link telling you where to get it?
A. I don't recall. They have a few instances, like I've said, you know, one out of 100,000 they have instances where the BSA is referenced in the bottom of an email that nobody probably read, even the email itself, the top of it, never mind the bottom of it. So obviously they've shown some mention of it, you know.
Q. There's some questions about email with your name Ben Joseph CEO on the email. I want to make sure I understand your explanation. Is that an automatic insert that you

set up in the system so that when you authorize somebody to send something, it automatically shows up?

A. That's what I was trying to explain.

THE COURT: Sustained. That's leading.

You can ask the question, but please don't ask it in a way that suggests what the answer is, sir.

MR. CHAN: Okay.

THE COURT: Or what you think the answer is.

BY MR. CHAN:

Q. Can you explain why some of the email have Ben Joseph CEO on them?

A. I mean, I tried to explain earlier, but I don't think it was clear enough. Those aren't emails. Let's start there. They're not emails. Those are logs of case filings done in the seller platform. Depending on what email address you're logged into for the seller platform, when you go to file a case, it already has some prefilled information about your account. The subject Ben Joseph CEO, I don't know, like, the context of that, but that could have been submitted by any number of staff and it would have still said Ben Joseph CEO on it if they used my account.

I'm just going to take a peak at it again.

Does that pretty much answer your question? I could give a little more context to how that arrived on there.

Q. Can you get close to the mic? I don't think we can hear you.
A. One second.
Yeah, I don't even think that information was written down. Because it has an address too. There's nowhere in a case log where you fill out your name and address. I think they're adding this as account information on top of the case, automatically Amazon's adding it on the back end, not even on the front end, and then downloading it from their system and making it appear as if I typed it up. This -- you would never put your name, company name, address, in a case. You would just have a box to type. And the typing starts with Dear Seller Performance Team. It doesn't start with Ben Joseph CEO. Amazon's adding that information as hidden subtext. I just realized that really studying it.
Q. Okay. So that's the original information that you recall?
A. This information wasn't written by me or anyone at Medical Collaborative. They're adding the company's information to the top of the case as an annotation, as a footnote.
Q. What exhibit is that?
A. I was just looking at one of the emails from the Twin Horses in 73 because we've spoken about it a few

times. That wasn't written is what I'm saying.
Q. What exhibit number is that, Mr. Ligeri?
A. This is Exhibit 73, I'm looking at page 8 of 30. Twin Horses 10/12/2020 11:38 a.m., new listing appeal.
The listing appeal area doesn't have a place for you to put your name and information. They're just adding that as the account information. Does that make sense?
MR. CHAN: Your Honor, this was not caught while the evidence was admitted. And in the interest of time, I'm not going to ask him to go through all of them.
May I ask the Court to take judicial notice, some of the email has been altered and it did not really show the original document? That's what he's testifying.
THE COURT: I know you objected when the emails -- when the communications came in from Exhibit 73, you asked that the original email be provided. I was satisfied, however, that the records were sufficiently authenticated and constituted business records. So I'm not going to take judicial notice of what you're asking me to say. But to the extent that the witness is saying that in fact he believes that Amazon inserted information in some way, the witness can say that. And it's a matter of inference to be drawn there from the entire context of the email.
Mr. Magliery, I saw you start to stand up. If

you have anything else --

MR. MAGLIERY: I have nothing to add, Your Honor.

BY MR. CHAN:

Q. Are you saying every time your name is there, it was inserted? Or are you saying sometimes it's inserted?

A. No. Like I said, I believe they're adding a footnote of the account credentials to the top of this case, you know. The case starts with the writing "Dear Amazon." I wouldn't, if I'm writing, start a case and say Ben Joseph, CEO, Medical Collaborative, 100 Commerce, Dear Amazon. That's not in the case body. We could look at the case body as a printout and see what the case body said. You're probably not going to see Ben Joseph, CEO, if you look at the case. But this digest has the footnote and the annotation.

MR. CHAN: Given the time, I think I'll rest, Your Honor.

THE COURT: All right. Thank you.

Any recross to follow up on, Mr. Magliery?

MR. MAGLIERY: Yes, Your Honor. I'll be as brief as possible.

THE COURT: If you could, thanks.

MR. MAGLIERY: Seven or eight minutes, at most.

RECROSS-EXAMINATION

BY MR. MAGLIERY:

Q. Mr. Ligeri, could you go to the BSA version that you were looking at with your counsel. I think it was Exhibit 9 in the big book. That one was the time period you identified as relevant with your counsel.

MR. CHAN: What was it again, Counsel?

MR. MAGLIERY: Exhibit 9.

THE WITNESS: Ah, they all fell out. I was afraid of that. All right. I'm here. I've got to reconstruct this book later, but I'm here.

