**PLAINTIFFS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**
**BENJAMIN LIGERI**
**CENTRAL CONCEPTS, INC**
**TRADEMARK HOLDINGS, LLC**
**GLOBAL SPECIALITY PRODUCTS, LLC DOCKET NO. 3:23-cv-00603**
**MEDCARE, LLC**
**Plaintiffs,**
**vs**
**AMAZON.COM, INC**
**AMAZON, LLC**
**AMAZON SERVICES, LLC**
**AMAZON MEXICO SERVICES, INC**
**AMAZON BUSINESS PAYMENTS, INC**
**AMAZON PAYMENTS, INC**
**AMAZON CAPITAL SERVICES, INC,**
**Defendants MAY 10, 2024**

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I. Plaintiffs' Proposed Findings of Fact

1. Plaintiff Benjamin Ligeri is the owner of the Marks described in the Verified Complaint, and has been doing business in various roles involving Amazon since prior to 2014. He testified that "I've been in retail and brand product development for about 15 years working as a wholesaler, a brand developer, and direct-to-consumer retailer working with Amazon both on the outside as a non-contractual brand purveyor and then also working on their platform." [Tr. p 232]

2. Plaintiff Ligeri is the CEO of Central Concepts, Trademark Holdings, LLC, Global Specialty Products, LLC and Medcare, LLC ("Companies").

3. Plaintiff Ligeri manages the Amazon stores associated with the Companies in the Verified Complaint, which were previously created by different persons and parties prior to his purchase and acquisition of them from their original owners.

4. Amazon's own account records by Mr. Eric Smith confirmed that Plaintiff Ligeri was not the original account registrant of any of the four Companies in the Verified Complaint and therefore Plaintiff Ligeri never checked a box or provided any form of digital signature that

he agreed to the BSA as asserted by the Defendants. [Tr. pp 187-192, Tr. 296]

5. Defendants assert that the BSA is binding on the Plaintiffs and it requires binding arbitration.

6. Plaintiff Ligeri is the successor operator of the Amazon stores associated with the Companies in the Verified Complaint and the account transfers were conducted in Amazon's Seller Central Portal. (Tr. p 254)

7. Plaintiff Ligeri, himself, is asserting trademark infringement claims in the Verified Complaint.

8. The BSA excludes trademark infringement claims. It does not require those claiming Trademark infringements to be subject to binding arbitration.

9. The BSA states that all account assignment, must have Amazon's prior written approval There was no record of any account assignment approved by Amazon (BSA clause 17)

10. The BSA and all other Terms of Service have been modified many times without any notice of modification delivered to any of the Plaintiffs directly. [Tr. p. 128-130]

11. Out of the hundreds of thousands of emails and messages between Plaintiffs and Defendants throughout the decade plus period of time alleged in the Verified Complaint, the BSA was only unilaterally referred to by Defendants seventy times, all of which are filtered emails by Mr. Eric Smith. [Tr. p. 304]. There are " no emails about the

BSA specifically." [Tr. 446]

12. The Record is devoid of any evidence that the Plaintiffs have actually consented to the BSA's Terms, either as an initial account registrant or as a subsequent account operator by account assignment or transfer .

13. Regardless of Amazon's lack of consent to transfer / assign the ownership of the Amazon stores associated with the Companies in the Verified Complaint, Amazon continued to profit from the sales revenues generated by Plaintiffs and collected the vast majority of the proceeds through various fee charges for Amazon itself, sometimes up to 90% of Plaintiff's revenue during a given quarter.

14. There were no negotiations and Plaintiffs had absolutely no opportunity or ability to negotiate any terms of the BSA.

15. The Defendants have superior bargaining power over Plaintiffs and offered the BSA terms on a take it or leave it basis. [Tr. pp 122-123]

16. The Parties do not have equal bargaining power. The Defendants' bargaining power is vastly and overwhelmingly superior.

17. Defendants sell products on their Platform that directly compete with Plaintiffs' products in a manner that infringes or facilitated the infringement by others of Ligeri's Marks.

18. Plaintiff Ligeri has been unable to adequately obtain remedy for Trademark Infringement using Amazon's Platform.

19. Even Defendants agree that the Plaintiffs here have spent more than ten years of building up their online business and Amazon’s own legal brief acknowledges the plaintiffs have built a business into hundreds of thousands dollars per month, .

20. The Amazon stores associated with Companies have been the subject of unexplained shut downs of their accounts by Defendants that Plaintiffs are unable to obtain any logical explanation of, let alone any meaningful description of any corrective action.

21. The Defendants' first witness Mr. Orzbatur cannot tell who registered an account, and according to Mr. Orzbatur's testimony, "I cannot tell because I do not have access to private data. As I mentioned, I have access to mass data, but not individuals." [April 8 Tr. p. 42], As to the database, he testified, "I do not directly manage that." [Id, p. 43]

22. The Defendants' witness testified, as to registering an account, one also "can confirm that somebody can click the box to go to the next step without physically clicking the link leading to the Amazon Services Business Solutions Agreement." [April 8 Tr. p. 47] Furthermore, Defendant's own witness is unaware of a control mechanism in place that would prevent any individual registering as a seller from advancing beyond the BSA (i.e., skipping and not reading it) without clicking a box or verifying a signature. [Id, pp. 47-48] In other words, a registrant need not read the BSA to advance to the next step.

