**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

BENJAMIN LIGERI
CENTRAL CONCEPTS, INC
TRADEMARK HOLDINGS, LLC
GLOBAL SPECIALTY PRODUCTS, LLC
MEDCARE, LLC,

Plaintiffs,

- against -

AMAZON.COM, INC
AMAZON, LLC
AMAZON SERVICES, LLC
AMAZON MEXICO SERVICES, INC
AMAZON BUSINESS PAYMENTS, INC
AMAZON PAYMENTS, INC
AMAZON CAPITAL SERVICES, INC,

Defendants.

Case No. 3:23-cv-00603-JAM

# DEFENDANT AMAZON'S POST-TRIAL BRIEF IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT, OR IN THE ALTERNATIVE TO TRANSFER VENUE

DAVIS WRIGHT TREMAINE LLP
John M. Magliery
Adam Sgro (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
Ph: (212) 489-8230
johnmagliery@dwt.com
adamsgro@dwt.com

*Attorneys for Defendants Amazon.com, Inc., Amazon.com Services LLC, Amazon Mexico Services, Inc., Amazon Payments, Inc., and Amazon Capital Services, Inc.*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ... 1

THE FACTUAL RECORD AMAZON ESTABLISHED AT TRIAL ... 3

A. Sellers Must Accept the Business Solutions Agreement to Create an Amazon Selling Account. ... 3

B. Each Version of the Business Solutions Agreement Amazon Introduced at Trial Contains an Arbitration Clause That Requires Arbitration of Plaintiffs' Non-IP Claims, and a Washington Forum Selection Clause for Plaintiffs' IP Claims. ... 4

C. Amazon Provides Sellers With Notice of the BSA and Its Policies on Seller Central. ... 6

D. Plaintiffs Owned, Operated, and Benefitted From Amazon Selling Accounts That Consented to the BSA During Registration. ... 7

E. Plaintiffs Were Aware of the BSA During Their Operation of Their Amazon Selling Accounts. ... 10

F. Plaintiff Ligeri Is Not a Credible Witness Because He Testified That He Lied to Amazon When It Was to His Benefit. ... 13

ARGUMENT ... 14

I. Washington Law Governs This Dispute ... 14

II. Plaintiffs Are Bound by the BSA. ... 15

A. Each of the Plaintiffs Is Bound as Successors of the Account Registrant Who Agreed to the BSA. ... 16

B. Plaintiffs Had Notice of the BSA, and Their Continued Operation of Plaintiffs' Selling Accounts Constitutes Acceptance. ... 17

C. Plaintiffs Are Bound by the Arbitration Clause Because They Directly Benefited From the BSA by Operating Their Amazon Selling Accounts. ... 21

D. Ligeri Is Bound by the Arbitration Clause Because His Close Relationship to the Entity Plaintiffs. ... 23

E. The BSA and Its Arbitration Clause Are Enforceable Against Plaintiffs. ... 24

III. Plaintiffs' Claims Must Be Brought in Arbitration Pursuant to the Mandatory Arbitration Clause in the BSA, or in King County, Washington, Courts. ........................ 27

CONCLUSION ........................................................................................................................ 28

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
170 F.3d 349 (2d Cir. 1999)....................22

*Am. States Ins. Co. v. Allstate Ins. Co.*,
922 A.2d 1043 (Conn. 2007)....................15

*Amazon.com, Inc. v. Sumeet Marketing Inc.*,
No. 23-cv-00331-JLR, Dkt. 69 (W.D. Wash. June 16, 2023)....................23

*Antollino v. Morgan Stanley & Co. LLC*,
No. 17-cv-1777 (VLB), 2018 WL 10483434 (D. Conn. May 11, 2018)....................19

*Arthur Anderson LLP v. Carlisle*,
556 U.S. 624 (2009)....................23

*Bezek v. NBC Universal*,
No. 17-cv-1087 (JCH), 2018 WL 2337131 (D. Conn. May 23, 2018),
*aff'd*, 770 F. App'x 599 (2d Cir. 2019)....................15

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)....................27

*Byrne v. Charter Commc'ns, Inc.*,
581 F. Supp. 3d 409 (D. Conn. 2022)....................16

*D'Antuono v. Serv. Rd. Corp.*,
789 F. Supp. 2d 308 (D. Conn. 2011)....................27

*Detroit Tigers, Inc. v. Ignite Sports Media, LLC*,
203 F. Supp. 2d 789 (E.D. Mich. 2002)....................15

*Doe v. Project Fair Bid Inc.*,
No. C11-809 MJP, 2011 WL 3516073 (W.D. Wash. Aug. 11, 2011)....................16

*E. Udolf, Inc. v. Aetna Cas. & Sur. Co.*,
573 A.2d 1211 (Conn. 1990)....................18

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,
485 F.3d 450 (9th Cir. 2007)....................23

*Homesite Ins. Co. v. Brezniak*,
581 F. Supp. 3d 424 (D. Conn. 2022)....................24, 25

*Int'l Chartering Servs., Inc. v. Eagle Bulk Shipping Inc.*,
138 F. Supp. 3d 629 (S.D.N.Y. 2015)....................22

*Larobina v. Altice Media Sols., LLC*,
No. FSTCV216054451S, 2022 WL 17959251 (Conn. Super. Ct. Dec. 22, 2022)....................25

*Magi XXI, Inc. v. Stato della Citta del Vaticano*,
714 F.3d 714 (2d Cir. 2013)....................23

*Nicosia v. Amazon.com, Inc.*,
815 F. App'x 612 (2d Cir. 2020)....................19, 21

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016)....................17, 19

*Peters v. Amazon Servs., LLC*,
2 F. Supp. 3d 1165 (W.D. Wash. 2013), *aff'd*, 669 F. App'x 487 (9th Cir. 2016)....................16

*Ragone v. Atl. Video at Manhattan Ctr.*,
595 F.3d 115 (2d Cir. 2010)....................27

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)....................17

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010)....................26, 27

*Rockstone Cap., LLC v. Caldwell*,
261 A.3d 1171 (Conn. App. 2021), *cert. denied*, 339 Conn. 914 (2021)....................19, 26

*Romney v. Franciscan Med. Grp.*,
349 P.3d 32 (Wash. 2015)....................25

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)....................19

*Shenzen Shileziyou Tech. Co. Ltd. v. Amazon.com, Inc.*,
No. 21-cv-7083-MMC, 2021 WL 5848062 (N.D. Cal. Dec. 9, 2021)....................16

*Tate v. Bernardi*,
No. NNICV186015203S, 2020 WL 6781491 (Conn. Super. Ct. Oct. 28, 2020)....................25

*Tourangeau v. Uniroyal, Inc.*,
138 F. Supp. 2d 259 (D. Conn. 2001)....................17

*TradeComet.com LLC v. Google, Inc.*,
647 F.3d 472 (2d Cir. 2011)....................26

*Ullman, Perlmutter & Sklaver v. Byers*,
900 A.2d 602 (Conn. App. 2006) ....................17

*Unicorn Glob., Inc. v. Golabs, Inc.*,
No. 20-cv-20323-N, 2021 WL 4712715 (N.D. Tex. July 27, 2021) ....................16

*Zuver v. Airtouch Commc'ns, Inc.*,
103 P.3d 753 (Wash. 2004) ....................27

**STATUTES**

9 U.S.C.
§ 3 ....................1
§ 4 ....................1

28 U.S.C. § 1404 ....................1

Wash. Rev. Code § 62A.1–202(a)(1) ....................17

**TREATISES**

Black's Law Dictionary 1446 (7th ed.1999) ....................17

In response to the Court's April 10, 2023, Order Re Post-Hearing Briefing Schedule (Dkt. No. 69) ("Order"), Defendants Amazon.com, Inc.; Amazon.com Services LLC; Amazon Mexico Services, Inc.; Amazon Payments, Inc.; and Amazon Capital Services, Inc. (collectively, "Amazon")[1] submit this post-trial brief in support of its motion for an order compelling Plaintiffs Benjamin Ligeri ("Ligeri"), Central Concepts, Inc. ("Central Concepts"), Trademark Holdings, LLC ("Trademark Holdings"), Global Specialty Products, LLC ("Global Specialty Products"), and Medcare, LLC ("Medcare") (collectively, "Plaintiffs") to arbitrate pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3, 4, or, in the alternative, to transfer venue to the Western District of Washington pursuant to 28 U.S.C. § 1404 based on the parties' choice of forum. *See* Dkt. 24.

