**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

BENJAMIN LIGERI
CENTRAL CONCEPTS, INC
TRADEMARK HOLDINGS, LLC
GLOBAL SPECIALTY PRODUCTS, LLC
MEDCARE, LLC,

Plaintiffs,

- against -

AMAZON.COM, INC
AMAZON, LLC
AMAZON SERVICES, LLC
AMAZON MEXICO SERVICES, INC
AMAZON BUSINESS PAYMENTS, INC
AMAZON PAYMENTS, INC
AMAZON CAPITAL SERVICES, INC,

Defendants.

Case No. 3:23-cv-00603-JAM

**DEFENDANT AMAZON'S [PROPOSED]**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

DAVIS WRIGHT TREMAINE LLP
John M. Magliery
Adam Sgro (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
Ph: (212) 489-8230
johnmagliery@dwt.com
adamsgro@dwt.com

*Attorneys for Defendants Amazon.com, Inc., Amazon.com Services LLC, Amazon Mexico Services, Inc., Amazon Payments, Inc., and Amazon Capital Services, Inc.*

In response to the Court's April 10, 2023, Order Re Post-Hearing Briefing Schedule (Dkt. No. 69) ("Order"), Defendants Amazon.com, Inc., Amazon.com Services LLC, Amazon Mexico Services, Inc., Amazon Payments, Inc., and Amazon Capital Services, Inc. (collectively, "Amazon")[1] submit these Proposed Findings of Fact and Conclusions of Law after the evidentiary hearing on Amazon's motion for an order compelling Plaintiffs Benjamin Ligeri (individually, "Ligeri"), Central Concepts, Inc. ("Central Concepts"), Trademark Holdings, LLC ("Trademark Holdings"), Global Specialty Products, LLC ("Global Specialty Products"), and Medcare, LLC ("Medcare") (collectively, "Plaintiffs") to arbitrate pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3, 4, or, in the alternative, to transfer venue to the Western District of Washington pursuant to 28 U.S.C. § 1404 based on the parties' choice of forum. *See* Dkt. 24.

# I. FINDINGS OF FACT

## A. Procedural Background

1. Plaintiffs filed the complaint in this action on May 9, 2023. Dkt. 1 ("Complaint").

2. Plaintiffs' Complaint asserts the following claims: (i) trademark infringement; (ii) negligence; (iii) recklessness and gross negligence; (iv) declaratory judgment that the terms of service are a voidable adhesion contract; (v) violation of the Connecticut Unfair Trade Practices Act; (vi) negligent misrepresentation; (vii) fraud and civil theft; (viii) tortious interference with business expectancies; (ix) conversion; (x) violation of the Sherman Act (antitrust); (xi) breach of fiduciary duty; (xii) unjust enrichment; and (xiii) theft of trade secrets. Dkt 1 at ¶¶ 92-172. Plaintiffs seek injunctive relief in only their First, and Tenth through Thirteenth Claims.

3. Amazon filed a motion to compel Plaintiffs to arbitrate their claims pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3, 4, or, in the alternative, to transfer venue to the Western District of Washington pursuant to 28 U.S.C. § 1404 based on the parties' choice of

[1] No entity named "Amazon, LLC" or "Amazon Business Payments, Inc." exists. Amazon.com Services LLC answers for Amazon Services, LLC, which does not exist.

forum (the "Motion"). *See* Dkt. 24.

4. The Court held oral argument on the motion on August 21, 2023 (Dkt. 43).

5. Pursuant to the Court's February 28, 2024 Order (Dkt. 50), the Court held an evidentiary hearing on the Motion on April 8 and 9, 2024. Dkt. 67-68.

6. Based on that hearing and the parties pre- and post-trial submissions, the Court makes the following findings of fact.

**B. Amazon Sellers' Acceptance of the Business Solutions Agreement When Creating an Amazon Selling Account.**

7. Amazon operates the Amazon.com store (the "Amazon Store"), and allows third parties to register selling accounts with Amazon that they can use to sell products to customers on that website. April 8-9, 2024 Hearing Transcript ("Trans."), 13-9-21.

8. During the registration process, sellers provide to Amazon information about themselves, such as the legal name of the individual and/or the company that is registering the account. *Id.*, 21:3-22:21; 27:5-28:17.

9. The information that Amazon has collected during registration to verify its sellers has increased over the years to make it more robust, as it is important for Amazon to know the identity of its sellers. *Id.* 27:5-28:17; 28:19-29:15; 29:17-30:15.

10. During the account registration process, Amazon requires each selling account to consent to the Amazon Services Business Solutions Agreement ("BSA"), which contains the terms of the relationship between Amazon and sellers. *Id.*, 15:1-4.

11. Sellers who registered selling accounts from 2019 to the present confirmed their agreement with Amazon's BSA by clicking a box that states "Agree and Continue" below the statement "By clicking on 'Agree and continue,' you agree to the Amazon Services Business Solutions Agreement.…" *Id.* 16:12-18:3; 19:17-25; 23:20-24:18; Amazon Exhibit 3. This agreement page contains a hyperlink to the BSA at the text "Amazon Services Business Solutions Agreement," which is shown in blue. *Id.* 21:3-22:21; 46:9-47:1.

12. Sellers who registered prior to 2019 confirmed their agreement to the BSA by

checking a box during the account creation process next to the statement "I have read and accepted the terms and conditions of the Amazon Services Business Solutions Agreement," with the BSA accessible through a hyperlink. *Id.* 24:19-25:20; 26:11-20; 27:20-28:13; Amazon Exhibit 1.

13. Registrants cannot complete the account creation process without clicking "Agree and Continue" or the box on the pre-2019 page. *Id.* 23:12-18; 28:9-17; 36:7-21.

14. Amazon records the registration date and acceptance of the BSA when its sellers create a selling account. *Id.* 38:3-24; 39:6-19; 60:9-18.

