**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

**BENJAMIN LIGERI**
**CENTRAL CONCEPTS, INC**
**TRADEMARK HOLDINGS, LLC**
**GLOBAL SPECIALITY PRODUCTS, LLC DOCKET NO. 3:23-cv-00603 (JAM)**
**MEDCARE, LLC**
**Plaintiffs,**
**vs**
**AMAZON.COM, INC**
**AMAZON, LLC**
**AMAZON SERVICES, LLC**
**AMAZON MEXICO SERVICES, INC**
**AMAZON BUSINESS PAYMENTS, INC**
**AMAZON PAYMENTS, INC**
**AMAZON CAPITAL SERVICES, INC,**
**Defendants MAY 10, 2024**

**PLAINTIFFS' REPLY BRIEF TO DEFENDANT AMAZON'S POST-TRIAL BRIEF IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT, OR IN THE ALTERNATIVE TO TRANSFER VENUE**

FOR THE PLAINTIFFS,
CENTRAL CONCEPTS, INC
TRADEMARK HOLDINGS, LLC
GLOBAL SPECIALITY PRODUCTS, LLC
MEDCARE, LLC

By:/s/ Paulus Chan
Paulus H. Chan, Esq.
157 Forest Hill Road,
North Haven CT 06473
Tel: (860) 250-9536
Fax: (860) 631-1111
Email: phc_ssg@yahoo.com

Dated this 17th day of May 2024 at
New Haven, Connecticut

*Note: This brief his hyperlinked and bookmarked for the Court's convenience and ease of reference.*

## TABLE OF CONTENTS

Page

I. Preliminary Statement.....1
II. Reply to Defendants' Proposed Findings of Fact.....2
III. Factual Record Established at Trial
- A. The Plaintiffs were not Required to Accept the BSA Terms Upon Accounts Subject to this Action being Created.....9
- B. The BSA Terms were not Contractually Agreed upon per State Law Principles of Forum Selection.....12
- C. Amazon's Providing Notice of the Buried and Obscured BSA After the Fact, After it Obtained Control of Plaintiff's IP rights, Inventory and 90% of its Revenue, Does Not Render the BSA Valid or Binding, but a Bait and Switch.....13
- D. Amazon Defendants Benefitted from the Usurpation and Hijacking of 90% of Plaintiffs' Revenue, and the BSA is a Device to Keep that Unilateral Control and Deny Remedy.....15
- E. Defendants are Not Credible as Established by Natalia Parker Declaration.....19

IV. Argument
- A. The Defendants Have Failed to Meet their Burden of Proof.....21
- B. Connecticut Law Governs this Dispute.....24
- C. There was no Validly Formed Contract Ratifying the BSA with its Forum Selection or Arbitration Clauses.....26
- D. The BSA's Arbitration and Forum Selection Clauses are a Contract of Adhesion and Unenforceable.....28
- E. Ligeri is not Bound by the BSA, at all.....28
- F. Nothing in the BSA is Enforceable at All Due to the Parties Having no Agreed Upon Terms Reduced to Writing and Validly Accepted.....29

V. Conclusion.....34
Certificate of Service.....36

## TABLE OF AUTHORITIES

**Page(s)**

**United States Cases**

*Amazon.com, Inc. v. Sumeet Marketing Inc.*, 2:23-cv-00331-JLR, Dkt. 69 at *8 (W.D. Wash. June 16, 2023)....................7

*Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009)....................7

*Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321 (1982)*.................... 24

*Gingras v. Think Fin., Inc., 922 F.3d 112, 126 (2d Cir. 2019)*....................29

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007)....................7, 8, 9

*Lipsett v. Popular Bank*, No. 22-3193-cv, 2024 WL 111247 (2d Cir. Jan. 10, 2024)....................21

*Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013)....................7

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776, 177 L. Ed. 2D 403 (2010).................... 8

*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 36 (2d Cir. 2002)...........27

*Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 222-23 (2d Cir. 2023)....................30, 31

**Connecticut Cases**

*Atlas v. Miller*, 20 Conn. App. 680, 683 (1990)....................26

*Bender v. Bender*, 292 Conn. 696, 731-32, 975 A.2d 636 (2009)..................30, 31

**Connecticut Cases (con't)** **Page(s)**

*Boland v. Catalano, 202 Conn. 333, 338-39 (1987)*........................................26

*Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 87-88, 612 A.2d 1130 (1992)..........................................................................................................30, 31

*Dunham v. Dunham*, 204 Conn. 303, 313 (1987)...........................................26

*Emigrant Mortgage Co. v. D'Agostino, 94 Conn.App. 793, 807, 896 A.2d 814, cert. denied, 278 Conn. 919, 901 A.2d 43 (2006)*...........................................................22-23

*Finlay v. Swirsky,* 103 Conn. 624, 631 (1925).................................................27

*First New Haven National Bank v. Statewide Motors Inc.*, 33 Conn. Sup. 579, 581-82 (1976)...........................................................................................................27

*General Electric Capital v. Transport Logistics*, 94 Conn. App. 541, 546 (2006)...........................................................................................................27

*Gruber v. Klein*, 102 Conn. 34, 36-37 (1925)...................................................27

*Hale v. Benvenuti, Inc., 38 Conn. Sup. 634, 638-39 (1983*.............................26

*Hanks v. Powder Ridge 276 Conn. 314 (Conn. 2005) 885 A.2d 734 2005 Conn. LEXIS 500*..........................................................................................7, 32, 33

*Hottle v. BDO Seidman, LLP, 268 Conn. 694, 719, 846 A.2d 862 (2004)*..........31

*Janusauskas v. Fichman, 264 Conn. 796 (2003)*.............................................26

*O'Connor v. O'Connor, 201 Conn. 632, 637 (Conn. 1986)*................................24

*Osborne v. Locke Steel Chain Co*., 153 Conn. 527, 530-31 (1966)....................27

*Presidential Capital Corp. v. Reale, 231 Conn. 500, 506-07 (1994)*..................26

*Rockstone Cap., LLC v. Caldwell, 206 Conn. App. 801, 813, 261 A.3d 1171, 1179 (2021)*........8

*Ryan v. Cerullo, 282 Conn. at 123-24, 918 A.2d 867 (2007)*........25

*Skelly v. Bristol Savings Bank, 63 Conn. 83, 87 (1893)*........26.

*State National Bank v. Dick, 164 Conn. 523, 529 (1973)*........27

**Washington Cases**

*Singh v. Edwards Lifesciences*, 151 Wn. App. 137, 143 (Wash. Ct. App. 2009)........26

**California Cases**

*Tunkl v. Regents of the University of California*, 60 Cal.2d 92, 101, 383 P.2d 441, 32 Cal.Rptr. 33 (1963)........7, 8, 32, 33

**Connecticut General Statutes**

General Statutes §52-59b (a)........25

General Statutes §52-59b (a)(3)(B)........25

**Secondary Legal Resources**

A. Corbin, Contracts (Rev. Ed. 1996) § 4.1, p. 525........26

Conn. Code Evid. §6-3........5

Conn. Code Evid. §8–4(a)........23

J. Calamari & J. Petrillo, Contracts (3rd Ed. 1987) § 4-2, pp. 187-90........27

Restatement (Second) of Contracts. § 208 (Am. L. Inst. 1981)........31

Restatement (Second), Contracts §§ 1, 4........26

In response to the Court's April 10, 2023, Order Re Post-Hearing Briefing Schedule (Dkt. No. 69) ("Order"), which allows seven days to respond to Defendant's Memorandum, Plaintiffs' hereby file this reply brief to the Defendants' Memorandum (No. 75) dated May 10, 2024 and Proposed Facts and Conclusions of Law (No. 76) dated May 10, 2024.

