# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BENJAMIN LIGERI *et al.*,
    *Plaintiffs*,

    v.

AMAZON.COM INC. *et al.*,
    *Defendants*.

No. 3:23-cv-603 (JAM)

## ORDER GRANTING MOTION TO COMPEL ARBITRATION AS TO MOST CLAIMS AND DISMISSING REMAINING NON-ARBITRABLE CLAIMS THAT ARE SUBJECT TO AN ALTERNATIVE FORUM SELECTION CLAUSE

The plaintiffs in this case use the Amazon website to sell products. They have filed a sprawling complaint alleging that several Amazon entities have engaged in a wide range of unlawful business practices. The Amazon defendants have filed a motion to compel arbitration and stay this action or, in the alternative, to transfer venue.

Following a two-day evidentiary hearing and consideration of both sides' post-trial memoranda, I conclude that the parties entered into a valid arbitration agreement that governs almost all of the plaintiffs' claims. Only the plaintiffs' claims for injunctive intellectual property relief are subject to an arbitration carve-out but with a valid forum selection clause designating that they must be pursued in a state or federal court in the State of Washington.

Therefore, I will grant Amazon's motion to compel arbitration and stay this action pending the outcome of the arbitration proceeding, subject to exception solely for the plaintiffs' claims for injunctive intellectual property relief, which shall be dismissed without prejudice to the right of the plaintiffs to re-file these claims in a federal or state court in Kings County in the State of Washington as the parties have agreed.

### BACKGROUND AND FINDINGS OF FACT

The plaintiffs in this case are Benjamin Ligeri and four entities that he owns: Central

Concepts, Inc.; Global Specialty Products, LLC; Medcare, LLC; and Trademark Holdings, LLC.[1] Each of the four entities sells goods in Amazon's online marketplace by operating an Amazon seller account.[2] The 13-count complaint alleges that Amazon deploys a range of abusive business tactics against third-party sellers, like plaintiffs, that operate on its website.[3]

In response to the plaintiffs' complaint, the Amazon defendants filed a motion to compel arbitration.[4] They claimed that the plaintiffs agreed to binding arbitration when they registered as third-party sellers on Amazon's website because registration involves agreeing to Amazon's Business Solutions Agreement ("BSA," "the agreement"), which contains a mandatory arbitration provision.[5]

By contrast, the plaintiffs maintained that no such agreement was binding on them because they did not themselves sign up to be third-party sellers; rather, they bought fully operational selling accounts from others.[6] In essence, their argument was: "If I don't physically click 'I agree,' no terms apply to me." And even if they had agreed to the clause, the plaintiffs maintained that the contract was unconscionable.[7]

I held oral argument on the motion to compel but, because neither party proffered sufficient competent evidence to support a ruling in its favor, I ruled it was necessary to conduct an evidentiary hearing.[8] *See Ligeri v. Amazon.com Inc.*, 2024 WL 839231 (D. Conn. 2024).

---

[1] Doc. #1 at 1 (¶ 1); Doc. #59 at 12. The 62-page complaint includes claims for trademark infringement (Count One), negligence (Count Two), recklessness and gross negligence (Count Three), declaratory judgment that the terms of service are a voidable adhesion contract (Count Four), the Connecticut Unfair Trade Practices Act (Count Five), negligent misrepresentation (Count Six), fraud and civil theft (Count Seven), tortious interference with business expectancies (Count Eight), conversion (Count Nine), Sherman Anti-Trust Act (Count Ten), breach of fiduciary duty (Count Eleven), unjust enrichment (Count Twelve), and theft of trade secrets (Count Thirteen). Doc. #1 at 44-62.

[2] Doc. #25-1 at 6; Doc. #59 at 12.

[3] *See, e.g.*, Doc. #1 at 7-8 (¶ 14), 11 (¶ 24), 36-37 (¶ 71), 38 (¶ 74), 40 (¶ 78-80).

[4] Doc. #24.

[5] Doc. #24-1 at 7.

[6] Doc. #25-1 at 14.

[7] *Id.* at 16-20.

[8] Doc. #43; Doc. #50.

Over the course of a two-day evidentiary hearing, the parties presented extensive testimony and exhibits. On April 8, 2024, Amazon called Orkun Ozbatur, an Amazon senior manager responsible for third-party seller registration; Kevin Pak, an Amazon senior manager whose team publishes content on the platform used by Amazon's third-party sellers; and Eric Smith, an Amazon manager whose team handles escalations.[9] On April 9, the plaintiffs called the main plaintiff, Benjamin Ligeri. Based on these witnesses' testimony and the evidence in the record, I make the following findings of fact.