BY MR. MAGLIERY:

Q. Are you able to look at Exhibit 9?

A. Yeah.

Q. Okay. And you reviewed a section with your counsel. Let's go to Section 18, Miscellaneous, on page 9 of 44.

A. Okay.

Q. Actually, I beg your pardon. It's on the top of page 10. The same thing happened during the redirect.

Do you see where it says "You may not assign this Agreement"?

A. I do.

Q. And then do you see where it says after that "Subject to that restriction, this Agreement will be binding on, inure to, and be enforceable against the parties and their

respective successors and assigns"; do you see that?
A. Yes.
Q. I think your counsel asked whether the assignment was ineffective. I'm asking you: Do you acknowledge that the agreement also says it binds any assigns?
A. Any what?
Q. Assigns. Successors and assigns.
A. It says subject to the restriction it binds successors and assigns. But the restriction is you can't assign it.
Q. I understand your argument. But do you acknowledge that it says it is binding on successors and assigns?
A. Those words are there, yes.
Q. Let's take a look at Section 16. Tell me when you're there.
A. That was section or page?
Q. Section 16, which is on page 8 of 44.
A. Okay. I'm there.
Q. It says: "We may amend any of the terms and conditions contained in this Agreement at any time and at our sole discretion. Any changes will be effective upon the posting of such changes on Seller Central or on the applicable Amazon Site, and you are responsible for reviewing these locations and informing yourself of all applicable changes or notices." Do you see that?

A. I do.
Q. And do you take up your responsibility to review changes to the BSA on Seller Central?
A. I don't.
Q. Okay. And I think you said with your counsel that you agreed that both you and Amazon have mutual benefits from your contractual relationship, right?
A. Um, yes. But the agreement is at sole discretion of Amazon.
Q. But you both benefit from it I think is what you said?
A. From the relationship, yes.
Q. Okay. You also said that you had a stellar reputation on Amazon and that you were increasing the stature of the platform. Do you remember that?
A. Yes, very much so.
Q. Were you ever -- withdrawn.
Were any of your accounts ever terminated because you threatened another seller on Amazon?
A. No.
Q. Were any of your -- withdrawn.
Do you remember when you brought a lawsuit against YouTube?
A. Oh, God. Yes.
Q. Do you remember that you were the subject of a

sanctions motion for threatening bodily harm to one of the counsel in that case?
A. No, I don't remember that.
Q. You don't remember that?
A. No.
Q. Do you remember when a sanctions order was issued against you for threatening bodily harm to one of the counsel in the case?
A. I think you're mistaken, sir, I do.
Q. You said you had never intentionally done anything wrong on the Amazon website, right?
A. Right.
Q. But you have engaged in the transfer of accounts; is that correct?
A. Yes.
Q. And you mentioned security throttling, is that a word you used?
A. Yeah, throttling.
Q. What do you think those throttles are checking for when they ask you to reverify your identity?
A. To make sure the account wasn't hacked is what they say. To make sure the intended person is using the account.
Q. And you also -- just going back, you said you'd never done anything intentionally wrong. But you did previously

testify that you thought it was okay to lie to Amazon in order to reinstate an account, right?

A. To a bot. To a bot system. To manipulate a bot, yes. And I don't think that's wrong, no.

MR. MAGLIERY: No further questions.

THE COURT: Since it's your witness, you have the last word. Do you have anything else you'd like to follow up that's within the scope of what we just heard on recross?

FURTHER REDIRECT EXAMINATION

BY MR. CHAN:

Q. On the paragraph that Counsel just asked you to read, which is second half of the statement about you may not assign the agreement, and then it says that subject to this restriction, meaning regardless this agreement will be binding on and be enforceable against the party, basically -- again, you're a businessman, you're not lawyer -- basically says whether you got assignment properly done or not, Amazon has the power, the authority to bind you for the entire agreement. So as a businessman and a reasonable regular person, do you think that second half about binding you, whether you have been assigned or not, you think that's fair?

MR. MAGLIERY: Objection, vague and confusing.

I'm sorry, I can't follow the question, Your Honor.

THE COURT: I understood the question.

You can answer the question, if you'd like.

THE WITNESS: I don't think it's fair. It doesn't seem to restrict account transfer but it restricts the agreement transferring, which seems to be perfect for my situation.

BY MR. CHAN:

Q. Do you even understand what an assignment is, Mr. Ligeri?

A. Um, yeah. I understand it, more or less.

Q. My last question, Your Honor.

Tenant 1 want to transfer the lease to Tenant 2, the landlord have to okay it, all three parties have to sign for the assignment to be enforceable. So what this clause says that even if Tenant 1, Tenant 2 did not get the tenant's approval, tenant 2 is liable for Tenant 1's rent. Do you think that's fair?