23. Kevin Pak is the Defendants' Senior Content Manager. [Tr. p. 68 April 8, 2024] Kevin Pak testified that there are "About 40" different versions of the BSA. Id, p. 70. Mr. Pak has been employed for the last nine years by Amazon (2015), and his knowledge therefore only goes back to that point. [Tr. p. 68]

24. Mr. Pak could only verify the BSA versions back from the present to September 1, 2017. [Tr. p. 76] He has no access to the systems that store earlier versions, stating that "They are stored in a content system owned by legal called iManage, which I do not have

direct access to." . [Tr. p. 83] Further, Mr. Pak testified that "the BSA is quite long, and the changes I make are to specific parts. So I don't know the overall word-by-word very closely, no." [Tr. p. 121]

25. Mr. Pak described the process of searching for the BSA from the Seller Central home page, which involves "four layers of hypertext before" a help page can be viewed, and from there, users would have to search for the BSA. Only a proper word search will yield the information on the BSA [Tr. pp. 115-117]

26. There are over 800,000 third party sellers on Amazon. Amazon notifies changes in the BSA only by publishing it and Amazon did not provide any data to prove what percentage of sellers, if any, actually clicked news, help or word search to get to the (BSA) agreement and consenting to it. [Tr. pp. 119-120]

27. Amazon's own witness stated that Amazon does not specifically keep or track the data of sellers clicking certain link or looking at certain information, including what percentage of sellers actually get actual notice of the BSA agreement and changes even though Amazon's own witness stated and agreed that it is important to keep traffic data . [ Tr. pp 125-126]. The BSA screen offers only two options – agree to consent or not do business with Amazon. Amazon does not send email to sellers to notify them of any changes to the BNA terms. In searching for information, the accuracy is dependent on the query [Tr. pp. 128-129] Amazon's witness stated that it would even take him half an hour to read through the BSA and it would take much longer if I was really trying to find specific information, really understand the nature of it [Tr. p. 131] Mr. Pak stated that " I don't think you're allowed to transfer your account to someone else" [Tr. p.133]

28. Mr. Pak, similarly to Mr. Orzbatur, testified that "My team doesn't handle the

authorization of additional users, if that's what you mean. We don't – we don't have a relation to that system.... I don't own the registration portal..." [Tr. p. 134-135] Amazon's new system named Ajuda is a more advanced, sophisticated and more capable that their old system [Tr p. 136]

29. Eric Smith testified that he runs "a team of risk managers or a couple teams of risk managers. Our job is to handle escalations within the company." [Tr. P. 138-139] He has access to seller account data. [Tr. p. 142]

30. Eric Smith verified that Plaintiff Ligeri did not open any of the seller accounts associated with the Company Plaintiffs. [Tr. pp. 149-150]

31. Eric Smith testified to the only way a record is made by Amazon as to seller registration, which specifically is, "I searched the seller ID in Paragon. I pulled up the customer summary tab for this particular seller. I scrolled down to the Registered Payment Accounts section and I screenshotted that section." to which Defendants' Counsel asked, "When Amazon wants to make a record of the information shown in this exhibit, how does it do that?", and Mr. Smith responded, " By the method that I described.", meaning that the only records kept by Defendants are screenshots of data that may be stored and will be changed or modified such that information is unreliable, lost or not appropriately captured. [Tr. pp. 151-152] Mr. Smith stated from Amazon's account records the names of the four original seller accounts registrants in the verified complaint and none of them was Mr. Benjamin Ligeri [Tr. pp. 187-192] Mr. Smith stated that the roughly seventy emails he provided at the hearing were "filtered" using a word search for Business solutions. [Tr. p. 194]

32. The Plaintiffs retained an IT expert to rebut testimony as to the Defendants'

witnesses' purported knowledge of their systems and electronic records relevant to the Computerized Business Records Exception to the Hearsay Rule. The Court determined that no such testimony was offered by the Defendants to authenticate their records, and therefore, the Court determined, "Then we don't need the expert." [Tr. p. 224]

33. As to who opened Amazon stores and accounts, the Plaintiff testified, that he never opened them, and that, "Amazon would have on file the driver's licenses of who opened them." He never clicked the box, nor did he show consent to agree to the BSA. [Tr. pp. 235-236]

34. As to what the Plaintiff meant when he opened the Health and Household Account, he testified that " the word "open" wasn't meant to be legalese. It just probably meant open for business. The Health and Household account is really only five years old, not a decade. There's a little bit of confusion in the wording there. Health and Household's five years old. The Amazon account originally registered by Jasmine Alcantra of Jasmine's Gifts LLC is a decade old. When I took it over as House and Household, it was about half a decade ago. When I bought it with a C Corp. that I was the majority shareholder of, that was about three years ago.", and that he meant he purchased the account, just like the others. [Tr. p. 240] Further, the account "...was not purchased from the original owner. It was purchased from the secondary owner... And this was a purchase of other property, intellectual property and other physical property, including an Amazon account... I purchased basically any valuable intellectual and physical property that the company had, which was largely trademarks, an Amazon selling account with active inventory, I purchased the inventory in the account as well. And that's about the sum of it." [Tr. p. 243]

35. The Court admitted in full Exhibits 2 and 4, which documented the transfer of

intellectual property and Amazon held inventory between Plaintiff and Wholly Wholesale.

36. The Court indicated it would consider the declaration of Natalia Parker, Exhibit 008.

37. As to Exhibit 5, the Court ruled, " I find that the witness has testified that this record came from the personal files and is evidence of an agreement that he had with Ms. Alcantra for the sale of Jasmine's Gifts for $1,500." [Tr. p. 253] Mr. Ligeri stated that there were neither questionnaires nor restrictions when he made all the necessary changes to have the purchased seller's accounts transferred. There was no requirement to click on anything that referenced the BSA either before, during or after the account transfers were made [Tr. pp 258-259]

38. As to the revenues produced relative to Plaintiffs, Ligeri testified that "you don't think of Amazon as anything that matters. They don't care about who you are or what you're doing. You're just listing products and they're taking their 90 percent of the fee. So it's not like some kind of a sacrificial lamb to them to say here we are. That's the relationship with Amazon. It's very cold. You list the product, you provide the product to them, you take care of all of the details related to that product, you take care of the customer. And they give you 10 percent of the proceeds. That's the relationship. That's how it's always been and that's how it will continue to be. There's no real relationship with Amazon. You're a dog. That's the relationship with Amazon. [Tr. p. 263]

39. As to an accounting of that high percentage of revenue taken, "Amazon doesn't send invoices. You can dig in to look at the data of your payments, but it doesn't get sent to you. They give you an overview payment screen that shows you broad strokes of gross sales, net sales, and such.", and the revenue goes first directly to Amazon. [Tr. pp. 268-

269, 272]