**PRELIMINARY STATEMENT**

The evidence at the hearing proved that Plaintiffs are bound by the Amazon Services Business Solutions Agreement ("BSA"), and their dispute with Amazon regarding their operation of selling accounts in the Amazon.com store ("Amazon Store") belongs in arbitration. Amazon's evidence showed that Plaintiffs are bound by the BSA because:

(i) They are the successors of the original selling account owners. Each of the Entity Plaintiffs,[2] including Ligeri personally, owned and operated four separate Amazon selling accounts that Plaintiffs purchased from family members and friends of Ligeri. Each of those selling accounts accepted the BSA during registration process, which contains a mandatory arbitration provision.

---

[1] No entity named "Amazon, LLC," or "Amazon Business Payments, Inc.," exists. Amazon.com Services LLC answers for Amazon Services, LLC, which does not exist.

[2] The "Entity Plaintiffs" are Central Concepts, Inc.; Trademark Holdings, LLC; Global Specialty Products, LLC; and Medcare, LLC.

(ii) Plaintiffs are further bound by the BSA because they had actual and constructive notice of its existence. Ligeri operated as an Amazon seller for over 14 years, and as early as 2013 he was aware that as a seller, he had an agreement with Amazon. Moreover, Plaintiffs and Amazon exchanged over 70 emails explicitly referencing the BSA, including in emails sent from Ligeri himself and one of Plaintiffs' executives that acknowledged the BSA as the Parties' operative contract. Ligeri further admitted that he was aware that Amazon made available its agreements and policies on Seller Central and that he could find relevant information on that site when he did look for it, had he actually wanted to do so.

(iii) Ligeri admitted to operating two new selling accounts during the pendency of this lawsuit with full knowledge that the BSA applies to sellers, manifesting his consent to its terms.

(iv) Plaintiffs received the benefits of selling millions of dollars of goods in the Amazon Store under the BSA, repeatedly accepted payments from Amazon under the BSA, and are therefore bound by the obligations of the BSA as well.

(v) Even if Ligeri did not personally consent to the BSA (he did), his close relationship to the Entity Plaintiffs who did consent to the BSA as the sole owner and principal means he can be required to arbitrate under the BSA.

The BSA's mandatory arbitration provision is subject to only narrow exceptions. The only relevant carve out here allows sellers to maintain certain intellectual property claims in the Western District of Washington (not the District of Connecticut) to enjoin infringement. Plaintiffs' intellectual property claims, however, seek both monetary and injunctive relief. As a

result, all Plaintiffs' claims belong in arbitration unless Plaintiffs are willing to split their intellectual property claims into two separate forums.

## THE FACTUAL RECORD AMAZON ESTABLISHED AT TRIAL

### A. Sellers Must Accept the Business Solutions Agreement to Create an Amazon Selling Account.

Amazon's employee who manages Amazon's worldwide seller registration process, Orkun Ozbatur, confirmed at the hearing that to create an Amazon Selling Account, registrants must go through an account registration process. April 8-9, 2024 Hearing Transcript ("Trans."), 13:2-14; 14:13-25. During the registration process, sellers provide to Amazon information about themselves, such as the legal name of the individual and/or the company that is registering the account. *Id.*, 21:3-22:21; 27:5-28:17. The information that Amazon has collected during registration to verify its sellers has increased over the years to make it more robust, given the critical importance of Amazon knowing the identity of its sellers. *Id.* 27:5-28:17; 28:19-29:15; 29:17-30:15.

Sellers who registered from 2019 to the present confirmed their agreement with Amazon's BSA by clicking a box that states "Agree and Continue" below the statement "By clicking on 'Agree and continue,' you agree to the Amazon Services Business Solutions Agreement.…" *Id.* 16:12-18:3; 19:17-25; 23:20-24:18; Amazon Exhibit 3. This agreement page contains a hyperlink to the BSA at the text "Amazon Services Business Solutions Agreement," which is shown in blue. *Id.* 21:3-22:21; 46:9-47:1. Prior to 2019, registrants confirmed their agreement to the BSA by checking a box during the account creation process next to the statement "I have read and accepted the terms and conditions of the Amazon Services Business Solutions Agreement," with the BSA accessible through a hyperlink. *Id.* 24:19-25:20; 26:11-20; 27:20-28:13; Amazon Exhibit 1. Registrants cannot complete the account creation process

without clicking “Agree and Continue” or the box on the pre-2019 page. *Id.* 23:12-18; 28:9-17; 36:7-21. Amazon records the registration date and acceptance of the BSA when its sellers create a selling account. *Id.* 38:3-24; 39:6-19; 60:9-18.

Sellers who are in the United States when registering for a selling account are directed to the seller registration page for the Amazon.com store (as opposed to other Amazon store for other countries, which reside at country-specific domains). The Amazon.com store is the Amazon site for the United States. *Id.* 30:16-31:11; 32:2-7.

### B. Each Version of the Business Solutions Agreement Amazon Introduced at Trial Contains an Arbitration Clause That Requires Arbitration of Plaintiffs' Non-IP Claims, and a Washington Forum Selection Clause for Plaintiffs' IP Claims.

Kevin Pak, Amazon's Senior Content Manager on the Seller Content Team who is responsible for the team that publishes content, such as the BSA, to Seller Central, testified about the versions of the BSA to which Amazon and its sellers have agreed. *Id.* 68:4-24; 69:19-70:7. Amazon keeps records of each version of the BSA that was in effect and stores those records in its content management systems. *Id.* 70:8-20. At trial, Amazon introduced the forty-one versions of the BSA that were in effect from 2014 to the present. Amazon Exhibit 6 (BSA in effect in 2014), 83:15-86:1; Amazon Exhibits 7-16 (BSAs in effect from 2014 to 2017), 77:18-83:10; Amazon Exhibits 17-45 (BSAs in effect from 2017 to 2023) 70:25-77:13.

Each of the BSAs Amazon introduced at trial prohibits the assignment of selling accounts and renders any such assignments a nullity. Nonetheless, the BSA also provides that it is binding on any successors and assigns. *Id.*, 462:15-463:13; Amazon Exhibit 9 (“You may not assign this Agreement, by operation of law or otherwise, without our prior written consent. Subject to that restriction, this Agreement will be binding on, inure to, and be enforceable against the parties and their respective successors and assigns”).