15. Sellers who are in the United States when registering for a selling account are directed to the seller registration page for the Amazon.com store (as opposed to other Amazon store for other countries, which reside at country-specific domains). *Id.* 30:16-31:11; 32:2-7.

16. Amazon keeps records of each historical version of the BSA, and stores those records in its content management systems. *Id.* 70:8-20. At trial, Amazon introduced the forty-one versions of the BSA that were in effect from 2014 to the present. Amazon Exhibit 6 (BSA in effect in 2014), 83:15-86:1; Amazon Exhibits 7-16 (BSAs in effect from 2014 to 2017), 77:18-83:10; Amazon Exhibits 17-45 (BSAs in effect from 2017 to 2023) 70:25-77:13.

17. By its terms, the BSA applies to the signatory and its "Affiliates," which is defined as "with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity." *Id.*, Amazon Exhibit 74.

18. Each of the BSAs Amazon introduced at trial prohibits the assignment of selling accounts and renders any such assignments a nullity. Nonetheless, the BSA also provides that it is binding on any successors and assigns. *Id.*, 462:15-463:13; Amazon Exhibit 9 ("You may not assign this Agreement, by operation of law or otherwise, without our prior written consent. Subject to that restriction, this Agreement will be binding on, inure to, and be enforceable against the parties and their respective successors and assigns").

19. Each version of the BSA has a mandatory arbitration clause in requiring the parties' disputes to be "resolved by binding arbitration." *Id.* ("Amazon and you both consent that

any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than in court….”). The only exception to arbitration in the BSA that is applicable to this case is that either party “may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights.” *Id.*, ¶ 18.

20. This carve out to the BSA’s arbitration clause applies only to claims “to enjoin infringement or other misuse of intellectual property rights.”

21. The different versions of the BSA define “intellectual property rights” as “any patent, copyright, Trademark, domain name, moral right, trade secret right, or any other intellectual property right arising under any Laws and all ancillary and related rights, including all rights of registration and renewal and causes of action for violation, misappropriation or infringement of any of the foregoing.”[2]

22. The BSA requires that any claim that falls into the IP exception and that is filed in court must be filed in the “Governing Courts,” which each BSA defines as “the state or Federal court in King County, Washington.” *Id.* Each of the BSAs is governed by the “Governing Laws,” which are “the laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law (if the Elected Country is Canada, Mexico, or the United States).” *Id.*

23. All versions of the BSA contain the following severability clause in Paragraph 18: “If any provision of this Agreement is deemed unlawful, void, or for any reason unenforceable, then that provision will be deemed severable from these terms and conditions and will not affect the validity and enforceability of any remaining provisions.”

[2] The BSA defines “Trademark” as “any trademark, service mark, trade dress (including any proprietary “look and feel”), trade name, other proprietary logo or insignia, or any other source or business identifier, protected or protectable under any Laws.”

24. Seller Central (Sellercentral.amazon.com) is the portal where sellers interact with their selling account, and where Amazon posts news, articles, and policies that are important for sellers, such as the BSA. *Id.* 68:14-24; 86:5-16; 86:20-88:24; Amazon Exhibit 48.

25. Sellers can access the operative version of the BSA on Seller Central by searching for the agreement in the search bar, and through links that Amazon makes available in relevant news articles. *Id.* 89:4-25; Amazon Exhibit 62; 92:1-93:1; Amazon Exhibit 74.

26. Amazon notified sellers of the changes to the BSA in ten articles posted to the Seller Central homepage from 2020 to the present, each of which also contained a link to the BSA. *Id.* 97:7-98:11; 98:22-102:7; 102:18-104:5; Amazon Exhibits 50-61. Amazon further notified sellers of the BSA and updates to that agreement through news articles posted to the Seller Central homepage which reference policy updates that impacted the BSA. *Id.* 94:17-95:6; 95:7-97:5; Amazon Exhibits 48-49.

27. Sellers can also access through Seller Central Amazon's seller code of conduct policies and FAQ pages which contain additional information about Amazon's seller policies, including whether Amazon permits the transferer of selling accounts. *Id.* 104:10-106:22, Amazon Exhibits 66-67 (2022-2024 Seller Codes of Conduct); 107:16-112:12, Amazon Exhibits 63-65 (Amazon's 2021-2024 FAQs on the transfer of selling accounts).

28. Amazon's Seller Code of Conduct prohibits sellers from "Allowing other people to act on your behalf in a way that violates Amazon's policies or your agreement with Amazon," and Amazon's FAQ on the transfer of selling accounts informs sellers that they may not transfer their selling accounts to new owners. *Id.*

### C. Plaintiffs Owned, Operated, and Benefitted From Amazon Selling Accounts That Consented to the BSA During Registration

29. Plaintiff Ligeri is the majority shareholder of each of the Entity Plaintiffs,[3] and operates each one as a "hands-on manager." Trans., 232:21-25; 233:17-18.

30. Plaintiffs are owners and operators of four Amazon selling accounts that operated under the merchant names Twin Horses, Health and Household, Medcare Industries, and Vanguard ("Plaintiff's Selling Accounts").

31. Ligeri acquired each of Plaintiffs' Selling Accounts by purchasing them from individuals close to him, such as his family members or employees. *Id.*, 235:10-18; 254:3-258:25.

32. Amazon has no records of consenting to the transfer of these accounts by the registrant to new owners, and prohibits such transfers. *Id.*, 163:13-164:2.

33. Ligeri testified that he faced certain "security throttles" that Amazon placed on the selling accounts he purchased to prevent the unauthorized use and access to these accounts, which he was able to bypass with varying degrees of success after repeated attempts. 260:10-261:7.

34. Ligeri testified that he purchased older selling accounts because they are more valuable as they are able to obtain disbursement of funds faster, and they have less "security throttles" than new accounts. *Id.*, 375:13-376:9.