**I. Preliminary Statement**

As owner of the biggest online market place in the world, where millions of transactions take place daily and where Defendants tracks billions of digital information with its advanced Information technology system, the Defendants did not provide one single piece of admissible evidence that the Plaintiffs have actually consented to the BSA. This is so even after the court had denied their first attempt to deceive the court with a completely false declaration by Natalia Parker back in august 2023. With such ample time, the Defendants still have failed to meet their burden of proof of their case. They have failed to proffer any admissible evidence to support the basic elements of contract formation - offer, consideration, acceptance and mutuality. By extension, and by reason of the additional evidence, the Record, the language and one-sided nature of the BSA itself has established that the BSA itself is an unenforceable adhesion contract and the BSA's arbitration and forum selection clauses are unconscionable, and constitute an adhesion agreement. The Defendants' entire system is a premeditated bait and switch to capture the Plaintiffs' data, trademarks, corporate goodwill, inventory and 90% of the Plaintiffs' revenue as the Defendants arbitrarily see fit to, without any meaningful recourse whatsoever.

The Plaintiffs are not bound by arbitration or the forum selection clauses because:

(i)The Amazon stores controlled by Plaintiffs were not acquired until after their creation, after which Defendants came to control over 90% of Plaintiffs' revenues as they saw fit, along with arbitrary authority to move and liquidate their inventory on a whim; Defendants have failed to produce any admissible evidence at trial that the relevant seller account creators had indeed consented to the BSA, despite seven and half months of notice by the court in the August 2023 hearing where Defendants attempted to prove consent by a declaration by Natalia Parker, which was proven at trial to be completely false.

(ii) Plaintiff Ligeri himself, suing for misappropriation of his Marks, did not at all need to agree to the BSA, nor did he, in order to pursue remedies under the Lanham Act;

(iii) No formal agreement was offered, ratified and accepted between the Plaintiffs and the Defendants, which the latter emphatically state they never approved of any agreement with the Plaintiffs under the BSA or otherwise, and for which they will likewise refuse Arbitration;

(iii) The Defendants have proffered no admissible evidence to prove consent that could be passable under the Computerized Business Exception ("CBE") to the Hearsay Rule, nor was any admissible evidence proffered such that any Clickwrap agreement was even executed at the accounts' origination.

**II. Reply to Defendants' Proposed "Findings of Fact"**

The Defendants view reality and the Record myopically. Proposed "Findings of

Fact" 44, 47, 48, 49, 55, 57, 58, 65, 66, 69, 70, 71, 72, 75, 76, 77, 78, 79 and 81 are opinions and impermissibly pyramided inferences. Proposed "Findings of Fact", 60, 61, 62, 63, 64, 65, 67, 68, 69, 70, 71, 73, 74, 79, 81, 83, 84, 86, 87, 88m, 89 and 90 (some common to the above) are also naked conclusions of law and rank assertion.

Proposed finding of fact # 60 fails under conflict of law analysis stated below. Proposed finding of fact # 61 and 62 fail as the most significant relationship to the contract and all the business activities took place in Connecticut, such as Plaintiffs offices, actual activities by the employees, inventory, warehousing, shipping and deliveries all related to its base state of Connecticut. Proposed finding of fact # 63 and 64 fail as Defendants did not prove consent by the original account holders, nor did Defendants prove there were authorized assignments to qualify Plaintiffs as successors, nor Defendant prove Plaintiffs actual knowledge and assent to the BSA. Proposed finding # 65 fails for the same reason for lack of proof of consent on every subsequent version of the BSA as required by Clickwrap application.

Proposed finding of fact # 66 and 67 fail as basic contract laws do not bind a non party of a contract. Defendants admit that Plaintiffs are not legally approved assignees, and cannot be a successor by definition.

Proposed finding of fact # 70 fails as the legal authority in Nicosia I is distinguished from the facts of this case and it is not binding.

Proposed finding of fact # 72 fails as emails merely referencing the BSA does not prove Plaintiffs' consent, especially these one-way only emails could not be answered.

Proposed finding of fact # 73 and 74 fail as Defendants failed to prove by evidence there was notice due to the very inconspicuous placement of the arbitration clause within the BSA, and the lack of direct email notifying Plaintiffs.

Proposed finding of fact # 79 fails as the record shows that Defendants are the only parties benefiting substantially by collecting up to 90% of Plaintiffs' sales proceeds. Proposed finding of fact # 84 fails as Defendants cannot overcome the unconscionable nature of the BSA's language and effects as the unconscionability analysis below concludes.

Proposed finding of fact # 89 fails as Defendants merely state a wrong conclusion of law with no legal authority.

Proposed Finding #8 of Defendants' is a truism, as is #9, which is general and lacks any specificity. Proposed Finding #10 is outright false relative to Plaintiffs – there was no requirement in the system that the BSA be clicked, opened, read and consented to prior to proceeding onward with the next step during Seller registration. Proposed Finding #18 cannot be true by Defendants' own admission, one cannot say the BSA is binding on Plaintiffs and then concurrently claim its terms – including the arbitration and forum selection causes, somehow inure to Plaintiffs. This is notwithstanding Defendants' policy of refusing to arbitrate to individuals who have never agreed to the BSA. In fact, Defendants' proposed findings 31 and 32 even concede this much. Proposed Finding 35 asserts Ligeri did no due diligence to determine whether rights under the BSA could be transferred, which in and of itself infers a lack of knowledge of the BSA and its specific terms.

Proposed Finding #47 is outright false. The Plaintiffs in fact dispute that they accepted the BSA consistent with #48 in that they were never given the opportunity to consent. Defendants' Proposed Finding #49 conveniently omits that Defendants control up to 90% of the revenue, all the inventory and inventory charges and decide how much of that Plaintiff's receive, which is 10% usually, after Defendants' have extracted all of their charges.

The "general contractual relationship" of Proposed Finding #51 is undefined and not fully known – and certainly not established to be the BSA. There are no records or any actual proof that could pass muster of the CBE that any of the Plaintiffs signed or agreed to the BSA at any time. The 70 filtered emails out of the hundreds of thousands giving the BSA a passing reference alluded to by Proposed Finding #52, emails that specifically state that any replies to them would remain unread, do not constitute an agreement to the BSA's terms, neither does undefined "awareness" of them point to true informed consent and actual ratification as Proposed Finding #58 impermissibly attempts to infer.

Proposed Findings of Fact 58-60 are specious character attacks. No foundation is laid as to why Connecticut Code of Evidence §6-3 should disqualify Ligeri from being deemed credible.