Amazon operates an online marketplace, the Amazon Store, where third parties may sell their products.[10] As Mr. Ozbatur testified, individuals or entities seeking to become third-party sellers must create a seller account.[11] Account registration takes place on Seller Central, "the portal through which sellers interact with Amazon."[12]

On the first page of the registration process, Amazon collects the prospective seller's name and email and asks them to select a password.[13] The content of subsequent pages has changed slightly over the years. In the current iteration of the registration process, in place since at least 2019, page two is a "welcome page" that informs prospective registrants of the information they will need to provide, and page three is the "agreements page."[14] In earlier versions, the agreements page was second.[15]

In both the pre-2019 and post-2019 versions of the agreements page, sellers must indicate their agreement to the BSA. Prior to 2019, they were required to check a box reading "I have read and accepted the terms and conditions of the Amazon Services Business Solutions

---

[9] Doc. #70 at 11, 13, 67-68, 138-39.
[10] *Id.* at 13-14.
[11] *Id.* at 14, 30.
[12] *Id.* at 15.
[13] *Ibid.*
[14] *Id.* at 15-16, 19, 25.
[15] *Id.* at 25.

Agreement."[16] Sellers who registered during 2019 or later were required to click on a box

reading "Agree and continue," which appeared below the statement "By clicking on 'Agree and

continue', you agree to the Amazon Services Business Solutions Agreement."[17] Both versions

contain a hyperlink embedded in the text "Amazon Services Business Solutions Agreement."[18]

The hyperlink, whose presence is indicated by the text appearing in blue or teal, opens a new

window where the registrant may view the full text of the BSA.[19]

      In both versions, a registrant cannot advance to subsequent pages and complete the

registration process without agreeing to the BSA. In the old version, the link to proceed to

subsequent pages would only work if the box indicating agreement was checked.[20] In the new

version, a registrant cannot proceed to subsequent pages without clicking "Agree and

continue."[21] In short, the testimony and documentary evidence conclusively shows that all

registrants of seller accounts have agreed to the BSA. They could not otherwise conduct business

on the Amazon website.

      There have been 41 versions of the agreement since 2014.[22]  As discussed below, the four

accounts at issue in this case were registered in January 2014, March 2014, June 2017, and

December 2019.[23] Accordingly, I consider the three BSAs in effect during those months, all of

which contain very similar arbitration, transfer, and severability clauses.[24]

      Start with arbitration. All three BSAs contain a "Miscellaneous" clause providing that

---

[16] *Id.* at 27-28; *See* Doc. #61 at 2.
[17] Doc. #70 at 22; *See* Doc. #61-2 at 2.
[18] Doc. #70 at 22, 28.
[19] *Id.* at 22, 28.
[20] *Id.* at 28.
[21] *Id.* at 23.
[22] *See* Doc. #61-5 (BSA effective in 2013); Docs. #61-6–#61-15 (BSAs in effect from 2014 to 2017); Docs. #61-16–#61-44 (BSAs in effect from 2017 to 2023).
[23] *See* Doc. #61-67 at 2-5; Doc. #70 at 145.
[24] *See* Doc. #61-5 (BSA in effect from February 2013 until April 2014); Doc. #61-15 (BSA in effect from May 2017 until September 2017); Doc. #61-30 (BSA in effect from November 2019 until January 2020).

Amazon and the seller consent to resolve "by binding arbitration" (in bold font) any "dispute" or "claim" that relates "in any way" to "this Agreement" or "your use of the Services."[25]

In the alternative, insofar as arbitration is not required, the BSA states that "[a]ny dispute with Amazon or its affiliates or claim relating in any way to this Agreement or your use of the Services" shall be "adjudicated in the Governing Courts," and the seller consents to "exclusive jurisdiction and venue in the Governing Courts."[26] All three versions then describe two carve-outs, one of which is relevant here: "you or we may bring suit in the Governing Courts . . . to enjoin infringement or other misuse of intellectual property rights."[27]

The BSA defines elsewhere the terms "Governing Courts" and "Governing Laws" to mean, respectively, the state or federal courts in King County, Washington, and the laws of the State of Washington; the term "Service" refers to selling on Amazon, Amazon WebStore, Fulfillment by Amazon, and other related services.[28]

All three versions also prohibit assignment of the Agreement to anyone else without Amazon's prior written consent.[29] Nevertheless, the BSAs also provide that the Agreement "will be binding on, inure to, and be enforceable against the parties and their respective successors and assigns."[30]