A. Can you run that by me one more time?

Q. Do you think that's fair by binding tenant to even those --

THE COURT: Can I ask, is this a landlord/tenant case? I lost that.

MR. CHAN: I'm using example of the process of assignment, Your Honor. Because it's difficult for a

regular Joe to understand.

THE COURT: Maybe that's a question for you or an issue for you to argue rather than to ask for the witness's opinion.

MR. CHAN: Okay. Strike that.

I think we're done for the day.

THE COURT: Thank you.

MR. CHAN: I apologize.

THE COURT: Anything else, Mr. Magliery?

MR. MAGLIERY: I just would ask whether the plaintiffs rest.

THE COURT: The plaintiffs rest?

MR. CHAN: Yes, Your Honor.

THE COURT: Okay. You can step down, sir. Thank you for trying to put that binder back together.

THE WITNESS: I'm going to take it to my table. I'm almost there.

THE COURT: Fair enough.

So let's chat about next steps. I know you brought this up. I have two initial kind of questions for you all, figure out what your positions are on this.

Is there an agreement concerning what state law applies, apart from the extent to which I'm required when applying the Federal Arbitration Act to apply generally federal law? But there are points at which it defaults to

underlying state law, particularly concerning contract formation. So my question is: Is there an agreement that the state of Washington law applies or --

MR. CHAN: I think the FAA was quite clear guideline is procedurally it's federal because we're in federal court. But interpreting the law should be the local forum where the dispute is being contested, which is Connecticut. So my understanding is that the Court would use Connecticut law interpreting the contract formation and all the related legal issues that surface.

THE COURT: I see. All right.

And what's your position, Mr. Magliery?

MR. MAGLIERY: Thank you, Your Honor.

Amazon's position is that the law of the state of Washington and the FAA apply. And that's because we obviously contend that through one of the various mechanisms we posited in our pretrial brief Mr. Ligeri and his four selling accounts are bound by the BSA. Section 18 says the governing laws will govern this agreement. There's a defined term of governing laws.

Even if the Court were to look at the threshold question, we still think that the state of Washington where Amazon is based and where it offers the seller platform still has the greatest interest or nexus to the question of contract formation.

THE COURT: So even if I look to Connecticut law in the first instance, by choice of law principles you argue Connecticut would defer to state of Washington law. That's your argument.

MR. MAGLIERY: Thank you.

THE COURT: I'm not going to resolve it now. I just want to figure out what the positions are.

MR. MAGLIERY: That's right.

THE COURT: Anything else on this issue?

MR. CHAN: We look at the old Erie doctrine, that also recommends diversity cases, which this is, that the Court should apply the law of the state that the action was taken.

In addition, there's no minimum contact of the plaintiff in the state of Washington.

And Counsel is using a circular argument saying that the BSA stated the law of Washington should control, but he forgot to mention this was mentioned in the definition page which is way down, which nobody looks at. So the original argument of did plaintiff even have notice and informed consent acknowledging that clause. So he's assuming that that clause applies. That's a circular argument. He hasn't proved --

THE COURT: I get the argument. I have your positions on this. I want to think about that.

MR. CHAN: Thank you, Your Honor.

THE COURT: The second issue I wanted to raise with you was the defendants, the proper defendants in this action.

Now, according to Amazon, looking at their pretrial briefing, there should be only three defendants in the case, which are Amazon.com Services, LLC, Amazon Payments, Inc., and Amazon Capital Services, Inc. As I look at the complaint, it names the last two of those defendants. It doesn't seem to name at all Amazon.com Services, LLC. It names Amazon Services, LLC, but not Amazon.com. And then it listed other entities such as Business Payments and Mexico Services, Amazon.com generally and Amazon, LLC.

So what's your position, Mr. Chan, on the proper defendants in this action?

MR. CHAN: I think, again, this issue just raised recently. I have not had time to do the necessary research to respond. But I think, pending the motion, if the Court grants -- if the Court denies motion to compel, then we are in the Court, then plaintiff should have the right to at least leave to amend the complaint to have the proper plaintiffs. But we're not even there. Because we don't even know whether we're going to court or which court. So it is premature. But I would ask for more time

for the plaintiffs to correct, maybe it was an error in identity, Your Honor.

THE COURT: Thank you.

Anything else on that issue?

MR. MAGLIERY: Your Honor, we would at this point refrain from a motion to dismiss because we think that should be handled in the arbitration. But what is clear, from our perspective and it's in the agreement, the contract provides that the agreement is between the contracting parties, a defined term, and any of its affiliates. In the BSA the contracting parties and the affiliates are both defined as well. We would ask for an order that the entire dispute be sent to arbitration and we'll deal with the parties in arbitration.

THE COURT: Okay. All right. So I'll consider that as well. I'm not deciding that right now.

Something else?