40. Plaintiffs' first constructive knowledge of the BSA's existence was in preparing for litigation, in the search for and through documents, which yielded a number of agreements in the "hundreds". [Tr. p. 272]

41. Amazon never disputed or terminated any of the accounts assigned and transferred to Plaintiffs, nor did the Plaintiffs receive any email from Amazon saying that the transfers were illegal and were not approved. After the transfer, Amazon would be "...paying the new entity the net proceeds.", and there was no interference "Except the security throttles" [Tr. p. 282]

42. The Court took the US House Subcommittee Report from Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary of the House of Representatives (Plaintiff's Exhibit 023) under advisement. [Tr. p. 291]. The report, relating to both was made pursuant to Congress' authority in aid of its legislative function. The Court also ruled that the sections of the report referring to forced arbitration are admissible and go to the weight of the evidence. [Tr. pp. 292-293]

43. Plaintiffs indicated the very real concern that if they divulged account information of their partners who sell their products under trademark license, Amazon Defendants could start shutting down their stores, which they subsequently did. [Tr. pp. 320-321, Plaintiff's Affidavit ¶¶ 7, 8, 9 , 12]. Defendants did exactly that to the Melbourne Account. [Tr. 324, Plaintiff's Affidavit, Id]

44. Plaintiffs operate two legacy accounts, which are accounts created before June 2016, where "Amazon let the seller receive a hundred percent of their net proceeds, whereas after they take all of your net proceeds and hold it and let you get your next net

proceeds amount while holding each successive net proceeds for another two weeks." [Tr. pp. 357-446] There are the My Medical Warehouse/Twin Horses and the Health and Household Amazon stores. [Id.] These accounts were more profitable and thus targeted for Amazon to shut down. [Tr. p. 447]

45. "A seller is not allowed to report another seller on infringement. Infringement reports take place outside of the Amazon seller system. They take place on Amazon.com outside of Seller Central by IP owners." [Tr. p. 377]

46. Plaintiff Ligeri did not go through the process "as Mr. Orzbatur described" to open a seller account at any time. [Tr., p. 387]

47. There was no meeting of the minds as to the BSA as Plaintiffs did not understand it or have full awareness of its terms at the inception. [Tr. p. 429]

48. Amazon frequently changes, on a random basis with no metrics that can be identified, the fees that it exacts, which frequently exceed 90% of the cost of the products. [Tr. pp. 443-444]

49. The decision whether to shut down or deactivate an account is random, unknowable, and by extension, unable to be resolved because there is no referential index on how the Plaintiffs could begin to troubleshoot any alleged or perceived issues. [Tr. pp. 445-446]

50. The trademark infringement dispute mechanisms set up by the Defendants do not work and are outside the BSA and Amazon's Seller Central platform/software, which yields arbitrary and unpredictable results. [Tr. p. 449]

51. Post hearing, Austin Kang (owner of Kangaus) reported to Global that his account had been suspended under the multiple selling account clause of the BSA,

section 3 which prohibits having multiple accounts, even though he did not have operate multiple accounts. [Supplementary Affidavit ¶¶4-7]

52. Defendants also targeted, in retaliation, the accounts of Mr. Jeffrey Joutras and Kyara Ribeiro, who also did not violate section 3 of the BSA as falsely alleged. Shortly after the April hearing transcript came out, Amazon deactivated the accounts of Kangaus and Melbourne Retail LLC, Tiberias Holdings LLC and Medcare LLC. Medcare is a Plaintiff in this action whose account has survived all the way through the recent motion to compel arbitration hearing and was just recently deactivated. This unlawful conduct by Amazon ensures that listings of deactivated accounts have no visibility whereas listings selling counterfeit products that infringe Plaintiff's Marks continue to sell, and the Defendants continue to profit from reverse confusion dilution of Plaintiff's Marks. [Supplementary Affidavit ¶12]

53. According to Plaintiff Ligeri, "Since the evidential hearing on April 8 and 9 of 2024, I have spoken with attorneys at ESQgo, the premier Amazon dispute resolution law firm that works directly with Amazon to solve issues pre-arbitration and during arbitration. I have been informed that Amazon does not accept arbitration requests from companies who have subsequently taken over businesses with Amazon accounts. Amazon only accepts arbitration disputes with the original account opener. This goes in line with Amazon's BSA which only applies to creators of Amazon accounts and is not transferrable. The BSA is not transferrable, the arbitration provisions are not transferrable, companies can't engage in arbitration with Amazon as Amazon only acknowledges the individual non artificial entity that submits its driver's license to Amazon at account sign up as valid parties to the BSA. This information as to arbitration being unavailable to me was unknown

to me prior to the evidential hearing." [Supplementary Affidavit ¶13]

54. Also, according to Plaintiff Ligeri, "Colby Ross, owner of the Amazon account Melbourne Retail, which has its billing and payables covered by Melbourne Retail LLC, has over 4,000 units of this urinal in stock at Amazon and his account was just deactivated leaving the Amazon seller owing the Plaintiff approximately 200,000 dollars in unpaid inventory bills. The Plaintiff can't arbitrate on behalf of someone else. Defendants' unlawful conduct has cost the Plaintiff 200,000 just with the deactivation of the Colby Ross account with no legal recourse despite the resulting classical aggrievement the situation presents." [Supplementary Affidavit ¶15]

## II. Plaintiffs' Conclusions of Law

A. The Defendants Have Not Provided Sufficient Admissible Evidence to meet their Burden of Proof that the Arbitration Clause in the BSA is binding to the Plaintiffs, and that the Claims Require Arbitration because there is Absolutely No Proof of Informed Consent by the Plaintiffs.

The Defendants have asserted that Sellers Must Accept the Business Solutions Agreement to Create an Amazon Selling Account. Even if this is true, Defendants' own record show that none of the Plaintiffs created the Amount selling account. The Parties do not dispute that the subject of the April 8 – 9, 2024 hearing was to ascertain whether or not the Plaintiffs consented to binding arbitration as so stated by the Defendants citing in the BSA, and more specifically, whether the Plaintiffs checked the box to consent pursuant to the ClickWrap agreement as initially maintained by the Natalia Parker Declaration (Plaintiff's Exhibit 008, which the Court took under advisement).