Each version of the BSA has a mandatory arbitration clause in requiring the parties' disputes to be "resolved by binding arbitration." *Id.* The only exception to arbitration in the BSA that is applicable to this case is that either party "may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights." *Id.*, ¶ 18. The different versions of the BSA define "intellectual property rights" as "any patent, copyright, Trademark, domain name, moral right, trade secret right, or any other intellectual property right arising under any Laws and all ancillary and related rights, including all rights of registration and renewal and causes of action for violation, misappropriation or infringement of any of the foregoing."[3]

A claim that falls into this IP exception and that is filed in court must be filed in the "Governing Courts," which each BSA defines as "the state or Federal court in King County, Washington." *Id.* Each of the BSAs is governed by the "Governing Laws," which are "the laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States)." *Id.*

Plaintiffs' Complaint asserts the following claims, all of which are subject to mandatory arbitration under the BSA, at least in part: (i) trademark infringement; (ii) negligence; (iii) recklessness and gross negligence; (iv) declaratory judgment that the terms of service are a voidable adhesion contract; (v) violation of the Connecticut Unfair Trade Practices Act; (vi) negligent misrepresentation; (vii) fraud and civil theft; (viii) tortious interference with

[3] "Trademark" is defined as "any trademark, service mark, trade dress (including any proprietary "look and feel"), trade name, other proprietary logo or insignia, or any other source or business identifier, protected or protectable under any Laws."

business expectancies; (ix) conversion; (x) violation of the Sherman Act (antitrust); (xi) breach of fiduciary duty; (xii) unjust enrichment; and (xiii) theft of trade secrets. Dkt 1 at ¶¶ 92-172.

The carve out to the BSA's arbitration clause only applies to claims "to enjoin infringement or other misuse of intellectual property rights." Plaintiffs seek injunctive relief in only their First and Tenth through Thirteenth Claims. Three of those claims, violation of the Sherman Act, breach of fiduciary duty, and unjust enrichment, are not based on Amazon's misuse or infringement of such intellectual property rights. The remaining two claims for trademark infringement and theft of trade secrets assert claims for monetary relief and injunctive relief, only the latter of which falls into the arbitration carve out.

### C. Amazon Provides Sellers With Notice of the BSA and Its Policies on Seller Central.

Seller Central (Sellercentral.amazon.com) is the portal where sellers interact with their selling account and where Amazon posts news, articles, and policies that are important for sellers, such as the BSA. *Id.* 68:14-24; 86:5-16; 86:20-88:24; Amazon Exhibit 48. Sellers can easily access the operative version of the BSA on Seller Central by searching for the agreement in the search bar and through links that Amazon makes available in relevant news articles. *Id.* 89:4-25; Amazon Exhibit 62; 92:1-93:1; Amazon Exhibit 74. Amazon notified sellers of the changes to the BSA in ten articles posted to the Seller Central homepage from 2020 to the present, each of which also contained a link to the BSA. *Id.* 97:7-98:11; 98:22-102:7; 102:18-104:5; Amazon Exhibits 50-61. Amazon further notified sellers of the BSA and updates to that agreement through news articles posted to the Seller Central homepage which reference policy updates that impacted the BSA. *Id.* 94:17-95:6; 95:7-97:5; Amazon Exhibits 48-49.

Sellers can also access through Seller Central Amazon's seller code of conduct policies and FAQ pages should they seek out additional information about Amazon's seller policies,

including whether Amazon permits the transferer of selling accounts. *Id.* 104:10-106:22, Amazon Exhibits 66-67 (2022-2024 Seller Codes of Conduct); 107:16-112:12, Amazon Exhibits 63-65 (Amazon's 2021-2024 FAQs on the transfer of selling accounts). Amazon's Seller Code of Conduct prohibits sellers from "Allowing other people to act on your behalf in a way that violates Amazon's policies or your agreement with Amazon;" and Amazon's FAQ on the transfer of selling accounts informs sellers that they may not transfer their selling accounts to new owners. *Id.*

### D. Plaintiffs Owned, Operated, and Benefitted From Amazon Selling Accounts That Consented to the BSA During Registration.

Testimony at trial from Plaintiff Ligeri and Eric Smith, a Manager of Risk managers at Amazon, demonstrated that Plaintiff's Selling Accounts[4] were operated both by Ligeri personally and by each of the Entity Plaintiffs. Plaintiff Ligeri is the majority shareholder of each of the Entity Plaintiffs and operates each one as a "hands-on manager." Trans., 232:21-25; 233:17-18.

Ligeri acquired each of Plaintiffs' Selling Accounts by purchasing them from individuals close to him, such as his family members or employees. *Id.*, 235:10-18; 254:3-258:25. Amazon has no records of consenting to the transfer of these accounts by the registrant to new owners and prohibits such transfers. *Id*., 163:13-164:2. Ligeri even testified to the "security throttles" that Amazon placed on the selling accounts he purchased to prevent the unauthorized use and access to these accounts, which he was able to bypass with varying degrees of success after repeated attempts. 260:10-261:7. Ligeri testified that he purchased older selling accounts because they are more valuable as they are able to obtain disbursement of funds faster, and they have less "security throttles" than new accounts. *Id.*, 375:13-376:9. Despite centering his business on the

[4] The "Plaintiff's Selling Accounts" operated under the merchant names Twin Horses, Health and Household, Medcare Industries, and Vanguard.

purchase of existing Amazon selling accounts, Ligeri did no due diligence to determine whether Amazon allowed the transfer of such accounts to new owners. *Id.*, 302:20-303:3.

In December 2014, Ligeri personally purchased Jasmine's Gifts LLC, its selling account (which Ligeri operated under the name Health and Household), and its inventory from Jasmine Alcantara. *Id.* 243:7-14; 251:8-11; Plaintiffs Exhibit 5. That selling account was opened on March 11, 2014, and as discussed above, agreed to the BSA during the account registration process. *Id.* 145:13-146:4; Amazon Exhibit 68. Jasmine Alcantra was an employee of a company, Yagoozon, for which Ligeri served as CEO. Ligeri admitted that he was involved in the operation of the account while it was owned by Ms. Alcantra. 326:11-327-3; 354:16-355:5. Ligeri personally operated the Health and Household account from at least 2015 to 2017 until he purported to transfer or license that account to Plaintiff Central Concepts, an entity that he owns and has sole control of. *Id.* 253:17-254:8; 324:16-20; 343:19-22; 345:1-346:7. The primary user on the Health and Household selling account is Ligeri, and the current Tax Verified Legal Name of the owner in Amazon's records is Central Concepts. *Id.*, 147:4-148:7; 148:8-25; Amazon Exhibit 68. Ligeri's name was also on several of the payment instruments used by the account during its operation. *Id.* 150:15-22; 153:9-24; 153:25-154:17; 154:19-155:19; Amazon Exhibit 69.

Plaintiff Ligeri, acting through Plaintiff Medcare as its sole employee and officer, purchased from his cousin Stephen Mignacca the Medcare Industries selling account and its inventory in April 2021. *Id.*, 248:1-8; 340:6-18; 341:1-16; Plaintiffs Exhibit 3. The Medcare Industries selling account was created on December 8, 2019, and it agreed to the BSA during the account creation process set forth above. *Id.* 145:13-146:4; Amazon Exhibit 68. The primary user on the Medcare Industries selling account is Medcare, the current Tax Verified Legal Name of

the owner in Amazon's records is Medcare, and the most recent payment accounts associated with the selling account are owned by Medcare. *Id.*, 147:4-148:7; 148:8-25; 156:12-19: 70; Amazon Exhibit 68, Amazon Exhibit 70.