35. Despite centering his business on the purchase of existing Amazon selling accounts, Ligeri did no due diligence to determine whether Amazon allowed the transfer of such accounts to new owners. *Id.*, 302:20-303:3.

36. In December 2014, Ligeri personally purchased Jasmine's Gifts LLC, its selling account (which Ligeri operated under the name Health and Household), and the account's inventory from Jasmine Alcantara. *Id.* 243:7-14; 251:8-11; Plaintiffs Exhibit 5.

---

[3] The "Entity Plaintiffs" are Central Concepts, Inc. ("Central Concepts"), Trademark Holdings, LLC ("Trademark Holdings"), Global Specialty Products, LLC ("Global Specialty Products"), and Medcare, LLC ("Medcare").

37. That selling account was opened on March 11, 2014, and as discussed above, agreed to the BSA during the account registration process. *Id.* 145:13-146:4; Amazon Exhibit 68.

38. Jasmine Alcantra was an employee of a company, Yagoozon, for which Ligeri served as CEO. Ligeri was involved in the operation of the account while it was owned by Ms. Alcantra. 326:11-327-3; 354:16-355:5.

39. Ligeri personally operated the Health and Household account from at least 2015 to 2017 until he purported to transfer or license that account to Plaintiff Central Concepts, an entity that he owns and has sole control of. *Id.* 253:17-254:8; 324:16-20; 343:19-22; 345:1-346:7. The primary user on the Health and Household selling account is Ligeri, and the current Tax Verified Legal Name of the owner in Amazon's records is Central Concepts. *Id.*, 147:4-148:7; 148:8-25; Amazon Exhibit 68. Ligeri's name was also on several of the payment instruments used by the account during its operation. *Id.* 150:15-22; 153:9-24; 153:25-154:17; 154:19-155:19; Amazon Exhibit 69.

40. Plaintiff Ligeri, acting through Plaintiff Medcare as its sole employee and officer, purchased from his cousin Stephen Mignacca the Medcare Industries selling account and its inventory in April 2021. *Id.*, 248:1-8; 340:6-18; 341:1-16; Plaintiffs Exhibit 3. The Medcare Industries selling account was created on December 8, 2019, and it agreed to the BSA during the account creation process. *Id.* 145:13-146:4; Amazon Exhibit 68. The primary user on the Medcare Industries selling account is Medcare, the current Tax Verified Legal Name of the owner in Amazon's records is Medcare, and the most recent payment accounts associated with the selling account are owned by Medcare. *Id.*, 147:4-148:7; 148:8-25; 156:12-19: 70; Amazon Exhibit 68, Amazon Exhibit 70.

41. The Vanguard selling account was created by Ligeri's father Joseph Ligeri, and Plaintiff Global Specialty Products purchased it from Joseph in 2020. *Id.*, 356:5-357:13; 360:2-16. Ligeri is the sole owner of that company. *Id.* 360:11-16.

42. Plaintiffs did not introduce at trial any purchase and sale agreement for this selling account. At the time the account was created, Ligeri used the same residential address as

his father. *Id.*, 357:10-25; 359:1-360:1. The Vanguard selling account was registered in June 2017, and agreed to the BSA during account creation. *Id.* 145:13-146:4; Amazon Exhibit 68.

43. Central Concepts (which Ligeri owns) was the original owner of Global Specialty Products until it sold the company to Ligeri. *Id.*, 360:11-361:1. Ligeri transferred the business of Central Concepts to Global Specialty Products once the Health and Household account was blocked, including all of its employees, inventory, email systems, and its licensing deals for use of Ligeri's trademarks. *Id.*, 362:13-364:10; 365:24-367-6; 368:17-369:14; 369:21-371:15; 372:3-373:10; Amazon Exhibits 77-80; Plaintiffs Exhibit 12. The primary user on the Vanguard selling account is Global Specialty Products, the current Tax Verified Legal Name of the owner in Amazon's records is Global Specialty Products, and the most recent payment accounts associated with the selling account are owned by Global Specialty Products. *Id.*, 147:4-148:7; 148:8-25; 159:25-160:4; Amazon Exhibit 68; Amazon Exhibit 72.

44. Given this interrelatedness, Global Specialty Products is an alter ego of Central Concepts.

45. In January 2023, Ligeri personally purchased the Twin Horses selling account and all of its inventory from his cousin, Timothy Mingacca, and licensed the use of that account to Plaintiff Trademark Holdings. *Id.* 334:6-20; 335:8-24; 334:17-335:3; Plaintiffs Exhibit 2. Plaintiff Ligeri is the sole owner of Trademark Holdings, LLC, and it has no employees. *Id.* 339:7-12. The Twin Horses selling account was opened on January 30, 2014, and agreed to the BSA during the account registration process. *Id.* 145:13-146:4; Amazon Exhibit 68. The primary user on the Twin Horses selling account is Ligeri, the current Tax Verified Legal Name of the owner in Amazon's records is Trademark Holdings, and the most recent payment accounts associated with the selling account are owned by Trademark Holdings. *Id.*, 147:4-148:7;148:8-25; 158:13-24; Amazon Exhibit 68; Amazon Exhibit 71.

46. Thus, each of the Entity Plaintiffs and Ligeri owned, operated, and did business through the Plaintiffs' Amazon Selling Accounts, and Plaintiffs benefited from those accounts by

selling products to customers during their operation. *Id.*, 160:6-162:22; 419:6-10; 437:7-12; 464:5-12; Amazon Exhibit 75.

47. Plaintiffs did not dispute that the registrant of each of Plaintiffs' Selling Accounts accepted the BSA during the account creation process. *Id.*, 388:19-389:22. Plaintiffs also conceded that a purchaser of a business is bound by the contracts of that business as a successor. *Id.*, 235:10-18; 354:5-15.