Proposed Findings 60-62 require the BSA to have actually been agreed to consistent with valid contract formation principles – a step that the Defendants skipped entirety and introduced no evidence to support. Consistent with that and contrary to Proposed Finding #63(i) there is no evidence that the original account holders indeed

agreed to the BSA; (ii) there is no actual or constructive knowledge in advance of the BSA's arbitration or forum selections clauses; and part (iii) of that proposed finding ignores that the Defendants received up to 90% of the benefit by taking up to 90% of the Plaintiffs' revenues under their take-it-or-leave-it arrangement. This is why Proposed Finding #s 64 through 69 can only speak to recently created accounts – there is no evidence on the Record that they ever came to apply to even the Original Account Holders who eventually sold the inventory, IP, access and corporate good will to present day Plaintiffs.

Defendants' Proposed Finding #64's reference to "evidence at trial demonstrated" only applies to accounts created now, today – not when accounts at issue actually came into existence, making Proposed Findings 65, 66, 67, 68 and 69 rank tautology. The reference to Nicosia I in Proposed Finding #70 renders it a legal nonsequitur. That case dealt with an Amazon buyer seeking to purchase an illegal product. Similarly, *Register.com* contemplated illegal data harvesting. This renders Proposed Findings 71, 72, 73 and 74 nonstarters because they are rank assumptions of "imputed knowledge" of the BSA. "Seller Central", as Proposed Finding 75 myopically references it, does not honestly account for the reticulated haystack of hundreds of thousands of articles where the BSA needle is buried. This forecloses Proposed Findings 76-79 as logical impossibilities.

The biggest problem with the proposed facts is what they fail to account for. Proposed Findings 79 and 80 do not account for Defendants' unilateral control of 90% of the revenue, deciding which inventory lives to be misclassified randomly or dies in liquidation, and wrongfully in bad faith locking the Plaintiffs out of their own accounts or

restrain the use of their intellectual property.

The fatal weakness of Proposed Findings of Fact 81 through 83 is the absence of "traditional contract principles". Defendants conclusion of law positioned as a "fact" cites to *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009), which at page 626, contemplates whether a nonparty can be bound by arbitration to under FAA, stating, "save upon such grounds exist at law or in equity for the revocation of contract." The Instant Matter's practical reality is the absence of contract formation for lack of consideration, informed consent and meeting of the minds and its procedural unconscionability. Defendants consume 90% of the revenue according to a randomly changing undisclosed formula while engaging in random destruction of inventory – and Defendants will still refuse arbitration anyway. Defendants purport *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) to apply ignoring both that reality and the absence of a secondary and binding sublicense agreement. Similarly, *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007); *Arthur Anderson LLP Inc.*, 2:23-cv-00331-JLR, Dkt. 69 at *8 (W.D. Wash. June 16, 2023) involved other agreements, and the approach attempted by Defendants here, as was the case there, was "too thin to meet [their] initial burden" Id.

Proposed Finding of Fact 84 assumes the Court is not paying attention. The factors set forth in *Tunkl v. Regents of the University of California*, 60 Cal.2d 92, 101, 383 P.2d 441, 32 Cal.Rptr. 33 (1963) as adopted in this forum by the Connecticut Supreme Court in *Hanks v. Powder Ridge* 276 Conn. 314 (Conn. 2005) 885 A.2d 734 2005 Conn. LEXIS 500

are specifically and clearly proven on the Record, and not refuted by Defendants. Contrary to Proposed Finding of Fact 85, itself a legal conclusion, the Plaintiffs did demonstrate all the elements of an adhesion contract per *Tunkl* to be operative. Similar, and contrary to Proposed Finding 86, the Plaintiffs never agreed to the BSA, and that does not foreclose the argument that its terms constituted an adhesion contract. Defendants citation to *Rockstone Cap., LLC v. Caldwell*, 206 Conn. App. 801, 813, 261 A.3d 1171, 1179 (2021) is unhelpful, because at p. 809, that case supports the Record developed over a two day trial that the terms under which both the BSA contemplated and the different arrangement under which the Parties actually operated without assent or agreement to the former was both procedurally and substantively oppressive to the Plaintiffs.

Proposed Finding 87 of Defendants is circular in its reference to *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776, 177 L. Ed. 2D 403 (2010), because arbitration agreements being on equal footing with other contracts requires actual contract formation from the onset. Defendants cited to *Holland Am. Line Inc, supra.* Had Defendants been fair to that case, they would have read the following: "In support of its effort to bring the Bureau Veritas entities under the umbrella of this forum selection clause, Holland America offers a single affidavit stating that it placed telephone orders for surveys of the Wind Song by calling BV Canada and, more recently, BVNA, and that it emailed its terms and conditions to andre.laroche@ca.bureauveritas.com." *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 455 (9th Cir. 2007). Defendants did the same thing here – engaged in business without an initially formed agreement, and then emailed not a

copy of the BSA, but 70 automated emails to which one could not respond referencing it. In essence, Defendants' case is weaker than the fact pattern in *Holland Am. Line Inc.*

Proposed Finding of Fact 88 is similarly circular logic and a rank legal conclusion. The tautology is that illegal terms of an adhesion contract are stricken and the remainder would stand. The rub is the Defendants are attempting to enforce the most oppressive terms of the adhesion contract to which the Plaintiffs never agreed – the forum selection and arbitration clauses. This proposed legal conclusion of Defendants skipped a major step. The remaining two legal conclusions of Defendants (89 and 90) cloaked as "proposed findings of fact" similarly assume the BSA applies.

## III. Factual Record Established at Trial

### A. The Plaintiffs were not Required to Accept the BSA Terms Upon Accounts Subject to this Action being Created

Amazon's own account records by Mr. Eric Smith confirmed that Plaintiff Ligeri was not the original account registrant of any of the four Companies in the Verified Complaint and therefore Plaintiff Ligeri never checked a box or provided any form of digital signature that he agreed to the BSA as asserted by the Defendants. [Tr. pp 187-192, Tr. 296] Plaintiff Ligeri is the purchaser and new operator of the Amazon stores associated with the Companies in the Verified Complaint and the account transfers were successful conducted in Amazon's Seller Central Portal without opposition or restriction. (Tr. P 254) The BSA and all other Terms of Service have been modified many times without any notice of modification directly delivered to any of the Plaintiffs. [Tr. p. 128-130] The Record is devoid of any evidence that the Plaintiffs have actually consented to the BSA's Terms, either as

an initial account registrant or as a subsequent account operator by account assignment or transfer.