Finally, all three versions contain a standard severability clause providing that if any portion of the BSA is found to be unlawful, void, or unenforceable, that provision will be

---

[25] *See* Doc. #61-5 at 5 (¶ 18); Doc. #61-15 at 9 (¶ 18); Doc. #61-30 at 7 (¶ 18).
[26] *See* Doc. #61-5 at 5 (¶ 18); Doc. #61-15 at 9 (¶ 18) (same); Doc. #61-30 at 7 (¶ 18) ("Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than in court, except that (i) you or we may bring suit in the Governing Courts, submitting to the jurisdiction of the Governing Courts and waiving our respective rights to any other jurisdiction, to enjoin infringement or other misuse of intellectual property rights.").
[27] *See* Doc. #61-5 at 5 (¶ 18); Doc. #61-15 at 9 (¶ 18); Doc. #61-30 at 7 (¶ 18).
[28] *See* Doc. #61-5 at 7-8; Doc. #61-15 at 13-14; Doc. #61-30 at 10-11.
[29] *See* Doc. #61-5 at 6; Doc. #61-15 at 10; Doc. #61-30 at 7.
[30] *See* Doc. #61-5 at 6; Doc. #61-15 at 10; Doc. #61-30 at 8.

deemed severable and will "not affect the validity and enforceability of any remaining provisions."[31]

Sellers may access these and other versions of the BSA through Seller Central. They can enter the term in Seller Central's search box and select the BSA from the results, navigate to it from articles discussing policy updates that Amazon posts on the News section of Seller Central, or visit the "Policies, agreements, and guidelines" page within the "Seller Central help" page.[32]

So much for the BSA. Now to the particular sellers at issue in this case: Ligeri and the entity plaintiffs. Ligeri testified that he is the sole owner of all four entities, Central Concepts, Inc.; Global Specialty Products, LLC; Medcare, LLC; and Trademark Holdings, LLC.[33]

Ligeri purchased the first of the seller accounts at issue in this case, "Health and Household," in December 2014 from an employee of a company where he served as CEO.[34] He personally operated the account from at least 2015 until 2017.[35] Central Concepts purchased the account in 2020.[36] Global Specialty Products purchased the next account, "Vanguard," from Ligeri's father in 2020.[37] In 2021, Medcare purchased the Medcare Industries selling account from Ligeri's cousin.[38] Finally, Ligeri purchased the fourth selling account, Twin Horses, from another of his cousins in 2023 and licensed use of that account to Trademark Holdings.[39] Ligeri further testified that he believes preexisting seller accounts are more valuable than new accounts because they have certain privileges that newer accounts do not enjoy.[40]

---

[31] Doc. #61-5 at 6; Doc. #61-15 at 10; Doc. #61-30 at 8.
[32] Doc. #70 at 89, 94-95, 97-98; *see* Docs. #61-61, #61-48, #61-49.
[33] Doc. #71 at 113, 115, 119-20, 134-35.
[34] *See* Docs. #55-5; #71 at 14, 100-01, 129.
[35] *See* Doc. #71 at 27, 128.
[36] *Id.* at 119.
[37] *Id.* at 130, 134.
[38] *Id.* at 114-15.
[39] *Id.* at 108-10.
[40] *Id.* at 149-50.

Amazon has no records of consenting to the transfers of these accounts from the original registrants to Ligeri or the entities he owns.[41]

All of the plaintiffs had knowledge of the BSA. The record contains approximately 70 electronic communications between the plaintiffs' seller accounts and Amazon that explicitly reference the BSA.[42] These include a February 2019 email to Health and Household, a December 2021 email to Vanguard, a December 2021 email to Medcare, and an April 2022 email to Twin Horses—all of which discuss the BSA and various terms therein.[43] Amazon's communications were sent to the email address associated with each selling account, and they were also accessible in Seller Central.

The plaintiffs themselves also explicitly referenced the BSA in their own communications to Amazon.[44] Further, Ligeri testified that when he purchased Twin Horses, he had been a seller on Amazon for 11 years and knew there were "rules and policies and procedures the seller needs to abide by."[45] He also admitted that he knew he could access these policies within Seller Central.[46]

Finally, the hearing established that Ligeri had previously testified in a different matter, filed in 2013, that he and his company had "several agreements with [Amazon]. We've signed off on but probably never read in full."[47] In his testimony before this Court, Ligeri confirmed that those were true statements.[48]

---

[41] Doc. #70 at 163-64.
[42] *See* Doc. #61-72.
[43] *Id.* at 13, 2, 23, 7.
[44] *Id.* at 8, 22.
[45] Doc. #71 at 108-09, 111.
[46] *Id.* at 111.
[47] *Id.* at 102-03.
[48] *Id.* at 104.