MR. CHAN: I think we both raised, asked the question for the Court to instruct us your practice, your preference regarding a post-trial brief given the complex legal and factual elements. It would not do justice with a 20-minute oral argument for your consideration. So I'm just wondering what your preference is.

THE COURT: Well, I'd like to hear from the parties. It's always important for me to hear from the

parties what your preferences are.

What are you proposing, Mr. Chan? And then I'll hear from Amazon.

MR. CHAN: We acknowledge that we lost time due to various reasons, but since we are done with the hearing, I think to do this right and to give enough information for this Court to do a decision, to make a right decision, I would not mind putting together a post-trial brief for the Court to consider. Because that would allow a lot more facts and legal argument to come together instead of doing a ten-minute oral which really would not do justice.

THE COURT: I see. So you're contemplating doing post-trial briefing, is that what you want to do? Do you want to do post-trial briefing?

MR. CHAN: I mean brief. I mean brief. Meaning a memorandum.

THE COURT: Yes.

MR. CHAN: That's what I meant.

THE COURT: Right. So you want to order the transcript of this trial --

MR. CHAN: Yes.

THE COURT: -- of the last two days, and then prepare a formal memorandum with your proposed findings of facts, conclusions of law; is that what you're proposing?

MR. CHAN: Yes. Knowing that it would cause possible further delay, but I think that would do justice to the system as well as providing the Court with the necessary information.

THE COURT: I see. Okay.

Mr. Magliery.

MR. MAGLIERY: Thank you, Your Honor.

We're prepared to close, sum up the evidence, and elucidate the legal arguments. I think there's been a delay which primarily the plaintiff has complained about. And we've briefed the issues already in the pretrial brief. So we propose summing up and submitting. The record, although I'm sure the Court has its work cut out, is not that long. It's only a two-day trial. I think we could submit today, if the Court had 20 more minutes. So our proposal would be to just summarize.

THE COURT: I see. Okay.

Anything else on this?

MR. CHAN: No. You asked for a position.

THE COURT: All right. I think I'm inclined to hear from you all, but I can't do it today. And what I can do is schedule a different date with you to hear from you. And if you believe that there's any additional matters that you want to raise by memoranda, I'm going to let you do that, and then I'll allow you to sum up in

light of that.

So if you have an agreement about how to proceed differently, but I think that my preference would be to allow you some time if you wish to point out anything in light of the testimony that we've heard over the last couple of days that you believe would be helpful. I'm not going to require you to submit -- you may, if you wish to -- proposed findings of facts and conclusions of law. But basically going to allow you to make an argument however you wish to make it that's most comfortable for you in terms of how the Court should rule on the basis of the evidence that's been presented at the trial. So I think I may let you have probably 30 days from now to file the post-submission, post-hearing briefing. But to the extent that our court reporter needs more time, I will definitely extend that in terms of her getting the transcripts out to you. You will need to place an order for those at this time if you wish to have the transcripts.

MR. CHAN: Yes, we will.

THE COURT: So I think we'll set a time for 30 days from now, which I guess would be -- gosh, it looks like May 3rd would be a 30-day period from now. Friday, May 3rd, to submit any post-trial memorandum that you wish to. And if you want to file a response to each other's

memoranda, you're welcome to do that by May 10. I think that will keep us on schedule. I'm not sure I need to have oral argument at that point if you have a full opportunity to present your written.

MR. MAGLIERY: I would agree with that, Your Honor. One or the other will suffice.

THE COURT: And if I do, I might just do it by Zoom or something that doesn't require travel for people.

So anything else you want me to be aware of right now?

MR. MAGLIERY: Nothing for us, Your Honor. Just to say that the travel would be no burden for at least the lawyers. And so if you choose to have in-person argument, we're happy to attend.

THE COURT: I didn't want to run up anything unnecessary in terms of expenses to both sides.

All right. Anything else?

MR. CHAN: No.

THE COURT: I saw Mr. Ligeri raised his hand.

MR. LIGERI: May I have a minute to ask my attorney?

THE COURT: Yes, please.

(Pause.)

MR. CHAN: Sorry, Your Honor. No more.

THE COURT: Anything else?

MR. MAGLIERY: Just one husband keeping matter. To whom should I give the original cross exhibits?

THE COURT: To the courtroom deputy, Ms. Lewis.

Thank you all for your patience over the last couple of days. I look forward to your post-trial memoranda. Thank you.

MR. CHAN: Sorry for the long day, Your Honor.

THE COURT: It's part of our business.

(Proceedings adjourned at 6:04 p.m.)

C E R T I F I C A T E

RE: BENJAMIN LIGERI, ET AL. v. AMAZON.COM INC., ET AL.

No. 3:23CV603(JAM)

I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 227 through 477 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/

DIANA HUNTINGTON, RDR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(860) 463-3180