Neither Ms. Parker or any of the other witnesses (Mr. Ozbatur, Mr. Pak and Mr. Smith) testified that they could satisfy all of the criteria to authenticate their electronic business records. Specifically, "To admit evidence under the business record exception to

the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52–180. The court must determine, before concluding that it is admissible, that the record was made in the Computerized business records exception to hearsay rule regular course of business, that it was in the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter.... To qualify a document as a business record, the party offering the evidence must present a witness who testifies that these three requirements have been met." (Internal quotation marks omitted.) *Emigrant Mortgage Co. v. D'Agostino*, 94 Conn.App. 793, 807, 896 A.2d 814, cert. denied, 278 Conn. 919, 901 A.2d 43 (2006) ; see also Conn. Code Evid. § 8–4(a). Second, the proponent of the computer generated business records "must establish that the basic elements of the computer system are reliable." Id, 656-657

Further, "[O]ur Supreme Court noted that "[b]usiness records that are generated by computers present structural questions of reliability that transcend the reliability of the underlying information that is entered into the computer. Computer machinery may make errors because of malfunctioning of the hardware, the computer's mechanical apparatus. Computers may also, and more frequently, make errors that arise out of defects in the software, the input procedures, the data base, and the processing program.... In view of the complex nature of the operation of computers and general lay unfamiliarity with their operation, courts have been cautioned to take special care to be certain that the foundation is sufficient to warrant a finding of trustworthiness and that the opposing party has full opportunity to inquire into the process by which information is fed into the computer.", Id, 657

As the Court itself noted, The Plaintiffs retained an IT expert to rebut any testimony as to the Defendants' witnesses' purported knowledge of their systems and electronic records relevant to the Computerized Business Records Exception to the Hearsay Rule. The Court determined that no such testimony was offered by the Defendants to authenticate their records, and therefore, the Court determined, "Then we don't need the expert." [Tr. p. 224] Further still, none of the witnesses have access to or can explain or authenticate what happened prior to their time at Amazon, the time in which the Legacy Accounts were started. Defendants nonetheless attempt to validate their claims that the BSA was agreed to or assented to by asserting that seventy filtered emails and communications out of many hundreds merely reference the BSA, and that the Plaintiffs received such emails , but there is no proof that plaintiffs indeed consented to the BSA. Plaintiff Ligeri stated that the plaintiff purchased the needed insurance, once they were reminded, regardless of the BSA terms. This is an impermissible pyramiding of inferences. In *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321 (1982), the Eleventh Circuit found that “[a]ccording to federal law there is no prohibition against pyramiding inferences; instead all inferences are permissible so long as they are reasonable.” The rub is that 70 filtered communications that merely reference the BSA out of hundreds of thousands contained in records that the Defendants cannot properly authenticate do not give rise to a reasonable inference, even if a handful reference purchase of insurance. The tautology in a self-serving message that parrots a purported agreement's requirements does not prove a valid meeting of the minds.

B. Arbitration is a Meaningless and Inadequate Remedy

The core of the Verified Complaint is that the Defendants' have established an

entire system and scheme to get third party sellers' funds, resources, products and intellectual property under their control such that they can pirate the profits and proceeds from the same. Trademark infringement was never the subject of the BSA. Defendants' systems are wholly inadequate to enforce the rights of Plaintiffs relative to their Marks. An arbitrator also does not have the power of this Court to order counterfeit products to be impounded or corrections and other entries to be made in USTPO's records. 15 USC §1116(a) assumes the presumption of irreparable harm related to this claim, which all the Defendants' arbitration claims and motion practices can do is impose delay for its own sake.

The Plaintiffs then discovered after the hearing that the Defendants won't even honor any demand for arbitration anyway. The Defendants are seeking a result as foretold and described and found by the US House Subcommittee Report from Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary of the House of Representatives (Plaintiff's Exhibit 023) – arbitration is meant to be a dead end in and of itself, and in this specific case, a remedy that the Defendants intend to deny anyway.

C. <u>There was no Meeting of the Minds or a Validly Formed Contract as to the BSA or Any Arbitration Provisions or Forum Selection Clause</u>.

Both the arbitration clause and the forum selection clause are not enforceable as Plaintiffs had no reasonable notice and had not consented to arbitrate or change of venue. The Arbitration clause was placed quite inconspicuously under clause 18, titled miscellaneous item, while both of the governing laws and forum selection clauses were placed in the very end under the definition section. Such placements were done with

deceit, in bad faith, and a bullying attitude, intended to show the Amazon muscles that Amazon can "define" what the rules and laws are. Such dishonesty, arrogance and disrespect of the law should not and must not be rewarded by granting Amazon's motion to compel arbitration and transfer venue. Rewarding Amazon under these circumstances runs contrary to settled law and public policy. It would further tilt the balance of power towards the already powerful such that justice could never prevail.

Defendants have not met the burden of proof that there was consent, or any of the commonly held requirements for the formation of a valid contract. In *Green v. XPO Last Mile, Inc*., 504 F. Supp. 3d 60, 64 (D. Conn. 2020), the court stated as follows: "...while parties may "agree to arbitrate ... whether the arbitration clause applies to a particular dispute, or whether it is enforceable, parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." That case plainly stated that arbitration is a creature of contract law. In *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 36 (2d Cir. 2002) the Second Circuit refused to enforce the arbitration clause because the court highly valued reasonable notice and the existence of actual consent and assent to the no so obvious license terms despite the Plaintiff actually downloading the software. The court ruled that the mere act of downloading the software did not unambiguously manifest assent. The Instant Matter also involves lack of reasonable notice and actual consent. Amazon's account records show that Plaintiffs fail to consent because they were not the original seller account opener or registrants. Furthermore, the entire Amazon account management does not truly seek seller's consent because Amazon did everything it possibly could to allow sellers who are opening accounts not to give their true informed consent. This is demonstrated by Amazon's own

actions and systematic procedures which tend to make it easy for the sellers to avoid true informed consent, rather than to seek seller's true informed consent. In very simple terms, Amazon's witness Mr. Orkun Ozbatur testified that a person or business who is registering for a new account as a new seller on Amazon does not have to click the BSA link to read the BSA but can go directly to the next step by simply clicking "accept". Therefore, in the initial seller account registration, any potential seller can totally skip clicking the box to review the BSA and go straight to the next step. Amazon's assertion that one must read and accept the BSA to go to the next step is quite incorrect and misleading. One does not need to actually read the BSA, rather, one can simply and totally ignore the BSA and go to the next step. Amazon treats those who skip the entire BSA as a consented party when it purposely created this back door loophole for sellers to skip the entire BSA.