Plaintiff Ligeri testified that the Vanguard selling account was created by his father, Joseph Ligeri, and that Plaintiff Global Specialty Products purchased it from Joseph in 2020. *Id.*, 356:5-357:13; 360:2-16. Ligeri is the sole owner of that company. 360:11-16. Notably, Plaintiffs did not introduce any purchase and sale agreement for this selling account. At the time the account was created, Ligeri used the same residential address as his father. *Id.*, 357:10-25; 359:1-360:1. The Vanguard selling account was registered in June 2017 and, as such, agreed to the BSA during account creation. *Id.* 145:13-146:4; Amazon Exhibit 68. Central Concepts (which Ligeri owns) was the original owner of Global Specialty Products until it sold the company to Ligeri. *Id.*, 360:11-361:1. Ligeri's testimony revealed that Global Specialty Products was an alter ego of Central Concepts and that the business of Central Concepts was transferred to Global Specialty Products once the Health and Household account was blocked, including all of its employees, inventory, email systems, and its licensing deals for use of Ligeri's trademarks. *Id.*, 362:13-364:10; 365:24-367-6; 368:17-369:14; 369:21-371:15; 372:3-373:10; Amazon Exhibits 77-80; Plaintiffs Exhibit 12. The primary user on the Vanguard selling account is Global Specialty Products, the current Tax Verified Legal Name of the owner in Amazon's records is Global Specialty Products, and the most recent payment accounts associated with the selling account are owned by Global Specialty Products. *Id.*, 147:4-148:7; 148:8-25; 159:25-160:4; Amazon Exhibit 68; Amazon Exhibit 72.

In January 2023, Ligeri personally purchased the Twin Horses selling account and all of its inventory from his cousin, Timothy Mingacca, and licensed the use of that account to Plaintiff

Trademark Holdings. *Id.* 334:6-20; 335:8-24; 334:17-335:3; Plaintiffs Exhibit 2. Plaintiff Ligeri is the sole owner of Trademark Holdings, LLC, and it has no employees. *Id.* 339:7-12. The Twin Horses selling account was opened on January 30, 2014, and, as discussed above, agreed to the BSA during the account registration process. *Id.* 145:13-146:4; Amazon Exhibit 68. The primary user on the Twin Horses selling account is Ligeri, the current Tax Verified Legal Name of the owner in Amazon's records is Trademark Holdings, and the most recent payment accounts associated with the selling account are owned by Trademark Holdings. *Id.*, 147:4-148:7;148:8-25; 158:13-24; Amazon Exhibit 68; Amazon Exhibit 71.

Each of the Entity Plaintiffs and Ligeri owned, operated, and did business through the Plaintiffs' Amazon Selling Accounts, and Plaintiffs benefited to the tune of millions of dollars a year in sales from these accounts. *Id.*, 160:6-162:22; 419:6-10; 437:7-12; 464:5-12; Amazon Exhibit 75. Critically, Ligeri does not dispute that the registrant of each of Plaintiffs' Selling Accounts accepted the BSA during the account creation process. *Id.*, 388:19-389:22. Moreover, Ligeri admitted that the purchaser of a business is bound by the contracts of that business as a successor. *Id.*, 235:10-18; 354:5-15.

**E. Plaintiffs Were Aware of the BSA During Their Operation of Their Amazon Selling Accounts.**

Plaintiff Ligeri was undoubtedly aware of the BSA through operation as an Amazon seller for over a 14-year period. *Id.* 232:16-20; 324:11-15. Ligeri was the CEO and minority owner of Yagoozon, which operated a selling account in the Amazon Store prior to 2013. *Id.*, 326:11-327-3. During a deposition in another litigation, Ligeri acknowledged that the company had agreements with Amazon, characterizing the relationship of Yagoozon as a seller who used Amazon's Fulfillment by Amazon services as follows: "We have several agreements with them. We've signed off on but probably never read in full…. We are certainly a form of affiliate in

partner [sic] with them." *Id.* 328:12-330:19; Amazon Exhibit 76. Ligeri further admitted he was aware there was a "general contractual relationship" between Amazon and Plaintiffs. *Id.*, 348:9-350. Thus, as early as 2013, Ligeri knew Amazon sellers have an agreement with Amazon, even if he had never bothered to read the agreement.

Amazon introduced at trial approximately 70 emails between Plaintiffs' Selling Accounts and Amazon that explicitly referenced the BSA. *Id.*, 164:20-13; 166:12-24; 169:9-170:1; Amazon Exhibit 73. Amazon sent these emails to the primary email address associated with Plaintiffs' Selling Accounts, and the emails were also accessible to Plaintiffs in Seller Central. *Id.*, 148:1-22; 164:4-19; 170:6-10. For example, Amazon sent emails to (i) the Vanguard Selling Account in December 2021 that referenced the BSA and its insurance requirements (*Id.*, 171:9-172:5); (ii) the Twin Horses Selling Account in April 2022 that referenced the BSA and its insurance requirements (*Id*., 178:21-179:18); (iii) the Health and Household Selling Account in February 2019 that referenced the BSA in reference to a reimbursement issue (*Id*., 179:19-180:21); and (iv) the Medcare Industries Selling Account in December 2021 that referenced the BSA in reference to the removal of products from Amazon's warehouses at the direction of the selling account (*Id*., 183:12-184:18). *Id.*, Amazon Exhibit 73.

Plaintiffs not only saw the emails from Amazon referencing the BSA but, in fact, responded to them. *Id*. 172:6-173:19; 173:20-176:11 (November 2017 and November 2020 emails from Vanguard to Amazon in response to Amazon emails referencing the BSA). Astonishingly, given Ligeri's denial of knowledge of the BSA, at least two of the emails from Plaintiffs explicitly referenced the BSA in their responses. An October 12, 2020, email from the Twin Horses selling account from "Ben Joseph CEO, Medical Collaborative" states that one of their listings was "deactivated on September 23, 2020, in accordance with Amazon Services

Business Solutions Agreement….” *Id.*, 176:16-178:19; Amazon Exhibit 73. Another communication from the Health and Household selling account dated February 14, 2023, stated "I am writing to request the reinstatement of my seller account Health and Household, which was deactivated in accordance with section 3 of Amazon's Business Solutions Agreement." *Id.* 397:17-399:14; Amazon Exhibit 73. Ligeri stated that this email appeared to have been sent by the Chief Technology Officer of Central Concepts with his authorization. *Id.* 398:23-399:15; Amazon Exhibit 73. The email further pledges that Plaintiffs would "Regularly review Amazon's policies and guidelines to ensure our account remains in compliance." Amazon Exhibit 73. Clearly, executives at the highest levels of the Entity Plaintiffs, including Ligeri himself, were aware of the BSA.

Ligeri's testimony was replete with admissions that he knew Amazon made its policies and agreements available in Seller Central and that he knew how to access those documents if he cared to find them. Ligeri admitted that when he bought the Medcare Industries and Twin Horses Selling Accounts, he knew that Amazon had policies on its Seller Central website where he could review them. *Id.*, 337:2-17; 342:2-25. When Ligeri sought out information on Seller Central, such as Fulfilled by Amazon fee tables or information relevant to an appeal, he was able to locate that information with ease. *Id.*, 379:5-380:25; 421:9-23. Ligeri also admitted that he was aware Amazon made changes to its policies and procedures over time but never looked to see where those changes came from, namely updates the to the BSA. *Id.*, 394:13-396:14.

Ligeri admitted that he simply didn't care to look for his agreement with Amazon in Seller Central, stating, "You look for things on Amazon when you need them. When you need to confirm something, you look," and that he "never searched for an arbitration clause on the help section" because he "was never interested in looking for one of those, to be cavalier about it."

450:10-451:3; 456:8-15. Ligeri's claims that he was unaware of the BSA simply because it had a confusing name and that he only read the first few lines of emails from Amazon simply are not credible and, even if they were, are an insufficient excuse. *Id*., 279:15-280:19; 393:21-394:12.