48. Ligeri admitted that Amazon exerted no pressure on him to enter into the BSA. *Id.*, 403:8-404:9. Ligeri also admitted that he was not forced to sell products in the Amazon Store, and that there were other ways for him to sell products to the public, including Global Specialty Products' Walmart storefront. *Id.*, 374:13-375-12.

49. At trial Ligeri identified only the withholdings, insurance, and taxes portions of the BSA as substantively unconscionable. *Id.*, 415:8-416:8; 416:9-417:17; 417:18-418:1.

### D. Plaintiffs Were Aware of the BSA During Their Operation of Their Amazon Selling Accounts.

50. The evidence at trial clearly demonstrated that Plaintiffs were aware of the BSA. Plaintiff Ligeri operated as an Amazon seller for over a 14-year period, including as the CEO and minority owner of Yagoozon, which operated a selling account in the Amazon Store prior to 2013. *Id.* 232:16-20; 324:11-15; 326:11-327-3. During a deposition in another litigation, Ligeri acknowledged that the Yagoozon had agreements with Amazon, characterizing the relationship of Yagoozon as a seller who used Amazon's Fulfillment by Amazon services as follows: "We have several agreements with them. We've signed off on but probably never read in full. … We are certainly a form of affiliate in partner [sic] with them." *Id.* 328:12-330:19; Amazon Exhibit 76.

51. Ligeri further admitted that there was a "general contractual relationship" between Amazon and Plaintiffs. *Id.*, 348:9-350. Thus, as early as 2013, Ligeri knew Amazon sellers have an agreement with Amazon, even if he had not actually read the agreement.

52. Amazon introduced at trial approximately 70 emails between Plaintiffs' Selling Accounts and Amazon that explicitly referenced the BSA. *Id.*, 164:20-13; 166:12-24; 169:9-170:1; Amazon Exhibit 73. Amazon sent these emails to the primary email address associated with Plaintiffs' Selling Accounts, and the emails were also accessible to Plaintiffs in Seller Central. *Id.*, 148:1-22; 164:4-19; 170:6-10.

53. For example, Amazon sent emails to (i) the Vanguard Selling Account in December 2021 that referenced the BSA and its insurance requirements (*Id.*, 171:9-172:5); (ii) the Twin Horses Selling Account in April 2022 that referenced the BSA and its insurance requirements (*Id.*, 178:21-179:18); (iii) the Health and Household Selling Account in February 2019 that referenced the BSA in reference to a reimbursement issue (*Id.*, 179:19-180:21); and (iv) the Medcare Industries Selling Account in December 2021 that referenced the BSA in reference to the removal of products from Amazon's warehouses at the direction of the selling account (*Id.*, 183:12-184:18). *Id.*, Amazon Exhibit 73.

54. Plaintiffs not only saw the emails from Amazon referencing the BSA but, in fact, responded to them. *Id.* 172:6-173:19; 173:20-176:11. At least two of the emails from Plaintiffs explicitly referenced the BSA in their responses. An October 12, 2020 email from the Twin Horses selling account from "Ben Joseph CEO, Medical Collaborative" states that one of their listings was "deactivated on September 23, 2020, in accordance with Amazon Services Business Solutions Agreement…." *Id.*, 176:16-178:19; Amazon Exhibit 73. Another communication from the Health and Household selling account dated February 14, 2023 stated "I am writing to request the reinstatement of my seller account Health and Household, which was deactivated in accordance with section 3 of Amazon's Business Solutions Agreement." *Id.* 397:17-399:14; Amazon Exhibit 73. According to testimony from Plaintiff Ligeri, this email was sent by the Chief Technology Officer of Central Concepts with his authorization. *Id.* 398:23-399:15; Amazon Exhibit 73. The email further pledges that Plaintiffs would "Regularly review Amazon's policies and guidelines to ensure our account remains in compliance." Amazon

Exhibit 73. Therefore, executives at the highest levels of the Entity Plaintiffs, including Ligeri himself, were aware of the BSA.

55. Ligeri's testimony was replete with admissions that he knew Amazon made its policies and agreements available in Seller Central, and that he knew how to access those documents if he cared to find them. Ligeri admitted that when he bought the Medcare Industries and Twin Horses Selling Accounts, he knew that Amazon had policies on its Seller Central website where he could review them. *Id.*, 337:2-17; 342:2-25. When Ligeri sought out information on Seller Central, such as Fulfilled by Amazon fee tables or information relevant to an appeal, he was able to locate that information with ease. *Id.*, 379:5-380:25; 421:9-23. Ligeri also admitted that he was aware Amazon made changes to its policies and procedures over time but never looked to see where those changes came from, namely updates the to the BSA. *Id.*, 394:13-396:14.

56. Ligeri admitted that he never looked for his agreement with Amazon in Seller Central, stating, "You look for things on Amazon when you need them. When you need to confirm something, you look," and that he "never searched for an arbitration clause on the help section" because he "was never interested in looking for one of those, to be cavalier about it." 450:10-451:3; 456:8-15. Ligeri's claims that he was unaware of the BSA simply because it had a confusing name and that he only read the first few lines of emails from Amazon are an insufficient excuse. *Id.*, 279:15-280:19; 393:21-394:12.

57. Plaintiff Ligeri owned and operated of two additional selling accounts during this litigation, with full knowledge of the BSA and its arbitration clause. Ligeri acquired the Tiberias selling account in March of 2022 through probate of his father's estate, and was active at the time of his testimony. *Id.*, 404:12-406:7; 435:8-18. Ligeri owned and operated the Melbourne selling account since 2023, and it was actively doing business with Amazon during the pendency of this lawsuit. *Id.*, 406:9-408:15; 435:8-18; Amazon Exhibit 81.

### E. Plaintiff Ligeri Is Not a Credible Witness Because He Testified That He Lied to Amazon When It Was to His Benefit.