Regardless of Amazon's lack of consent to transfer / assign the ownership of the Amazon stores associated with the Companies in the Verified Complaint, Amazon continued to profit greatly from the sales revenues generated by Plaintiffs and collected the vast majority of the proceeds through various fee charges for Amazon itself, sometimes up to 90% of Plaintiff's revenue during a given quarter. There were no negotiations and Plaintiffs had absolutely no opportunity or ability to negotiate any terms of the BSA. Even Defendants agree that the Plaintiffs here have spent over a decade successfully building their business. The Defendants' first witness Mr. Orzbatur cannot tell who registered what accounts, as he stated, "I cannot tell because I do not have access to private data. As I mentioned, I have access to mass data, but not individuals." [April 8 Tr. p. 42], As to the database, he testified, "I do not directly manage that." [Id, p. 43] The Defendants' witness testified, as to registering an account, one also "can confirm that somebody can click the box to go to the next step without physically clicking the link leading to the Amazon Services Business Solutions Agreement." [April 8 Tr. p. 47]

Furthermore, Defendant's own witness is unaware of a control mechanism in place that would prevent any individual registering as a seller from advancing beyond the BSA (i.e., skipping and not reading it) without clicking a box or verifying a signature. [Id, pp. 47-48] In other words, a registrant need not read the BSA to advance to the next step. Amazon therefore has designed and created a simple bypass for seller account registrant

to skip clicking or reading the BSA entirely and move to the next step. Mr. Pak could only verify the BSA versions back from the present to September 1, 2017. [Tr. p. 76] He has no access to the systems that store earlier versions, stating that "They are stored in a content system owned by legal called iManage, which I do not have direct access to." . [Tr. p. 83] Further, Mr. Pak testified that "the BSA is quite long, and the changes I make are to specific parts. So I don't know the overall word-by-word very closely, no." [Tr. p. 121] Amazon’s own witness stated that Amazon does not specifically keep or track the data of sellers clicking certain link or looking at certain information, including what percentage of sellers actually get actual notice of the BSA agreement and changes even though Amazon’s own witness stated and agreed that it is important to keep traffic data. [Tr. pp 125-126]. The BSA screen offers only two options – agree to consent or not do business with Amazon. Amazon does not send email to sellers directly to notify them of any changes to the BNA terms. In searching for information, the accuracy is dependent on the query [Tr. pp. 128-129]

As to what the Plaintiff meant when he opened the Health and Household Account, he testified that " the word "open" wasn't meant to be legalese.”, and that he purchased the account, just like the others. [Tr. p. 240] Further, the account "...was not purchased from the original owner. It was purchased from the secondary owner... a purchase of other property, intellectual property and other physical property, including an Amazon account... basically any valuable intellectual and physical property that the company had, which was largely trademarks, an Amazon selling account with active

inventory...." [Tr. p. 243] The Court admitted in full Exhibits 2 and 4, which documented the transfer of intellectual property and Amazon held inventory between Plaintiff and Wholly Wholesale.

Eric Smith verified that Plaintiff Ligeri did not open any of the seller accounts associated with the Company Plaintiffs. [Tr. pp. 149-150]. The Plaintiffs retained an IT expert to rebut testimony as to the Defendants' witnesses' purported knowledge of their systems and electronic records relevant to the Computerized Business Records Exception to the Hearsay Rule. The Court determined that no such testimony was offered by the Defendants to authenticate their records, and therefore determined, "Then we don't need the expert." [Tr. p. 224] As to who opened Amazon stores and accounts, the Plaintiff never clicked the box associated with the Clickwrap Defendants allege, nor did he show consent to agree to the BSA at any time. [Tr. pp. 235-236]

B. The BSA Terms were not contractually agreed upon per State Law Principles of Forum Selection

The above enumerated facts and the entirety of the Record are devoid of any offer of any permutation of the BSA prior to the Plaintiffs acquiring the accounts at issue in this case. The BSA's terms were never considered, accepted or executed. According to the BSA itself, the Defendants assert that, because assignment isn't permitted, there is no capacity for the Plaintiffs to even become successors. By extension, the Defendants wouldn't agree to arbitration anyway. Regardless of what State's laws of contract formation apply, the Defendants are without any admissible evidence of offer, acceptance, consideration or awareness. There was no meeting of the minds as to the BSA as Plaintiffs

did not understand it or have full awareness of its terms at the inception. [Tr. p. 429]

More troubling for the Defendant is the consideration element. The Plaintiffs subsequently learned, post-trial, that Amazon won't arbitrate with them. Plaintiffs' first constructive knowledge of the BSA's existence was in preparing for litigation, in the search for and through documents, which yielded a number of agreements in the "hundreds". [Tr. p. 272]

The Defendants have superior bargaining power over Plaintiffs and offered the BSA terms on a take it or leave it basis. [Tr. Pp 122-123] The Parties do not have equal bargaining power. The Defendants' bargaining power is vastly and overwhelmingly superior. Regardless of that unequal bargaining power, the Record is devoid of any specific terms and consideration arrived at, let alone anything resembling the BSA.

C. Amazon's Providing Notice of the Buried and Obscured BSA after the fact, after it obtained control of Plaintiff's IP rights, inventory and up to 90% of its revenue, does not render the BSA valid or binding, but a well-designed scheme, bait and switch

Amazon's witness stated that it would even take him half an hour to read through the BSA and, "...much longer if I was really trying to find specific information, really understand the nature of it." [Tr. p. 131] Out of the hundreds of thousands of emails and messages between Plaintiffs and Defendants throughout the decade plus period of time alleged in the Verified Complaint, the BSA was only unilaterally referred to by Defendants seventy times, all of which are filtered emails by Mr. Eric Smith. [Tr. p. 304]. There are "...no emails about the BSA specifically." [Tr. 446] The BSA states that all account assignment must have Amazon's prior written approval. There was no record of any

account assignment approved by Amazon (BSA clause 17) Kevin Pak is the Defendants' Senior Content Manager. [Tr. p. 68 April 8, 2024]

Kevin Pak testified that there are "About 40" different versions of the BSA. Id, p. 70. Mr. Pak has been employed for the last nine years by Amazon (2015) with his knowledge only going back to that point. [Tr. p. 68] Mr. Pak described the process of searching for the BSA from the Seller Central home page, which involves "four layers of hypertext before" a help page can be viewed, and from there, users would have to search for the BSA. [Tr. pp. 115-117] There are over 800,000 third party sellers on Amazon. Amazon notifies changes in the BSA only by publishing it. [Tr. pp. 119-120] Amazon’s assertion that one must read and accept the BSA to go to the next step is quite incorrect and misleading. One does not need to actually read the BSA; rather, one can simply and totally ignore the BSA and go to the next step. Amazon operates with rank assumption of the BSA's acceptance.

Plaintiff Mr. Ligeri testified that he was never informed of the BSA and any changes to the BSA. There are direct doubts as to which sellers actually consented for subsequent changes made to the BSA. Amazon never provided direct notices to the sellers of any changes to the BSA. As Amazon’s own witness Mr. Kevin Pak explained amazon employs a “notice of publication” approach to inform their sellers of a new version of or any changes to their BSA.This is done by uploading the new BSA onto their website for public viewing. However, a seller who signs on their regular seller central platform portal home page does not automatically see the new BSA or changes made to the BSA. The seller has to do the following:

1. Perform a specific word search "Amazon Services Business Solution Agreement" and find the appropriate link to click to see the content;
2. Click the help button, which shows ALL the hints and directions and find the proper information; and
3. Keep track of the news and hope not to miss any important BSA changes.