## CONCLUSIONS OF LAW

Courts sometimes resolve motions to compel arbitration on the papers and without a hearing if there appears to be no genuine fact issue in dispute. On the other hand, if a court concludes upon evaluation of the parties' submissions that there remains a genuine issue of fact concerning whether they agreed to arbitrate, then the Federal Arbitration Act requires the court to conduct a trial. *See* 9 U.S.C. § 4. "[T]he proper procedure for the district court to follow, upon finding that a genuine dispute of material fact exists, is to hold the motion to compel arbitration in abeyance pending a trial on the issue of arbitrability." *Jin v. Parsons Corp.*, 966 F.3d 821, 828 (D.C. Cir. 2020); *see also NATS, Inc. v. Radiation Shield Techs., Inc.*, 2023 WL 2416160, at *2 (2d Cir. 2023).[49]

A court conducting a trial or evidentiary hearing is not required to engage in a summary-judgment like procedure or to view the facts in the light most favorable to the non-moving party; instead, as with a usual evidentiary hearing, a court may receive and assess evidence to determine whether a preponderance of the evidence establishes that the parties entered into a valid arbitration agreement. *See, e.g., Reiterman v. Abid*, 26 F.4th 1226, 1233 (11th Cir. 2022); *Chester v. DirecTV, L.L.C.*, 607 F. App'x 362, 364 (5th Cir. 2015).

### *Choice of law*

"Because arbitration is a creature of contract, I must consider whether—as a matter of [state] contract law—the parties to this lawsuit have agreed to arbitration." *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 66-67 (D. Conn. 2020). But the parties dispute which state's laws apply; Amazon says Washington, plaintiffs say Connecticut.[50] The BSA, by its terms, is

---

[49] Unless otherwise noted and for ease of reading, this ruling omits all internal quotations, brackets, and derivative citations for all quotations from cases.

[50] Amazon relies at certain points in its briefing on Connecticut law but without suggesting that it differs in any material respect from Washington law.

governed by Washington law. But because the plaintiffs' central claim here is that they never even agreed to the BSA as a whole, the inquiry cannot end there.

A federal court sitting in federal question jurisdiction applies the choice-of-law rules of the forum state to decide which state's law governs issues of contract formation. *See Levy v. Credit Plus, Inc.*, 2023 WL 2644352, at *5 (S.D.N.Y. 2023). "Connecticut has adopted the Second Restatement's 'most significant relationship' approach to determining which jurisdiction's law governs a contract." *Wilmore v. Charter Commc'ns LLC*, 2023 WL 2503306, at *4 (D. Conn. 2023); *see Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461 (2007). Section 188 of the Restatement sets forth five factors for courts to consider in determining the applicable law: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2).

Because in this case the places of contracting and negotiation are online, I look to the other three factors. *See Starke v. Squaretrade, Inc.*, 2017 WL 3328236, at *5 (E.D.N.Y. 2017) (applying New York's similar "center of gravity" approach and proceeding to other factors where places of contracting and negotiation were online or unknown). Here, the place of performance and location of the contract's subject matter are both the state of Washington. The BSA, by its terms, is an agreement that governs the services Amazon provides to sellers.[51] Thus, its terms are performed in, and relate to conduct that occurs where, Amazon is located: the State

---

[51] Doc. #61-5 at 2 ("Welcome to Amazon Services Business Solutions, a suite of optional merchant services for sellers . . . . By registering for or using the service(s), you (on behalf of yourself or the business you represent) agree to be bound by the terms of this agreement."); Doc. #61-15 at 3 ("Welcome to Amazon Services Business Solutions, a suite of optional services for sellers . . . . This Amazon Services Business Solutions Agreement . . . contains the terms and conditions that govern your access to and use of the services."); Doc. #61-30 at 2 ("Welcome to Amazon Services Business Solutions, a suite of optional services for sellers . . . . This Amazon Services Business Solutions Agreement . . . contains the terms and conditions that govern your access to and use of the services.").

of Washington. The only factor that cuts in favor of Connecticut is that Ligeri is domiciled here;

but this is counterbalanced by Amazon's principal place of business, also in Washington.