Given Amazon's resources, Amazon could have easily installed a restriction such that a potential seller must actually click the box and actually review the entire BSA by scrolling down the BSA content before the seller can proceed to the next step. In reality, this is not the mechanism employed by Amazon. Hence the seller may consent by default without even opening the BSA, let alone reading it thoroughly, understanding it and then provide a true informed consent.

The court should wonder Amazon's true intent with this built-in system design defect without a properly control mechanism where many sellers can click the continue button without giving any true informed consent. The total lack of evidence by Amazon in a digital or paper format further indicates that Amazon has no record of Plaintiffs' consent or any other sellers' consent. The court must not and should not reward Amazon for such bad faith scheme to trick sellers into the alleged consent.

The Plaintiffs witness Mr. Ligeri testified that he was never informed of the BSA and any changes to the BSA. Likewise, there are questionable doubts as to which sellers actually consented for subsequent changes made to the BSA, Amazon did not provide direct notices to the sellers of any changes to the BSA. As Amazon's own witness Mr. Kevin Pak explained amazon employs a "notice of publication" approach to inform their sellers of a new version of or any changes to their BSA. This is done by uploading the new BSA onto their website for public viewing. However, a seller who signs on their regular seller central platform portal home page does not automatically see the new BSA or changes made to the BSA. The seller has to do the following:

1. Perform a specific word search "Amazon Services Business Solution Agreement" and find the appropriate link to click to see the content;
2. Click the help button, which shows ALL the hints and directions and find the proper information; and
3. Keep track of the news and hope not to miss any important BSA changes.

Likewise, even if a seller finds a new version of BSA, he or she does not have to actually read any new version of BSA to be able to continue to the next step on seller central. Mr. Kevin Pak also testified that Amazon does not perform any data analysis to keep track what percentage of people actually respond and click to see the news, changes or updates of a new BSA. While Mr. Pak himself said it would be important to know how effective the current notice by publishing system works but Amazon does not want to know its efficiency or any need for improvement. It is obvious that Amazon is trying to prove consent by simply showing the existence of a poorly designed system yet claims that it works perfect and all sellers must have consented because they move to the next step.

This is Amazon's second try of proving consent with no evidence while the first time Amazon tried to claim evidence that they never had through the declaration of Ms. Natalia Parker. Her declaration turned out to be completely false as Mr. Eric Smith's testimony with actual account records completely contradict Ms. Parker's declaration .

In *Mundi v. Union Sec. Life*, 555 F.3d 1042, 1043 (9th Cir. 2009)) The Ninth Circuit refused to enforce the arbitration clause for lack of privity between the parties. In the Instant Matter, this Court should also rule the arbitration clause unenforceable for lack of privity. The facts and testimony of this case clearly established the obvious conclusion that there was no true informed consent.

With a seven month advanced notice from the court's last hearing on August 2023, Defendants still failed to provide any properly authenticated evidence or any of their records to prove that the Plaintiffs indeed consented to the terms of the BSA. The Defendants fail to overcome the immutable fact that none of the Plaintiffs executed or were required to execute any Click Wrap agreements as alleged by Natalia Parker's affidavit. In fact, Mr. Eric Smith testified from amazon's own records that none of the four initial seller account registrants was Mr. Benjamin Ligeri. This contradiction brings to light Ms. Natalia Parker might have committed perjury to get a quick score back in August 2023. The Defendants then attempted to prove consent by merely describing how the registration system is supposed to operate in the present, as of April 2024, what a prospective seller must do in order to become a seller.

Even assuming the BSA as of April 2024, which does not bind the Plaintiffs, Amazon stated in the BSA that Amazon must consent and approve any assignment of the BSA. Amazon's own failure to enforce its policy on executing and approving any and all

assignments of the agreement to future Sellers does not necessarily excuse the consent requirement that binds the Plaintiffs just because Amazon claims that the BSA says it binds all successor users. Since Amazon's no assignment clause is clear and unambiguous, the BSA cannot be binding on the Plaintiffs as successor accounts since there were no properly assignments with Amazon's prior written approval as required by the BSA itself. The Parties therefore operated outside the BSA under a new contractual terms when the Plaintiffs offer to use the Amazon platform and pay the appropriate Amazon fees upon the account transfers in the Seller Central Portal and after Amazon constructively rectify this new arrangement by allowing the Plaintiffs to sell on its platform and accepting the fees from the Plaintiffs. Amazon has constructively rectified the Plaintiffs as NEW sellers by its action and by not requiring the Plaintiffs' consent to the BSA. Amazon wants to control the sellers' accounts by proper assignment of the BSA and when it fails, now Amazon wants to bind a non-contractual party to the BSA. Amazon cannot be above the basic contract laws of this land.

D. <u>Plaintiffs' Trademark Claims are Clearly Outside the Scope of Arbitration</u>

This matter concerns as its primary moving force, trademark infringement by Amazon, contemplated by the Lanham Act, and which even the Defendants themselves concede should be heard by this Court and is excluded from arbitration under the BSA. Clause 18. Miscellaneous. " we may bring suit in the Governing Courts to enjoin infringement or other misuse of intellectual property rights". Amazon sells private label products and compete with Plaintiffs' trademarked products. The Verified Complaint stated that Amazon uses electronic data and schemes to find plaintiffs' established high volume products and purposely steer buyers to Amazon's own private label products by posting

similar looking products next to Plaintiffs, and use get it now feature, and amazon's preferred product label to attract buyers. This is a reverse trade mark infringement when the junior seller Amazon literally confuses consumers because of its Corporate ID and status and buyers may think Amazon's products was the actual trademarked popular products or that Plaintiffs senior sellers status is second to Amazon's junior seller status.