Plaintiff Ligeri's consent to the BSA is evident from his ownership and operation of two additional selling accounts during this litigation, with full knowledge of the BSA and its arbitration clause. Ligeri acquired the Tiberias selling account in March of 2022 through probate of his father's estate and was active at the time of his testimony. *Id*., 404:12-406:7; 435:8-18. Ligeri has owned and operated the Melbourne selling account since 2023, and it was actively doing business with Amazon during the pendency of this lawsuit. *Id*., 406:9-408:15; 435:8-18; Amazon Exhibit 81. By its terms, the BSA applies to the signatory and its "Affiliates," which is defined as "with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity." *Id.*, Amazon Exhibit 74.

### F. Plaintiff Ligeri Is Not a Credible Witness Because He Testified That He Lied to Amazon When It Was to His Benefit.

The Court should not credit Ligeri's testimony that he was unaware of the BSA. Not only is there substantial evidence that he knew of the BSA, even if he never read it, Ligeri admitted that it was common practice to make misrepresentations to Amazon to get his accounts reinstated, and that he had no qualms about lying to Amazon when it was to his benefit. Ligeri's words speak for themselves:

> Q: You're saying he was actually making misrepresentations to Amazon to reinstate the account?
>
> A. It's a very common practice when you're dealing with robots to make -- you say whatever it is those robots might need to hear to do the right thing at the end of the day. Since we've never done anything unethical in the history of operations with Amazon.
>
> Q. Except lying to Amazon to get your account reinstated?

> A. … Whatever it is he comes up with to try to win this appeal is fair game and it's completely legitimate even if it is a lie. It's an honest tactic.
>
> Q. So anything goes once you're trying to get your account reinstated?
>
> A. Absolutely 100 percent.
>
> Q. And you can make material misstatements to Amazon, you can tell them things that aren't true?
>
> A. If going through the proper channels doesn't work and the robot just keeps saying sorry, we need more, we need more, you're going to keep saying things to trigger their soundbites to potentially act properly, yes. …
>
> Q. Is the manner in which you just described, how you would say anything to make an appeal, consistent with how you think, in general, it's appropriate to treat your relationship with Amazon?
>
> A. Yes.

399:24-402:11.

## ARGUMENT

### I. Washington Law Governs This Dispute

Washington law applies to this dispute. The BSA is governed by Washington law. Amazon Exhibits 6-45. Plaintiffs do not dispute that they had an agreement with Amazon or that they operated their businesses in the Amazon Store. *See* Transcript of August 16, 2023 Hearing, 38:20-24 ("THE COURT: Are you denying that Amazon uses the BSA as the agreement that governs third-party sellers on the website? MR. CHAN: No. No, we're not denying that. We're denying the assertion that plaintiff has seen it, read it, and consented to it."); 41:2-5 ("And the only thing that plaintiff is claiming is he's not bound by the arbitration and the change of venue because he was never shown, he never had a chance to consent to it.").

Even if the BSA's choice of law provision does not apply, under Connecticut law, the Court should look to the state with the "most significant relationship" to the contract. *Am. States Ins. Co. v. Allstate Ins. Co.*, 922 A.2d 1043, 1047 (Conn. 2007) (adopting the test of the Second

Restatement, Conflict of Laws); *Bezek v. NBC Universal*, No. 17-cv-1087 (JCH), 2018 WL 2337131, at *9 (D. Conn. May 23, 2018), *aff'd*, 770 F. App'x 599 (2d Cir. 2019) (applying the factors in the Restatement). Under Section 196 of the Second Restatement, when dealing with a contract for services, the Court should apply "the local law of the state where the contract requires that the services, or a major portion of the services, be rendered." Amazon's principal place of business is in Washington, and Plaintiffs claims all target Amazon's practices with respect to the Amazon Store and Seller Central. As a result, the services at issue were primarily rendered in Washington. The only connection to Connecticut is that the Plaintiff Ligeri resides there. *See* Complaint at ¶ 1.[5] Thus, Washington law should apply. *See Detroit Tigers, Inc. v. Ignite Sports Media, LLC,* 203 F. Supp. 2d 789, 795 (E.D. Mich. 2002) (finding Illinois law controlled a dispute over unsigned contract involving the hosting of a website, as that was the location of defendant, and where defendant was to perform the hosting services).

## II. Plaintiffs Are Bound by the BSA.

Plaintiffs are bound by the BSA, including the arbitration provision, because (i) they are the successors in interest to the original account owners who agreed to the BSA during account creation; (ii) Plaintiffs had actual or constructive (inquiry) knowledge of the BSA, and their continued operation of their Selling Accounts constitutes assent to its terms; and (iii) even if they did not directly agree to the BSA, they are bound because they received direct benefits of that agreement. Should the Court find that either Ligeri or the Entity Plaintiffs are not personally parties to the BSA, each should be deemed to be bound by it due to the close relationship between and among them, which constitutes a well-recognized ground to require even a non-

[5] Notably, none of the Plaintiff Entities are Connecticut entities, and there is no information in the record as to their principal offices. Complaint at ¶ 1.

signatory to an arbitration agreement to arbitrate a claim. Ligeri has failed to establish even an iota of a prima facie case that the BSA and its arbitration provision is unenforceable on any grounds.

### A. Each of the Plaintiffs Is Bound as Successors of the Account Registrant Who Agreed to the BSA.

The uncontested evidence Amazon adduced at trial demonstrated that persons who register Amazon selling accounts are required to consent to the BSA during the account creation process by checking a box or clicking a button manifesting their agreement to its terms. Trans. 16:12-18:3; 19:17-25; 21:3-22:21; 23:12-25:20; 26:11-20; 27:20-28:17; 36:7-21; 46:9-47:1; Amazon Exhibit 1; Amazon Exhibit 3. Plaintiffs do not dispute that such agreements are enforceable or that the original account holders assented to the BSA. *Id.*, 388:19-389:22. Nor can they, as courts have routinely held that this type of clickwrap agreement is enforceable. *See, e.g.*, *Doe v. Project Fair Bid Inc.*, No. C11-809 MJP, 2011 WL 3516073, at *4 (W.D. Wash. Aug. 11, 2011); *Byrne v. Charter Commc'ns, Inc.*, 581 F. Supp. 3d 409, 417 (D. Conn. 2022); *Shenzen Shileziyou Tech. Co. Ltd. v. Amazon.com, Inc.*, No. 21-cv-7083-MMC, 2021 WL 5848062, at *2-3 (N.D. Cal. Dec. 9, 2021); *Peters v. Amazon Servs., LLC*, 2 F. Supp. 3d 1165, 1173 (W.D. Wash. 2013), *aff'd*, 669 F. App'x 487 (9th Cir. 2016); *Unicorn Glob., Inc. v. Golabs, Inc.*, No. 20-cv-20323-N, 2021 WL 4712715, at *2 (N.D. Tex. July 27, 2021).

Although the BSA restricts a selling account owner from assigning the agreement without Amazon's consent, it nevertheless provides that it is binding on and enforceable against any successors and assigns. *Id.*, 462:15-463:13; Amazon Exhibit 9. "A successor is a person who succeeds to the rights, responsibilities, or place of another, or replaces or follows another. With regard to corporations, a successor is one 'that, through amalgamation, consolidation or other assumption of interests, is vested with the rights and duties of an earlier corporation.'"

*Tourangeau v. Uniroyal, Inc.*, 138 F. Supp. 2d 259, 265–66 (D. Conn. 2001) (citing Black's Law Dictionary 1446 (7th ed.1999)).