58. The Court does not credit Ligeri's testimony that he was unaware of the BSA. Not only is there substantial evidence that he knew of the BSA, even if he never read it, Ligeri admitted that it was his practice to make misrepresentations to Amazon to get his accounts reinstated, and that he had no qualms about lying to Amazon when it was to his benefit.

59. At trial Ligeri testified as follows (399:24-402:11):

> Q: You're saying he was actually making misrepresentations to Amazon to reinstate the account?
>
> A. It's a very common practice when you're dealing with robots to make -- you say whatever it is those robots might need to hear to do the right thing at the end of the day. Since we've never done anything unethical in the history of operations with Amazon.
>
> Q. Except lying to Amazon to get your account reinstated?
>
> A. … Whatever it is he comes up with to try to win this appeal is fair game and it's completely legitimate even if it is a lie. It's an honest tactic.
>
> Q. So anything goes once you're trying to get your account reinstated?
>
> A. Absolutely 100 percent.
>
> Q. And you can make material misstatements to Amazon, you can tell them things that aren't true?
>
> A. If going through the proper channels doesn't work and the robot just keeps saying sorry, we need more, we need more, you're going to keep saying things to trigger their soundbites to potentially act properly, yes. …
>
> Q. Is the manner in which you just described, how you would say anything to make an appeal, consistent with how you think, in general, it's appropriate to treat your relationship with Amazon?
>
> A. Yes.

## II. CONCLUSIONS OF LAW

### A. Washington Law Governs This Dispute.

60. Washington law applies to this dispute. The BSA is governed by Washington law, and as discussed below, the Court concludes that Plaintiffs are bound by the BSA. Amazon

Exhibits 6-45. Plaintiffs do not dispute that they had an agreement with Amazon or that they operated their businesses in the Amazon Store. *See* Transcript of August 16, 2023 Hearing, 38:20-24.

61. Even if the BSA's choice of law provision does not apply, under Connecticut law, the Court should look to the state with the "most significant relationship" to the contract. *Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461, 922 A.2d 1043, 1047 (2007) (adopting the test of the Second Restatement, Conflict of Laws); *Bezek v. NBC Universal*, No. 3:17-CV-1087 (JCH), 2018 WL 2337131, at *9 (D. Conn. May 23, 2018), aff'd, 770 F. App'x 599 (2d Cir. 2019) (applying the factors in the Restatement). Under Section 196 of the Second Restatement, when dealing with a contract for services, the Court should apply "the local law of the state where the contract requires that the services, or a major portion of the services, be rendered."

62. Amazon's principal place of business is in Washington, and Plaintiffs claims all target Amazon's practices with respect to the Amazon Store and Seller Central. As a result, the services at issue were primarily rendered in Washington. The only connection to Connecticut is that the Plaintiff Ligeri resides there. Thus, Washinton law applies. *See Detroit Tigers, Inc. v. Ignite Sports Media, LLC*, 203 F. Supp. 2d 789, 795 (E.D. Mich. 2002) (finding Illinois law controlled a dispute over unsigned contract involving the hosting of a website, as that was the location of defendant and where defendant was to perform the online services).

**B. Plaintiffs Are Bound by the BSA.**

63. The Court finds that each of the Plaintiffs is bound by the BSA, including the arbitration provision, because (i) they are the successors in interest to the original account owners who agreed to the BSA during account creation; (ii) Plaintiffs had actual or constructive (inquiry) knowledge of the BSA, and their continued operation of their Selling Accounts constitutes assent to its terms; and (iii) even if they did not directly agree to the BSA, they are bound because they received direct benefits of that agreement. Ligeri is further bound because of

his close relationship with the Entity Plaintiffs, each of which consented to the BSA. The Court also rejects Plaintiffs' arguments that the BSA is unconscionable or otherwise unenforceable.

### C. Each of the Plaintiffs Is Bound as Successors of the Account Registrant Who Agreed to the BSA.

64. The evidence at trial demonstrated that persons who register Amazon selling accounts are required to consent to the BSA during the account creation process by checking a box or clicking a button manifesting their agreement to its terms. Trans. 16:12-18:3; 19:17-25; 21:3-22:21; 23:12-25:20; 26:11-20; 27:20-28:17; 36:7-21; 46:9-47:1; Amazon Exhibit 3; Amazon Exhibit 1.

65. Courts have routinely held that this type of clickwrap agreement is enforceable, and Plaintiffs do not dispute that such clickwrap agreements are enforceable, or that the original account holders assented to the BS. *Id.*, 388:19-389:22; *see, e.g., Doe v. Project Fair Bid Inc.*, No. C11-809, 2011 WL 3516073, at *4 (W.D. Wash. Aug. 11, 2011); *Byrne v. Charter Commc'ns, Inc.*, 581 F. Supp. 3d 409, 417 (D. Conn. 2022); *Shenzen Shileziyou Tech. Co. Ltd. v. Amazon.com, Inc.*, No. 21-cv-7083-MMC, 2021 WL 5848062, at *2-3 (N.D. Cal. Dec. 9, 2021); *Peters v. Amazon Servs., LLC*, 2 F. Supp. 3d 1165, 1173 (W.D. Wash. 2013), aff'd, 669 F. App'x 487, 488 (9th Cir. 2016); *Unicorn Glob., Inc. v. Golabs, Inc.*, 2021 WL 4712715, at *2 (N.D. Tex. July 27, 2021).

66. Although the BSA restricts a selling account owner from assigning the agreement without Amazon's consent, it nevertheless provides that it is binding on and enforceable against any successors and assigns. *Id.*, 462:15-463:13; Amazon Exhibit 9. Plaintiffs did not dispute that the purchaser of a business is bound by the contracts of that business as a successor. *Id.*, 235:10-18; 354:5-15.