Likewise, even if a seller finds a new version of BSA, he or she does not have to actually read any new version of BSA to be able to continue to the next step on seller central. Mr. Kevin Pak also testified that Amazon does not perform any data analysis to keep track what percentage of people actually respond and click to see the news, changes or updates of a new BSA. While Mr. Pak himself said it would be important to know how effective the current notice by publishing system works but Amazon does not want to know its efficiency or any need for improvement. It is obvious that Amazon is trying to prove consent by simply showing the existence of a poorly designed system yet claims that it works perfect and all sellers must have consented because they move to the next step. This is Amazon's second try of proving consent with no evidence while the first time Amazon tried to claim evidence that they never had through the declaration of Ms. Natalia Parker. Her declaration turned out to be completely false as Mr. Eric Smith's testimony with actual account records completely contradict Ms. Parker's declaration.

D. <u>Amazon Defendants Benefited from the Usurpation and Hijacking of up to 90% of Plaintiffs' Revenue, and the BSA is a Device to Keep that Unilateral Control and Deny Remedy</u>

Plaintiff Ligeri manages the Amazon stores associated with the Companies in the

Verified Complaint previously created by different parties prior to his purchase and acquisition of them. Plaintiff Ligeri, himself, is asserting trademark infringement claims in the Verified Complaint. The BSA excludes trademark infringement claims. It does not require those claiming Trademark infringements to be subject to binding arbitration. Plaintiff Ligeri has been unable to adequately obtain remedy for Trademark Infringement using Amazon's Platform. Defendants sell products on their Platform that directly compete with Plaintiffs' products in a manner that infringes or facilitated the infringement by others of Ligeri's Marks. The Amazon stores associated with Companies have been the subject of unexplained shut downs of their accounts by Defendants that Plaintiffs are unable to obtain any logical explanation of, let alone any meaningful description of any corrective action.

As to the revenues produced relative to Plaintiffs and the real world agreement in reality itself, it is not the BSA. Ligeri testified what it really is and what the terms actually are in practice: "They don't care about who you are or what you're doing. You're just listing products and they're taking their 90 percent of the fee. … That's the relationship with Amazon. It's very cold. You list the product, you provide the product to them, you take care of all of the details related to that product, you take care of the customer. And they give you 10 percent of the proceeds. That's the relationship....There's no real relationship with Amazon. You're a dog. That's the relationship with Amazon.” [Tr. p. 263]

As to an accounting of that high percentage of revenue taken, "Amazon doesn't send invoices. You can dig in to look at the data of your payments, but it doesn't get sent

to you. They give you an overview payment screen that shows you broad strokes of gross sales, net sales, and such.", and the revenue goes first directly to Amazon. [Tr. pp. 268-269, 272]

Amazon never disputed or terminated any of the accounts assigned and transferred to Plaintiffs. After the transfer, Amazon would be "...paying the new entity the net proceeds.", and there was no interference "Except the security throttles" [Tr. p. 282] The Court took the US House Subcommittee Report from Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary of the House of Representatives (Plaintiff's Exhibit 023) under advisement. [Tr. p. 291]. The report was made pursuant to Congress' authority in aid of its legislative function. The Court also ruled that the sections of the report referring to forced arbitration are admissible and go to the weight of the evidence. [Tr. pp. 292-293]

Plaintiffs indicated the very real concern that if they divulged account information of their partners who sell their products under trademark license, Amazon Defendants could start shutting down their stores, which they subsequently did after the trial. [Tr. pp. 320-321, Plaintiff's Affidavit ¶¶ 7, 8, 9 , 12]. Defendants did exactly that to the Melbourne Account. [Tr. 324, Plaintiff's Affidavit, Id] Plaintiffs operate two legacy accounts, which are accounts created before June 2016, where "Amazon let the seller receive a hundred percent of their net proceeds, whereas after they take all of your net proceeds and hold it and let you get your next net proceeds amount while holding each successive net proceeds for another two weeks." [Tr. pp. 357-446] There are the My Medical

Warehouse/Twin Horses and the Health and Household Amazon stores. [Id.] These accounts were more profitable and thus targets for Amazon to shut down. [Tr. p. 447] "A seller is not allowed to report another seller on infringement. Infringement reports take place outside of the Amazon seller system. They take place on Amazon.com outside of Seller Central by IP owners." [Tr. p. 377]

Amazon frequently changes, on a random basis with no metrics that can be identified, the fees that it exacts, which frequently exceed 90% of the cost of the products. [Tr. pp. 443-444] The decision whether to shut down or deactivate an account is random, unknowable, and by extension, unable to be resolved. [Tr. pp. 445-446] The trademark infringement dispute mechanisms set up by the Defendants do not work and are outside the BSA and Amazon's Seller Central platform/software. [Tr. p. 449] Post hearing, Austin Kang (owner of Kangaus) reported to Global that his account had been suspended under the multiple selling account clause of the BSA, section 3 which prohibits having multiple accounts, even though he did not have operate multiple accounts. [Supplementary Affidavit ¶¶4-7] Defendants also targeted, in retaliation, the accounts of Mr. Jeffrey Joutras and Kyara Ribeiro, who also did not violate section 3 of the BSA as falsely alleged. Shortly after the April hearing transcript came out, Amazon deactivated the accounts of Kangaus and Melbourne Retail LLC, Tiberias Holdings LLC and Medcare LLC.

Medcare is a Plaintiff in this action whose account has survived through the two day trial until its recent activation. This unlawful conduct by Amazon ensures that listings of deactivated accounts have no visibility whereas listings selling counterfeit products that

infringe Plaintiff's Marks continue to sell, and the Defendants continue to profit from reverse confusion dilution of Plaintiff's Marks. [Supplementary Affidavit ¶12] According to Plaintiff Ligeri, "Since the evidential hearing on April 8 and 9 of 2024, I have spoken with attorneys at ESQgo, the premier Amazon dispute resolution law firm that works directly with Amazon to solve issues pre-arbitration and during arbitration. I have been informed that Amazon does not accept arbitration requests from companies who have subsequently taken over businesses with Amazon accounts. Amazon only accepts arbitration disputes with the original account opener. … This information as to arbitration being unavailable to me was unknown to me prior to the evidentiary hearing." [Supplementary Affidavit ¶13] Also, according to Plaintiff Ligeri, "Colby Ross, owner of the Amazon account Melbourne Retail, which has its billing and payables covered by Melbourne Retail LLC, has over 4,000 units of this urinal in stock at Amazon and his account was just deactivated leaving the Amazon seller owing the Plaintiff approximately 200,000 dollars in unpaid inventory bills. The Plaintiff can't arbitrate on behalf of someone else. Defendants' unlawful conduct has cost the Plaintiff 200,000 just with the deactivation of the Colby Ross account with no legal recourse despite the resulting classical aggrievement the situation presents." [Supplementary Affidavit ¶15]

E. <u>Defendants are not Credible as Established by the Natalia Parker Declaration</u>

Eric Smith testified to the only way a record is made by Amazon as to seller registration, which specifically is, "I searched the seller ID in Paragon. I pulled up the customer summary tab for this particular seller. I scrolled down to the Registered

Payment Accounts section and I screenshotted that section." to which Defendants' Counsel asked, "When Amazon wants to make a record of the information shown in this exhibit, how does it do that?", and Mr. Smith responded, " By the method that I described.", meaning that the only records kept by Defendants are screenshots of data that may be stored and will be changed or modified such that information is unreliable, lost or not appropriately captured. [Tr. pp. 151-152] Mr. Smith stated from Amazon's account records the names of the four original seller accounts registrants in the verified complaint, and none of them was Mr. Benjamin Ligeri [Tr. pp. 187-192] Mr. Smith stated that the roughly seventy emails he provided at the hearing were "filtered" using a word search for business solutions. [Tr. p. 194]

The Court indicated it would consider the declaration of Natalia Parker, Exhibit 008. Both the Defendants' testimony and Plaintiff Ligeri's verified that the Parker Declaration was false because he did not go through the process "as Mr. Orzbatur described" to open a seller account at any time. [Tr., p. 387]

The Defendants are not credible, but should also be noted as having purposefully misled the Court. "Where a defendant is a corporation, this requires pleading facts that give rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.... Ascribing a state of mind to a corporate entity is a difficult and sometimes confusing task. This is true "not because 'collective intent' ... is an oxymoron," but because "the hierarchical and differentiated corporate structure" often muddies the distinction between a deliberate fraud and an unfortunate (yet

unintentional) error caused by mere mismanagement... In response to this problem, most courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (citations ommitted).