Accordingly, I conclude that Connecticut's choice of law principles would defer to the

laws of Washington, the State with the most significant relationship to the transaction and the

parties. *See* Restatement (Second) of Conflict of Laws § 188(1); *see also Detroit Tigers, Inc. v.*

*Ignite Sports Media, LLC*, 203 F. Supp. 2d 789, 794-95 (E.D. Mich. 2002) (applying § 188 to

conclude that Illinois law controlled dispute over unsigned contract for website hosting, where

defendant was located in Illinois and was to perform the hosting services there).[52]

### Agreement to arbitrate

The plaintiffs argue in part that they are not bound by the BSA because they did not

themselves click a button or check a box indicating their assent to its terms. But under

Washington law, this alone is not dispositive. For the reasons explained below, I conclude that

the plaintiffs' subsequent conduct over years of selling on the Amazon website once they

acquired the preexisting accounts binds them to the terms of the BSA under two distinct but

similar principles: inquiry notice and equitable estoppel.

To understand the first, consider Washington's contract formation standard: "for a

contract to form, the parties must objectively manifest their mutual assent." *Keystone Land &*

*Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004) (*en banc*). Mutual assent is a question

of fact that may be deduced by reference to "outward manifestations and circumstances

surrounding the transaction." *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 492 (Wash. 2020)

(*en banc*); *see P.E. Sys., LLC v. CPI Corp.*, 289 P.3d 638, 643 (Wash. 2012) (*en banc*).

---

[52] Plaintiffs offer authority on Connecticut's choice of law rules for actions sounding in tort. *See* Doc. #77 at 29-30. Once again, they mistake the scope of the current dispute, which concerns only the arbitration clause, not the merits of the underlying case. The question is one of contract law, not tort law.

Washington courts have long recognized that circumstances manifesting assent include situations where a party may not have even read the contract. *See, e.g., M.A. Mortenson Co., Inc. v. Timberline Software Corp.*, 998 P.2d 305, 313 (Wash. 2000) (*en banc*) ("[I]t was not necessary for [plaintiff] to actually read the agreement in order to be bound by it.") (collecting cases). Whether a party had actual knowledge of the terms of an agreement is not dispositive.

Instead, "the central issue of concern in Washington in determining whether or not a consumer is bound by an alleged contract is whether the consumer has notice of and access to the terms and conditions of the contract prior to the conduct which allegedly indicates his or her assent." *Hunichen v. Atonomi LLC*, 2019 WL 7758597, at *7 (W.D. Wash. 2019); *see also Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1314 (W.D. Wash. 2018) ("Because actual knowledge is not at issue here, the question is whether Wilson was on inquiry notice of Huuuge's Terms of Use.").

A party who knows only that terms exist is bound by those terms because, under Washington law, "a person who has notice of facts that are sufficient to put him or her upon inquiry notice is deemed to have notice of all facts that reasonable inquiry would disclose." *Kim v. Forest*, 2014 WL 4792613, at *11 (Wash. Ct. App. 2014) (quoting *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 146 P.3d 423, 431 (Wash. 2006) (*en banc*)); *see* WASH. REV. CODE ANN. § 62A.1-202(a)(3) ("[A] person has 'notice' of a fact if the person . . . [f]rom all the facts and circumstances known to the person at the time in question, has reason to know that it exists.").

In short, users of online services are bound by terms of use if they are on inquiry notice of those terms and then proceed to use the service. By so proceeding, they manifest their assent. In *Harbers v. Eddie Bauer, LLC*, for example, the court applied "ordinary state-law principles" of contract formation to conclude that an online shopper was bound by the retailer's arbitration

clause. 2019 WL 6130822, at *6 (W.D. Wash. 2019). In that case, the shopper had made online purchases at Eddie Bauer, which required her to click a "submit order" button that was located just below a disclosure stating, "[b]y ordering you agree to . . . [the] Terms of Use." *Ibid.* The court agreed with the conclusions of "[c]ourts in this circuit and others" that "disclosures similar to those on Eddie Bauer's Review Page provide customers notice sufficient to manifest mutual assent." *Id.* at *7; *see also Weimin Chen v. Sierra Trading Post, Inc.*, 2019 WL 3564659, at *2 (W.D. Wash. 2019) ("Because [plaintiff] assented to the terms by clicking the 'Place my order' button . . . there is a valid agreement to arbitrate.").

Here, Ligeri and the four entity plaintiffs were on inquiry notice. As an initial matter, I note that Ligeri's knowledge may be imputed to the entities he owned and controlled. *See J.M.S. Farms, Inc. v. Dep't of Wildlife*, 842 P.2d 489, 493 (Wash. Ct. App. 1992) ("Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization else it could always limit its liability."). And in this case, the knowledge was longstanding. As early as 2013, Ligeri knew that third-party sellers had "several agreements" with Amazon. That he may not have read them is not dispositive, as discussed above.