### E. The Arbitration Provisions Constitute an Adhesion Agreement with Oppressive and Unenforceable Terms

The enforceability the BSA itself and all the related unilateral adhesion agreements should not be arbitrated. Count 4 of the complaint directly challenges the entire BSA agreement as an adhesion contract, unconscionable and unenforceable and seeks this court's declaratory judgment. Defendants are asking the Court to step aside and turn a blind eye on this particular count and enforce the arbitration clause of the same BSA being challenged. This is showing of total disrespect to this court and an affront to our legal system. The Defendants are asking, through their unilaterally adhesion agreement, to deny all meaningful remedy and due process to the Plaintiffs. In *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) The district court denied the defendants motions to compel arbitration pursuant to the loan agreements at issue. The court concluded that the arbitration agreements are unconscionable and unenforceable because they insulate Defendants from claims that they have violated state and federal laws. Similarly, in this instant case, in this instant case, the arbitration clause of the agreement is unconscionable and unenforceable because they would insulate Defendants from claims by the Plaintiffs that the Defendants have violated state and federal laws, especially the claims under the Lanham Act and the Sherman Anti-Trust Act.

The Operative Complaint also involves anti-competitive actions, in violation of anti-trust laws and wrongful actions violating the Unified Connecticut Trade Secrets Acts, which are obviously outside the scope of BSA's arbitration clause. Only a competent court can rule on and enforce whether Amazon has violated these state and federal laws. An arbitrator lacks the enforcement powers to appropriate provide due justice to all claims, especially the Trademark Infringement claims the BSA is designed to evade. The entire BSA is unenforceable. It is an adhesion contract, unconscionable contract.

"Under Connecticut law, the doctrine of unconscionability is a defense to contract enforcement that is intended "to prevent oppression and unfair surprise." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 87-88, 612 A.2d 1130 (1992) (internal quotation marks and citation omitted). "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Bender v. Bender*, 292 Conn. 696, 731-32, 975 A.2d 636 (2009) (internal quotation marks and citation omitted). The question of whether a contract is unconscionable "is a matter of law to be decided by the court based on all the facts and circumstances of the case." *Cheshire*, 223 Conn. at 87, 612 A.2d 1130 (internal quotation marks and citation omitted)." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 222-23 (2d Cir. 2023) "Like those of many other jurisdictions, Connecticut courts have parsed the unconscionability inquiry into procedural and substantive prongs. See Restatement (Second) of Conts. § 208 (Am. L. Inst. 1981) (collecting cases by jurisdiction). A successful unconscionability defense " 'generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on

the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " *Bender*, 292 Conn. At 732, 975 A.2d 636 (quoting *Hottle v. BDO Seidman, LLP,* 268 Conn. 694, 719, 846 A.2d 862 (2004)).

Procedural unconscionability relates to the "process by which the allegedly offensive terms found their way into the agreement." *Cheshire*, 223 Conn. at 87 n.14, 612 A.2d 1130 (internal quotation marks and citation omitted). It applies when there was "an absence of meaningful choice" by one of the parties. *Bender*, 292 Conn. at 732, 975 A.2d 636 (internal quotation marks omitted). Substantive unconscionability, by contrast, relates to "the content of the contract," Cheshire, 223 Conn. at 87 n.14, 612 A.2d 1130 (internal quotation marks and citation omitted), and applies when contract terms are "unreasonably favorable" to one party, Bender, 292 Conn. at 732, 975 A.2d 636 (internal quotation marks omitted). In short, the doctrine of procedural unconscionability is "intended to prevent unfair surprise," and the doctrine of substantive unconscionability is "intended to prevent oppression." Smith, 247 Conn. at 349, 721 A.2d 1187." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 223-24 (2d Cir. 2023)

Tarpon governs. The BSA is a dead end that perfectly functions as it was designed to. The Defendants own BSA requires them to accept and approve of transfers of an Amazon store, and absent that, as confirmed by newly discovered information after the hearing, Defendants will not arbitrate anyway. Moreover, this State has adopted, in *Hanks v. Powder Ridge* 276 Conn. 314 (Conn. 2005) 885 A.2d 734 2005 Conn. LEXIS 500, the factors set forth in California per *Tunkl v. Regents of the University of California*, 60 Cal.2d 92, 101, 383 P.2d 441, 32 Cal.Rptr. 33 (1963). The Instant Matter requires an evaluation, "...relevant to this determination [whether]: "[1] [The agreement] concerns a business of a

type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in per forming a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bar gaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." Id., 98-101. The court clarified that an exculpatory agreement may affect the public interest adversely even if some of the Tunkl factors are not satisfied. Id., 101." *Hanks v. Powder Ridge*, 276 Conn. 314, 328 (Conn. 2005)

As to the First *Tunkl* Factor per the Verified Complaint, retail commerce, banking, money transmitting, trade secrets protection and trademark infringement are highly regulated and thought suitable for that regulation – all of which Defendants purport to do as the world's largest online retailer. As to the Second *Tunkl* Factor, the Defendants seek exculpation from having to determine this dispute in this Court, a dispute concerning retail commerce, banking, money transmitting, trade secrets protection and trademark infringement. The Third Factor is also established because the Defendants hold themselves out as willing to enlist or allow any entity to become a third party seller. The

Fourth Factor is also satisfied because the Defendants are the gatekeeper of the largest online retail market for third party sellers in the world that simultaneously operate a larger logistics infrastructure than the United States Postal Service, hence their decisive bargaining advantage. The BSA itself satisfies the Fifth Factor, "“a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence” *Hanks v. Powder Ridge, supra.* The Sixth Factor, and the most compelling one clearly demonstrated beyond a reasonable doubt and not merely beyond the preponderance of the evidence, is that "“the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents” Id. This is especially true with 90 percent of the Plaintiffs' revenue locked up and a fee schedule that can radically change untethered to any metric in reality on a whim. The Defendants wield commercially god-like powers to decide who may continue on and whether or not a third party seller will make payroll on a given week, regardless of the quality of that seller's products and despite full compliance with the BSA's terms.