By Ligeri's own testimony, he does not dispute that the purchaser of a business is bound by the contracts of that business as a successor. *Id*., 235:10-18; 354:5-15. Plaintiffs introduced evidence and testimony showing that each of the Entity Plaintiffs, and Ligeri personally in his own name, acquired Plaintiffs' Selling Accounts from the prior owners and the business associated with those accounts. *Id.*, 235:10-18; 254:3-258:25; Plaintiffs' Exhibits 2, 3, 5. In fact, Plaintiffs base their entire case on this assertion, because had they registered their own selling accounts as Amazon requires, they would have had to have consented to the BSA. As successors to the original selling account holders due to their acquisition of those accounts, Plaintiffs are bound under the terms of the BSA, whether or not Ligeri did any due diligence to discover the agreements each account owner made with Amazon when creating the accounts. To hold otherwise would allow Plaintiffs to game the system and consciously avoid all their obligations under the BSA.

### B. Plaintiffs Had Notice of the BSA, and Their Continued Operation of Plaintiffs' Selling Accounts Constitutes Acceptance.

Plaintiffs are bound by the BSA and its arbitration provision because the evidence shows that Ligeri had actual notice of the BSA during his operation of the accounts. One who has actual notice of an offeror's terms of service and continues to utilize the service with knowledge of those terms are bound by them. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401 (2d Cir. 2004); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) ("***Nicosia I***") ("Under Washington law, a person has notice of a fact if she '[h]as actual knowledge of it.' Wash. Rev. Code § 62A.1–202(a)(1)"). *Ullman, Perlmutter & Sklaver v. Byers*, 900 A.2d 602, 605 (Conn.

App. 2006) (parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated) (alterations and quotations omitted).

Further, Ligeri's knowledge of the BSA, as the owner and principal of each of the Entity Plaintiffs, can be imputed to those entities. Trans., 232:21-25; 233:17-18; *E. Udolf, Inc. v. Aetna Cas. & Sur. Co.*, 748, 573 A.2d 1211, 1214 (Conn. 1990) ("The knowledge of individual officers and employees at a certain level of responsibility will be deemed the knowledge of the corporation") (citations and quotations omitted).

Ligeri knew of the existence of the agreement Amazon has with its sellers, even if he did not know the name of the agreement, as early as 2013 when he was deposed in a case as the CEO and minority owner of Yagoozon, an entity which operated a selling account in the Amazon Store. Id. 232:16-20; 324:11-15; 326:11-327-3. Ligeri testified that "We have several agreements with them [Amazon]. We've signed off on but probably never read in full.… We are certainly a form of affiliate in partner [sic] with them [Amazon]." *Id.* 328:12-330:19; Amazon Exhibit 76. Ligeri further admitted that there was a "general contractual relationship" between Amazon and Plaintiffs. *Id*., 348:9-350.

Plaintiffs were explicitly aware of the BSA through their communications with Amazon. Amazon introduced at trial approximately 70 emails between Plaintiffs' Selling Accounts and Amazon that explicitly referenced the BSA. *Id.*, 164:20-13; 166:12-24; 169:9-170:1; Amazon Exhibit 73. Plaintiffs responded to Amazon's emails referencing the BSA and, in fact, explicitly referenced the BSA in two communications they sent to Amazon, one of which was sent by "Ben Joseph CEO," and another that was purportedly sent by Central Concepts' Chief Technology Officer. 172:6-173:19; 173:20-176:11; 176:16-178:19; 397:17-399:14; Amazon Exhibit 73.

Plaintiffs' actual notice of the BSA is sufficient to bind them to the BSA regardless of their claim that they were unaware of the arbitration provision contained in that agreement. In *Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 613-14 (2d Cir. 2020) ("***Nicosia II***"), the Second Circuit held that an Amazon customer "was bound by the arbitration agreement based on ordinary principles of notice and assent," *even if not specifically made aware of the arbitration provision*, because of the customer's continued interaction with Amazon after notice of the existence of the contract. *See also Rockstone Cap., LLC v. Caldwell*, 261 A.3d 1171, 1179 (Conn. App. 2021), *cert. denied*, 339 Conn. 914 (2021) (the "negligent failure to read and understand an agreement" is insufficient for escape contractual obligations).

Inquiry notice exists where a reasonable person in the position of the Plaintiffs would have known about BSA's arbitration provision and the conduct required to assent to it. *Antollino v. Morgan Stanley & Co. LLC*, No. 17-cv-1777 (VLB), 2018 WL 10483434, at *3 (D. Conn. May 11, 2018); *see Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124 (2d Cir. 2012) ("What constitutes sufficient inquiry notice of a term not actually read by the offeree depends on various factors including, but not limited to, the conspicuousness of the term, the course of dealing between the parties, and industry practices."); *Nicosia I*, 834 F.3d at 233 ("Where there is no actual notice of contract terms, 'an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent."') (citations and quotations omitted).

Amazon makes the BSA, its Seller Code of Conduct and related FAQs available on Seller Central, the portal that all Amazon sellers use to manage their accounts. This content is accessible through the search function on each Seller Central page and through links that Amazon makes available in relevant news articles. Trans. 68:14-24; 86:5-16; 86:20-88:24;

Amazon Exhibit 48; 89:4-25; Amazon Exhibit 62; 92:1-93:1; Amazon Exhibit 74; 104:10-106:22, Amazon Exhibits 66-67 (2022-2024 Seller Codes of Conduct); 107:16-112:12, Amazon Exhibits 63-65 (Amazon's 2021-2024 FAQs on the transfer of selling accounts). Amazon further notified sellers of the changes to the BSA in ten articles posted to the Seller Central homepage from 2020 to the present, each of which also contained a link to the BSA. *Id.* 97:7-98:11; 98:22-102:7; 102:18-104:5; Amazon Exhibits 50-61.

Given Ligeri's admitted knowledge he had some agreement with Amazon, if he was unaware of that agreement's terms it is purely through his own negligence or willful avoidance. Ligeri testified that he was aware that Amazon's various policies and agreements are available in Seller Central, and that he knew how to find relevant documents when looking for them. *Id.*, 337:2-17; 342:2-25. In fact, Ligeri testified that he *did* find various policies and information in Seller Central when he actually looked, such as with Fulfilled by Amazon fee tables or information relevant to an appeal of an Amazon decision about his selling account. *Id.*, 379:5-380:25; 421:9-23. Nonetheless, Ligeri admitted he simply did not look for Amazon's agreement that applied to selling accounts as he was "never interested" in doing so. *Id.*, 302:20-303:3; 394:13-396:14; 450:10-451:3; 456:8-15. Ligeri's claim that the name of the BSA was "confusing" – which was not credible – is irrelevant because he never looked for it, and because it fails to satisfy the reasonable person standard for inquiry notice. *Id.*, 279:15-280:19; 393:21-394:12; 456:11-15 (Ligeri: "Because it has the name Amazon Solutions Business, it seems like a deal between Raytheon and NASA, it doesn't seem like a real agreement between sellers and Amazon, by name. It's kind of hidden in the name is what it really is."). Thus, Plaintiffs were clearly on inquiry notice of the BSA.