67. "A successor is a person who succeeds to the rights, responsibilities, or place of another, or replaces or follows another. With regard to corporations, a successor is one 'that, through amalgamation, consolidation or other assumption of interests, is vested with the rights and duties of an earlier corporation.'" *Tourangeau v. Uniroyal, Inc.*, 138 F. Supp. 2d 259, 265–

66 (D. Conn. 2001) (citing Black's Law Dictionary 1446 (7th ed.1999)).

68. The evidence shows that each of the Entity Plaintiffs, and Ligeri personally in his own name, owned and operated Plaintiffs' Selling Accounts. *Id.*, 235:10-18; 254:3-258:25; Plaintiffs Exhibits 2, 3, 5. Plaintiffs entire case is based on their acquisition of pre-existing Amazon selling accounts, because had they registered their own selling accounts as Amazon requires, they would have had to have consented to the BSA.

69. Plaintiffs are the successors in interest to the original selling account holders due to their acquisition of those accounts. As a result, Plaintiffs are bound under the terms of the BSA.

### D. Plaintiffs Accepted the BSA Because They Had Notice of It During Their Continued Operation of Plaintiffs' Selling Accounts.

70. Ligeri had actual notice of the BSA during his operation of Plaintiffs' Selling Accounts, which constitutes acceptance of the BSA and its arbitration. One who has actual notice of an offeror's terms of service and continues to utilize the service with knowledge of those terms are bound by them. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401 (2d Cir. 2004); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) ("***Nicosia I***") ("Under Washington law, a person has notice of a fact if she '[h]as actual knowledge of it.' Wash. Rev. Code § 62A.1–202(a)(1)"). *Ullman, Perlmutter & Sklaver v. Byers*, 96 Conn. App. 501, 505–06, 900 A.2d 602, 605 (2006) (parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated) (alterations and quotations omitted).

71. Ligeri's personal knowledge of the BSA can be imputed to the Entity Plaintiffs as their sole owner and principal. Trans., 232:21-25; 233:17-18; *E. Udolf, Inc. v. Aetna Cas. & Sur. Co.*, 214 Conn. 741, 748, 573 A.2d 1211, 1214 (1990) ("The knowledge of individual officers and employees at a certain level of responsibility will be deemed the knowledge of the corporation") (citations and quotations omitted).

72. Ligeri's knowledge of the BSA stems from his operation of Amazon selling accounts for over 14 years and Plaintiffs' multiple communications with Amazon referencing the

BSA. Plaintiffs responded to Amazon's emails referencing the BSA, and in fact, explicitly referenced the BSA in two communications they sent to Amazon, one of which was sent by "Ben Joseph CEO," and another that was purportedly sent by Central Concepts' Chief Technology Officer.

73. Plaintiffs' actual notice of the BSA is sufficient to bind them to the BSA regardless of their claim that they were unaware of the arbitration provision contained in that agreement. *See Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 613-14 (2d Cir. 2020) ("***Nicosia II***") (holding that an Amazon customer "was bound by the arbitration agreement based on ordinary principles of notice and assent," *even if not specifically made aware of the arbitration provision*, because of the customer's continued interaction with Amazon after notice of the contract); *see also Rockstone Cap., LLC v. Caldwell*, 206 Conn. App. 801, 812, 261 A.3d 1171, 1179 (2021) (the "negligent failure to read and understand an agreement" is insufficient for escape contractual obligations).

74. Inquiry notice exists where a reasonable person in the position of the Plaintiffs would have known about BSAs arbitration provision terms and the conduct required to assent to it. *Antollino v. Morgan Stanley & Co. LLC*, No. 17-CV-1777 (VLB), 2018 WL 10483434, at *3 (D. Conn. May 11, 2018); *see Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124 (2d Cir. 2012) ("What constitutes sufficient inquiry notice of a term not actually read by the offeree depends on various factors including, but not limited to, the conspicuousness of the term, the course of dealing between the parties, and industry practices."); *Nicosia I*, 834 F.3d at 233 ("Where there is no actual notice of contract terms, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent.") (citations and quotations omitted).

75. Amazon's efforts to make the BSA and changes to that agreement, its Seller Code of Conduct and related FAQs available on Seller Central, the portal that all Amazon sellers use to manage their accounts, are sufficient to put Plaintiffs on inquiry notice of the BSA. The fact that Ligeri admitted he was generally aware he had an agreement with Amazon, he was aware

that Amazon's various policies and agreements are available in Seller Central, and that he knew how to find, and was able to find, relevant Amazon policies and agreements when looking for them, demonstrates that he had reasonable inquiry notice of the BSA.

76. If Ligeri was unaware of the terms of the BSA, his unawareness was result of his failure to review the terms of that agreement through which he did business in the Amazon Store. Ligeri's claim that the name of the BSA was "confusing"–which was not credible—is irrelevant because he never looked for it, and because it fails to satisfy the reasonableness standard for inquiry notice. *Id.*, at 120 ("where there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent").

77. Ligeri's continued operation of Amazon selling accounts during the pendency of this case with full knowledge of the BSA and its arbitration clause constitutes acceptance of that agreement. Under the Second Circuit's ruling in *Nicosia II*, a customer's continued use of Amazon's services after receiving notice of the arbitration clause in that proceeding constituted assent to that clause. *Nicosia II*, 815 F. App'x 613-14. Here, Ligeri's continued use of Amazon's services pursuant to the BSA through his operation of the Melbourne and Tiberias selling accounts after Amazon put him on notice of the arbitration provision in the BSA by filings its motion to compel in July 2023 constitutes acceptance of the BSA. Dkt. 24.