**IV. Argument**

A. <u>Defendants Have Failed to Meet their Burden of Proof</u>

In a recent case, *Lipsett v. Popular Bank*, No. 22-3193-cv, 2024 WL 111247 (2d Cir. Jan. 10, 2024), a Second Circuit panel recently found that a bank's effort to impose such terms and conditions by mailing an "update" to a customer was insufficient to establish contractual assent. The panel laid out the basic legal requirements: (1) "[t]he party seeking to compel arbitration bears the initial burden of demonstrating the existence of an agreement to arbitrate"; (2) "a contract requires a meeting of the minds and a manifestation of mutual assent"; (3) a "manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms"; (4) "[w]here the requested assent is largely passive, courts focus on whether the terms were 'reasonably communicated to the user'"; (5) where an offeree does not read a contract and does not have "actual notice of certain contract terms, he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent"; and (6) inquiry notice "turns on whether the contract terms were presented to the offeree in a clear and conspicuous way" considering the "totality of the circumstances." *Id*. at *1-2 (citations

omitted).

These principles inform the inventory of facts to follow, or in this case, the lack thereof. The Defendants have asserted that Sellers must accept the business solutions agreement to Create an Amazon Selling Account. To the contrary, Defendants' own records show that none of the Plaintiffs created an Amazon selling account. The Parties do not dispute that the subject of the April 8 – 9, 2024 hearing was to ascertain whether or not the Plaintiffs consented to binding arbitration required by the BSA, and more specifically, whether the Plaintiffs checked the box to consent pursuant to the ClickWrap agreement as initially maintained by the Natalia Parker Declaration (Plaintiff's Exhibit 008, which the Court took under advisement).

Neither Ms. Natalia Parker or any of the other witnesses (Mr. Ozbatur, Mr. Pak and Mr. Smith) testified that they could satisfy all of the criteria to authenticate their electronic business records. Specifically, "To admit evidence under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52–180. The court must determine, before concluding that it is admissible, that the record was made in the Computerized business records exception to hearsay rule regular course of business, that it was in the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter.... To qualify a document as a business record, the party offering the evidence must present a witness who testifies that these three requirements have been met." (Internal quotation marks omitted.) *Emigrant*

*Mortgage Co. v. D'Agostino*, 94 Conn.App. 793, 807, 896 A.2d 814, cert. denied, 278 Conn. 919, 901 A.2d 43 (2006) ; see also Conn. Code Evid. § 8–4(a). Second, the proponent of the computer generated business records “must establish that the basic elements of the computer system are reliable.” Id, 656-657

Further, "[O]ur Supreme Court noted that “[b]usiness records that are generated by computers present structural questions of reliability that transcend the reliability of the underlying information that is entered into the computer. Computer machinery may make errors because of malfunctioning of the hardware, the computer's mechanical apparatus. Computers may also, and more frequently, make errors that arise out of defects in the software, the input procedures, the data base, and the processing program.... In view of the complex nature of the operation of computers and general lay unfamiliarity with their operation, courts have been cautioned to take special care to be certain that the foundation is sufficient to warrant a finding of trustworthiness and that the opposing party has full opportunity to inquire into the process by which information is fed into the computer.”, Id, 657

As the Court itself noted, The Plaintiffs retained an IT expert to rebut any testimony as to the Defendants' witnesses' purported knowledge of their systems and electronic records relevant to the Computerized Business Records Exception to the Hearsay Rule. The Court determined that no such testimony was offered by the Defendants to authenticate their records. As a direct consequence, the Court determined, "Then we don't need the expert." [Tr. p. 224] None of the Defendants' witnesses have access to or can

explain or authenticate what happened prior to their time at Amazon, the time in which the Legacy Accounts were started. Defendants nonetheless attempt to validate their claims that the BSA was agreed to or assented to by asserting that seventy filtered emails and communications out of many hundreds merely reference the BSA, and that the Plaintiffs received such emails, but there is no proof that Plaintiffs indeed consented to the BSA. Plaintiff Ligeri stated that the Plaintiffs purchased the needed insurance, once they were reminded, regardless of the BSA terms.

Defendants infer this to mean assent to the BSA's terms – all of them, including arbitration. This is an impermissible pyramiding of inferences. In *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321 (1982), the Eleventh Circuit found that "[a]ccording to federal law there is no prohibition against pyramiding inferences; instead all inferences are permissible so long as they are reasonable." The rub is that 70 filtered communications that merely reference the BSA out of hundreds of thousands contained in records that the Defendants cannot properly authenticate do not give rise to a reasonable inference, even if a handful reference purchase of insurance. The tautology in a self-serving message that parrots a purported agreement's requirements does not prove a valid meeting of the minds.

B. Connecticut Law Governs this Dispute

Connecticut has adopted "the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury, or *lex loci delicti*." *O'Connor v. O'Connor*, 201 Conn. 632, 637 (Conn. 1986) This Action involves a

series of torts wherein the Defendants purposefully reached into this jurisdiction per our Long Arm statute. Section 52-59b (a) provides in relevant part: "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual... who in person or through an agent ... (3) commits a tortious act outside the state causing injury to person or property within the state ... if such person or agent ... (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. ...." A trial court, therefore, has personal jurisdiction over a defendant under § 52-59b (a) (3) (B) when (1) the defendant, himself or through an agent, commits a tortious act outside Connecticut, (2) that act causes injury to a person or property in Connecticut, (3) that act gives rise to the cause of action claimed by the plaintiff, (4) the defendant expected or reasonably should have expected that the act would have consequences in Connecticut, and (5) the defendant derives substantial revenue from interstate or international commerce. See *Ryan* v. *Cerullo,* 282 Conn. at 123-24, 918 A.2d 867.