Beyond Ligeri's personal knowledge, the entities themselves received direct notice, in the form of over 70 communications explicitly referencing the BSA. Sometimes the entities themselves invoked the BSA in their own communications to Amazon. The record clearly shows they knew the BSA existed and governed their contractual relationship with Amazon.

And despite this notice, the plaintiffs continued to do business with the defendants. There is no legally relevant difference between these plaintiffs and those in *Harbers* and *Chen*. Rather than clicking a "submit order" button, the plaintiffs continued to operate on Amazon's website,

thereby availing themselves of the services Amazon provides to third-party sellers. Because they did so while on notice of the BSA's existence, they are bound by its terms. *See Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 614 (2d Cir. 2020) (applying Washington and Second Circuit law to hold that plaintiff assented to arbitration clause through his continued use of Amazon services after receiving notice of the clause, and was therefore bound by it); *cf. G.G. v. Valve Corp.*, 2017 WL 1210220 (W.D. Wash. 2017) (finding that minors could not disaffirm contract on account of minority where they continued to use defendant's services; therefore, minors remained bound by arbitration agreement), *aff'd in part, vacated on other grounds, G.G. v. Valve Corp.*, 799 F. App'x 557 (9th Cir. 2020).

On top of all this, the plaintiffs are also bound to adhere to the BSA under the doctrine of equitable estoppel. Unlike inquiry notice, which is bound up with assent, equitable estoppel is an exception to the usual contract rules. Because a party cannot be required to arbitrate if he has not agreed to, "nonsignatories to a contract generally are not bound by an arbitration clause in that contract." *Norwood v. MultiCare Health Sys.*, 548 P.3d 978, 984 (Wash. Ct. App. 2024). "One exception to this general rule is when equitable estoppel applies." *Ibid.*

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Townsend v. Quadrant Corp.*, 268 P.3d 917, 922 (Wash. 2012) (*en banc*). This doctrine "may require a nonsignatory to arbitrate a claim if that person, despite never having signed the agreement, knowingly exploits the contract in which the arbitration agreement is contained." *Ibid.*

Importantly, the phrase "knowingly exploits" does not mean that the nonsignatory's claims invoke specific terms of the contract. *See Marshall v. Hipcamp Inc.*, 2024 WL 2325197, at *6 (W.D. Wash. 2024) (rejecting nonsignatory's argument that because his tort claims did not

rest on specific terms of the contract at issue, he was not estopped). Instead, a nonsignatory can be said to have exploited a contract if he "obtained a direct benefit" as a result of the contract. *Ibid.* (collecting cases).

Here, the record shows that Ligeri and the entity plaintiffs obtained a benefit: access, in their capacity as sellers, to Amazon's buyer base. That they are unhappy with the quality of this access or the terms on which it is secured—as evidenced by their 13-count complaint—makes no difference to whether they were bound to arbitrate a dispute about their unhappiness. The plaintiff in *Hipcamp*, for instance, was held to have benefitted from a contract for campsite booking services despite subsequently falling 80 feet at the campsite itself and sustaining serious injuries. *Id.* at *2.

The plaintiffs here were able to sell on Amazon's store, which, as Ligeri admitted, they chose to do despite the existence of alternative retailers and platforms.[53] Ligeri also specifically testified that older seller accounts had value (which is presumably why he chose to buy preexisting accounts rather than creating new ones).[54]

In sum, the plaintiffs are bound by the terms of the BSA because they benefitted thereby, and parties like the plaintiffs are equitably estopped from enjoying the benefits of a contract while ducking its burdens. Ligeri could not stick his head in the sand and ignore all that he might not like about Amazon's agreements just so that he could reap whatever benefits he wanted from selling his products on Amazon's website.

The plaintiffs' contrary arguments are not persuasive. First, their principal comment on the matters of inquiry notice and equitable estoppel is that a Second Circuit case cited by the defendants and referenced above, *Nicosia*, 815 F. App'x 612, was about a buyer, while the

---

[53] Doc. #71 at 148-49.
[54] *Id.* at 149-50.

plaintiffs are sellers.[55] But the analysis here does not rest solely, or even primarily, on *Nicosia* or whether a party was a buyer rather than a seller.