Clause 16 of the BSA reads as follow:

> 16. Modification. We may amend any of the terms and conditions contained in this Agreement (including the Service Terms and Program Policies) at any time and at our sole discretion. Any changes will be effective upon the posting of such changes on Seller Central or on the Amazon Site, and you are responsible for reviewing these locations and informing yourself of all applicable changes or notices. All notice of changes to the Agreement will be posted for at least 30 days. Changes to Program Policies may be made without notice to you. You should refer regularly to Seller Central to understand the current Agreement and Program Policies and to be sure that the items you offer for sale can be sold via the Service. your continued use of a service after amazon's posting of any changes will constitute your acceptance of such changes or modifications. if you do not agree to any changes to this agreement, you must terminate this agreement as provided above.

This is a classic example of an agreement where one party takes all the benefits and control while the other party gets nothing and a classic definition of an adhesion contract that is unfair, and over reaching because one party, Amazon, is exercising its superior power over the other vulnerable party, the Plaintiffs.

F. Defendants' Direct Benefits Estoppel Argument Fails

Defendants allege that Plaintiffs benefited directly from the BSA by operating their Amazon Selling account fails because the Defendants cited the wrong case, *Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 613 (2d Cir. 2020). In *Nicosia*, the Plaintiff was a buyer, not a seller, and the buyer did have some notice of the relevant agreement and most importantly, the Defendants here actually benefited more form the Plaintiffs seller account since as much as 90% of the Plaintiffs sales revenues went to Amazon for sales commissions, inventory space and management charges, shipping fees, fulfillment by Amazon fees, etc. Here, the Defendants have sadly and mistakenly misused the doctrine of Direct benefits estoppel against the Plaintiff because all the facts and roles of the parties are obviously distinguished from the Nicosia case cited.

G. Continued Use and Assent Does not Apply in this Case

Defendants are aware, despite their assertion of application, that *Nicosia* will not apply here. Frist, that summary order states:

> "RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL." *Nicosia v. Amazon.com*, 21-2624-cv, (2d Cir. Jan. 19, 2023)

The Second Circuit further states:

> "This case was previously before us in Nicosia v. Amazon.com, Inc., 834 F.3d 220, 226 (2d Cir. 2016) (Nicosia I), when we vacated the dismissal of Nicosia's claims on a motion to dismiss and remanded the case for further proceedings. The case returned to this Court in Nicosia v. Amazon.com, Inc, 815 Fed.Appx. 612, 613-14 (2d Cir. 2020) (summary order) (Nicosia II), when we affirmed the district court's judgment compelling arbitration and dismissing the case based on a finding that Nicosia agreed to Amazon's then-effective Conditions of Use ("CoU"), which bound him to arbitrate his claims. Following Nicosia II, Nicosia commenced an arbitral proceeding against Amazon before the American Arbitration Association. He elected to proceed solely on the threshold issue of whether the then-operative CoU was void to the extent it applied to illegal sales of products containing sibutramine." Nicosia v. Amazon.com, 21-2624-cv, 2 (2d Cir. Jan. 19, 2023)

As to Nicosia I, the underlying matter, Nicosia is an Amazon customer. On both January 30 and April 19, 2013, he used the Amazon website to purchase 1 Day Diet (One Day Diet) Best Slimming Capsule 60 Pills ("1 Day Diet "), a weight loss drug containing sibutramine. Sibutramine is a Schedule IV stimulant that was withdrawn from the market in October 2010 by the Food and Drug Administration (the "FDA") because its association with cardiovascular risks and strokes outweighed its limited weight loss value. Prior to the FDA's removal of sibutramine from the market, it was only available to consumers with a doctor's prescription. After its removal, the FDA advised physicians to stop prescribing sibutramine and to advise patients to cease its consumption due to its risks, including "major adverse cardiovascular events." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 226 (2d Cir. 2016) Even if it were binding precedent, the fact pattern and claims are so radically dissimilar that they warrant no good faith consideration of any kind.

H. <u>The Forum Selection Clause is Unenforceable</u>

The Forum Selection Clause is not enforceable for the reasons already stated in addition to those here. Defendants previously cited to *Melwani v. Amazon.com*, 20-cv-

09739 (AJN), 3 (S.D.N.Y. Sep. 27, 2021), which, in fact, supports Plaintiffs' position, not Defendants ("Under Second Circuit law, courts apply a four-part framework to determine the validity and enforceability of a forum selection clause." Ward, 2020 WL 2832771, at *3. Courts are to consider: (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive . . . and (3) whether the claims and parties involved in the suit are subject to the forum selection clause. If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable. A party can overcome this presumption only by (4) making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." Id)

In the instant case, the forum selection clause was not reasonably communicated to the Plaintiffs, the party resisting enforcement as there was no communication at all between the Plaintiffs and the Defendants until the Plaintiffs present legal action against the Defendants. The forum selection clause was purposely, most likely in bad faith, and deeply embedded under the definition section of the BSA. Such important clause should have had its own heading and be published conspicuously. In the instant case, the forum selection clause does not appear to be mandatory. In the instant case, the claims and parties involved in the suit are NOT subject to the forum selection clause because they involve Intellectual property infringement claims, anti-trust violations and specific Connecticut Trade secret law violations.

The forum selection clause does NOT cover the claims and parties involved in the dispute. Lastly in this instant case, enforcing the forum selection clause would be most

unreasonable, unjust as Plaintiffs have to travel 3000 miles to Washington State. Defendants have not even established any personal jurisdiction over Plaintiffs, and Defendants' convenience in their home state of Washington should not be more important than Justice for the Plaintiffs to litigate in their own home state under the long arm statute which the Defendants have NOT challenged. Furthermore, Defendants committed fraudulent conducts and enforcing the forum selection clause would be unreasonable and unjust to the Plaintiffs and even to the common conscious mind. Under the totality of the circumstances, given Defendants conduct and the alleged wrongful actions, and the applicable laws on Intellectual property, anti-trust laws, Connecticut Unfair Trade Practice act, and the remedies being sought by the Plaintiffs, enforcing the forum selection clause is overreaching in every possible way. Lastly, the Defendants also embedded the choice of law clause within the definition section of the BSA, which together makes the forum selection clause even more potent and prejudicial to the Plaintiffs as a Washington court applying Washington laws would most likely favor the Washington State defendants regarding Plaintiffs claims that the Defendants violated several Connecticut and Federal statutes. Ruling the BSA's Forum Selection Clause is binding, which coupled with the hidden Choice of law clause will likely, gravely and prejudicially affect the outcome of all the Plaintiffs claims in favor of the Defendants.