Ligeri's continued operation of two additional Amazon selling accounts during the pendency of this case with full knowledge of the BSA and its arbitration clause constitutes acceptance of that agreement. The Second Circuit held in *Nicosia II* that a customer's continued use of Amazon's services after receiving notice of the arbitration clause in that proceeding constituted assent to that clause. *Nicosia II*, 815 F. App'x 613-14. Here, Ligeri continued to utilize Amazon's services pursuant to the BSA through his operation of the Melbourne and Tiberias selling accounts after Amazon put him on notice of the arbitration provision in the BSA by filings its motion to compel arbitration in this case in July 2023. Dkt. 24; Trans., 404:12-408:15; 435:8-18; Amazon Exhibit 81. For two reasons, this continued use after admitted knowledge of the arbitration provision constitutes agreement with the BSA. First, under general agency principles, closely-related entities may be bound by an arbitration provision. Ligeri is the agent of himself and each of the Entity Plaintiffs, which are all closely held companies. The close relationship is discussed *infra* at II.D. Second, by its term, the BSA makes clear on the very first page that it applies to the person or business agreeing to its terms and its "Affiliates," which are defined as "with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity." Amazon Exhibit 74. The Entity Plaintiffs and the entities that own the Tiberias and Melbourne selling accounts are all wholly-owned by Ligeri. Thus, under *Nicosia II*, Plaintiffs are bound by the BSA.

### C. Plaintiffs Are Bound by the Arbitration Clause Because They Directly Benefited From the BSA by Operating Their Amazon Selling Accounts.

It is clear Plaintiffs are parties to the BSA as successors to the original account owners and through their knowledge of the BSA and continued operation of Plaintiffs' Selling Accounts. But even if Plaintiffs did not directly assent to the BSA, they are required to arbitrate their claims as non-parties because they openly admit that they have directly benefited from the BSA through

the use of Plaintiffs' Amazon Selling Accounts in accruing millions of dollars of sales to customers. Trans., 160:6-162:22; 419:6-10; 437:7-12; 464:5-12; Amazon Exhibit 75.

"A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). Under the "doctrine of direct benefit estoppel, 'a non-signatory who claims entitlement to payment based on the contractual obligations of a signatory is seeking a benefit under the contract.'" *Int'l Chartering Servs., Inc. v. Eagle Bulk Shipping Inc.*, 138 F. Supp. 3d 629, 636–37 (S.D.N.Y. 2015) (citations omitted). Direct benefits estoppel allows a party to an arbitration agreement to invoke arbitration against a non-party to the agreement where the non-party has directly benefited from the terms of the agreement in a manner that would make it unfair for the non-party to be able to enjoy the fruits of the agreement without sharing in its obligation to engage in arbitration of disputes.

Plaintiffs clearly benefited from the operation of their selling accounts. Plaintiff Ligeri admitted in his testimony that both he and Amazon mutually benefited from his operation of Plaintiffs' Selling Accounts. 437:7-23. For example, Plaintiffs made millions in sales to customers through these accounts, and Amazon makes payments to sellers pursuant to the terms of the BSA. Trans. 160:6-163-9, Amazon Exhibit 75; *see, e.g.*, Amazon Exhibit 42 at S-5 ("we will remit to you your available balance on a bi-weekly (14 day) (or at our option, more frequent) basis)…." The BSA has its own section, titled "Selling on Amazon Service Terms" that is dedicated to how Amazon sellers can participate in this service. Amazon Exhibit 42 at 11 ("The Selling on Amazon Service ('Selling on Amazon') is a Service that allows you to offer certain products and services directly on the Amazon Sites."). Plaintiff Ligeri further testified that he used Amazon's Fulfilled by Amazon ("FBA") services in connection with Plaintiffs' Selling

Accounts, which is a service that Amazon provides to sellers under the terms of the BSA. Trans. 332:15-333:6; 419:11-421-25; Amazon Exhibit 74 at 27-28. While Plaintiffs' Complaint is artfully pled in an attempt to avoid invoking a direct claim under the BSA, it is inconceivable that their claims regarding Amazon's obligations to Plaintiffs are not directly tied to that agreement. Thus, Plaintiffs are bound by the arbitration clause in the BSA and are estopped from cherry-picking the provisions of the BSA they wish to apply to them.

### D. Ligeri Is Bound by the Arbitration Clause Because His Close Relationship to the Entity Plaintiffs.

Ligeri is individually bound by the BSA because he personally owned and operated several of the selling accounts at issue in the past. Trans. *Id.* 243:7-14; 251:8-11; 324:16-20; 343:19-22; 345:1-346:7; Plaintiffs Exhibit 5 (Health and Household Selling Account); 334:6-20; 335:8-24; 334:17-335:3; Plaintiffs Exhibit 2 (Twin Horses Selling Account).

Even if Ligeri individually did not consent to the BSA, traditional contract principles hold that he can still be subject to arbitration under various traditional principles of contract and agency law. See, *e.g.*, *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (finding that a non-party to an arbitration agreement can have that agreement enforced by or against them using traditional contract principles such as assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel).

Where a non-signatory party is closely related to the signatory of the contract with the arbitration clause, the non-signatory can be required to arbitrate. *See Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (enforcing a forum selection clause against a non-signatory to a contract when the non-signatory is closely related to the signatory); *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007); *Amazon.com, Inc. v. Sumeet Marketing Inc.*, No. 23-cv-00331-JLR, Dkt. 69 at *8 (W.D. Wash. June 16, 2023)

(finding the principals who signed the BSA on behalf of the companies they controlled are bound by the BSA as closely related parties).

Ligeri undoubtedly has a close relationship with the Entity Plaintiffs and thus is bound by the BSA. Ligeri is the sole owner of each of the Entity Plaintiffs and operates each one as a "hands-on manager" and is the primary user on two of the selling accounts. Trans., 232:21-25; 233:17-18; 339:7-12 (Trademark Holdings); 341:1-16 (Medcare); 345:1-346:7 (Central Concepts); 360:11-16 (Global Specialty Products); Amazon Exhibit 68. Ligeri operates the businesses interchangeably, transferring their inventory, assets, and operations between himself and the Entity Plaintiffs when it is advantageous to do so such that their operations are indistinguishable. *Id.*, 253:17-254:8, 324:16-20; 343:19-22, 345:1-346:7 (Ligeri transferred the Health and Household account from himself to Central Concepts); 362:13-364:10; 365:24-367-6; 368:17-369:14; 369:21-371:15; 372:3-373:10; Amazon Exhibits 77-80; Plaintiffs Exhibit 12 (Ligeri transferred the business of Central Concepts to Global Specialty Products); 334:6-20; 335:8-24; 334:17-335:3; Plaintiffs Exhibit 2 (Ligeri licensed the use of the Twin Horses selling account to Trademark Holdings); Complaint at ¶¶ 1, 4, 5, 13. Moreover, Ligeri and the Entity Plaintiffs' claims in the Complaint are completely indistinguishable. Thus, Amazon demonstrated at trial that Ligeri's intimate relationship with the Plaintiffs' Selling Accounts and the Entity Plaintiffs is sufficient to hold him to the BSA.