78. Ligeri's acceptance of the BSA in connection with his operation of the Melbourne and Tiberias selling accounts binds Plaintiffs to the BSA. First, under general agency principles, closely related entities may be bound by an arbitration provision. Ligeri is the agent of himself and each of the Entity Plaintiffs, which are all closely held companies. Second, by its terms the BSA makes clear on the first page that it applies to the person or business its "Affiliates," which "any other entity that directly or indirectly controls, is controlled by, or is under common control with that entity." Amazon Exhibit 74. The Entity Plaintiffs and the entities that own the Tiberias and Melbourne selling accounts are all owned by Ligeri, and thus are affiliates. Thus, under *Nicosia II*, Plaintiffs are bound by the BSA.

**E. Plaintiffs Are Bound by the Arbitration Clause Because They Directly Benefited From the BSA by Operating Their Amazon Selling Accounts.**

79. Plaintiffs are required to arbitrate their claims for the additional reason that they have directly benefited from the BSA through the use of Plaintiffs' Amazon Selling Accounts in accruing millions of dollars of sales. "A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). Under the "doctrine of direct benefit estoppel, 'a non-signatory who claims entitlement to payment based on the contractual obligations of a signatory is seeking a benefit under the contract.'" *Int'l Chartering Servs., Inc. v. Eagle Bulk Shipping Inc.*, 138 F. Supp. 3d 629, 636–37 (S.D.N.Y. 2015) (citations omitted). Direct benefits estoppel allows a party to an arbitration agreement to invoke arbitration against a non-party to the agreement where the non-party has directly benefited from the terms of the agreement in a manner that would make it unfair for the non-party to be able to enjoy the fruits of the agreement without sharing in its obligation to engage in arbitration of disputes.

80. Plaintiffs benefited from the operation of their selling accounts. Plaintiff Ligeri admitted in his testimony that both he and Amazon mutually benefited from his operation of Plaintiffs' Selling Accounts. Trans. 437:7-23. For example, Plaintiffs made millions in sales to customers through these accounts, and Amazon makes payments to sellers pursuant to the terms of the BSA. Trans. 160:6-163-9, Amazon Exhibit 75; *see, e.g.*, Amazon Exhibit 42 at S-5 ("we will remit to you your available balance on a bi-weekly (14 day) (or at our option, more frequent) basis) …." The BSA has its own section, titled "Selling on Amazon Service Terms" that is dedicated to how Amazon sellers can participate in this service. Amazon Exhibit 42 at 11 ("The Selling on Amazon Service ('Selling on Amazon') is a Service that allows you to offer certain products and services directly on the Amazon Sites."). Plaintiff Ligeri further testified that he used Amazon's Fulfilled by Amazon ("FBA") services in connection with Plaintiffs' Selling Accounts, which is a service that Amazon provides to sellers under the terms of the BSA. Trans. 332:15-333:6; 419:11-421-25; Amazon Exhibit 74 at 27-28. The Plaintiffs' operation of these

selling accounts flows directly from the terms of the BSA, and every payment they received from Amazon was made pursuant to the BSA. While Plaintiffs' Complaint is artfully pled to avoid invoking a claim under the BSA, all of Plaintiffs claims are directly tied to that agreement.

**F. Ligeri Is Bound by the Arbitration Clause Because His Close Relationship to the Entity Plaintiffs.**

81. Ligeri is individually bound by the BSA because he personally owned and operated several of the selling accounts at issue in the past. Even if Ligeri individually did not consent to the BSA, he is bound under traditional contract principles and subject to arbitration under various traditional principles of contract and agency law as a closely related party to the signatory entities. See*, e.g., Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009).

82. Where a non-signatory party is closely related to the signatory of the contract with the arbitration clause, the non-signatory can be required to arbitrate. *See Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (enforcing a forum selection clause against a non-signatory to a contract when the non-signatory is closely related to the signatory); *Holland Am. Line Inc. v. Wartsila N. Am., Inc*., 485 F.3d 450, 456 (9th Cir. 2007); *Amazon.com, Inc. v. Sumeet Marketing Inc.,* 2:23-cv-00331-JLR, Dkt. 69 at *8 (W.D. Wash. June 16, 2023) (finding the principals who signed the BSA on behalf of the companies they controlled are bound by the BSA as closely related parties).

83. Ligeri has a close relationship with the Entity Plaintiffs, and thus is bound by the BSA because he is the sole owner of each of the Entity Plaintiffs, and operates each one as a "hands-on manager." Further, Ligeri operated the businesses interchangeably, transferring their inventory, assets, and operations between himself and the Entity Plaintiffs. Thus, Ligeri's intimate relationship with the Plaintiffs' Selling Accounts and the Entity Plaintiffs is sufficient to hold him to the BSA.

**G. The BSA and Its Arbitration Clause Are Enforceable Against Plaintiffs.**

84. Plaintiffs have failed to show that the arbitration and forum selection provision in the BSA is illegal or unenforceable on the grounds of unconscionability or any other grounds.

Plaintiffs have the burden of showing that the BSA is both procedurally and substantively unconscionable. *Homesite Ins. Co. v. Brezniak*, 581 F. Supp. 3d 424, 433 (D. Conn. 2022) ("Under Connecticut law, the party that raises unconscionability as a defense to the enforcement of any contract typically has the burden of showing that the contract is both procedurally and substantively unconscionable") (citations and quotations omitted). Procedural unconscionability "focuses on the process by which the allegedly offensive terms found their way into the agreement," and is "intended to prevent unfair surprise." *Id.* (citations omitted). "Substantive unconscionability focuses on the 'content of the contract,'" and "is intended to prevent oppression" by terms that are "so one-sided as to shock the conscience" or allocate risks or costs in a way that "is overly harsh or one-sided and is not justified by the circumstances in which the contract was made." *Id.*[4]

85. Plaintiffs have not proven that the BSA was procedurally unconscionable. Even if the BSA is a contract of adhesion, a contract of adhesion is not enforceable under either Washington or Connecticut law. *See, e.g., Homesite Ins. Co.*, 581 F. Supp. at 434 ("the exclusion is not unenforceable simply because of the adhesive nature of the Policy and the unequal standing of the parties"); *Romney*, 186 Wash. App. at 737 ("An adhesion contract is not necessarily procedurally unconscionable."); *Tate v. Bernardi*, No. NNICV186015203S, 2020 WL 6781491, at *5 (Conn. Super. Ct. Oct. 28, 2020) ("An adhesion contract is not automatically unenforceable, in order to be unenforceable, the contract must also be unduly oppressive or unconscionable"); *Larobina v. Altice Media Sols., LLC*, No. FSTCV216054451S, 2022 WL 17959251, at *4 (Conn. Super. Ct. Dec. 22, 2022) ("That an agreement properly might be characterized as a contract of adhesion – such as an insurance policy/contract – does not necessarily equate to unconscionability.").