In resolving conflict of law tort questions, the State of Washington has abandoned the *lex loci delicti* rule and follows the *Restatement (Second) of Conflict of Laws*' most significant relationship test. Where a conflict exists, Washington courts decide which law applies by determining which jurisdiction has the most significant relationship to a given issue. The court "must evaluate the contacts both quantitatively and qualitatively, based upon the location of the most significant contacts as they relate to the particular issue at hand." The contacts to be evaluated for their relative importance to the issue were set forth

in *Johnson v. Spider Staging Corp.:* "(a) the place where the injury occurred, "(b) the place where the conduct causing the injury occurred, "(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and "(d) the place where the relationship, if any, between the parties is centered." *Singh v. Edwards Lifesciences*, 151 Wn. App. 137, 143 (Wash. Ct. App. 2009) Three quarters of the factors set forth in that analysis still revert us back to this venue – especially because Washington Court cannot enforce the Connecticut Unfair Trade Practices and the Connecticut Trade Secrets Acts.

C. There was no Validly Formed Contract Ratifying the BSA with its forum Selection or Arbitration Clauses

A contract is an agreement enforceable at law. Contracts may be express or implied. If the agreement is shown by the direct words of the parties, spoken or written, the contract is an express one. If such agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances, then the contract is an implied one. *Janusauskas v. Fichman*, 264 Conn. 796 (2003); *Boland v. Catalano*, 202 Conn. 333, 338-39 (1987); *Skelly v. Bristol Savings Bank*, 63 Conn. 83, 87 (1893); *Atlas v. Miller*, 20 Conn. App. 680, 683 (1990); *Hale v. Benvenuti, Inc*., 38 Conn. Sup. 634, 638-39 (1983); 1 Restatement (Second), Contracts §§ 1, 4. To be enforceable, an agreement must be definite and certain as to its essential terms and requirements. *Presidential Capital Corp. v. Reale*, 231 Conn. 500, 506-07 (1994); *Dunham v. Dunham*, 204 Conn. 303, 313 (1987); 1 A. Corbin, Contracts (Rev. Ed. 1996) § 4.1, p. 525.

More specifically to the Instant Matter, there is an abject dearth where evidence

ought to have even been presented as to what the consideration was. Without consideration, there is no enforceable contract. See *State National Bank v. Dick*, 164 Conn. 523, 529 (1973); *Osborne v. Locke Steel Chain Co*., 153 Conn. 527, 530-31 (1966); *Finlay v. Swirsky,* 103 Conn. 624, 631 (1925); *Gruber v. Klein*, 102 Conn. 34, 36-37 (1925); *General Electric Capital v. Transport Logistics*, 94 Conn. App. 541, 546 (2006); *First New Haven National Bank v. Statewide Motors Inc.*, 33 Conn. Sup. 579, 581-82 (1976); J. Calamari & J. Petrillo, Contracts (3rd Ed. 1987) § 4-2, pp. 187-90. More specifically, the only evidence provided on this topic came from Plaintiffs. There never was any intent on the part of Defendants to actually arbitrate even if Plaintiffs' demanded it, or ever needed to demand it (which they do not). This was made clear by testimony, by the language of the BSA itself repudiating any assignments not agreed to in advance, by the US House of Representatives Subcommittee report and by way of Plaintiff's supplemental affidavit post-trial. The idea is to deny remedy at all by forcing the Plaintiffs into a venue where nothing will happen, and in the very unlikely event that it did, where the trier of fact lacks trademark infringement remedies that this Court actually has.

In *Specht v. Netscape Commc'ns Corp*., 306 F.3d 17, 36 (2d Cir. 2002) The Second Circuit refused to enforce the arbitration clause because the court valued reasonable notice and the existence of actual consent and assent. There, the Second Circuit ruled that the mere act of downloading the software, analogous to Amazon's mere emailing of the terms and Plaintiffs' use of Amazon, did not unambiguously manifest assent to the arbitration provision contained in the 50 page license terms. In this case similarly involves the

lack of a validly formed contract.

D. The BSA's Arbitration and Forum Selection Clauses are a Contract of Adhesion and Unenforceable

The core of the Verified Complaint is that the Defendants' have established an entire system and scheme to get third party sellers' funds, resources, products and intellectual property under their control such that they can pirate the profits and proceeds from the same. Trademark infringement was never the subject of the BSA. Defendants' systems are wholly inadequate to enforce the rights of Plaintiffs relative to their Marks. An arbitrator also does not have the power of this Court to order counterfeit products to be impounded or corrections and other entries to be made in USTPO's records. 15 USC §1116(a) assumes the presumption of irreparable harm related to this claim, which all the Defendants' arbitration claims and motion practices can do is impose delay for its own sake.

The Plaintiffs then discovered after the hearing that the Defendants won't even honor any demand for arbitration anyway. The Defendants are seeking a result as foretold and described and found by the US House Subcommittee Report from Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary of the House of Representatives (Plaintiff's Exhibit 023) – arbitration is meant to be a dead end in and of itself, and in this specific case, a remedy that the Defendants intend to deny anyway.

E. Ligeri is not bound by the BSA, at all

Plaintiff Ligeri is the owner of the Marks. He never agreed to any BSA, nor did he

need to in order to assert his trademark infringement claims. No one disputes that he is the owner of all the Marks at issue. Not even the BSA he never agreed to claims that he has to seek arbitration. Plaintiff Ligeri, himself, personally, may operate the Corporate Plaintiffs but in no way himself is the direct owner of the Amazon stores. There isn't even a scintilla of evidence or a single legal authority anywhere on the Record forcing Plaintiff Ligeri into arbitration or a Washington Court.

F. Nothing in the BSA is enforceable at all because the parties have no agreed upon terms reduced to writing and validly accepted

The enforceability the BSA itself and all the related unilateral adhesion agreements should not be arbitrated. Count 4 of the complaint directly challenges the entire BSA agreement as an adhesion contract, unconscionable and unenforceable and seeks this court's declaratory judgment. Defendants are asking the Court to step aside and turn a blind eye on this particular count and enforce the arbitration clause of the same BSA being challenged. This is showing of total disrespect to this court and an affront to our legal system. The Defendants are asking, through their unilaterally adhesion agreement, to deny all meaningful remedy and due process to the Plaintiffs. In *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) The district court denied the defendants motions to compel arbitration pursuant to the loan agreements at issue. The court concluded that the arbitration agreements are unconscionable and unenforceable because they insulate Defendants from claims that they have violated state and federal laws. Similarly, in this instant case, in this instant case, the arbitration clause of the agreement is unconscionable and unenforceable because they would insulate Defendants from claims by the Plaintiffs

that the Defendants have violated state and federal laws, especially the claims under the Lanham Act and the Sherman Anti-Trust Act.

The Operative Complaint also involves anti-competitive actions, in violation of anti-trust laws and wrongful actions violating the Unified Connecticut Trade Secrets Acts, which are obviously outside the scope of BSA's arbitration clause. Only a competent court can rule on and enforce whether Amazon has violated these state and federal laws. An arbitrator lacks the enforcement powers to appropriate provide due justice to all claims, especially the Trademark Infringement claims the BSA is designed to evade. The entire BSA is unenforceable. It is an adhesion contract, unconscionable contract.