In this context, the distinction between buyer and seller is meaningless. What matters is the plaintiffs' orientation toward Amazon; in both *Nicosia* and the instant case, plaintiffs received a service from Amazon and sought to avoid arbitrating their claims. Nor is it relevant that Amazon allegedly benefitted more than the plaintiffs did from the parties' transactions with one another.[56] It is not a contest about which party benefited more. The plaintiffs themselves derived a benefit from the BSA, and this is enough to bind them to the BSA.

The plaintiffs' other arguments are equally misguided. It makes no difference that Ligeri himself did not personally check a box, for all the reasons discussed at length above.[57] And the plaintiffs' claim that Amazon should have made it impossible for a prospective seller to complete the registration process without actually reading the BSA is contrary to the entire principle of inquiry notice.[58]

The same goes for the plaintiffs' claims that the arbitration clause was inconspicuous and the BSA itself "buried."[59] They were not. The case cited for this proposition, *Specht v. Netscape Commc'ns Corp.*, declined to find an agreement where notice of the *existence* of terms was hidden. 306 F.3d 17, 30 (2d Cir. 2002). It does not stand for the principle that a party is relieved of responsibility for the contents of an agreement. Here, prospective sellers knew of the BSA before they even completed registration, and they were responsible for reading and understanding its terms.

---

[55] Doc. #74 at 26-27.
[56] *Id.* at 26.
[57] *Id.* at 12.
[58] *Id.* at 17.
[59] Doc. #74 at 15; Doc. #77 at 33.

Next, the plaintiffs argue that Ligeri is not personally bound by arbitration.[60] But "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). Ligeri owned and controlled the companies bound by the BSA, so he is bound as well. *See Amazon.com Inc. v. Sumeet Mktg. Inc.*, No. 23-cv-00331-JLR, Doc. #69 at 8 (W.D. Wash. 2023) (holding that the BSA and its forum-selection clause applied to the individuals who owned Amazon seller accounts).

Finally, the plaintiffs argue that "arbitration is a meaningless and inadequate remedy" for their infringement claims. But their antipathy towards arbitration is contrary to the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). And the BSA contains a carve-out for injunctive infringement claims. These may be brought in the courts of Washington, pursuant to a forum selection clause that binds plaintiffs for all the reasons the arbitration clause does.[61] In sum, the plaintiffs' use of the seller accounts binds them to the terms of the BSA, including the arbitration and forum selection clauses.

### *Unconscionability*

The plaintiffs also argue that the BSA is unenforceable because it is an unconscionable contract of adhesion.[62] "Under Washington law an agreement to arbitrate may be voided if it is determined to be either procedurally or substantively unconscionable." *Hipcamp*, 2024 WL

---

[60] Doc. #77 at 33-34.
[61] I decline to consider plaintiffs' evidentiary objections, which were already ruled on at argument, as improper motions for reconsideration. Nor will I accept their attempt to supplement the factual record, which closed at the conclusion of the evidentiary hearing, or any attendant legal arguments. *See* Doc. #74-1 (Ligeri Affidavit).
[62] Doc. #74 at 21-23.

2325197, at *7 (citing *Burnett*, 470 P.3d at 494). The procedural unconscionability analysis

considers 1) the manner in which the contract was entered; 2) whether the party had a reasonable

opportunity to understand its terms; and 3) whether the important terms were hidden in a maze of

fine print. *Burnett*, 470 P.3d at 495. Additionally, "[a]n adhesion contract is not necessarily

procedurally unconscionable." *Ibid.*

None of these factors weigh in plaintiffs' favor. Ligeri testified at the hearing that he was

not pressured to enter into the BSA with Amazon—nor could he have been, given that others

created the accounts, which he then purchased.[63] Nobody forced Ligeri to sell his products on

Amazon's website. And as a highly experienced businessman he could have, at any time,

accessed and reviewed the terms.

Nor was the arbitration clause hidden; it appears plainly in the contract. The BSA is long,

yes, but if that were enough to render its terms unconscionable, inquiry notice would be a nullity

in many cases, given that most contracts are long. Further, the clause was bolded and contained a

straightforward explanation of what arbitration entails.

To determine whether a provision is so one-sided as to be substantively unconscionable,

Washington courts consider whether it is "shocking to the conscience, monstrously harsh, and

exceedingly calloused." *Id.* at 496. The plaintiffs' claim that the arbitration clause is

unconscionable because it insulates Amazon from all liability is incorrect.[64] As the BSA itself

explains, arbitrators are empowered to award money damages; and injuries that cannot be thus

repaired, such as infringement, may be litigated in the courts of Washington. Plaintiffs otherwise

point to no way in which the arbitration provision is "monstrously harsh."