**III. Conclusion**

Accordingly, it should be *Held* by the Court:

A. Both the arbitration clause and forum selection clause are unenforceable due to lack of consent. Defendants have provided absolutely zero evidence that the Plaintiffs consented to the BSA when the seller accounts were created, nor did the

Defendants provide evidence that the subsequent various updated versions of the BSA were continuously consented by the Plaintiffs as required by the Clickwrap application.

B. Plaintiffs did not have adequate notice to provide true informed consent to the arbitration clause and the forum selection clause. The Arbitration clause was placed inconspicuously under clause 18, titled miscellaneous item, while both of the governing laws and forum selection clauses were placed in the very end under the definition section. Such placements were done with deceit, in bad faith, and a bullying attitude, intended to show the Amazon muscles that Amazon can "define" what the rules and laws are. Such dishonesty, arrogance and disrespect of the laws of this land should not and must not be rewarded by granting Amazon's motion to compel arbitration and transfer venue. Rewarding Amazon under these circumstances and realities would be very bad public policy and further tilt the balance of power towards the already powerful and justice will never prevail.

C. The extreme adhesion nature of the entire BSA makes it unenforceable. The evidence has established that the alleged binding BSA is a unilateral, take it or leave it contract that micromanages every aspect of the Plaintiffs' business while unilaterally hijacking control of 90% of their cash flow in addition to their intellectual property. The BSA then denies them the remedy on the grounds that the Defendants purport to never have approved the transfer of stores operated by Plaintiffs to them – and Plaintiff Ligeri has subsequently confirmed that Defendants will not even arbitrate with entities to whom they never approved account transfers for. This of course hasn't stopped the Defendants from happily accepting Plaintiffs'

hard earned sales revenues  from their Marks, but also those sales  revenues Defendants have unjustly acquired by diluting Plaintiffs' Marks . This is further aggravated by the theft of Plaintiffs' data and trade secrets, which Defendants use to directly complete against Plaintiffs. Further, the retaliatory account shut downs Plaintiff Ligeri's testimony illustrated to be in the offing actually and in fact occurred – a measure that was taken not as a consequence of any violation of the BSA, but as a measure of reminding the Plaintiffs just how much commercially god-like power Defendants wield to decide, arbitrarily, which businesses will live and which ones will die for lack of payroll. Once one is in the Amazon system, the Defendants' BSA, if enforced, obstructs meaningful remedy of any kind, and indeed, it looks Plaintiffs and those similarly situated into the same flywheel from whence there is no escape or return. Defendants use the BSA to exert total dominion and control over all profits, inventory, revenue and trademarks such that Plaintiffs cannot merely pick up and go somewhere else. Indeed, the BSA and arbitration motion practice put the Plaintiffs' future and corporate existence on life support, indefinitely, while their direct competitors – including the Defendants who directly use Plaintiffs' marks, trade secrets and converted funds – continue to capture their lost sales, sales that would have otherwise gone to the Plaintiffs.

D. Defendants offer no admissible evidence that satisfies the Computerized Business Exception to the Hearsay Rule. By extension, they cannot authenticate their computerized business records.  After seven months of waiting, all the Defendants offer are certain information systems in place with obvious defects which allow sellers to skip the BSA entirely and easily and Defendants offer absolutely no proof

that their systems are working effectively to secure any true informed consent by the sellers.

E. The Plaintiffs have satisfied all the *Tunkl* factors in demonstrating the BSA to be an adhesion contract, which in tandem with the decision in *Tarpo*n, requires this Court to deny enforceability. The BSA also, admittedly on its face, excludes the Trademark Infringement claims alleged by everyone. The BSA, on its face, also denies arbitration to entities not approved by the Defendants to operate as third party sellers. Information discovered subsequently verifies that Defendants will refuse arbitration anyway. The trademark infringement that has been on the record still remains entitled to the presumption of irreparable harm per 15 USC §1116(a). No arbitrator remains able to impound any offending counterfeit products, nor can any relief be had through arbitration or while Defendants continue to tie the Court's hands with dilatory motion practice. Indeed, the Defendants have placed the Declaration of Natalia Parker before this Honorable Court as a false statement designed to impede, delay and frustrate this case. That Declaration falsely asserted Mr. Ligeri to have checked all the boxes to execute the Clickwrap for accounts he never created or was aware of the existence of at the time they were created. The forum selection clause fares no better for the same reasons clearly demonstrated on the Record.

Accordingly, Amazon's motion to compel arbitration and venue transfer should be denied.

FOR THE PLAINTIFFS,
CENTRAL CONCEPTS, INC
TRADEMARK HOLDINGS, LLC
GLOBAL SPECIALITY PRODUCTS, LLC
MEDCARE, LLC

By:/s/ Paulus Chan
Paulus H. Chan, Esq.
157 Forest Hill Road,
North Haven CT 06473
Tel: (860) 250-9536
Fax: (860) 631-1111
Email: phc_ssg@yahoo.com

Dated this 10th day of May 2024 at
New Haven, Connecticut

CERTIFICATE OF SERVICE

I, Paulus Chan, certify that a copy of the foregoing was transmitted to Counsel for the Defendants below on or before this May 10, 2024 via PACER's ECF filings system.
/s/ Paulus Chan

Paulus Chan

John M. Magliery
Davis Wright Tremaine LLP - NY
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
212-489-8320
Fax: 212-489-8340
Email: johnmagliery@dwt.com