**E. The BSA and Its Arbitration Clause Are Enforceable Against Plaintiffs.**

Plaintiffs have not and cannot show that the arbitration and forum selection provision in the BSA is illegal and unenforceable. Plaintiffs have not met their heavy burden of showing that the BSA is both procedurally and substantively unconscionable. *Homesite Ins. Co. v. Brezniak*, 581 F. Supp. 3d 424, 433 (D. Conn. 2022) ("Under Connecticut law, the party that raises unconscionability as a defense to the enforcement of any contract typically has the burden of

showing that the contract is both procedurally and substantively unconscionable") (citations and quotations omitted). Procedural unconscionability "focuses on the process by which the allegedly offensive terms found their way into the agreement" and is "intended to prevent unfair surprise." *Id.* (citations omitted). "Substantive unconscionability focuses on the 'content of the contract,'" and "is intended to prevent oppression" by terms that are "so one-sided as to shock the conscience" or allocate risks or costs in a way that "is overly harsh or one-sided and is not justified by the circumstances in which the contract was made." *Id.*[6]

Plaintiffs have made no argument and at trial submitted no evidence that the BSA was procedurally unconscionable. In fact, Ligeri admitted that Amazon exerted no pressure on him to enter into the BSA or become an Amazon seller. Trans., 403:8-404:9. Ligeri also admitted that he was not forced to sell products in the Amazon Store and that there were other ways for him to sell products to the public, including by selling in the Walmart online store. *Id.*, 374:13-375-12. Even if the BSA is a contract of adhesion, a contract of adhesion is not enforceable under either Washington or Connecticut law. *See, e.g., Homesite Ins. Co.*, 581 F. Supp. at 434 ("the exclusion is not unenforceable simply because of the adhesive nature of the Policy and the unequal standing of the parties"); *Romney*, 186 Wash. App. at 737 ("An adhesion contract is not necessarily procedurally unconscionable."); *Tate v. Bernardi*, No. NNICV186015203S, 2020 WL 6781491, at *5 (Conn. Super. Ct. Oct. 28, 2020) ("An adhesion contract is not automatically unenforceable, in order to be unenforceable, the contract must also be unduly oppressive or unconscionable"); *Larobina v. Altice Media Sols., LLC*, No. FSTCV216054451S, 2022 WL 17959251, at *4 (Conn. Super. Ct. Dec. 22, 2022) ("That an agreement properly might be

---

[6] On procedural and substantive unconscionability, Washington law is substantially consistent with Connecticut law. *See Romney v. Franciscan Med. Grp.*, 349 P.3d 32, 36 (Wash. App. 2015).

characterized as a contract of adhesion – such as an insurance policy/contract – does not necessarily equate to unconscionability.”). Plaintiffs’ claims that they never agreed to the BSA during account creation forecloses any argument that the BSA is procedurally unconscionable. *See Rockstone Cap., LLC*, 261 A.3d at 1179 (“our court has limited determinations of procedural unconscionability to cases where bargaining or contractual improprieties were committed by the plaintiff”). Amazon is not bound by the actions or representations of the individuals who sold Plaintiffs their selling accounts. *Id.* (“Where the claim of unconscionability is directed at the actions and representations of third parties, rather than the plaintiff, we have required that an agency relationship exist between the plaintiff and the third party.”). *Id*. at 1179-80.

Plaintiffs cannot identify any substantively unconscionable element of the BSA either. It is undisputable that both arbitration clauses and forum selection clauses can be enforceable and, thus, are not substantively unconscionable, and Ligeri admitted as such. Trans., 373:11-374:2; *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (“The FAA thereby places arbitration agreements on an equal footing with other contracts … and requires courts to enforce them according to their terms.”); *TradeComet.com LLC v. Google, Inc*., 647 F.3d 472, 475 (2d Cir. 2011) (“forum selection clauses ‘are prima facie valid’”) (citations and quotations omitted). While Ligeri identified certain provisions he believed were unconscionable involving withholdings, insurance, and taxes, none of those relate to the arbitration clause. *Id*., 415:8-416:8; 416:9-417:17; 417:18-418:1. It is telling that Ligeri claims the BSA is unconscionable, but with full knowledge of its terms he consciously chose to operate two new selling accounts pursuant to that very agreement. *Id*., 404:12-408:15; 435:8-18; Amazon Exhibit 81.

Even if some part of the BSA was substantively unconscionable, all versions of the BSA contain the following severability clause in Paragraph 18: “If any provision of this Agreement is

deemed unlawful, void, or for any reason unenforceable, then that provision will be deemed severable from these terms and conditions and will not affect the validity and enforceability of any remaining provisions." Amazon Exhibit 74. Therefore, the Court may strike any unconscionable provisions and preserve the arbitration provision. *Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 768 (Wash. 2004) ("[W]hen parties have agreed to a severability clause in an arbitration agreement, courts often strike the offending unconscionable provisions to preserve the contract's essential term of arbitration."); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract"); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. at 70–71 ("a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate"); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125 (2d Cir. 2010); *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 327 (D. Conn. 2011).

## III. Plaintiffs' Claims Must Be Brought in Arbitration Pursuant to the Mandatory Arbitration Clause in the BSA, or in King County, Washington, Courts.

The testimony and evidence introduced at trial affirmed the unmistakable conclusion that all the claims Plaintiffs have asserted in this case belong in arbitration, except for Plaintiffs' limited claims for injunctive relief pertaining to their intellectual property claims.

The dispute resolution provision in each version of the BSA Amazon introduced at trial contains a mandatory arbitration clause: "Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than in court…." *See* Amazon Exhibits 6-45, 74 at Paragraph 18. This arbitration clause is subject to only a few narrow exceptions, only one of which is applicable here, which reads "you or we may

bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights." Thus, only Plaintiffs' claims to *enjoin intellectual property infringement* are appropriate for resolution by a court.

The intellectual property infringement exception to the arbitration clause requires that Plaintiffs assert those claims in the "Governing Courts," which are the "state or Federal court in King County, Washington." Because this Court is not one of the Governing Courts, any of Plaintiffs claims that are not sent to arbitration must be transferred to the District Court for the Western District of Washington.

The carve out to the BSA's arbitration clause only applies to claims "to enjoin infringement or other misuse of intellectual property rights." *See* Amazon Exhibits 6-45, 74 at Paragraph 18. As discussed in Amazon's pre-trial brief (Dkt. 60), only Plaintiffs' trademark infringement claim (Count 1) and theft of trade secrets (Count 13) claim seek injunctive relief and fall within the BSA's definition of "intellectual property."[7] Because these two claims seek monetary and injunctive relief, the monetary aspect of these claims must still go to arbitration.

## **CONCLUSION**

The individuals who registered each of the Plaintiffs Selling Accounts agreed to the BSA and its terms—including the arbitration agreement—when they registered those accounts with Amazon. Plaintiffs are bound to the BSA as owners of the accounts and as successors to any person from whom they claim to have purchased the accounts. By operating selling accounts for

[7] The BSA defines "intellectual property rights" as "any patent, copyright, Trademark, domain name, moral right, trade secret right, or any other intellectual property right arising under any Laws and all ancillary and related rights, including all rights of registration and renewal and causes of action for violation, misappropriation or infringement of any of the foregoing."

over a ten-year period and by his own admissions, Ligeri was unmistakenly aware that sellers in the Amazon Store have an agreement with Amazon. Plaintiffs had both actual and inquiry notice of the BSA through their communications with Amazon and the BSA's consistent availability in Seller Central. As such, Plaintiffs are bound by the BSA and its arbitration provision. All of Plaintiffs' claims fall within the binding arbitration provision. Only Plaintiffs' claims for injunctive relief for alleged trademark infringement and misappropriation of trade secrets, should they seek to split these claims between court and arbitration, fall outside its scope. Nonetheless, these claims belong in the Western District of Washington under the forum selection clause in the BSA.

Dated: New York, New York
May 10, 2024

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: *__/s/ John M. Magliery_______*
John M. Magliery (CT29798)
johnmagliery@dwt.com
Adam Sgro (*pro hac vice)*
adamsgro@dwt.com
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
Ph: (212) 489-8230

*Attorneys for Defendants Amazon.com, Inc., Amazon.com Services LLC, Amazon Mexico Services, Inc., Amazon Payments, Inc., and Amazon Capital Services, Inc.*