[4] On procedural and substantive unconscionability, Washington law is substantially consistent with Connecticut law. *See Romney v. Franciscan Med. Grp.*, 186 Wash. App. 728, 735, 349 P.3d 32, 36 (2015).

86. Plaintiffs' claims that they never agreed to the BSA during account creation forecloses any argument that the BSA is procedurally unconscionable. *See Rockstone Cap., LLC v. Caldwell*, 206 Conn. App. 801, 813, 261 A.3d 1171, 1179 (2021) ("our court has limited determinations of procedural unconscionability to cases where bargaining or contractual improprieties were committed by the plaintiff"). Amazon is not bound by the actions or representations of the individuals who sold Plaintiffs their selling accounts. *Id.* ("Where the claim of unconscionability is directed at the actions and representations of third parties, rather than the plaintiff, we have required that an agency relationship exist between the plaintiff and the third party.").

87. Plaintiffs have not proven that the BSA or any parts thereof are substantively unconscionable. It is undisputable that both arbitration clauses and forum selection clauses can be enforceable, and thus are not substantively unconscionable. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776, 177 L. Ed. 2d 403 (2010) ("The FAA thereby places arbitration agreements on an equal footing with other contracts… and requires courts to enforce them according to their terms."); *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011) ("forum selection clauses are prima facie valid") (citations and quotations omitted).

88. Even if one or more clauses of the BSA that Plaintiffs identified as unconscionable were problematic, none of those clauses pertain to the arbitration clause. Were any of those clauses substantively unconscionable, they could be severed from the agreement without affecting the arbitration clause. *Zuver v. Airtouch Commc'ns*, Inc., 153 Wash. 2d 293, 320, 103 P.3d 753, 768 (2004) ("[W]hen parties have agreed to a severability clause in an arbitration agreement, courts often strike the offending unconscionable provisions to preserve the contract's essential term of arbitration."); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445, 126 S. Ct. 1204, 1209, 163 L. Ed. 2d 1038 (2006) ("as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract"); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71, 130 S. Ct. 2772, 2778, 177 L. Ed. 2d 403 (2010) ("a party's challenge to another provision of the contract, or to the contract as a whole, does not

prevent a court from enforcing a specific agreement to arbitrate"); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125 (2d Cir. 2010); *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 327 (D. Conn. 2011).

### H. Plaintiffs' Claims Must Be Brought in Arbitration Pursuant to the Mandatory Arbitration Clause in the BSA, or in King County, Washington, Courts.

89. All of Plaintiffs claims asserted in the Complaint belong in arbitration pursuant to the BSA, except for Plaintiffs' limited claims for injunctive relief pertaining to their intellectual property claims, which must be brought in the state or Federal court in King County, Washington (which the BSA defines as the "Governing Courts"). Because this Court is not one of the Governing Courts, any of Plaintiffs claims that are not sent to arbitration must be transferred to the District Court for the Western District of Washington.

90. Only Plaintiffs' trademark infringement claim (Count 1) and theft of trade secrets (Count 13) claim seek injunctive relief and fall within the BSA's definition of "intellectual property." Because these two claims seek monetary and injunctive relief, the monetary aspect of these claims must still go to arbitration, should the Plaintiffs wish to split the claims between court and arbitration.

## III. <u>CONCLUSION</u>

Based on the foregoing findings of fact and conclusions of law, the Court finds and concludes that Plaintiffs' claims are subject to arbitration under the BSA. Moreover, Plaintiffs' claims are subject to a mandatory forum selection clause. Therefore, the Court transfers this case to the Federal District Court for the Western District of Washington. The Court further compels Plaintiffs to arbitrate their claims, and stays this case pending arbitration and the filing of a complaint that complies with the BSA's arbitration provision carve out. Plaintiffs are directed to file an arbitration demand within 30 days of this final order, should they wish to proceed in arbitration. Plaintiffs may proceed with their claims for injunctive relief under their trademark

infringement claim (Count 1) and theft of trade secrets (Count 13) in Court in the Western District of Washington by filing an amended complaint asserting only those claims within 30 days of this final order. Should Plaintiffs fail to file the demand or an amended complaint by this deadline, Amazon may seek dismissal of the case for failure to prosecute. Either party may move to re-open the case, in order to seek further action by the Federal District Court for the Western District of Washington, to the extent appropriate.

ORDERED, ADJUDGED, AND DECREED this _____ day of ___________, 2024.

Honorable Jeffrey A. Meyer
United States District Judge

Presented by:
DAVIS WRIGHT TREMAINE LLP

By: */s/ John M. Magliery*
John M. Magliery (CT29798)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
Ph: (212) 489-8230
johnmagliery@dwt.com

Adam Sgro (*pro hac vice)*
adamsgro@dwt.com

*Attorneys for Defendants*
*Amazon.com, Inc.,*
*Amazon.com Services LLC,*
*Amazon Mexico Services, Inc.,*
*Amazon Payments, Inc., and*
*Amazon Capital Services, Inc.*