"Under Connecticut law, the doctrine of unconscionability is a defense to contract enforcement that is intended "to prevent oppression and unfair surprise." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 87-88, 612 A.2d 1130 (1992) (internal quotation marks and citation omitted). "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Bender v. Bender*, 292 Conn. 696, 731-32, 975 A.2d 636 (2009) (internal quotation marks and citation omitted). The question of whether a contract is unconscionable "is a matter of law to be decided by the court based on all the facts and circumstances of the case." *Cheshire*, 223 Conn. at 87, 612 A.2d 1130 (internal quotation marks and citation omitted)." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 222-23 (2d Cir. 2023) "Like those of many other jurisdictions, Connecticut courts have parsed the unconscionability inquiry into procedural

and substantive prongs. See Restatement (Second) of Conts. § 208 (Am. L. Inst. 1981) (collecting cases by jurisdiction). A successful unconscionability defense " 'generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " *Bender*, 292 Conn. At 732, 975 A.2d 636 (quoting *Hottle v. BDO Seidman, LLP,* 268 Conn. 694, 719, 846 A.2d 862 (2004)).

Procedural unconscionability relates to the "process by which the allegedly offensive terms found their way into the agreement." *Cheshire*, 223 Conn. at 87 n.14, 612 A.2d 1130 (internal quotation marks and citation omitted). It applies when there was "an absence of meaningful choice" by one of the parties. *Bender*, 292 Conn. at 732, 975 A.2d 636 (internal quotation marks omitted). Substantive unconscionability, by contrast, relates to "the content of the contract," Cheshire, 223 Conn. at 87 n.14, 612 A.2d 1130 (internal quotation marks and citation omitted), and applies when contract terms are "unreasonably favorable" to one party, Bender, 292 Conn. at 732, 975 A.2d 636 (internal quotation marks omitted). In short, the doctrine of procedural unconscionability is "intended to prevent unfair surprise," and the doctrine of substantive unconscionability is "intended to prevent oppression." Smith, 247 Conn. at 349, 721 A.2d 1187." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 223-24 (2d Cir. 2023)

*Tarpon* governs. The BSA is a dead end that perfectly functions as it was designed to. The Defendants own BSA requires them to accept and approve of transfers of an

Amazon store, and absent that, as confirmed by newly discovered information after the hearing, Defendants will not arbitrate anyway. Moreover, this State has adopted, in *Hanks v. Powder Ridge* 276 Conn. 314 (Conn. 2005) 885 A.2d 734 2005 Conn. LEXIS 500, the factors set forth in California per *Tunkl v. Regents of the University of California*, 60 Cal.2d 92, 101, 383 P.2d 441, 32 Cal.Rptr. 33 (1963). The Instant Matter requires an evaluation, "...relevant to this determination [whether]: "[1] [The agreement] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in per forming a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bar gaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." Id., 98-101. The court clarified that an exculpatory agreement may affect the public interest adversely even if some of the Tunkl factors are not satisfied. Id., 101." *Hanks v. Powder Ridge*, 276 Conn. 314, 328 (Conn. 2005)

The First *Tunkl* Factor is established as the Verified Complaint details, retail commerce, banking, money transmitting, trade secrets protection and trademark infringement are highly regulated and thought suitable for that regulation – all of which Defendants purport to do as the world's largest online retailer. As to the Second *Tunkl* Factor, the Defendants seek exculpation from having to determine this dispute in this Court, a dispute concerning retail commerce, banking, money transmitting, trade secrets protection and trademark infringement. The Third Factor is also established because the Defendants hold themselves out as willing to enlist or allow any entity to become a third party seller. The Fourth Factor is also satisfied because the Defendants are the gatekeeper of the largest online retail market for third party sellers in the world that simultaneously operate a larger logistics infrastructure than the United States Postal Service, hence their decisive bargaining advantage. The BSA itself satisfies the Fifth Factor, "a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence" *Hanks v. Powder Ridge, supra.*

The Sixth Factor, and the most compelling one clearly demonstrated beyond a reasonable doubt and not merely beyond the preponderance of the evidence, is that "the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents" Id. This is especially true with up to 90 percent of the Plaintiffs' revenue locked up and a fee schedule that can radically change untethered to any metric in reality on a whim. The Defendants wield commercially god-like

powers to decide who may continue on and whether or not a third party seller will make payroll on a given week, regardless of the quality of that seller's products and despite full compliance with the BSA's terms.

The language of the BSA itself is oppressive. Clause 16 of the BSA reads as follow:

> 16. Modification. We may amend any of the terms and conditions contained in this Agreement (including the Service Terms and Program Policies) at any time and at our sole discretion. Any changes will be effective upon the posting of such changes on Seller Central or on the Amazon Site, and you are responsible for reviewing these locations and informing yourself of all applicable changes or notices. All notice of changes to the Agreement will be posted for at least 30 days. Changes to Program Policies may be made without notice to you. You should refer regularly to Seller Central to understand the current Agreement and Program Policies and to be sure that the items you offer for sale can be sold via the Service. your continued use of a service after amazon's posting of any changes will constitute your acceptance of such changes or modifications. if you do not agree to any changes to this agreement, you must terminate this agreement as provided above.

This is a classic example of an adhesion agreement where one party takes all the benefits and control while the other party receives no consideration of any kind in return.

**V. Conclusion**

The Defendants have failed to offer any admissible evidence that the BSA was a validly formed contract. Defendants failed to show one single piece of evidence either a printout log sheet or a digital signature executing any sort of Clickwrap agreement's execution, let alone one ratifying the BSA. The Defendants' sole reliance on their description of what should have happened in the present within the Defendant's digitally designed system is not enough to meet the burden of proof of what happened many years ago.

The Defendants have failed to prove that its arbitration and forum selection clauses should be enforced because they did not prove a contract was actually formed. They have

proved, however, that they are not credible and were not forthright with the Court, as evidenced by the Natalia Parker Declaration. The evidence also demonstrates that the forum selection and arbitration clauses are unenforceable, oppressive adhesion terms – terms that the Defendants wouldn't honor anyway because: (1) they state they never approved any assignments of Amazon stores and (2) they won't arbitrate due to the BSA's terms no matter what, anyway. The Verified Complaint and US House Subcommittee Report paint a very clear picture of the intentional dead end road built by the Defendants to first hijack Plaintiffs' funds, inventory, corporate goodwill and trademarks and then deny them any functional remedy. The Court should reject this invitation by the Defendants to continue in their rank theft of the Plaintiffs' business, trade secrets and misappropriation of Ligeri's Marks by denying the motion to compel arbitration and transfer venue. Justice can only occur here, in this Court.

FOR THE PLAINTIFFS,
CENTRAL CONCEPTS, INC
TRADEMARK HOLDINGS, LLC
GLOBAL SPECIALITY PRODUCTS, LLC
MEDCARE, LLC

By:/s/ Paulus Chan
Paulus H. Chan, Esq.
157 Forest Hill Road,
North Haven CT 06473
Tel: (860) 250-9536
Fax: (860) 631-1111
Email: phc_ssg@yahoo.com

Dated this 17th day of May 2024 at
New Haven, Connecticut

CERTIFICATE OF SERVICE

I, Paulus Chan, certify that a copy of the foregoing was transmitted to Counsel for the Defendants below on or before this May 17, 2024 via PACER's ECF filings system.
/s/ Paulus Chan

Paulus Chan

John M. Magliery
Davis Wright Tremaine LLP - NY
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
212-489-8320
Fax: 212-489-8340
Email: johnmagliery@dwt.com