The plaintiffs argue that the BSA is invalid because Amazon unilaterally changed its

---

[63] Doc. #71 at 177-78.
[64] Doc. #77 at 34-35.

terms. But all versions of the BSA itself provide that Amazon may amend the terms at any time and at the company's sole discretion.[65] The plaintiffs next claim that "[a]rbitration is a fatally imperfect remedy for trademark infringement."[66] But the BSA excludes intellectual property claims seeking injunctive relief from the arbitration provision, providing instead a forum selection clause by which injunctive infringement claims must be adjudicated in the Washington courts. Finally, the plaintiffs' argument that the arbitration clause is too vague or too broad is belied by the clear language of the clause itself.

In addition, to the extent the plaintiffs believe that other provisions of the BSA may be unconscionable—Ligeri referenced the terms governing service fee payments, insurance, and taxes at the hearing, and the plaintiffs' briefing notes that Amazon may change its terms at will—these would be severable under the BSA's severability clause.[67] Thus, the plaintiffs have failed to carry their burden to show that the agreement to arbitrate is unenforceable due to unconscionable terms.

### *Arbitration carve-out and forum selection clause for injunctive intellectual property claims*

As noted above, the parties did not agree to arbitrate any of plaintiffs' claims for injunctive relief with respect to infringement or misuse of their intellectual property. Instead, they agreed that the parties may pursue such claims in the state or federal courts of Kings County in the State of Washington.

To determine whether a forum-selection clause is enforceable, a court must resolve the following three issues: "(1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive . . .; and (3) whether the

---

[65] *See* Docs. #61-5–#61-45.
[66] Doc. #25-1 at 20.
[67] Doc. #71 at 190-91.

claims and parties involved in the suit are subject to the forum-selection clause." *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014). If the forum-selection clause meets all three requirements, it is presumptively enforceable. *Ibid.* This presumption can only be overcome by "making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Ibid.*

Here, I conclude on the basis of the evidentiary record and for all the reasons described above with respect to the enforceability of the arbitration clause that the parties entered into a valid forum selection clause that governs plaintiffs' claims for injunctive relief with respect to infringement or misuse of their intellectual property. The clause was reasonably communicated, it is mandatory as to any claim not required to be arbitrated, and the intellectual property injunctive relief claims are within the scope of the forum selection clause.

Accordingly, to the extent that the plaintiffs seek injunctive relief with respect to their claims for trademark infringement (Count One) and theft of trade secrets (Count Thirteen), it was not proper for the plaintiffs to seek such injunctive relief here in the District of Connecticut. Therefore, I will dismiss Counts One and Thirteen insofar as they seek injunctive relief and without prejudice to the plaintiffs' re-filing of these injunctive relief claims in a federal or state court of Kings County in the State of Washington.[68]

## CONCLUSION

For the reasons set forth above, the Court GRANTS the Amazon defendants' motion to compel arbitration as to all of the plaintiffs' claims except for those aspects of Counts One and Thirteen that seek injunctive relief with respect to the defendants' alleged trademark

---

[68] I have considered the alternative of simply transferring such claims rather than dismissing them, but it is unclear to me whether the plaintiffs wish to proceed in either a state or federal court in Kings County, so the better option is to dismiss them and allow the plaintiffs to choose where they wish to proceed consistent with the forum selection clause.

infringement and theft of the plaintiffs' trade secrets (Doc. #24). The Court further STAYS these claims pending arbitration. *See Smith v. Spizzirri*, 601 U.S. 472 (2024).

In light of the valid arbitration carve-out and forum selection clause, the Court DISMISSES the plaintiffs' claims for trademark infringement and theft of trade secrets to the extent they seek injunctive relief for these claims, without prejudice to the plaintiffs' re-filing of these claims for injunctive relief in a federal or state court of Kings County in the State of Washington.

Amazon shall file a status report concerning the progress of arbitration on **November 1, 2024**, and every 90 days thereafter. One or both parties shall promptly file a notice on the docket when arbitration is completed and state their positions whether the Court should dismiss the case or whether it is necessary for the Court to take any further action. In light of this ruling granting the motion to compel arbitration, the Court DENIES as moot Ligeri's motion for taking judicial notice of a related action (Doc. #48).

The Clerk of Court shall administratively close this case subject to re-opening for the purposes of dismissal and/or any further action that may be warranted upon notification by the parties that they have completed the arbitration process.

It is so ordered.

Dated at New Haven this 2nd day of August 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge